# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| NORTH CAROLINA A. PHILIP RANDOLPH INSTITUTE and ACTION NC,<br><br>    Plaintiffs,<br><br>      v.<br><br>THE NORTH CAROLINA STATE BOARD OF ELECTIONS; DAMON CIRCOSTA, in his official capacity as CHAIR OF THE STATE BOARD OF ELECTIONS; STELLA ANDERSON, in her official capacity as SECRETARY OF THE STATE BOARD OF ELECTIONS; JEFF CARMON III, in his official capacity as MEMBER OF THE STATE BOARD OF ELECTIONS; KAREN BRINSON BELL, in her official capacity as EXECUTIVE DIRECTOR OF THE STATE BOARD OF ELECTIONS; and JOSH STEIN, in his official capacity as ATTORNEY GENERAL OF THE STATE OF NORTH CAROLINA,<br><br>    Defendants. | Civil Action No. 20-cv-876<br><br><br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION AND REQUEST TO EXPEDITE** |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................1

STATEMENT OF FACTS ...........................................................................3

I.      North Carolina's Strict Liability Voting Law was enacted for the specific
        purpose of deterring Black individuals from attempting to vote...........................3

        A.      In 1899, the North Carolina General Assembly reenacted the Strict
                Liability Voting Law with discriminatory intent. ........................................4

        B.      The key features of the Strict Liability Voting Law have remained
                intact since 1899. ......................................................................6

II.     North Carolina's Strict Liability Voting Law disproportionately impacts
        Black individuals. ........................................................................7

III.    The Strict Liability Voting Law fails to provide fair notice of criminal
        liability. ..................................................................................8

IV.     The Strict Liability Voting Law deters eligible individuals from registering
        to vote and voting. ....................................................................10

QUESTIONS PRESENTED ........................................................................11

ARGUMENT...............................................................................................11

I.      Plaintiffs are likely to succeed on the merits of their constitutional claims...........11

        A.      The Strict Liability Voting Law is void for vagueness under the Due
                Process Clause. ........................................................................12

        B.      The Strict Liability Voting Law violates the Equal Protection
                Clause........................................................................................15

II.     Absent injunctive relief, Plaintiffs will suffer irreparable harm in the
        November 3, 2020 presidential election.............................................................18

III.    The balance of hardships tips heavily in favor of granting a preliminary
        injunction. ................................................................................21

i

IV.   The public interest strongly favors granting Plaintiffs' motion for a
      preliminary injunction. ......................................................................................23

Case 1:20-cv-00876-LCB-JLW   Document 3   Filed 09/24/20   Page 3 of 33

# TABLE OF AUTHORITIES

**Cases**

*Abbott v. Perez,*
  138 S.Ct. 2305 (2018)................................................................................16

*Action NC v. Strach,*
  216 F. Supp. 3d 597 (M.D.N.C. 2016) ............................................. 18, 23

*Chen v. City of Houston,*
  206 F.3d 502 (5th Cir. 2000).................................................................16

*City of Chicago v. Morales,*
  527 U.S. 41 (1999)................................................................................14

*Colautti v. Franklin,*
  439 U.S. 379 (1979)......................................................................... 12, 13

*Cotton v. Fordice,*
  157 F.3d 388 (5th Cir. 1998).................................................................16

*Fish v. Kobach,*
  309 F. Supp. 3d 1048 (D. Kan. 2018), *aff'd*, 309 F. Supp. 3d 1105 (10th Cir.
  2020) ......................................................................................................21

*Georgia Coal. for People's Agenda v. Kemp,*
  347 F. Supp. 3d 1251 (N.D. Ga. 2018)...............................................20

*Gingles v. Edmisten,*
  590 F. Supp. 345 (E.D.N.C. 1984), *aff'd in part, rev'd in part sub nom,*
  *Thornburg v. Gingles,* 478 U.S. 30 (1986) ..............................................5

*Grayned v. City of Rockford,*
  408 U.S. 104 (1972...............................................................................14

*Greidinger v. Davis,*
  988 F.2d 1344 (4th Cir. 1993)...............................................................21

*Hayden v. Paterson,*
  594 F.3d 150 (2d Cir. 2010)..................................................................16

*Hunter v. Underwood,*
  471 U.S. 222 (1985)..............................................................................15

Case 1:20-cv-00876-LCB-JLW   Document 3   Filed 09/24/20   Page 4 of 33

*Johnson v. U.S.*,
    576 U.S. 591 (2015)..................................................................................................12

*Jones v. Governor of Florida*,
    No. 20-12003, 2020 WL 5493770 (11th Cir. Sept. 11, 2020 ...................................13

*Kolender v. Lawson*,
    461 U.S. 352 (1983)..................................................................................................12

*League of Women Voters of N.C. v. North Carolina*,
    769 F.3d 224 (4th Cir. 2014)....................................................................... 11, 18, 23

*League of Women Voters of U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ............................................................................... 18, 19

*Manning v. Caldwell for City of Roanoke*,
    930 F.3d 264 (4th Cir. 2019)........................................................................... 12, 14

*Newsom ex rel. Newsom v. Albemarle Cty Sch. Bd.*,
    354 F.3d 249 (4th Cir. 2003).....................................................................................23

*North Carolina State Conf. of NAACP v. Cooper*,
    430 F. Supp. 3d 15 (M.D.N.C. 2019) ......................................................................18

*North Carolina State Conf. of NAACP v. McCrory*,
    831 F.3d 204, 220 (4th Cir. 2016) ...........................................................................15

*Peoples Rights Org., Inc. v. City of Columbus*,
    152 F.3d 522 (6th Cir. 1998).....................................................................................13

*Project Vote v. Blackwell*,
    455 F. Supp. 2d 694 (N.D. Oh. 2006).......................................................................19

*Ramos v. Louisiana*,
    140 S. Ct. 1390, (2020) (Gorsuch, J.)................................................................ 16, 17

*Smith v. Meese*,
    821 F.2d 1484 (11th Cir. 1987).................................................................................19

*Stahl v. City of St. Louis, Mo.*,
    687 F.3d 1038 (8th Cir. 2012)..................................................................................14

*State v. Taylor*,
    713 S.E.2d 82 (N.C. Ct. App. 2011)................................................................. 10, 23

Case 1:20-cv-00876-LCB-JLW   Document 3   Filed 09/24/20   Page 5 of 33

*U.S. v. McLeod*,
    385 F.2d 734 (5th Cir. 1967)......................................................................19

*Veasey v. Abbott*,
    888 F.3d 792 (5th Cir. 2018)......................................................................16

*Village of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
    455 U.S. 489 (1982).....................................................................................13

*Whatley v. Zatecky*,
    833 F.3d 762 (7th Cir. 2016 ......................................................................13

**Statutes**

N.C. Gen. Stat. § 13-1....................................................................................8

N.C. Gen. Stat. § 15A-1340.1 .......................................................................1

N.C. Gen. Stat. § 163-22(d) ..........................................................................7

N.C. Gen. Stat. § 163-275(13) .....................................................................20

N.C. Gen. Stat. § 163-275(5) .............................................................1, 6, 8, 11

N.C. Gen. Stat. §§ 163-275 ...........................................................................1

N.C. Gen. Stat. ch. 15A, art. 81B .................................................................9

N.Y. Penal Law § 65.20 ...............................................................................14

**Constitution**

N.C. Const., art. I, Section 3, § 3 (1835) .....................................................3

N.C. Const., art. VI, § 1 (1868).....................................................................3

Case 1:20-cv-00876-LCB-JLW   Document 3   Filed 09/24/20   Page 6 of 33

**INTRODUCTION**

N.C. G<small>EN</small>. S<small>TAT</small>. § 163-275(5) (the "Strict Liability Voting Law") is a racially discriminatory relic of the nineteenth century that imposes stringent criminal penalties on voting by North Carolina residents who are on parole, probation or post-release supervision for a felony conviction—*even if those individuals mistakenly believe they are eligible to vote*. Violating the vague Strict Liability Voting Law is a Class I felony that carries a penalty of up two years in prison. N.C. G<small>EN</small>. S<small>TAT</small>. § 15A-1340.17; Ex. 1 at 127:4–9. While virtually every other election crime punishable as a Class I felony in North Carolina requires fraudulent intent, *see, e.g.,* N.C. G<small>EN</small>. S<small>TAT</small>. §§ 163-275(1, 3–4, 7–9), the Strict Liability Voting Law has no *mens rea* requirement whatsoever.

Recent high-profile prosecutions of individuals who mistakenly voted before completion of their felony sentences have had a far-reaching chilling effect. Eligible North Carolina residents with criminal convictions are now too scared to vote, for fear of unintentionally violating the Strict Liability Voting Law and facing felony charges. This chilling effect has been particularly pronounced in the State's Black communities, as the overwhelming majority of individuals prosecuted for violating the Strict Liability Voting Law are Black.

The Strict Liability Voting Law has substantially impeded the efforts of the organizational plaintiffs in this action—the North Carolina A. Philip Randolph Institute ("NC APRI") and Action NC (collectively, "Plaintiffs")—to carry out their core missions. NC APRI is a state affiliate of the National A. Philip Randolph Institute, the

1

senior constituency group of the AFL-CIO. Montford Dec. at ¶¶ 4–5. NC APRI's core mission is to increase the political participation of Black workers in the state. *Id.* at ¶ 6. Action NC works to reduce the root causes of poverty and inequality in North Carolina. McCoy Dec. at ¶ 3. Its core mission is to build grassroots political power by increasing the number of individuals who vote in minority and low-income communities. *Id.* at ¶ 4.

Plaintiffs are particularly concerned that the Strict Liability Voting Law will improperly deter voting by individuals who have completed all aspects of their sentences but for the payment of fines, fees and/or restitution. McCoy Dec. at ¶¶ 11–12; Montford Dec. at ¶ 12. These individuals are now eligible to vote under the Wake County Superior Court's decisions in *Comm. Success Initiative v. Moore*, No. 19-CVS-15941 (N.C. Super. Ct. Sept. 4, 2020) (Exhibits 13–14). Yet many are nevertheless afraid to vote in the upcoming election for fear of criminal prosecution under the Strict Liability Voting Law. McCoy Dec. at ¶¶ 11–12; Montford Dec. at ¶ 12.

Absent timely injunctive relief from this Court, Plaintiffs will suffer irreparable harm because the Strict Liability Voting Law will make it substantially more difficult for them to mobilize eligible voters with past criminal convictions to vote in the upcoming 2020 presidential election. Plaintiffs respectfully ask this Court to preliminarily enjoin the enforcement of the Strict Liability Voting Law in time for prospective voters to register to vote for the 2020 election. Such relief is plainly in the public interest, as it will ensure that every eligible voter with a past criminal conviction has the opportunity to cast a ballot, free from the crippling fear of prosecution under the Strict Liability Voting Law.

2

Defendants will in no way be harmed if this Court pauses enforcement of this unjust law because there are numerous alternative methods for ensuring that ineligible individuals with felony convictions do not vote in the 2020 election, as detailed in the *Post-Election Audit Report: General Election 2016* published by the North Carolina State Board of Elections ("NCSBE"). Ex. 2 at 3–4.

## STATEMENT OF FACTS

I.  **North Carolina's Strict Liability Voting Law was enacted for the specific purpose of deterring Black individuals from attempting to vote.**

Before the Civil War, the North Carolina Constitution explicitly denied voting rights in state elections to free Black men. N.C. CONST. art. I, Section 3, § 3 (1835). But in 1868, North Carolina adopted a new constitution that removed racial restrictions on the right to vote. N.C. CONST., art. VI, § 1 (1868). This enabled Black individuals to participate in the State's government in previously unprecedented numbers and roles.[1]

In 1875, North Carolina amended its constitution to frustrate and impede the influence of Black citizens. The 1875 amendments included a provision disenfranchising individuals convicted of felonies or infamous crimes "unless such person shall be restored to citizenship in a mode prescribed by law." Ex. 16 at art. VI, § 1. It was widely understood that this provision would disproportionately impact Black individuals.[2] The

---

[1] *See generally* William Mabry, White Supremacy and the North Carolina Suffrage Amendment, 13 N.C. Hist. Rev. 1 (1936).

[2] Ex. 15 (1876 newspaper article noting that "the great majority of the criminals are negroes").

3

following year, the North Carolina General Assembly ("General Assembly") adopted the

first iteration of the Strict Liability Voting Law, which provided:

> If a person be challenged as being convicted of any crime
> which excludes him from the right of suffrage, he shall be
> required to answer any questions in relation to such alleged
> conviction; but his answer to such questions shall not be used
> against him in any criminal prosecution, but if any person so
> convicted shall vote at any election, without having been
> legally restored to the rights of citizenship, he shall be
> deemed guilty of an infamous crime, and, on conviction
> thereof, shall be punished by a fine not exceeding one
> thousand dollars, or imprisonment at hard labor not exceeding
> two years, or both.

Ex. 17 at § 62 (emphasis added). The law did not include an intent requirement. Rather,

criminal liability attached even if the individual was not aware that he was ineligible to

vote due to his criminal conviction.

A.     In 1899, the North Carolina General Assembly reenacted the Strict Liability
       Voting Law with discriminatory intent.

During the 1880s and 1890s, Black individuals in North Carolina slowly amassed

political power through the exercise of their right to vote. In 1898, the State Democratic

Executive Committee of North Carolina (the "Committee") cautioned that "the negroes

have been given dominion over many of our towns, and unless the white people unite to

stop it, they will obtain control over every town in the State." Ex. 18 at 48. The

Committee claimed that Black individuals engaged in widespread voting fraud, and

specifically highlighted purported voting by Black individuals with felony convictions.

*See id.* at 88 ("Under the election law of 1895, … negro ex-convicts and negro repeaters

4

were registered and voted galore. The doors of fraud were thrown wide open to these irresponsible and ignorant voters and no protection whatsoever was afforded to the honest voters of the State."); *see also id.* at 84, 86. The Committee asserted that it would "rescue the white people of the east from the curse of negro domination," and promised "to enact such laws as will give security and protection to the property and people of every town and community in the State." *Id.* at 38, 118-19. In the November 1898 election, the Democrats took control of the General Assembly.

In 1899, the General Assembly enacted *An Act to Regulate Elections* ("1899 Election Act"). Consistent with the 1876 constitutional amendment, the 1899 Election Act provided that individuals convicted of felonies or infamous crimes "shall not be allowed to register or vote in this state … unless they shall have been legally restored to the rights of citizenship." Ex. 19 at Ch. 507, § 18. The 1899 Election Act reenacted the 1877 version of the Strict Liability Voting Law almost verbatim. *Id.* at § 72. While the 1899 Act imposed felony-level criminal penalties on individuals with felony convictions who voted without any fraudulent intent, that same Act established only misdemeanor-level penalties for active interference with elections through violence or intimidation. *See id.* at §§ 52, 54.

A year later, the General Assembly approved an amendment to the state constitution that established a poll tax, a literacy test, and a grandfather clause. Ex. 20 at art. VI, § 4. That amendment was "specifically designed to disenfranchise [B]lack voters." *Gingles v. Edmisten*, 590 F. Supp. 345, 359 (E.D.N.C. 1984), *aff'd in part*, *rev'd*

5

*in part sub nom*, *Thornburg v. Gingles*, 478 U.S. 30 (1986).

**B.      The key features of the Strict Liability Voting Law have remained intact since 1899.**

In 1931, the General Assembly reenacted many of the voting crimes included in the 1899 Act, including the Strict Liability Voting Law and the misdemeanor-level penalties for active interference with elections through violence or intimidation. Ex. 21 at Ch. 348, §§ 9(3, 4, 6) & § 10(5). The 1931 law provided uniform penalties for felony-level election crimes, including the Strict Liability Voting Law. *Id.* at § 10. The 1931 Act also streamlined the language of the 1899 version of the Strict Liability Voting Law, and specified that the law applied with equal force to primary elections. *Id.* at § 10(5). But the key features of the 1931 version of the Strict Liability Voting Law—strict felony-level criminal liability for voting after a felony conviction before restoration to citizenship—remained unchanged.

Since 1931, the General Assembly has changed just one single word in the Strict Liability Voting Law:

> It shall be unlawful: … For any person convicted of a crime which excludes ~~him~~ the person from the right of suffrage, to vote at any primary or election without having been restored to the right of citizenship in due course and by the method provided by law.

N.C. GEN. STAT. § 163-275(5) (edited to reflect changes from the 1931 version). The Strict Liability Voting Law has otherwise remained completely intact. The General Assembly has also left largely intact the 1899 laws imposing misdemeanor-level

6

penalties for active interference with elections through violence or intimidation. N.C. GEN. STAT. §§ 163-274(4–5, 7).

Virtually every other election crime punishable as a Class I felony in North Carolina requires fraudulent intent. *See, e.g.*, N.C. GEN. STAT. §§ 163-275(1, 3–4, 7–9). But as the NCSBE has explained, "[t]he language contained in the felon voting statute does not include an element of intent, such that violating the statute does not require evidence that the statute was knowingly violated for a possible violation to have occurred." Ex. 3 at 1.

## II. North Carolina's Strict Liability Voting Law disproportionately impacts Black individuals.

Black individuals constitute an outsized percentage of individuals in North Carolina who are no longer incarcerated but are still serving some aspect of a sentence for a felony conviction—the category of ineligible voters the Strict Liability Voting Law targets. Ex. 9 at 3–4.  In the course of an audit of the 2016 presidential election, the NCSBE determined that 441 individuals with felony convictions may have voted before their sentences were completed. Ex. 2 at 3. 66% of these individuals were Black. Ex. 4.

The NCSBE referred these cases to the state's District Attorneys, as required under state law. *See* N.C. GEN. STAT. § 163-22(d); Ex. 2 at 3. "[S]ome [D]istrict [A]ttorneys express[ed] understandable concern that a felon who has voted may not have been aware of the unlawfulness of his actions." Ex. 2 at Appendix 7. Several District Attorneys "summarily declined" to bring charges because they determined that "there

7

was insufficient evidence to prove that the defendant was ever notified of his or her ineligibility to vote." Ex. 5 at 1, 4–8.

But in 2018, the Alamance County District Attorney charged twelve individuals ("the Alamance 12") with violating the Strict Liability Voting Law. Ex. 1 at 129:24–131:2. Nine members of the Alamance 12 were Black. *Id.* In 2019, the District Attorney of Hoke County charged four individuals with violating the Strict Liability Voting Law. *Id.* All four were Black. *Id.* Many of these defendants have expressed a deep-seated fear of ever voting again. Ex. 12 at 2–4 & Haith Aff. at ¶¶ 9–10.

## III. The Strict Liability Voting Law fails to provide fair notice of criminal liability.

The Strict Liability Voting Law renders it a Class I felony "[f]or any person convicted of a crime which excludes the person from the right of suffrage, to vote at any primary or election without having been restored to the right of citizenship in due course and by the method provided by law." N.C. Gen Stat.§ 163-275(5). To determine how to be "restored to the rights of citizenship," a prospective voter must look outside the state's election laws to N.C. GEN. STAT. § 13-1 (the "Citizenship Restoration Law"), which does not specifically mention the restoration of voting rights. The Citizenship Restoration Law provides in relevant part:

> Any person convicted of a crime, whereby the rights of citizenship are forfeited, shall have such rights automatically restored upon the occurrence of any one of the following conditions:

8

(1) The <u>unconditional discharge</u> of an inmate, of a probationer, or of a parolee by the agency of the State having jurisdiction of that person or of a defendant under a suspended sentence by the court …

(4) With regard to any person convicted of a crime against the United States, the <u>unconditional discharge</u> of such person by the agency of the United States having jurisdiction of such person …

(5) With regard to any person convicted of a crime in another state, the <u>unconditional discharge</u> of such person by the agency of that state having jurisdiction of such person ….

*Id.* (emphasis added). Neither the Citizenship Restoration Law nor any other North Carolina statute defines the term "unconditional discharge." No published North Carolina state court decision has expressly defined the term.

The State has construed the Citizenship Restoration Law as "preclud[ing] the restoration of citizenship rights until the completion of the sentence, including any period of parole, post-release supervision or probation." Ex. 13 at 5. In 1994, North Carolina's Structured Sentencing Act abolished parole and required post-release supervision for felony convictions. *See* N.C. GEN. STAT. ch. 15A, art. 81B. Yet until recently, many of the State's voting materials did not mention the completion of post-release supervision as a requirement for the restoration of voting rights. Ex. 1 at 82:22–86:9, 94:14–96:4, 98:3–100:17, 105:12–106:5, 112:1–23; Ex. 6–7.

The NCSBE has acknowledged that when individuals violate the Strict Liability Voting Law, "education and understanding of the law appear to be the primary problem." Ex. 2 at 5. The NCSBE has also recognized that numerous deficiencies in the processes

9

for notifying individuals convicted of felonies of the loss of their voting rights, and removing such individuals from the voter registration rolls, have contributed to violations of the Strict Liability Voting Law. Ex. 2 at 3–4 & Appendix 7; Ex. 3 at 2; Ex. 5 at 1. Some of these problems have since been addressed, Ex. 2 at 3–4 and Ex. 5 at 2, but individuals who mistakenly voted before felony sentence completion in the 2016 election remain subject to potential criminal charges under the State's boundless statute of limitations for felony prosecutions. *See State v. Taylor*, 713 S.E.2d 82, 90 (N.C. Ct. App. 2011) ("no statute of limitations bars the prosecution of a felony" in North Carolina).

## IV. The Strict Liability Voting Law deters eligible individuals from registering to vote and voting.

The vagueness of the Strict Liability Voting Law, coupled with the recent prosecutions, have instilled a fear of voting in eligible individuals with past criminal convictions because of the possibility of unintentionally violating the law and triggering criminal charges. Montford Dec. at ¶¶ 10–11; McCoy Dec. at ¶¶ 9–10; Zimmer Dec. at ¶¶ 7–9; Ex. 10 at ¶¶ 20–21; Ex. 11 at ¶ 23; Ex. 12.

This chilling effect has substantially impeded Plaintiffs from carrying out their missions of increasing political participation among Black and low-income voters; and Plaintiffs have consequently had to expend additional time and resources to educate and mobilize potential voters. Montford Dec. at ¶¶ 10–11; McCoy Dec. at ¶¶ 9–10. Even with these additional efforts, Plaintiffs are very concerned that the Strict Liability Voting Law will deter voting by eligible individuals, including individuals who are now eligible to

10

vote under the Wake County Superior Court's September 4, 2020 decision in *Comm. Success Initiative* v. *Moore.* Montford Dec. at ¶ 12; McCoy Dec. at ¶¶ 11–12.

## QUESTIONS PRESENTED

1.      Whether the Strict Liability Voting Law (N.C. GEN. STAT. § 163-275(5)) violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution; and

2.      Whether Plaintiffs are entitled to preliminary injunctive relief.

## ARGUMENT

A court may grant a preliminary injunction if plaintiffs "demonstrate that (1) they are likely to succeed on the merits; (2) they will likely suffer irreparable harm absent an injunction; (3) the balance of hardships weighs in their favor; and (4) the injunction is in the public interest." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014). Plaintiffs easily satisfy each of these requirements.[3]

**I.      Plaintiffs are likely to succeed on the merits of their constitutional claims.**

As demonstrated below, Plaintiffs are likely to succeed on the merits of their due process and equal protection claims challenging the constitutionality of the Strict Liability Voting Law.

---

[3] Unless otherwise noted, internal quotation marks, alterations and citations are omitted throughout.

**A.** **The Strict Liability Voting Law is void for vagueness under the Due Process Clause.**

"[T]he question of a statute's vagueness is a purely legal issue." *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 272 (4th Cir. 2019). "To survive a vagueness challenge" under the Due Process Clause of the Fourteenth Amendment, "a statute must give a person of ordinary intelligence adequate notice of what conduct is prohibited and must include sufficient standards to prevent arbitrary and discriminatory enforcement." *Id.* "[T]he standard of certainty is higher" for criminal statutes. *Kolender v. Lawson*, 461 U.S. 352, 358 n.8. (1983); *see also Manning*, 930 F.3d at 272-73 (a "stricter standard" of clarity applies to criminal laws). This is because a law may not "consign a person to the risk of significant penal consequences without first providing sufficiently definite notice of prohibited activities." *Manning*, 930 F.3d at 276-77; *see also Johnson v. U.S.*, 576 U.S. 591, 595 (2015) ("The prohibition of vagueness in criminal statutes is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law, and a statute that flouts it violates the first essential of due process."). A criminal statute may be unconstitutionally vague even if it is not vague in all its applications. *See Kolender*, 461 U.S. at 358 n.8; *Johnson*, 135 S.Ct. at 602

"[T]he constitutionality of a vague statutory standard is closely related to whether the standard incorporates a requirement of *mens rea*." *Colautti v. Franklin*, 439 U.S. 379, 395 (1979). "[A] scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of the notice to the complainant that his conduct is proscribed."

12

*Village of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498-99 (1982).

For example, in *Jones v. Governor of Florida*, the en banc Eleventh Circuit found the

scienter requirement dispositive in rejecting a vagueness challenge to Florida laws

criminalizing registering to vote and voting before felony sentence completion. No. 20-

12003, 2020 WL 5493770, at *19–20 (11th Cir. Sept. 11, 2020). The Eleventh Circuit

emphasized that "no felon who honestly believes he has completed the terms of his

sentence commits a crime by registering and voting." *Id.* at *20.

Where a vague criminal statute has no scienter requirement, however, the law acts

as "a trap for those who act in good faith." *Colautti*, 439 U.S. at 395. Such statutes

require "a relatively stringent review." *Peoples Rights Org., Inc. v. City of Columbus*, 152

F.3d 522, 534, 536 (6th Cir. 1998) (finding a criminal ordinance "unconstitutionally

vague" were the defendant could be held liable despite his "complete lack of

knowledge"); *see also Whatley v. Zatecky*, 833 F.3d 762, 780 (7th Cir. 2016) ("[H]olding

defendants strictly liable for indeterminate offenses would be contrary to every Supreme

Court vagueness case[.]").[4]

"[T]he most important factor affecting the clarity that the Constitution demands of

a law is whether it threatens to inhibit the exercise of constitutionally protected rights."

*Village of Hoffman Ests.*, 455 U.S. at 499. Vague laws "inevitably lead citizens to steer

---

[4] In general, criminal statutes "that require no *mens rea* are disfavored," particularly if the offenses are punishable by imprisonment. *Staples v. U.S.*, 511 U.S. 600, 617 (1994) (Thomas, J.).

13

far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972). A vague criminal law that both (1) "contains no *mens rea* requirement," and (2) "infringes on constitutionally protected rights" cannot stand. *City of Chicago v. Morales*, 527 U.S. 41, 55 (1999); *see also, e.g., Stahl v. City of St. Louis, Mo.*, 687 F.3d 1038, 1042 (8th Cir. 2012) (holding unconstitutionally vague a strict liability ordinance criminalizing participation in demonstrations that obstruct traffic, and finding "especially problematic … the ordinance's resulting chilling effect on core First Amendment speech").

The Strict Liability Voting Law—a criminal statute with no scienter requirement punishable by up to two years in prison—is unconstitutionally vague by any standard. While the law criminalizes voting before an individual has "been restored to the right of citizenship," the law provides no guidance on when an individual regains his or her citizenship rights. The Strict Liability Voting Law instead implicitly incorporates by reference the Citizenship Restoration Law, which in turn provides that citizenship is restored upon an individual's "unconditional discharge." *See generally Manning*, 930 F.3d at 273, 276-77 (finding a criminal statute unconstitutionally vague based on the vagueness of a term incorporated by reference). Nowhere in the State's statutes or the case law is the term "unconditional discharge" expressly defined.[5]

Because the Strict Liability Voting Law carries serious criminal penalties even for

---

[5] In other states, the term "unconditional discharge" references a sentence in which no punishment is imposed. *See, e.g.*, N.Y. Penal Law § 65.20.

inadvertent violations, it inevitably chills the constitutionally-protected act of voting by eligible individuals with criminal convictions. Thus, this law does not pass constitutional muster under the Due Process Clause.

### B.     The Strict Liability Voting Law violates the Equal Protection Clause.

When "a facially neutral law, like the one at issue here," was "motivated by invidious racial discrimination," that law is "just as abhorrent, and just as unconstitutional, as laws that expressly discriminate on the basis of race." *North Carolina State Conf. of NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir. 2016).

A law that was originally enacted with racial animus violates the Equal Protection Clause if (i) the law was never purged of its original discriminatory taint, and (ii) the law continues to have present-day disproportionate effects. *See Hunter v. Underwood*, 471 U.S. 222, 233 (1985) (holding that a criminal disenfranchisement law "violate[d] [E]qual [P]rotection" where "its original enactment was motivated by a desire to discriminate against [B]lacks on account of race and the section continues to this day to have that effect"). The Strict Liability Voting Law meets each of *Hunter*'s prongs for an equal protection violation.

*First*, the Strict Liability Voting Law was originally enacted in 1877 and reenacted in 1899 with a specific intent to disenfranchise Black voters. In 1931, the General Assembly reenacted the Strict Liability Voting Law with minor modifications that left the substance of the law intact.

*Second*, the Strict Liability Voting Law has never been purged of its original

15

discriminatory taint because the key provisions of the Strict Liability Voting Law—strict felony-level liability for voting after a felony conviction before restoration to citizenship—have remained unchanged since 1899.

Neither the "mere passage of time," *Chen v. City of Houston*, 206 F.3d 502, 518 (5th Cir. 2000), nor a "reenact[ment] … without significant change," *Hayden v. Paterson*, 594 F.3d 150, 167 (2d Cir. 2010), is sufficient to purge a discriminatory law of its original taint. Rather, only "*substantial*, race-neutral alterations in an old unconstitutional law may remove the discriminatory taint." *Veasey v. Abbott*, 888 F.3d 792, 802 (5th Cir. 2018).

The taint is removed if the revised version of the law does not "use criteria that arguably carr[y] forward the effects of any discriminatory intent on the part of the [prior] [l]egislature." *Abbott v. Perez*, 138 S.Ct. 2305, 2325 (2018). For example, in *Cotton v. Fordice*, the Fifth Circuit held that amendments to the racially-motivated selection of crimes in Mississippi's criminal disenfranchisement provision "removed the discriminatory taint associated with the original version." 157 F.3d 388, 391 (5th Cir. 1998). The court found it significant that one of the amendments "broadened" the provision by "adding … crimes historically excluded from the list because they were not considered '[B]lack' crimes." *Id.*

When a racially-motivated law is reenacted with its key discriminatory features intact, however, that law retains its original discriminatory taint. The Supreme Court recently made this commonsense principle clear in *Ramos v. Louisiana*, which struck

16

down a racially-motivated Louisiana law permitting nonunanimous verdicts for the convictions of serious crimes.[6] Louisiana originally adopted the law following its 1898 constitutional convention, which aimed "to 'establish the supremacy of the white race.'" 140 S. Ct. 1390, 1394 (2020) (Gorsuch, J.). There was no dispute that "race was a motivating factor" in the law's original enactment. *Id.* Although Louisiana revised and "eventually recodified" the law "in new proceedings untainted by racism," *id.* at 1401 n.44, the law's key features—nonunanimous jury verdicts for serious offenses—remained unchanged. The *Ramos* Court placed great weight on the law's "racist history" in its constitutional analysis. *Id.*; *see also id.* at 1418 (Kavanaugh, J., concurring) (explaining that although "Louisiana's modern policy decision to retain nonunanimous juries … may have been motivated by neutral principles (or just by inertia)," "the Jim Crow origins and racially discriminatory effects (and the perception thereof) of non-unanimous juries in Louisiana … should matter and should count heavily in favor" of striking down the law).

As in *Ramos*, there is no reasonable dispute that "race was a motivating factor" in the original enactment of the Strict Liability Voting Law, *id.* at 1394, and the law's key discriminatory features have remained unchanged since.

**Third**, the Strict Liability Voting Law bears more heavily on the Black community. Black individuals were disproportionately flagged by the NCSBE for violating the Strict Liability Voting Law in the 2016 election, and they have been

---

[6] The Court considered a challenge under the Sixth Amendment, not the Equal Protection Clause, but its reasoning is nonetheless relevant here.

disproportionately prosecuted for those violations. The Strict Liability Voting Law thus violates the Equal Protection Clause.

## II. Absent injunctive relief, Plaintiffs will suffer irreparable harm in the November 3, 2020 presidential election.

"[T]o demonstrate irreparable harm, a party must establish that the harm is (1) certain and great, actual and not theoretical, and so imminent that there is a clear and present need for equitable relief; and (2) that, once occurred, the threatened harm would be beyond remediation." *North Carolina State Conf. of NAACP v. Cooper*, 430 F. Supp. 3d 15, 51 (M.D.N.C. 2019) ("*NC NAACP*") (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7-8 (D.C. Cir. 2016) (*"LWVUS"*)). "By their very nature, laws impacting the right to vote create the potential for irreparable harm; once an election occurs, 'there can be no do-over and no redress.'" *Id.* (quoting *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014)) ("*LWVNC*"). Courts therefore "routinely deem restrictions on fundamental voting rights irreparable injury." *LWVNC* at 247. "[D]iscriminatory voting procedures in particular are the kind of serious violation of the Constitution … for which courts have granted immediate relief." *Id.*

"Organizations with core voter-advocacy missions … are irreparably harmed when the defendant's actions perceptibly impair the organization's programs, making it more difficult to carry out [their] mission" of registering voters and getting out the vote. *NC NAACP* at 51; *see also Action NC v. Strach*, 216 F. Supp. 3d 597, 643 (M.D.N.C. 2016) (voting rights organizations demonstrated irreparable harm by showing that

18

defendants' actions "perceptibly impair[ed] [their] ability to mobilize and educate voters before the General Election, a key piece of their missions"); *LWVUS*, 838 F.3d 1, 9 (D.C. Cir. 2016) (voting rights organizations demonstrated irreparable harm by showing that that the challenged laws "unquestionably make it more difficult for the [organizations] to accomplish their primary mission of registering voters").

The Strict Liability Voting Law has significantly impaired Plaintiffs' core missions of encouraging broad political participation by members of Black and low-income communities in North Carolina. Montford Dec. at ¶¶ 9–17; McCoy Dec. at ¶¶ 9–15. The threat of prosecution for voting law violations inevitably has a chilling effect on political participation. *See, e.g., Smith v. Meese*, 821 F.2d 1484, 1494 (11th Cir. 1987) (finding plaintiffs adequately alleged that a policy of discriminatory voter fraud prosecutions resulted in "the chilling of the plaintiffs' right to vote"); *U.S. v. McLeod*, 385 F.2d 734, 747, 749-50 (5th Cir. 1967) (recognizing that "the mental anguish and nuisance of having to defend baseless prosecutions could well deter [black individuals] from participating in the registration process," and observing that "[h]arassment in the form of baseless arrests and prosecutions is one of the most effective means of putting a halt to a voter registration drive."). Strict liability criminal statutes have a particularly powerful chilling effect. *See, e.g., Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 705 (N.D. Oh. 2006) (enjoining enforcement of a strict liability criminal statute applicable to voter registration organizations, and reasoning that "the prospect of being labeled a felon for mere inadvertence, confusion, or innocent mistake weighs heavily upon anyone . …

19

Indeed, it is logical to conclude that anyone would be chilled in these circumstances.").

To combat the chilling effect of the Strict Liability Voting Law, Plaintiffs have diverted substantial time and resources from their broad-based voter registration and get-out-the-vote efforts to educate eligible individuals with criminal convictions that they may safely vote without fear of prosecution. Montford Dec. at ¶ 11; McCoy Dec. at ¶ 10. "Such mobilization opportunities cannot be remedied once lost." *Georgia Coal. for People's Agenda v. Kemp*, 347 F. Supp. 3d 1251 (N.D. Ga. 2018).

Plaintiffs have also been forced to decline requests for voting assistance from individuals who are unsure of their sentence completion status, both because of the possibility that these individuals might inadvertently vote when they are not eligible to do so, and because of the potential that Plaintiffs themselves might face criminal liability under N.C. GEN. STAT. § 163-275(13) for registering an ineligible individual to vote. Montford Dec. at ¶¶ 13–15; McCoy Dec. at ¶¶ 13–14. If the Strict Liability Voting Law included a scienter requirement, then Plaintiffs would do their best to assist these individuals in good faith, consistent with their missions of encouraging broad political participation. Montford Dec. at ¶ 16; McCoy Dec. at ¶ 14.

Plaintiffs will suffer irreparable harm unless this Court enjoins the enforcement of the Strict Liability Voting Law before the registration window closes for the November 3, 2020 general election. Absent injunctive relief, Plaintiffs may not be able to mobilize *eligible* voters with criminal convictions to vote in the 2020 election, because of the pervasive fear of inadvertently violating the Strict Liability Voting Law and facing

20

felony-level prosecution. This chilling effect will significantly impede Plaintiffs' core missions.

### III. The balance of hardships tips heavily in favor of granting a preliminary injunction.

While Plaintiffs will suffer irreparable harm if the Strict Liability Voting Law is not preliminarily enjoined, Defendants will incur no hardship if this Court issues an injunction.

To the extent Defendants wish to ensure that individuals who are still serving sentences for felony convictions do not vote in the November 3, 2020 election, Defendants have many other mechanisms available for doing so. *See generally, Greidinger v. Davis*, 988 F.2d 1344, 1354 (4th Cir. 1993) (holding that Virginia could not require voter registration applicants to provide their Social Security Numbers, and reasoning that "Virginia's interest in preventing voter fraud … could easily be met" using other methods).

The District of Kansas's decision in *Fish v. Kobach* is instructive. There, the court held unconstitutional a Kansas law requiring individuals to provide documentary proof of citizenship in order to register to vote. 309 F. Supp. 3d 1048, 1103 (D. Kan. 2018), *aff'd*, 309 F. Supp. 3d 1105 (10th Cir. 2020). While the court acknowledged that Kansas had "legitimate interests" in ensuring that noncitizens do not register to vote, *id.* at 1108, the court noted that "the law has acted as a deterrent to registration and voting for substantially more eligible Kansans than it has prevented ineligible voters from

registering to vote," *id.* at 1113. The court found that "many confirmed instances of noncitizen registration or attempted registration in Kansas were due to either applicant confusion or mistake, or errors by [state] and county employees, not intentional voter fraud." *Id.* at 1103. The court determined that this "[l]ack of intent matters" because "it frames the acceptable alternative approaches that would allow [the Kansas Secretary of State] to better enforce the State's citizenship requirement while imposing a less burdensome process on Kansans who apply to register to vote." *Id.* For instance, the court pointed to "better, more meaningful efforts toward training" state employees who register voters, to ensure that "noncitizens do not inadvertently end up on the voter rolls." *Id.*

Here, the NCSBE has already identified changes to the State's "registration and list maintenance processes" and other procedures that would substantially reduce the possibility that an ineligible individual with a felony conviction might vote. Ex. 2 at 3–4. These changes include:

- "Working with public safety officials and the court system to ensure that convicted felons are expressly notified that they lose their voting rights upon conviction, and regain them only after completing their sentence, including probation and parole";

- "Increasing data-sharing between local election officials to ensure a felon removed in one county does not re-register in another country, unless his or her sentence is complete";

- "Updating elections software to check felon status at the time of registration"; and

- "Educating the public about voting requirements through [the] NCSBE website, outreach events, news releases, social media and other means."

*Id.* at 4. Some of these changes have already been implemented. *Id.* at 3–4; Ex. 3 at 2. The Conference of District Attorneys of North Carolina has recommended additional changes, including amending the standard plea transcript form to notify individuals of the loss of their voting rights. Ex. 8.

Adopting procedural safeguards—rather than imposing strict criminal liability—is the fairest and most effective way to prevent erroneous voting by individuals with felony convictions. In any event, Defendants will not be prejudiced in their ability to bring criminal charges under the Strict Liability Voting Law, as no statute of limitations applies to felony prosecutions under North Carolina law. *See Taylor*, 713 S.E.2d at 90.

## IV. The public interest strongly favors granting Plaintiffs' motion for a preliminary injunction.

"By definition, the public interest . . . favors permitting as many qualified voters to vote as possible." *LWVNC*, 769 F.3d at 247–48 (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012)); *see also Action NC*, 216 F. Supp. 3d at 648 ("Favoring enfranchisement and ensuring that qualified voters exercise their right to vote is always in the public interest."). Enforcing the requirements of the Equal Protection and Due Process Clauses is also in the public interest. *See Newsom ex rel. Newsom v. Albemarle Cty Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) ("Surely, upholding constitutional rights serves the public interest.").

Granting a preliminary injunction here is plainly in the public interest, because it will ensure that eligible voters with criminal convictions are not deterred from casting a

ballot due to the threat of prosecution under a racially discriminatory and unconstitutionally vague criminal statute.

## REQUEST FOR EXPEDITED CONSIDERATION

In light of the upcoming election, Plaintiffs respectfully request expedited briefing and consideration of this Motion. There is good cause to expedite briefing and consideration here, as the last day to register to vote by mail is October 9, 2020 and the last day to register in-person during the early voting period is October 31, 2020. Plaintiffs respectfully request that the Court shorten the requirements of Local Civil Rule 7.3(f) to require Defendants' response within fourteen days of service of this Motion and Plaintiffs' reply within five days of service of the response. Plaintiffs further request that the Court provide expedited consideration of a hearing date and decision on Plaintiffs' Motion.

Dated: September 24, 2020

By:    /s/ Allison J. Riggs

<table>
<tr>
<td>

SIMPSON THACHER & BARTLETT LLP<br>
Jonathan K. Youngwood (*special appearance forthcoming*)<br>
Nihara K. Choudhri (*special appearance forthcoming*)<br>
Andrew B. Garber (*special appearance forthcoming*)<br>
425 Lexington Avenue<br>
New York, NY 10017<br>
Tel: (212) 455-2000<br>
Fax: (212) 455-2502<br>
jyoungwood@stblaw.com<br>
nchoudhri@stblaw.com<br>
andrew.garber@stblaw.com

</td>
<td>

SOUTHERN COALITION FOR SOCIAL JUSTICE<br>
Allison J. Riggs (State Bar No. 40028)<br>
1415 West Highway 54, Suite 101<br>
Durham, NC 27707<br>
Tel: (919) 323-3380<br>
Fax: (919) 323-3942<br>
allisonriggs@southerncoalition.org<br><br><br><br><br>
*Attorneys for Plaintiffs*

</td>
</tr>
</table>

25

## CERTIFICATE OF WORD COUNT

Pursuant to Local Rule 7.3(d)(1), the undersigned counsel hereby certifies that the foregoing Memorandum of Law in Support of Plaintiffs' Motion for a Preliminary Injunction and to Expedite contains 6120 words (including headings and footnotes) as measured by Microsoft Word.

/s/ Allison J. Riggs
Allison J. Riggs

**CERTIFICATE OF SERVICE**

I certify that on the 24th day of September, 2020, the foregoing Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunction and Request to Expedite was served by electronic mail to Defendants' Counsel, Alec McC. Peters, Chief Deputy Attorney General at the address apeters@ncdoj.gov, and Katelyn Love, General Counsel for the North Carolina State Board of Elections, at the address Katelyn.Love@ncsbe.gov, with consent of counsel to accept service in this manner.


/s/ Allison J. Riggs
Allison J. Riggs

27