**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

NORTH CAROLINA A. PHILIP RANDOLPH
INSTITUTE and ACTION NC,

    Plaintiffs,

        v.

THE NORTH CAROLINA STATE BOARD OF
ELECTIONS; DAMON CIRCOSTA, in his official
capacity as CHAIR OF THE STATE BOARD OF
ELECTIONS; STELLA ANDERSON, in her official
capacity as SECRETARY OF THE STATE BOARD
OF ELECTIONS; JEFF CARMON III, in his official
capacity as MEMBER OF THE STATE BOARD OF
ELECTIONS; STACY "FOUR" EGGERS IV, in his
official capacity as MEMBER OF THE STATE
BOARD OF ELECTIONS; TOMMY TUCKER, in his
official capacity as MEMBER OF THE STATE
BOARD OF ELECTIONS; KAREN BRINSON
BELL, in her official capacity as EXECUTIVE
DIRECTOR OF THE STATE BOARD OF
ELECTIONS; VALERIE M. ASBELL, in her official
capacity as DISTRICT ATTORNEY FOR
PROSECUTORIAL DISTRICT 7; ROBERT S.
BANKS, in his official capacity as DISTRICT
ATTORNEY FOR PROSECUTORIAL
DISTRICT 35; LOCKE BELL, in his official capacity
as DISTRICT ATTORNEY FOR PROSECUTORIAL
DISTRICT 38; TED BELL, in his official capacity as
DISTRICT ATTORNEY FOR PROSECUTORIAL
DISTRICT 41; SEAN BOONE, in his official capacity
as DISTRICT ATTORNEY FOR PROSECUTORIAL
DISTRICT 17; C. RICKY BOWMAN, in his official
capacity as DISTRICT ATTORNEY FOR
PROSECUTORIAL DISTRICT 23; T. LYNN
CLODFELTER, in his official capacity as DISTRICT
ATTORNEY FOR PROSECUTORIAL
DISTRICT 28; BRANDY L. COOK, in her official
capacity as DISTRICT ATTORNEY FOR
PROSECUTORIAL DISTRICT 27; AVERY M.
CRUMP, in her official capacity as DISTRICT

Civil Action No. 1:20-cv-00876

**FIRST AMENDED
COMPLAINT FOR
DECLARATORY AND
<u>INJUNCTIVE RELIEF</u>**

ATTORNEY FOR PROSECUTORIAL
DISTRICT 24; BENJAMIN R. DAVID, in his official
capacity as DISTRICT ATTORNEY FOR
PROSECUTORIAL DISTRICT 6; JONATHAN M.
DAVID, in his official capacity as DISTRICT
ATTORNEY FOR PROSECUTORIAL
DISTRICT 15; SATANA DEBERRY, in her official
capacity as DISTRICT ATTORNEY FOR
PROSECUTORIAL DISTRICT 16; MATTHEW L.
DELBRIDGE, in his official capacity as DISTRICT
ATTORNEY FOR PROSECUTORIAL DISTRICT 9;
FARIS C. DIXON, in his official capacity as
DISTRICT ATTORNEY FOR PROSECUTORIAL
DISTRICT 3; SUSAN I. DOYLE, in her official
capacity as DISTRICT ATTORNEY FOR
PROSECUTORIAL DISTRICT 13; SETH H.
EDWARDS, in his official capacity as DISTRICT
ATTORNEY FOR PROSECUTORIAL DISTRICT 2;
ROBERT A. EVANS, in his official capacity as
DISTRICT ATTORNEY FOR PROSECUTORIAL
DISTRICT 8; GARRY W. FRANK, in his official
capacity as DISTRICT ATTORNEY FOR
PROSECUTORIAL DISTRICT 33; N. LORRIN
FREEMAN, in her official capacity as DISTRICT
ATTORNEY FOR PROSECUTORIAL
DISTRICT 10; ANDREW M. GREGSON, in his
official capacity as DISTRICT ATTORNEY FOR
PROSECUTORIAL DISTRICT 37; TOM E.
HORNER, in his official capacity as DISTRICT
ATTORNEY FOR PROSECUTORIAL
DISTRICT 34; SARAH M. KIRKMAN, in her official
capacity as DISTRICT ATTORNEY FOR
PROSECUTORIAL DISTRICT 32; MICHAEL K.
HARDIN, in his official capacity as DISTRICT
ATTORNEY FOR PROSECUTORIAL
DISTRICT 29; ERNEST R. LEE, in his official
capacity as DISTRICT ATTORNEY FOR
PROSECUTORIAL DISTRICT 5; SUZANNE
MATTHEWS, in her official capacity as DISTRICT
ATTORNEY FOR PROSECUTORIAL
DISTRICT 12; SPENCER MERRIWEATHER, in his
official capacity as DISTRICT ATTORNEY FOR
PROSECUTORIAL DISTRICT 26; MICHAEL W.
MILLER, in his official capacity as DISTRICT

ATTORNEY FOR PROSECUTORIAL
DISTRICT 39; GREG A. NEWMAN, in his official
capacity as DISTRICT ATTORNEY FOR
PROSECUTORIAL DISTRICT 42; JAMES R.
O'NEILL, in his official capacity as DISTRICT
ATTORNEY FOR PROSECUTORIAL
DISTRICT 31; JASON E. RAMEY, in his official
capacity as DISTRICT ATTORNEY FOR
PROSECUTORIAL DISTRICT 22; SCOTT REILLY,
in his official capacity as DISTRICT ATTORNEY
FOR PROSECUTORIAL DISTRICT 36; TREY
ROBISON, in his official capacity as DISTRICT
ATTORNEY FOR PROSECUTORIAL
DISTRICT 30; W. REECE SAUNDERS, in his
official capacity as DISTRICT ATTORNEY FOR
PROSECUTORIAL DISTRICT 21; MATTHEW C.
SCOTT, in his official capacity as DISTRICT
ATTORNEY FOR PROSECUTORIAL
DISTRICT 20; SCOTT THOMAS, in his official
capacity as DISTRICT ATTORNEY FOR
PROSECUTORIAL DISTRICT 4; ROXANN L.
VANEEKHOVEN, in her official capacity as
DISTRICT ATTORNEY FOR PROSECUTORIAL
DISTRICT 25; MICHAEL D. WATERS, in his
official capacity as DISTRICT ATTORNEY FOR
PROSECUTORIAL DISTRICT 11; ASHLEY
HORNSBY WELCH, in her official capacity as
DISTRICT ATTORNEY FOR PROSECUTORIAL
DISTRICT 43; WILLIAM R. WEST, in his official
capacity as DISTRICT ATTORNEY FOR
PROSECUTORIAL DISTRICT 14; TODD M.
WILLIAMS, in his official capacity as DISTRICT
ATTORNEY FOR PROSECUTORIAL
DISTRICT 40; ROBERT A. WOMBLE, in his official
capacity as DISTRICT ATTORNEY FOR
PROSECUTORIAL DISTRICT 1; and JAMES R.
WOODALL, in his official capacity as DISTRICT
ATTORNEY FOR PROSECUTORIAL
DISTRICT 18,

      Defendants.

## TABLE OF CONTENTS

Page

INTRODUCTION ....................................................................................................1

JURISDICTION & VENUE ......................................................................................4

PARTIES ..................................................................................................................5

STATEMENT OF FACTS .......................................................................................12

I.   North Carolina's Strict Liability Voting Law Was Enacted for the Specific
     Purpose of Deterring Black Individuals From Attempting to Vote. ......................12

     A.   In 1899, the North Carolina General Assembly reenacted the Strict
          Liability Voting Law with unequivocal discriminatory intent....................15

     B.   The key features of the Strict Liability Voting Law have remained
          intact since 1899. ...................................................................................21

II.  North Carolina's Strict Liability Voting Law Disproportionately Impacts
     Black Individuals..................................................................................................29

III. The Strict Liability Voting Law Fails to Provide Fair Notice of Criminal
     Liability.................................................................................................................34

IV.  The Strict Liability Voting Law Deters *Eligible* Individuals From Voting. ..........44

V.   The Strict Liability Voting Law Impedes Plaintiffs' Efforts to Carry Out
     Their Missions......................................................................................................52

CLAIMS ..................................................................................................................54

     COUNT ONE......................................................................................................54

     COUNT TWO .....................................................................................................56

PRAYER FOR RELIEF .........................................................................................58

i

# INTRODUCTION

1.     This lawsuit challenges the constitutionality of N.C. GEN. STAT. § 163-275(5) (the "Strict Liability Voting Law"), a racially discriminatory relic of the nineteenth century that imposes stringent criminal penalties on voting by North Carolina residents who are on parole, probation or post-release supervision for a felony conviction—*even if those individuals mistakenly believe they are eligible to vote.* Violating the Strict Liability Voting Law is a Class I felony that carries a penalty of up two years in prison. N.C. GEN. STAT. § 15A-1340.17.[1] Under this vague and confusing law, and with grossly inadequate efforts by Defendants in this matter to provide constitutionally-adequate notice to voters of potential violations of the law, mistakenly voting in North Carolina can and does result in criminal prosecution.

2.     The Strict Liability Voting Law was originally enacted in 1877 with an intent to disenfranchise Black voters. *See* 1876–77 N.C. Sess. Laws 537. In 1899, the North Carolina General Assembly (the "General Assembly") reenacted the Strict Liability Voting Law almost verbatim in a broad legislative initiative to suppress the Black vote and reinstate white control throughout the state. *See* 1899 N.C. Sess. Laws 681. Despite the law's racist roots, the General Assembly has never amended the key

---

[1] *See also* Deposition of Karen Brinson Bell, Executive Director of the North Carolina State Board of Elections ("Bell Dep."), *Community Success Initiative v. Moore*, No. 19-CVS-15941 (N.C. Super. Ct. July 16, 2020) (*"CSI"*), (Exhibit 1), at 127:4–9 (Q: "Ms. Bell, do you understand that under the current law, if a person votes while on felony probation or post-release supervision, that's a crime for which a person can face up to two years in prison? A: That is my understanding, yes.").

1

features of the Strict Liability Voting Law. It has remained on the books meaningfully unchanged since 1899.

3.      Virtually every other election crime punishable as a Class I felony in North Carolina requires intent. *See, e.g.*, N.C. GEN. STAT. §§ 163-275(1, 3, 4, 7–9). But "felon voting is a strict liability offense, and thus a felon may be convicted of a crime even if he or she does not know that voting while serving an active sentence is wrongful."[2] The North Carolina State Board of Elections ("NCSBE") has recognized that violations of the Strict Liability Voting Law are almost always unintentional, and "education and understanding of state law appear to be the primary problem."[3]

4.      Nevertheless, District Attorneys in North Carolina have prosecuted voters for violations of the Strict Liability Voting Law. In Alamance and Hoke Counties, as just two examples, District Attorneys have prosecuted sixteen North Carolina residents, thirteen of whom are Black, for violating the State's draconian Strict Liability Law.[4] These high-profile criminal cases, as well as the vague wording of the Strict Liability

---

[2] *Post-Election Audit Report: General Election 2016*, North Carolina State Board of Elections (Apr. 21, 2017) ("*Post-Election Audit Report*"), (Exhibit 2), at 3.

[3] *Id.* at 5.

[4] *See* Bell Dep. (Exhibit 1) at 129:24-131:2; Jack Healy, "Arrested, Jailed and Charged with a Felony. For Voting," N.Y. TIMES (Aug. 2, 2018), https://www.nytimes.com/2018/08/02/us/arrested-voting-north-carolina.html; Gilbert Braez, "Convicted felons charged with illegally voting in Hoke," WRAL.com (Aug. 1, 2019), https://www.wral.com/convicted-felons-charged-with-illegally-voting-in-hoke/18545541/.

2

Law, have chilled countless *eligible* voters with criminal convictions from exercising their right to cast a ballot. Leaders of nonprofit organizations that serve individuals transitioning out of the criminal justice system have attested to this de facto disenfranchisement. For example, Diana Powell, the Executive Director of Justice Served N.C., has testified that "[m]any of [the organization's] clients have expressed to [her] that they are afraid to be prosecuted for inadvertently voting before they have completed their full probation or post-release sentence. . . . These men and women remain incredibly fearful of casting a ballot even after their voting rights have been restored."[5]

5. Justice Served N.C., together with the Community Success Initiative and the North Carolina State Conference of the NAACP, recently brought suit in Wake County Superior Court challenging the State's post-incarceration criminal disenfranchisement scheme under various provisions of the North Carolina State Constitution. On September 4, 2020, the Wake County Superior Court issued a decision enjoining the NCSBE and other State defendants "from preventing a person convicted of a felony from registering to vote and exercising their right to vote if that person's only remaining barrier to" sentence completion "is the payment of a monetary amount."[6]

---

[5] Affidavit of Diana Powell ("Powell Aff."), *CSI* (May 6, 2020) at ¶ 21, https://forwardjustice.org/wp-content/uploads/2020/07/Jacobson-Decl.-and-Exhibits_US_167801403_2-1.pdf.

[6] Order on Plaintiffs' Motion for a Preliminary Injunction, *CSI* (Sept. 4, 2020), at 10, https://assets.documentcloud.org/documents/7202706/19-CVS-15941-Order-on-Plt-MPI.pdf.

North Carolina residents who have completed all aspects of their sentences except for the full payment of fines, fees and restitution are now eligible to vote. Despite this injunction, however, individuals with only outstanding financial obligations in connection with a felony conviction might and indeed will opt not to vote because of the fear of criminal prosecution under the Strict Liability Voting Law.

6.      The Strict Liability Voting Law not only harms voters, but it also impedes the essential work of organizations such as the North Carolina A. Philip Randolph Institute and Action NC, the plaintiffs in this action (collectively, "Plaintiffs"). These organizations are dedicated to increasing political participation by residents of North Carolina through voter registration drives and get-out-the-vote efforts. However, the specter of prosecution under the Strict Liability Voting Law has substantially impeded Plaintiffs' efforts to carry out their missions.

7.      Plaintiffs seek a declaration that the Strict Liability Voting Law violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution; permanent injunctive relief enjoining enforcement of the Strict Liability Voting Law; and such other and further relief as this Court deems just and proper.

## JURISDICTION & VENUE

8.      This action is brought pursuant to 42 U.S.C. § 1983.

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343 (civil rights

4

jurisdiction) because this case arises under the United States Constitution and seeks equitable and other relief for the deprivation of constitutional rights under color of state law.

10. This Court has personal jurisdiction over all of the Defendants, as each is either a state government entity or a state government official in North Carolina.

11. This Court is authorized to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

12. This Court is authorized to award attorneys' fees and costs under 42 U.S.C. § 1988(b) and 28 U.S.C. § 1920.

13. Venue is properly set within the United States District Court for the Middle District of North Carolina pursuant to 28 U.S.C. § 1391(b)(1).

## PARTIES

### *Plaintiffs*

14. Plaintiff NORTH CAROLINA A. PHILIP RANDOLPH INSTITUTE ("NC APRI") is a nonprofit, nonpartisan organization and is the North Carolina division of the national A. Philip Randolph Institute, the senior constituency group of the AFL-CIO dedicated to advancing racial equality and economic justice. APRI grew out of the legacy of African-American trade unionists' advocacy for civil rights and the passage of the federal Voting Rights Act and continues to advocate for social, political and economic justice for all working Americans. NC APRI is a statewide organization with local chapters across the state. Its chapters are located in Durham, Greensboro, the Piedmont,

5

Raleigh, Roanoke Rapids and Fayetteville. NC APRI has members who are registered voters across North Carolina. To advance its core mission of advancing racial equality, NC APRI works to increase access to the polls, voter registration and voter education, particularly among working class African Americans. It distributes nonpartisan voter guides and hosts phone banks to encourage voter participation. APRI also organizes transportation to the polls throughout the early voting period, concentrating its efforts in predominantly African-American neighborhoods, and encourages first-time registration during the early voting period using same-day registration. NC APRI engaged in these efforts in 36 North Carolina counties in 2012. The Strict Liability Voting Law has substantially impeded the NC APRI's ability to carry out its mission with respect to Black community members with criminal convictions. NC-APRI has had difficulty persuading eligible Black individuals with criminal convictions to register to vote and vote, because of their fear of prosecution under the Strict Liability Voting Law. That is, the law has rendered it practically impossible for the organization to accomplish a central component of its mission – registering these individuals to vote and encouraging them to then vote. Moreover, in certain cases, NC APRI has been forced to decline requests from Black community members with felony convictions for guidance on voter eligibility requirements and assistance with registering to vote and voting, due to the risk of inadvertent violations of the Strict Liability Voting Law. NC APRI has instead forwarded those requests along to organizations with expertise in the laws governing voting after a felony conviction. NC APRI has also been forced to divert time, money and resources

6

from its voter registration and get-out-the-vote activities to educate volunteers on the potential risks of registering an individual with a felony conviction, and to caution community members on the potential risks of voting after a felony conviction before sentence completion.

15.     Plaintiff ACTION NC is a nonprofit, nonpartisan organization focused on reducing the root causes of poverty, underdevelopment, and social and economic inequality in North Carolina. Action NC operates through three regional offices in Charlotte, Durham, and Raleigh. Issues that Action NC works on include voter participation, education, immigration, health care, fair and affordable housing, and neighborhood organizing. As part of its mission of community engagement and empowerment, Action NC is committed to increasing voter participation in North Carolina's low-income communities, by, among other activities, conducting voter registration drives in neighborhoods and at public sites, generating and distributing issue-based materials in low-income neighborhoods, and hosting public presentations on issues related to elections and voting in these neighborhoods. The Strict Liability Voting Law has substantially impeded the Action NC's ability to carry out its mission with respect to community members with criminal convictions. Action NC has had difficulty persuading eligible North Carolina residents with criminal convictions to register to vote and vote, because of their fear of prosecution under the Strict Liability Voting Law. Moreover, Action NC fears violating N.C. GEN. STAT. § 163-275(13), which imposes criminal penalties on third-party voter registration groups for violations of North Carolina's

7

election laws, should they register voters who might ultimately be liable for voting in violation of the Strict Liability Voting Law.

### *Defendants*

16.     Defendant the NCSBE is the agency responsible for the administration of the election laws of the State of North Carolina. N.C. GEN. STAT. § 163-22(a)-(b). It is comprised of five members appointed by the Governor. *Id.* § 163-19(b). The NCSBE oversees the county boards of elections. *Id.* § 163-22(c). The NCSBE is also responsible for maintaining the State's "official list of registered voters," and ensuring that only individuals who are eligible to vote are on that list. *Id.* § 163-82.11(a, c). The NCSBE drafts the State's voter registration and other voting-related materials. *Id.* §§ 163-22(e), 163-82.3(a). The NCSBE is statutorily obligated to "investigate when necessary or advisable, the administration of election laws, frauds and irregularities in elections in any county and municipality and special district[.]" *Id.* § 163-22(d)*; see also* § 163-278 (providing that the NCSBE has a "duty . . . to investigate any violations" of the criminal statutes governing voting and elections). The NCSBE is also statutorily obligated to "report violations of the election laws to the Attorney General or district attorney or prosecutor of the district for further investigation and prosecution." *Id.* § 163-22(d).

17.     Defendant DAMON CIRCOSTA is the Chair of the NCSBE. Mr. Circosta is sued in his official capacity.

18.     Defendant STELLA ANDERSON is the Secretary of the NCSBE. Ms. Anderson is sued in her official capacity.

8

19. Defendant JEFF CARMON III is a Member of the NCSBE. Mr. Carmon is sued in his official capacity.

20. Defendant STACY "FOUR" EGGERS IV is a Member of the NCSBE. Mr. Eggers is sued in his official capacity.

21. Defendant TOMMY TUCKER is a Member of the NCSBE. Mr. Tucker is sued in his official capacity.

22. Defendant KAREN BRINSON BELL is the Executive Director of the NCSBE. The NCSBE's Executive Director is appointed by the NCSBE's members, and serves as the "chief State elections official." *Id.* § 163-27. Ms. Brinson is sued in her official capacity.

23. Defendants VALERIE M. ASBELL, District Attorney for Prosecutorial District 7; ROBERT S. BANKS, District Attorney for Prosecutorial District 35; LOCKE BELL, District Attorney for Prosecutorial District 38; TED BELL, District Attorney for Prosecutorial District 41; SEAN BOONE, District Attorney for Prosecutorial District 17 (which includes Alamance County); C. RICKY BOWMAN, District Attorney for Prosecutorial District 23; T. LYNN CLODFELTER, District Attorney for Prosecutorial District 28; BRANDY L. COOK, District Attorney for Prosecutorial District 27; AVERY M. CRUMP, District Attorney for Prosecutorial District 24; BENJAMIN R. DAVID, District Attorney for Prosecutorial District 6; JONATHAN M. DAVID, District Attorney for Prosecutorial District 15; SATANA DEBERRY, District Attorney for Prosecutorial District 16; MATTHEW L. DELBRIDGE, District Attorney for Prosecutorial District 9;

9

FARIS C. DIXON, District Attorney for Prosecutorial District 3; SUSAN I. DOYLE, District Attorney for Prosecutorial District 13; SETH H. EDWARDS, District Attorney for Prosecutorial District 2; ROBERT A. EVANS, District Attorney for Prosecutorial District 8; GARRY W. FRANK, District Attorney for Prosecutorial District 33; N. LORRIN FREEMAN, District Attorney for Prosecutorial District 10; ANDREW M. GREGSON, District Attorney for Prosecutorial District 37; TOM E. HORNER, District Attorney for Prosecutorial District 34; SARAH M. KIRKMAN, District Attorney for Prosecutorial District 32; MICHAEL K. HARDIN, District Attorney for Prosecutorial District 29 (which includes Hoke County); ERNEST R. LEE, District Attorney for Prosecutorial District 5; SUZANNE MATTHEWS, District Attorney for Prosecutorial District 12; SPENCER MERRIWEATHER, District Attorney for Prosecutorial District 26; MICHAEL W. MILLER, District Attorney for Prosecutorial District 39; GREG A. NEWMAN, District Attorney for Prosecutorial District 42; JAMES R. O'NEILL, District Attorney for Prosecutorial District 31; JASON E. RAMEY, District Attorney for Prosecutorial District 22; SCOTT REILLY, District Attorney for Prosecutorial District 36; TREY ROBISON, District Attorney for Prosecutorial District 30; W. REECE SAUNDERS, District Attorney for Prosecutorial District 21; MATTHEW C. SCOTT, District Attorney for Prosecutorial District 20; SCOTT THOMAS District Attorney for Prosecutorial District 4; ROXANN L. VANEEKHOVEN, District Attorney for Prosecutorial District 25; MICHAEL D. WATERS, District Attorney for Prosecutorial District 11; ASHLEY HORNSBY WELCH, District Attorney for Prosecutorial District

10

43; WILLIAM R. WEST, District Attorney for Prosecutorial District 14; TODD M. WILLIAMS, District Attorney for Prosecutorial District 40; ROBERT A. WOMBLE, District Attorney for Prosecutorial District 1; and JAMES R. WOODALL, District Attorney for Prosecutorial District 18, are District Attorneys in North Carolina (collectively, the "District Attorneys"). They are sued in their official capacities. District Attorneys are responsible for prosecuting "all criminal actions," *Id.* § 7A-61, and are specifically empowered to "to investigate . . . and prosecute any violations" of voting-related criminal statutes. *Id.* § 163-278. At least two District Attorneys have brought criminal charges pursuant to the Strict Liability Voting Law against North Carolina residents who mistakenly voted in the 2016 election while still on probation or parole for a felony conviction.

11

## STATEMENT OF FACTS

**I.     North Carolina's Strict Liability Voting Law Was Enacted for the Specific Purpose of Deterring Black Individuals From Attempting to Vote.**

24.     Before the Civil War, the North Carolina Constitution explicitly denied voting rights in State elections to free Black men. *See* N.C. CONST. art. I, Section 3, § 3 (1835) ("No free negro, free mulatto, or free person of mixed blood, descended from negro ancestors to the fourth generation inclusive, (though one ancestor of each generation may have been a white person,) shall vote for members of the Senate or House of Commons.").[7]

25.     Because Black individuals had no right to vote, North Carolina's pre-Civil War criminal disenfranchisement law applied only to white individuals. That law did not disenfranchise individuals convicted of all felonies. Rather, only individuals convicted of "infamous crimes" were disenfranchised in North Carolina.[8] Disenfranchised individuals could regain their right to vote by petitioning the Superior Court of Law to restore their

---

[7] The complete text of North Carolina's 1835 Constitution is included in "North Carolina Constitutional Convention, Journal of the Convention, Called by the Freemen of North-Carolina, to Amend the Constitution of the State, Which Assembled in the City of Raleigh, on the 4th of June, 1835, and Continued in Session Until the 11th Day of July Thereafter" (Raleigh: J. Gales and Son, 1835), https://docsouth.unc.edu/nc/conv1835/conv1835.html.

[8] *See* 1840-41 N.C. Sess. Laws 68–69, https://digital.ncdcr.gov/digital/collection/p249901coll22/id/166374.

12

rights of citizenship.[9]

26.     After the Civil War, North Carolinians seized on the State's criminal disenfranchisement law to limit Black suffrage. In 1867, during the debates on the Reconstruction Act, Representative Thaddeus Stevens of Pennsylvania reported that he had "received information from gentlemen connected with the Freedmen's Bureau . . . that in North Carolina and other States where punishment at the whipping-post deprives the person of the right to vote, they are now every day whipping negroes for a thousand and one trivial offenses."[10] Representative Stevens stated that "in one county . . . they had whipped every adult male negro who they knew of. They were all convicted and sentenced at once . . . for the purpose of preventing these negroes from voting under the bills which have been passed."[11]

27.     In 1868, North Carolina adopted a new constitution ("1868 Constitution") that granted the right to vote, without regard to race, to "[e]very male person born in the United States, and every male person who has been naturalized, twenty-one years old or upward" who had resided in the State for twelve months and the county for thirty days.[12]

---

[9] *Id.*

[10] Cong. Globe, 39th Cong. 2d Sess. 324 (Jan. 7, 1867), http://lcweb2.loc.gov/cgi-bin/ampage?collId=llcg&fileName=075/llcg075.db&recNum=3377, 1987) .

[11] *Id.*

[12] N.C. CONST., art. VI, § 1 (1868), https://www.carolana.com/NC/Documents/NC_Constitution_1868.pdf.

13

The 1868 Constitution did not include a criminal disenfranchisement provision. During the years that followed the adoption of the 1868 Constitution, Black citizens participated in government in previously unprecedented numbers and roles.[13]

28.     In 1875, North Carolina amended its constitution to frustrate and impede the influence of Black citizens.[14] The 1875 constitutional amendments included a criminal disenfranchisement provision, which read as follows: "[N]o person, who, upon conviction or confession in open Court, shall be adjudged guilty of felony, or any other crime infamous by the laws of this State, and hereafter committed, shall be deemed an elector, unless such person shall be restored to the rights of citizenship in a manner prescribed by law."[15] It was widely understood that this provision would

---

[13] *See generally* William Mabry, *White Supremacy and the North Carolina Suffrage Amendment*, 13 N.C. Hist. Rev. 1 (1936).

[14] For example, the 1868 Constitution was amended to permit the General Assembly to enact legislation to change local government positions from elected offices to appointments. N.C. CONST., amend. XXV (as amended in 1875). "The purpose of this amendment, as was well understood, was to block control of local government in the eastern counties by [B]lacks who were in the majority there." John V. Orth, *North Carolina Constitutional History*, 70 N.C. L. Rev. 1759, 1783 (1992). The 1875 constitutional amendments also included provisions establishing segregated education in public schools and prohibiting interracial marriage. *See* N.C. CONST., art. IX § 2, art. XIV § 8 (as amended in 1875), https://www.carolana.com/NC/Documents/NC_Constitution_as_Amended_by_1875_Convention.pdf.

[15] N.C. CONST. (1868), art. VI § 1 (as amended in 1875).

disproportionately impact Black North Carolinians.[16]

29.     In 1877, the North Carolina Legislature enacted a new law imposing strict criminal liability on individuals convicted of disenfranchising offenses who voted before they were restored to the rights of citizenship:

> If a person be challenged as being convicted of any crime which excludes him from the right of suffrage, he shall be required to answer any questions in relation to such alleged conviction; but his answer to such questions shall not be used against him in any criminal prosecution, but if any person so convicted shall vote at any election, without having been legally restored to the rights of citizenship, he shall be deemed guilty of an infamous crime, and, on conviction thereof, shall be punished by a fine not exceeding one thousand dollars, or imprisonment at hard labor not exceeding two years, or both.[17]

The law did not include an intent requirement. Rather, criminal liability attached even if the individual was not aware that he was ineligible to vote due to his criminal conviction. This racially discriminatory criminal law remains on the books today, virtually unchanged since 1877.

### A.     In 1899, the North Carolina General Assembly reenacted the Strict Liability Voting Law with unequivocal discriminatory intent.

30.     During the 1880s and 1890s, Black individuals in North Carolina slowly

---

[16] *See, e.g.*, *The Centennial* (Warrenton, N.C. Aug. 25, 1876), at 2 ("[T]he great majority of the criminals are negroes . . .").

[17] 1876–77 N.C. Sess. Laws 537 (emphasis added), https://digital.ncdcr.gov/digital/collection/p249901coll22/id/196439.

15

amassed political power through the exercise of their right to vote. In 1898, the State Democratic Executive Committee of North Carolina (the "Committee") enumerated a list of Black elected officials in counties around the state, and asserted that "any one can see how the negro is progressing as a ruler of white men."[18] The Committee warned that "[g]radually, step by step, the negroes have been given dominion over many of our towns, and unless the white people unite to stop it, they will obtain control over every town in the State."[19] The Committee posited that "negro rule is a curse to both races."[20]

31.    The Committee reported that Black voters accounted for "fully one-third" of all votes cast "in any general election in the State."[21] According to the Democratic Committee's calculations, there were "at least 120,000 negro voters in the State; and it is rare that one of them fails to vote."[22]

32.    The Committee claimed that Black individuals engaged in widespread voting fraud, and specifically highlighted purported voting by Black individuals with felony convictions. The Committee asserted that "[u]nder the election law of 1895, . . .

_____

[18] Democratic Executive Committee of North Carolina, *The Democratic Hand Book* 145 (1898), https://docsouth.unc.edu/nc/dem1898/dem1898.html.

[19] *Id.* at 48; *see also id.* at 145 ("[I]f the negro progresses in office-holding in the future as in the last two or three years, it will not be long before he is in absolute control.").

[20] *Id.* at 32.

[21] *Id.* at 37.

[22] *Id.*

16

negro boys under twenty-one years of age, negroes imported from beyond the borders of the State, negro ex-convicts and negro repeaters were registered and voted galore. The doors of fraud were thrown wide open to these irresponsible and ignorant voters and no protection whatsoever was afforded to the honest voters of the State."[23] The Committee contended that Black individuals "were of a roving disposition, moved from place to place, and could readily conceal their identity. For the same reason it was easy to import them from other communities and to register ex-convicts and boys under twenty-one years of age. These facts . . . made it easy for them, with little danger of detection, to register and vote at several different places."[24]

33.    The Committee argued that "this is a white man's country and white men must control and govern it. They must govern it not only because they are white men, but because they can do it better than the negro. The negro has, whenever tried, demonstrated his unfitness and inability to rule. It is better for the negro, as well as for the white man, that the white man should make and administer the laws."[25] The Committee stated that it is "the special mission of the Democratic Party to rescue the white people of the east from the curse of negro domination," and promised that "[t]here is one thing the

_____

[23] *Id.* at 88; *see also id.* at 86 ("There are instances . . . in many of the negro counties, where negro election officers have been shown to have persuaded negroes to register, knowing them to be ex-convicts or under age ").

[24] *Id.* at 84.

[25] *Id.* at 38.

Democratic Party never has done and never will do—and that is to set the negro up to rule over white men."[26] The Committee "denounce[d] all enactments of the last two Legislatures by which cities and towns in the State have been turned over to negro domination," and "pledge[d] . . . to enact such laws as will give security and protection to the property and people of every town and community in the State."[27]

34.     The Committee represented that "the white men of the State . . . do not practice carrying elections by fraud."[28] But in the November 1898 election, the Democratic Party "resorted to the threat of violence," and held rallies at which "large groups of men . . . openly brandishing weapons rode through predominantly African American neighborhoods in an effort to scare away potential Republican voters from the polls."[29] The Democrats "won a majority of the seats in the legislature and quickly began work on legislation that would effectively disenfranchise African American voters for decades to come."[30]

35.     In 1899, the General Assembly enacted *An Act to Regulate Elections* (the

---

[26] *Id.*

[27] *Id.* at 189.

[28] *Id.* at 92.

[29] *The North Carolina Election of 1898: An Introduction*, The University of North Carolina at Chapel Hill, https://exhibits.lib.unc.edu/exhibits/show/1898/history (last visited Sept. 24, 2020).

[30] *Id.*

"1899 Election Act").[31] Consistent with the 1875 constitutional amendment, the 1899 Election Act provided that "persons who upon conviction or confession in open court shall have been adjudged guilty of felony or other crime infamous by the laws of this state" after January 1, 1867 "shall not be allowed to register or vote in this state . . . unless they shall have been legally restored to the rights of citizenship."[32]

36.    The 1899 Election Act reenacted the Strict Liability Voting Law almost verbatim:

> If any person be challenged as being convicted of any crime which excludes him from the right of suffrage, he shall be required to answer any questions in relation to such alleged convictions; but his answer to such questions shall not be used against him in any criminal prosecution, but if any person so convicted shall vote at the election, without having been restored to the rights of citizenship he shall be guilty of an infamous crime, and punished by a fine not exceeding one thousand dollars or imprisoned at hard labor not exceeding two years or both.[33]

Like the original version enacted in 1877, the 1899 version of the Strict Liability Voting Law included no intent requirement.

37.    While the 1899 Act imposed felony-level criminal penalties on individuals with felony convictions who voted without any fraudulent intent, that same Act

---

[31] *See* 1899 N.C. Sess. Laws 658, https://digital.ncdcr.gov/digital/collection/p249901coll22/id/229909/rec/1.

[32] *Id.* at 665, https://digital.ncdcr.gov/digital/collection/p249901coll22/id/229916/rec/1.

[33] *Id.* at 681 (emphasis added), https://digital.ncdcr.gov/digital/collection/p249901coll22/id/229932.

established only misdemeanor-level penalties for active interference with elections

through violence or intimidation. For example, the 1899 Act provided that:

- "Any person who by force and violence shall break up or stay any election by assaulting the officers thereof or depriving them of the ballot boxes or by any other means, his aiders and abettors, shall be guilty of a misdemeanor and imprisoned not more than three months and pay such fine as the court shall adjudge, not exceeding one hundred dollars.[34]

- "Any person who shall discharge from employment, withdraw patronage from or otherwise injure, threaten, oppress or attempt to intimidate any qualified voter of this state because of the vote such voter may or may not have cast in any election shall be guilty of a misdemeanor."[35]

- "If any person shall interrupt or disturb the registrar while actually engaged in the registration of voters or the registrar or judges of election while holding the election or in counting and adding up the result thereof, or the board of county canvassers or the state board of canvassers while engaged in the discharge of their official duties, or behave in a disorderly or boisterous manner in the presence of said officers while so engaged in the legal discharge of the duties of their several positions, such person shall be guilty of a misdemeanor and shall be fined not more than fifty dollars or imprisoned not more than thirty days."[36]

38.     In 1900, the North Carolina General Assembly approved an amendment to

the state constitution (the "Suffrage Amendment") that broadened the scope of the state's

criminal disenfranchisement exception as follows:

> No person who has been convicted, or who has confessed his
> guilt in open court upon indictment, of any crime, the

---

[34] *Id.* at 676, https://digital.ncdcr.gov/digital/collection/p249901coll22/id/229927.

[35] *Id.* at 677, https://digital.ncdcr.gov/digital/collection/p249901coll22/id/229928.

[36] *Id.* at 676–77, https://digital.ncdcr.gov/digital/collection/p249901coll22/id/229927.

20

> punishment of which is now, or may hereafter be,
> imprisonment in the State's prison, shall be permitted to vote,
> unless the said person shall be first restored to citizenship in
> the manner prescribed by law.[37]

The Suffrage Amendment also established a poll tax, a literacy test and a grandfather clause.[38] The Suffrage Amendment was "specifically designed to disenfranchise [B]lack voters." *Gingles v. Edmisten*, 590 F. Supp. 345, 359 (E.D.N.C. 1984), *aff'd in part*, *rev'd in part sub nom*, *Thornburg v. Gingles*, 478 U.S. 30 (1986).

### B. The key features of the Strict Liability Voting Law have remained intact since 1899.

39.     In 1931, the North Carolina General Assembly enacted *An Act to Make More Effective the Control of the State Over Corrupt Practices in Primaries and Elections* ("1931 Act").[39] The 1931 Act reenacted many of the voting crimes included in the 1899 Act, including the Strict Liability Voting Law.[40] There were some differences between the 1899 Act and the 1931 Act. For instance, the 1931 Act grouped together misdemeanor-level election crimes and felony-level election crimes.[41] The 1931 Act also

---

[37] 1900 N.C. Sess. Laws 55, *amending* N.C. Const., art. VI, § 2, https://digital.ncdcr.gov/digital/collection/p249901coll22/id/226838.

[38] *Id.*

[39] *See* 1931 N.C. Sess. Laws 438, https://digital.ncdcr.gov/digital/collection/p249901coll22/id/239722.

[40] *See id.* at 441-445, https://digital.ncdcr.gov/digital/collection/p249901coll22/id/239725.

[41] *See id.*

21

provided uniform penalties for felony-level election crimes: any individual convicted of a felony-level election crime, including a violation of the Strict Liability Voting Law, would "be imprisoned in the State's prison not less than four months or fined not less than one thousand dollars or both, in the discretion of the Court."[42]

40.     The 1931 Act streamlined the language of the 1899 version of the Strict Liability Voting Law, and specified that the law applied with equal force to primary elections. But the key features of the 1931 version of the Strict Liability Voting Law were identical to the 1899 Act version—that is, voting while ineligible because of a prior felony conviction was itself a felony under North Carolina law, and one for which no intent element was required to prove culpability.

---

[42] *Id.* at 443, https://digital.ncdcr.gov/digital/collection/p249901coll22/id/239727.

22

|  | 1899 Act | 1931 Act |
|---|---|---|
| *Statutory language* | "[I]f any person . . . convicted of any crime which excludes him from the right of suffrage . . . shall vote at the election without having been restored to the rights of citizenship he shall be deemed guilty of an infamous crime . . . " [43] | "It shall be unlawful: . . . [f]or any person, convicted of a crime which excludes him from the right of suffrage, to vote at any primary or election without having been restored to the right of citizenship in due course and by the method provided by law"[44] |
| *Applies to* | Any person convicted of a "crime which excludes him from the right of suffrage" | Any person convicted of a "crime which excludes him from the right of suffrage" |
| *Offending conduct* | To "vote at the election without having been restored to the rights of citizenship" | To "vote at any primary or election without having been restored to the right of citizenship in due course and by the method provided by law" |
| *Scienter requirement?* | No scienter requirement | No scienter requirement |
| *Offense level?* | Felony[45] | Felony |

[43] 1899 N.C. Sess. Laws 681, https://digital.ncdcr.gov/digital/collection/p249901coll22/id/229932.

[44] 1931 N.C. Sess. Laws 444, https://digital.ncdcr.gov/digital/collection/p249901coll22/id/239728.

[45] Any crime punishable by imprisonment was a felony at the time of the 1899 Act. *See State v. Bryan*, 16 S.E. 909, 909 n.1 (N.C. 1893) ("Act 1891, c. 205 declares 'that a felony is a crime which may be punishable by either death or imprisonment. Any other crime is a misdemeanor.'").

23

41.  The 1931 Act also reenacted the misdemeanor-level penalties codified in

the 1899 Act for active interference with elections through violence or intimidation.

| 1899 Act—Misdemeanors | 1931 Act—Misdemeanors |
|---|---|
| "Any person who <u>by force and violence shall break up</u> or stay any election by assaulting the officers thereof or depriving them of the ballot boxes or by any other means, his aiders and abettors, shall be guilty of a misdemeanor . . ."[46] | "It shall be unlawful: . . . For any person to <u>break up or by force or violence</u> to stay or to interfere with the holding of any primary or election, to interfere with the possession of any ballot box, election book, ticket or return sheet by those entitled to possession of the same under the law . . ."[47] |
| "Any person who shall <u>discharge from employment</u>, withdraw patronage from, or otherwise injure, <u>threaten, oppress or attempt to intimidate</u> any qualified voter of this state because of the vote such voter may or may not have cast in any election shall be guilty of a misdemeanor."[48] | "It shall be unlawful: . . . For any person, directly or indirectly, to <u>discharge or threaten to discharge from employment</u>, or otherwise <u>intimidate or oppress</u> any legally qualified voter on account of any vote such voter may cast or consider or intend to cast, or not to cast, or which he may have failed to cast;"[49] |
| "If any person shall <u>interrupt or disturb</u> the registrar while actually engaged in the registration of voters or the registrar or judges of election while engaged in holding the election or in counting and adding up the result thereof, or the board of county canvassers or the state board of | "It shall be unlawful: . . . For any person to be guilty of any <u>boisterous conduct so as to disturb</u> any member of any election or canvassing board or any registrar or judge of elections in the performance of |

[46] 1899 N.C. Sess. Laws 676 (emphasis added), *supra* note 36.

[47] 1931 N.C. Sess. Laws 441 (emphasis added),
https://digital.ncdcr.gov/digital/collection/p249901coll22/id/239725.

[48] 1899 N.C. Sess. Laws 677 (emphasis added), *supra* note 37.

[49] 1931 N.C. Sess. Laws 441 (emphasis added), *supra* note 49.

24

| 1899 Act—Misdemeanors | 1931 Act—Misdemeanors |
|---|---|
| canvassers while engaged in the discharge of their official duties, or <u>behave in a disorderly or boisterous manner</u> in the presence of said officers while so engaged in the discharge of their official duties, or obstruct such officers in the legal discharge of the duties of their several positions, such person shall be guilty of a misdemeanor . . ."[50] | his duties as imposed by law."[51] |

42.     Since 1931, the General Assembly has changed just one single word (and removed one comma) in the Strict Liability Voting Law, as noted below:

> It shall be unlawful: . . . For any person~~,~~ convicted of a crime which excludes ~~him~~ the person from the right of suffrage, to vote at any primary or election without having been restored to the right of citizenship in due course and by the method provided by law.[52]

The Strict Liability Voting Law has otherwise remained completely intact.

43.     The General Assembly has also left intact the 1899 laws imposing low-level criminal penalties for certain serious election crimes. Under present-day North Carolina law, it is merely a Class 2 misdemeanor to interfere with an election by force or violence, or to intimidate a legally qualified voter. N.C. GEN. STAT. §§ 163-274(4–5, 7).

---

[50] 1899 N.C. Sess. Laws 676–77, *supra* note 36.

[51] 1931 N.C. Sess. Laws 441 (emphasis added), *supra* note 49.

[52] N.C. GEN. STAT. § 163-275(5) (edited to reflect changes from 1931 N.C. Sess. Laws 444).

25

| 1899 Act—Misdemeanors | Present-Day Law—Misdemeanors |
|---|---|
| "Any person who <u>by force and violence shall break up</u> or stay any election by assaulting the officers thereof or depriving them of the ballot boxes or by any other means, his aiders and abettors, shall be guilty of a misdemeanor . . ."[53] | "It shall be unlawful: . . . For any person to <u>break up or by force or violence</u> to stay or interfere with the holding of any primary or election, to interfere with the possession of any ballot box, election book, ballot or return sheet by those entitled to possession of the same under the law . . ."[54] |
| "Any person who shall <u>discharge from employment</u>, withdraw patronage from, or otherwise injure, <u>threaten, oppress or attempt to intimidate</u> any qualified voter of this state because of the vote such voter may or may not have cast in any election shall be guilty of a misdemeanor."[55] | "It shall be unlawful: . . . For any person, directly or indirectly, to <u>discharge or threaten to discharge from employment</u>, or otherwise <u>intimidate</u> or oppose any legally qualified voter on account of any vote such voter may cast or consider or intend to cast, or not to cast, or which that voter may have failed to cast;"[56] |

---

[53] 1899 N.C. Sess. Laws 676 (emphasis added), *supra* note 36.

[54] N.C. GEN. STAT. § 163-274(4) (emphasis added).

[55] 1899 N.C. Sess. Laws 677 (emphasis added), *supra* note 37.

[56] N.C. GEN. STAT. § 163-274(7) (emphasis added).

| 1899 Act—Misdemeanors | Present-Day Law—Misdemeanors |
|---|---|
| "If any person shall <u>interrupt or disturb</u> the registrar while actually engaged in the registration of voters or the registrar or judges of election while engaged in holding the election or in counting and adding up the result thereof, or the board of county canvassers or the state board of canvassers while engaged in the discharge of their official duties, or <u>behave in a disorderly or boisterous manner</u> in the presence of said officers while so engaged in the discharge of their official duties, or obstruct such officers in the legal discharge of the duties of their several positions, such person shall be guilty of a misdemeanor . . ."[57] | "It shall be unlawful: . . . For any person to be guilty of any <u>boisterous conduct so as to disturb</u> any member of any election board or any chief judge or judge of election in the performance of that person's duties as imposed by law."[58] |

44.    The Strict Liability Voting Law is an outlier in North Carolina's election laws. Virtually every other election crime punishable as a Class I felony requires intent. For example, it is unlawful:

- "For any person <u>fraudulently</u> to cause that person's name to be placed upon the registration books of more than one election precinct or <u>fraudulently</u> to cause or procure that person's name or that of any other person to be placed upon the registration books in any precinct when registration in that precinct does not qualify the person to vote legally therein, or to impersonate falsely another registered voter for the purpose of voting in the stead of the other voter." N.C. GEN. STAT. § 163-275(1) (emphasis added).

---

[57] 1899 N.C. Sess. Laws 676–77, *supra* note 37.

[58] N.C. GEN. STAT. § 163-274(5) (emphasis added).

- "For any person who is an election officer, a member of an election board or other officer charged with any duty with respect to any primary or election, _knowingly_ to make any false or fraudulent entry on any election book or any false or fraudulent returns, or _knowingly_ to make or cause to be made any false statement on any ballot, or to do any_ fraudulent_ act or _knowingly and fraudulently_ omit to do any act or make any report legally required of that person." _Id._ § 163-275(3) (emphasis added).

- "For any person _knowingly_ to swear falsely with respect to any matter pertaining to any primary or election." _Id._ § 163-275(4) (emphasis added).

- "For any person _with intent to commit a fraud_ to register or vote at more than one precinct or more than one time, or to induce another to do so, in the same primary or election, or to vote illegally at any primary or election." _Id._ § 163-275(7) (emphasis added).

- "For any chief judge or any clerk or copyist to make any entry or copy _with intent to commit a fraud_." _Id._ § 163-275(8) (emphasis added).

- "For any election official or other officer or person to make, certify, deliver or transmit any false returns of any primary or election, or to make any erasure, alteration, or conceal or destroy any election ballot, book, record, return or process _with intent to commit a fraud_." _Id._ § 163-275(9) (emphasis added).

45.    Yet there is no intent requirement of any kind under the Strict Liability Voting Law. As the NCSBE has explained, "[t]he language contained in the felon voting statute does not include an element of intent, such that violating the statute does not require evidence that the statute was knowingly violated for a possible violation to have occurred."[59]

---

[59] August 12, 2018 Letter from the Chief Investigator of the NCSBE to the District Attorney for Judicial District 16A ("Aug. 12, 2018 NCSBE Letter") (Exhibit 3), at 1.

46.    The penalties for violating the Strict Liability Voting Law are exceedingly harsh: An individual who mistakenly votes while on parole, probation or post-release supervision for a felony conviction may be imprisoned for up to two years.[60]

## II.    North Carolina's Strict Liability Voting Law Disproportionately Impacts Black Individuals.

47.    Black individuals constitute an outsized percentage of individuals in North Carolina who are no longer incarcerated but are still serving some aspect of a sentence for a felony conviction—the category of individuals the Strict Liability Voting Law targets.

48.    In the course of an audit of the 2016 presidential election, the NCSBE determined that 441 individuals with felony convictions may have voted before their sentences were completed.[61] 66% of these individuals were Black.[62]

49.    The NCSBE referred these cases to the state's District Attorneys, as required under state law. *See* N.C.G.S. § 163-22(d) (requiring the NCSBE to "report violations of the election laws to the Attorney General or district attorney or prosecutor of the district for further investigation and prosecution").[63]

---

[60] *See* N.C. GEN. STAT. § 15A-1340.17; Bell Dep. (Exhibit 1) at 127:4–9.

[61] *Post-Election Audit Report* (Exhibit 2) at 3.

[62] NCSBE Response to Public Records Request (May 29, 2018) (Exhibit 4).

[63] *See also Post-Election Audit Report* at 3.

29

50.     "[S]ome [D]istrict [A]ttorneys express[ed] understandable concern that a felon who has voted may not have been aware of the unlawfulness of his actions."[64] Many District Attorneys "summarily declined" to bring charges because they "determined there was insufficient evidence to prove that the defendant was ever notified of his or her ineligibility to vote."[65]

51.     But in April 2018, the District Attorney of Alamance County charged twelve individuals ("the Alamance 12") with violating the Strict Liability Voting Law.[66] Black individuals comprise less than 21% of Alamance County's population.[67] But nine members of the Alamance 12 (75% of those prosecuted) were Black. [68] *The Washington Post* reported that "[i]n the case of the Alamance 12, . . . most seem to have had no intent

---

[64] *Id.* at Appendix 7.

[65] August 9, 2017 Letter from the Chief Investigator of the NCSBE to the General Counsel of the North Carolina Department of Public Safety, the Chief Legal Counsel for Governmental Affairs of the Judicial Branch of the North Carolina Administrative Office of the Courts, and the President of the North Carolina Conference of District Attorneys ("Aug. 9, 2017 NCSBE Letter") (Exhibit 5), at 1; *see also id.* at 4-8 (communications from District Attorneys declining to prosecute violations of the Strict Liability Voting Law).

[66] Healy, *supra* note 4.

[67] United States Census, *Quick Facts: Alamance County, North Carolina*, https://www.census.gov/quickfacts/alamancecountynorthcarolina (last visited Sept. 23, 2020).

[68] Healy, *supra* note 4.

to break the law; they were simply unaware of it."[69]

52. *The New York Times* separately interviewed five of the members of the Alamance 12. Each "said their votes were an unwitting mistake—a product of not understanding the voter forms they signed and not knowing the law. They said they believed they were allowed to vote because election workers let them fill out voter registration and eligibility forms, then handed them ballots. They said they never would have voted if anyone had told them they were ineligible." [70]

53. Several Black members of the Alamance 12 moved to dismiss the charges on the grounds that the Strict Liability Voting Law violates the Equal Protection Clauses of the United States and North Carolina constitutions.[71] The Equal Protection claims were never adjudicated because the defendants ultimately pled guilty to misdemeanor charges of obstruction of justice, in exchange for a dismissal of the felony charges under the Strict Liability Voting Law.[72]

---

[69] Editorial Board, "An Assault on minority voting continues in North Carolina," THE WASH. POST (Aug. 12, 2018), https://www.washingtonpost.com/opinions/an-assault-on-minority-voting-continues-in-north-carolina/2018/08/12/b60ea52c-9a8f-11e8-8d5e-c6c594024954_story.html.

[70] Healy, *supra* n. 4.

[71] *SCSJ Challenges NC Law that punishes returning citizens with felonies for voting while ineligible*, Southern Coalition for Social Justice (June 8, 2018), https://www.southerncoalition.org/scsj-challenges-nc-law-punishes-returning-citizens-felonies-voting-ineligible/.

[72] *Statement Regarding Alamance County Voters Accused of Voting While Ineligible*, Southern Coalition for Social Justice (Aug. 13, 2018),

31

54.    In August 2019, the Hoke County District Attorney charged four individuals with violating the Strict Liability Voting Law.[73] All four individuals are Black.[74]

55.    One of the individuals charged in Hoke County, Lanisha Bratcher, was arrested the day after she was discharged from the hospital for a miscarriage.[75] She was mourning the loss of her baby when the police came to her door.[76] Ms. Bratcher explained that she did not know she was ineligible to vote in the 2016 election. "I had no intention to trick anybody or to be malicious in any kind of way . . . If you expect us to know that we should know we should not do something then we should not be on the list or even allowed to do it."[77]

56.    Like the Alamance County defendants, Ms. Bratcher moved to dismiss the charges against her on the grounds that the Strict Liability Voting Law violates the Equal

https://www.southerncoalition.org/statement-regarding-alamance-county-voters-accused-voting-ineligible/.

[73] Baez, *supra* note 4.

[74] *Id.*

[75] Sam Levine, "A black woman faces prison because of a Jim Crow-era plan to 'protect white voters,'" GUARDIAN (Dec. 16, 2019), https://www.theguardian.com/us-news/2019/dec/16/north-carolina-felony-vote-law-black-woman.

[76] *Id*.

[77] *Id.*

Case 1:20-cv-00876-LCB-JLW   Document 36   Filed 02/23/21   Page 36 of 64

Protection Clauses of the United States and North Carolina constitutions.[78] The District

Attorney's Office responded by dismissing the charges against her under the Strict

Liability Voting Law, and then bringing two new indictments that *doubled* the felony

charges against her under a different provision of the same statute (N.C. GEN. STAT.

§ 163-275(4)).[79]

57.     Some of the individuals prosecuted under the Strict Liability Voting Law

have expressed a deep-seated fear of voting in the future. "[I]t's going to really take a

mighty wind from heaven to make me vote again," says Keith Sellars, a 45-year old

Black member of the Alamance 12 who was "arrested . . . in the middle of a highway,

while his 10- and 7-year old daughters cried in the back seat."[80]

58.     Anthony Haith, another Black member of the Alamance 12, has said, "I am

still fearful of voting now. I do not want to go to jail for voting. . . . I honestly do not

---

[78] Motion to Dismiss Under the 14th Amendment of the U.S. Constitution and Article I,
§ 19 of the N.C. Constitution, *State of North Carolina v. Bratcher-Bain*, No. 19-CRS-
051171 (N.C. Super. Ct. Oct. 8, 2019), http://renapply.web.unc.edu/files/2019/12/S-v-
Bratcher-EP-Discrim-MTD-Oct-2019.pdf.

[79] Sam Levine, "A black woman faces prison for a voting mistake. Prosecutors just
doubled the charges," GUARDIAN (July 21, 2020), https://www.theguardian.com/us-
news/2020/jul/21/voting-arrest-racist-law-north-carolina-lanisha-brachter.

[80] Sam Levine, "They Didn't Know They Were Ineligible to Vote. A Prosecutor Went
After Them Anyway," HUFFPOST (Aug. 13, 2018),
https://www.huffpost.com/entry/alamance-county-felon-
voting_n_5b71f4d8e4b0530743cca87d.

33

know if I will ever vote again[.]"[81] Mr. Haith has "said he would tell his four children also not to vote."[82]

59.    Taranta Holman, also a Black member of the Alamance 12, has similarly said he will never cast another ballot. "Even when I get this cleared up, I still won't vote. . . . That's too much of a risk." [83]

60.    Lanisha Bratcher, whose felony charges remain pending, says "[s]he's not sure if she'll ever vote again, even once she's legally allowed to."[84] But her husband has urged her to reconsider: "If you don't vote again, then the law would have done exactly what it was supposed to do, which is to suppress your vote. . . . If they've got you afraid, then the law did what it's supposed to do." [85]

### III.    The Strict Liability Voting Law Fails to Provide Fair Notice of Criminal Liability.

61.    The Strict Liability Voting Law renders it a Class I felony "[f]or any person

---

[81] Affidavit of Anthony Haith ("Haith Aff.") at ¶¶ 10, 14, Exhibit A. to Brief of Amici Curiae, North Carolina Justice Center and Down Home NC, *CSI* (July 23, 2020), https://assets.documentcloud.org/documents/7009817/Amicus-NC-Justice-Center-and-Down-Home.pdf.

[82] The Observer Editorial Board, "Another Attack on Voting in North Carolina," CHARLOTTE OBSERVER (Aug. 14, 2018), https://www.charlotteobserver.com/opinion/editorials/article216646385.html.

[83] Healy, *supra* note 4.

[84] Levine, *supra* note 78.

[85] *Id.*

34

convicted of a crime which excludes the person from the right of suffrage, to vote at any primary or election without having been restored to the right of citizenship in due course and by the method provided by law." N.C. GEN. STAT. § 163-275(5).

62.     But the Strict Liability Voting Law does not define which crimes "exclude[] the person from the right of suffrage," nor does it provide any information concerning how an individual may be "restored to the right of citizenship." To understand which crimes are disenfranchising, a prospective voter must turn to the statute entitled, *Qualifications to vote; exclusion from electoral franchise*, which provides as follows:

> [T]he following classes of persons shall not be allowed to vote in this State: . . . Any person adjudged guilty of a felony against this State or the United States, or adjudged guilty of a felony in another state that also would be a felony if it had been committed in this State, unless that person shall be first restored to the rights of citizenship in the manner prescribed by law.

N.C. GEN. STAT. § 163-55(a)(2) ("Criminal Disenfranchisement Law"). The Criminal Disenfranchisement Law mirrors the disenfranchisement provision of the state constitution. N.C. CONST., art. VI, § 2(3).

63.     To determine how to be "restored to the rights of citizenship," a prospective voter must look outside the state's election code to Chapter 13, entitled *Citizenship Restored.* Pursuant to N.C. GEN. STAT. § 13-1 (the "Citizenship Restoration Law"), an individual convicted of a disenfranchising crime regains citizenship rights upon his or her "unconditional discharge." The Citizenship Restoration Law provides in its entirety as follows:

35

Any person convicted of a crime, whereby the rights of citizenship are forfeited, shall have such rights automatically restored upon the occurrence of any one of the following conditions:

(1) The <u>unconditional discharge</u> of an inmate, of a probationer, or of a parolee by the agency of the State having jurisdiction of that person or of a defendant under a suspended sentence by the court.

(2) The unconditional pardon of the offender.

(3) The satisfaction by the offender of all conditions of a conditional pardon.

(4) With regard to any person convicted of a crime against the United States, the <u>unconditional discharge</u> of such person by the agency of the United States having jurisdiction of such person, the unconditional pardon of such person or the satisfaction by such person of a conditional pardon.

(5) With regard to any person convicted of a crime in another state, the <u>unconditional discharge</u> of such person by the agency of that state having jurisdiction of such person, the unconditional pardon of such person or the satisfaction by such person of a conditional pardon.[86]

*Id.* (emphasis added). The Citizenship Restoration Law does not specifically mention the restoration of voting rights.

64.     Neither the Citizenship Restoration Law nor any other North Carolina statute defines the term "unconditional discharge." The NCSBE also does not define the

---

[86] The Citizenship Restoration Law, which provides for automatic re-enfranchisement, was first enacted in 1971. Prior to the enactment of the Citizenship Restoration Law, individuals with felony convictions had to petition the court for the restoration of voting rights.

36

term "unconditional discharge" anywhere in the state's Voter Registration Application or on the section of the NCSBE's website entitled, *Registering as a Person in the Criminal Justice System* ("NCSBE Website").[87]

65.     The State has construed the Citizenship Restoration Law as "preclud[ing] the restoration of citizenship rights until the completion of the sentence, including any period of parole, post-release supervision or probation."[88] Parole was abolished in North Carolina in 1994; the General Assembly instead imposed post-release supervision for all individuals convicted of felonies under the Structured Sentencing Act.[89] Yet until a few months ago, the State's Voter Registration Application, Absentee Ballot Application and Certificate, and One-Stop Application (pursuant to which an individual can register to vote during early voting) made no mention of post-release supervision.[90]

---

[87] *See* North Carolina Voter Registration Application, *available at* https://dl.ncsbe.gov/Voter_Registration/NCVoterRegForm_06W.pdf (last visited Sept. 23, 2020); *see also Registering as a Person in the NC Criminal Justice System*, NCSBE, https://www.ncsbe.gov/registering/who-can-register/registering-person-nc-criminal-justice-system (last visited Sept. 23, 2020).

[88] Order on Plaintiffs' Motion for Summary Judgment, *CSI* (Sept. 4, 2020), at 5, https://assets.documentcloud.org/documents/7202707/19-CVS-15941-Order-on-Plt-MSJ.pdf.

[89] *See* Post-Release Supervision and Parole Commission, North Carolina Department of Public Safety, https://www.ncdps.gov/about-dps/boards-commissions/post-release-supervision-parole-commission.

[90] *See* Prior Version of the North Carolina Voter Registration Application, at 2, Instruction for Section 1 (Exhibit 6); Prior Version of the One Stop Application (Exhibit 7); Bell Dep. (Exhibit 1) at 82:18–86:9, 94:14–96:4, 112:1-23.

37

66.     The NCSBE's script for poll workers to use when verifying voter eligibility also failed to mention post-release supervision; poll workers were simply instructed to ask whether prospective voters "have completed their sentence, including any probation or parole."[91] Defendant Karen Brinson Bell, the Executive Director of the NCSBE, has testified that an individual on post-release supervision who answered "no" to this question "would be allowed to vote" by the poll worker, but "could then be prosecuted for the crime of illegally voting."[92]

67.     Some individuals convicted of felonies in North Carolina are sentenced to unsupervised probation; these individuals may not even realize that they are legally on probation because they are not subject to the oversight of a probation officer.[93]

68.     The confusion caused by the State's voting materials is exacerbated by the State's inadequate procedures for notifying individuals with felony convictions that they are ineligible to vote. When the NCSBE "conducted interviews of suspected violators" of the Strict Liability Voting Law following the 2016 post-election audit, the NCSBE discovered "a wide pattern of defendants in multiple counties who claim[ed] they were

---

[91] Bell Dep. (Exhibit 1) at 98:3–100:17.

[92] *Id.* at 105:12–106:5.

[93] In 2019, 249 individuals convicted of felonies were sentenced to unsupervised probation. *Structured Sentencing Statistical Report: Fiscal Year 2019,* North Carolina Sentencing and Policy Advisory Commission, at 21, https://www.nccourts.gov/assets/documents/publications/FY-2019-Statistical-Report-Web_Combined.pdf?H5Ee8hJhBdhzh_BVFmV4L9tcbiQXnmaB.

never informed of their loss of voting rights upon conviction and sentencing."[94]

69. The NCSBE determined that there were "deficiencies in the notice provided to felons who are still serving an active felony sentence, notably during the periods of probation and parole—the window during which current felons tend to vote."[95] Specifically, the NCSBE found that "there was no documented procedure by which convicted felons were informed of the loss of their voting rights by probation officers while on felony probation/parole/supervised release."[96] The NCSBE also found that "associated court judgments and plea agreements . . . did not inform felons upon a plea or at sentencing that they had lost their eligibility to vote while serving an active felony sentence, including probation/parole/supervised release."[97]

70. Neither the standard guilty plea form in North Carolina nor the statutes requiring judges to inform defendants of their rights upon conviction contain any reference to the loss of voting rights. *See, e.g.*, N.C. GEN. STAT. § 15A-1022. Under North Carolina law, the only entity statutorily required to notify an individual with a felony conviction of the loss of voting rights pending full sentence completion is the

---

[94] Aug. 9, 2017 NCSBE Letter (Exhibit 5), at 1.

[95] *Id.* at 2.

[96] Aug. 12, 2018 NCSBE Letter (Exhibit 3), at 2.

[97] *Id.* at 2. The North Carolina Department of Public Safety has since revised its probation brochure "to include information concerning loss of voting rights." *Id.*

39

county board of elections, which must send removal letters "to the last known address of registered voters who appear on the convicted felon list."[98] List maintenance, though— that is, the accuracy of North Carolina's voter registration lists—remains the ultimate responsibility of the NCSBE. N.C. GEN. STAT. § 163-82.11(a, c). No statutorily-mandated notification procedures apply to individuals who were not registered to vote at the time they were convicted of a felony.

71.     Anthony Haith, one of the members of the Alamance 12, is among the victims of the State's inadequate notification procedures. He explained: "When I voted in the 2016 election, I was still on probation for a previous conviction. I did not know I was unable to vote, or I would not have voted. When I was put on probation, I was informed of many things that I could not do or have. However, no one ever told me that I could not vote."[99]

72.     The NCSBE has recognized that although "individuals are required to affirm that they are not serving an active felony sentence both when registering to vote and presenting to vote," "not all voters read this language prior to signing" the forms.[100] This may be the consequence of low adult literacy levels through the State: For example,

---

[98] Aug. 9, 2017 NCSBE Letter (Exhibit 5) at 2; *see also* N.C. GEN. STAT. §163-82.14(c)(3).

[99] Haith Aff., *supra* note 84 at ¶ 5.

[100] *Post-Election Audit Report* (Exhibit 2) at Appendix 7.

24% of adults in Alamance County and 26% of adults in Hoke County lack basic literacy skills.[101]

73.     The NCSBE has also acknowledged that "some forms, such as the federal voter registration application, do not contain warnings against registering and voting while serving an active felony sentence, since laws concerning felon voting rights vary from state to state."[102]

74.     Under North Carolina law, county boards of elections are required to remove individuals with felony convictions from the voter registration rolls. N.C. GEN. STAT. § 163-82.14(a)(1), (c)(3). But in the course of its post-2016 election investigations, the NCSBE discovered that county boards of elections had not consistently done so.[103] The NCSBE recognized that the failure to remove individuals with felony convictions from the voter registration rolls had resulted in "unintentional violations" of the Strict Liability Voting Law.[104] The NCSBE explained that "[a]n individual may, for instance, legally register to vote before becoming a felon and then appear at the polls while on

---

[101] *Literacy Map Gap*, Barbara Bush Foundation for Family Literacy, http://map.barbarabush.org/overview/#intro (last visited Sept. 24, 2020).

[102] Aug. 9, 2017 NCSBE Letter (Exhibit 5), at 2.

[103] *Post-Election Audit Report* (Exhibit 2) at 2–4.

[104] *Id.* at 3.

41

probation. Such a person may not understand they are ineligible."[105]

75.     Since the 2016 post-election audit, the NSCBE has redesigned certain of its voting forms with checkboxes "to ensure participants are aware of voter qualifications."[106] However, there is no checkbox to alert a registrant that he or she cannot be currently serving a felony sentence.[107] The only places on the Voter Registration Application that reference ineligibility for serving a current felony sentence are the fine print at the bottom of the form and the dense application instructions.[108] The NCSBE has also implemented "new processes . . . to ensure [that] those serving felony sentences do not remain on the voter rolls," as well as software improvements "to check felon status at the time of registration."[109] In addition, the Department of Public Safety has revised its probation brochure at the NCSBE's suggestion "to include information concerning loss of voting rights."[110]

76.     While these improvements to the State's notification procedures and voter registration roll protocols may reduce *some* future unintentional violations of the Strict Liability Voting Law, these changes still do not provide constitutionally-adequate notice

---

[105] *Id.*

[106] *Id.* at 4 & Appendix 8.

[107] *See* North Carolina Voter Registration Application, *supra* note 90.

[108] *Id.*

[109] *Post-Election Audit Report* (Exhibit 2) at 2–4.

[110] Aug. 12, 2018 NCSBE Letter (Exhibit 3), at 2.

42

to, for example, voters on unsupervised probation who may be completely unaware that they are still serving a felony sentence. Moreover, the changes also do nothing to protect from criminal liability the individuals who voted in the 2016 election before sentence completion. Those individuals may still be prosecuted under the Strict Liability Voting Law *at any time*, as "no statute of limitations bars the prosecution of a felony" in North Carolina. *State v. Taylor*, 713 S.E.2d 82, 90 (N.C. Ct. App. 2011).

77.    Even with the recent changes made by the NCSBE, it is still entirely possible for an individual to mistakenly vote while on parole, probation or post-release supervision for a felony conviction. For example, the section of the NCSBE's website concerning voting after a felony conviction is entitled, "*Registering as a Person in the NC Criminal Justice System.*"[111] An individual who is still serving a sentence for an out-of-state or federal felony conviction may not realize that he or she is ineligible to vote in North Carolina. Such an individual could face felony-level prosecution under the Strict Liability Voting Law for mistakenly voting in reliance on the NCSBE's own guidance.

78.    Since the *CSI* decision, the NCSBE has updated its website with the following guidance: "[Y]ou may register to vote and vote if you are serving an extended term of probation, post-release supervision, or parole, you have outstanding fines, fees or restitution, and you do not know of any other reason that your probation, post-release

_____

[111] *See supra* note 90.

supervision, or parole was extended."[112] This guidance advises individuals that they "may

. . . vote" if they are unaware that they are subject to any other conditions of their felony

sentence other than the payment of fines, fees and/or restitution.[113] Yet under the Strict

Liability Voting Law, an individual with a felony conviction who votes before

completing the non-financial terms of his or her sentence is subject to criminal

prosecution, irrespective of whether that individual believed in good faith that he or she

was eligible to vote. The NCSBE's updated guidance does not mention the Strict

Liability Voting Law or how it might impact individuals who vote based on an erroneous

belief that they are eligible to do so.

**IV.    The Strict Liability Voting Law Deters *Eligible* Individuals From Voting.**

79.    The vagueness of the Strict Liability Voting Law, coupled with the recent

prosecutions under this law, have caused *eligible* individuals with criminal convictions to

refrain from voting, for fear of unintentionally violating the law and triggering criminal

charges. Corey Purdie, the Executive Director of Wash Away Unemployment, has

personally been told by North Carolina residents with past criminal convictions "that they

have a fear of voting and getting arrested for doing so."[114]

---

[112] *Id.*

[113] *Id.*

[114] Affidavit of Corey Purdie, *CSI* (May 6, 2020), at ¶ 23, https://forwardjustice.org/wp-content/uploads/2020/07/Jacobson-Decl.-and-Exhibits_US_167801403_2-1.pdf.

80.    The enforcement of the Strict Liability Voting Law disproportionately deters voting by Black individuals, who comprise a disproportionate percentage of individuals with criminal convictions in North Carolina.[115] According to the North Carolina Justice Center and Down Home NC, "African-American voters are discouraged from attempting to exercise their fundamental right to vote because of the fear caused by the disenfranchisement laws and their enforcement. *This includes those with no felony records*."[116]

81.    Confusion regarding eligibility to vote is a significant problem among individuals with past criminal convictions. During oral argument in *CSI*, Judge Keith Gregory of the Wake County Superior Court observed that even "when the person is eligible to vote, there's confusion there as to their eligibility.[117] Diana Powell, the Executive Director of Justice Served N.C., has testified that she "regularly speak[s] with

---

[115] Black individuals comprise just 22% of the State's population. *Quick Facts North Carolina*, *supra* note 63. But in 2019, for instance, 44% of all individuals convicted of felonies and 41% of all individuals convicted of misdemeanors in North Carolina were Black. *Structured Sentencing Statistical Report*, *supra* note 96, at 7, 38.

[116] Brief of Amici Curiae, North Carolina Justice Center and Down Home NC, *CSI* (July 24, 2020), at 1 (emphasis added), https://assets.documentcloud.org/documents/7009817/Amicus-NC-Justice-Center-and-Down-Home.pdf; *see also id.* at 5 ("Not only are the prosecuted voters themselves fearful of ever resuming voting after their prosecutions, but community members are also impacted by the prosecutions, subsequently becoming less likely to engage in the voting process.").

[117] Hearing Transcript, *CSI* (Aug. 19, 2020), at 181, https://www.documentcloud.org/documents/7203894-CSI-v-Moore-transcript.html.

people who are confused as to whether or not they are eligible to vote after having been convicted of a crime."[118] Dennis Gaddy, the Executive Director of Community Success Initiative, has testified that "[t]he current law creates confusion among [his] clients about whether they have the ability to vote after they have been released from incarceration or while they are on probation."[119] Mr. Purdie of Wash Away Unemployment has testified similarly.[120]

82.     This rampant confusion is due in part to the State's inadequate procedures for notifying individuals with felony convictions of the restoration of their voting rights. When individuals complete their sentences for felony convictions in North Carolina state courts, the Department of Public Safety provides them with a notification of the restoration of their voting rights, along with an application to register to vote. *See* N.C. GEN. STAT. § 163.82.20A. But these voting rights restoration notifications are "striking for their lack of clarity. The voting rights information is buried in densely worded pamphlets . . . distributed in an exit packet that often contains a lot of other important

---

[118] Powell Aff., *supra* note 5, at ¶ 20.

[119] Affidavit of Dennis Gaddy, *CSI* (May 6, 2020), at ¶ 17, https://forwardjustice.org/wp-content/uploads/2020/07/Jacobson-Decl.-and-Exhibits_US_167801403_2-1.pdf.

[120] Purdie Aff., *supra* note 117, at ¶ 23.

documents, and this may cause information about voting rights to be crowded out."[121]

Moreover, no state agency is statutorily required to notify individuals who have

completed their sentences for a federal or out-of-state conviction of the restoration of

their voting rights.[122]

83.     While county boards of elections are statutorily required to advise

registered voters of their *ineligibility* to vote following a felony conviction, *see* N.C. GEN.

STAT. §163-82.14(c)(3), neither the NCSBE nor the county boards of elections advise

individuals who have completed their sentences that they are *eligible* to vote.[123] During

oral argument in *CSI*, Judge Gregory of the Wake County Superior Court recognized that

this one-way notification protocol inevitably results in fear and confusion among

individuals who are eligible to vote:

> [I]f a person has been convicted of a felony and . . . they
> believe they can't vote, even if they are . . . at a point now
> where they actually can vote, but they are afraid because
> they've received a letter previously saying, you can't vote.
> Now they are eligible, but they are afraid because they don't
> know because they haven't received a letter telling them they

_____

[121] Marc Meredith and Michael Morse, *Do Voting Rights Notification Laws Increase Ex-Felon Turnout?*, ANNALS, *AAPSS*, 65651 (Jan. 2014) at 241240, https://www.sas.upenn.edu/~marcmere/workingpapers/FelonNotification.pdf.

[122] *See, e.g.*, Bell Dep. (Exhibit 1) at 65:24–66:9.

[123] *Id.* at 41:16–23 (Q: "So after a person finishes their felony sentence, does either the State Board of Elections or a county board of elections send voters a notification telling them they're now once again eligible to vote?" A: We do not send a letter . . . of that nature. Sorry."); *see also id.* at 46:15–47:4.

47

can vote. . . . [T]hat's confusing.[124]

84.    Individuals with criminal convictions do not always know whether they have completed all aspects of their sentences for felony convictions. Diana Powell, the Executive Director of Justice Served, has testified that she has "spoken to individuals who are unsure of whether or not they are on misdemeanor probation or felony probation, as well as individuals who are unsure if their probation has been extended due to an inability to pay court costs, fees, fines or restitution."[125] Such an individual would not be able to obtain guidance concerning his or her eligibility to vote from the NCSBE. The Executive Director of the NCSBE testified that when an individual with a felony conviction is "not certain" regarding the completion of his or her sentence, "the best thing [she] can do as an election official is to say, 'That's outside the scope of elections and you should speak with your officer as to whether you have completed your sentence or not.'"[126]

85.    "[L]ack of clarity" concerning the restoration of voting rights in North Carolina "has been exacerbated by the prosecutions that have occurred across the state,

---

[124] Transcript, CSI, *supra* 120, at 173.

[125] Powell Aff., *supra* note 5, at ¶ 20.

[126] Bell Dep. (Exhibit 1), at 88:12–89:19.

chilling the voting activity of many members of society."[127] Plaintiffs and many similar organizations have reported the "fear caused by prosecutions on their work" to register voters.[128] Their "workers encounter people who have never been disqualified, or who are no longer disqualified, from voting who hold on to apprehension based on the pervasive fear of a felony conviction or jail time." [129]

      86.   North Carolina's voter challenge laws exacerbate this pervasive fear. Under these laws, a registered voter may challenge a prospective voter's eligibility to vote "if the challenger knows, suspects or reasonably believes such a person not be qualified and entitled to vote." N.C. GEN. STAT. § 163-90.1(a). To initiate a challenge to a prospective voter's eligibility on the basis of a criminal conviction, a registered voter must simply complete a Voter Challenge Form and check the box that states: "The person has been adjudged guilty of a felony and the person's rights of citizenship have not been restored."[130] North Carolina law provides that "[i]f a registered voter is challenged as having been convicted of any crime which excludes him from the right of suffrage, he shall be required to answer any question in relation to the alleged conviction[.]" N.C.

---

[127] Amicus Brief of the North Carolina Justice Center and Down Home NC, *supra* note 119, at 1.

[128] *Id.* at 5.

[129] *Id.*

[130] A sample Voter Challenge Form is available at http://nebula.wsimg.com/132d4773df0be073741b179d330b5e06?AccessKeyId=46DCFE3716DFE59A2104&disposition=0&alloworigin=1.

49

GEN. STAT. § 163-90. Even though the answers may not be used against them, the

harassment of being challenged is enough to deter people from voting. *Id.*

87.    In the event the prospective voter is deemed ineligible based on a voter

challenge, the county board of election may refer the case to the NCSBE. *See* N.C. GEN.

STAT. § 163-33(3) (providing that the county board of elections must "investigate . . .

violations of laws by elections officers and other persons, and report violations to the

State Board of Elections"). The NCSBE may then choose to investigate the case.[131]

88.    Because of the potential threat of voter challenges, the NCSBE Website

recommends that individuals with felony convictions obtain documentary proof of

sentence completion in the form of a Certificate of Restoration of Forfeited Rights of

Citizenship to verify their eligibility to vote:

> Once you complete your felony sentence or receive a pardon,
> you are eligible to vote and may register. You can ask your
> releasing officer for your Certificate of Restoration of
> Forfeited Rights of Citizenship. This is not required to
> register to vote, but will prove your eligibility to vote if
> someone challenges your registration.[132]

The NCSBE Website provides no guidance on how to procure a Certificate of

Restoration of Forfeited Rights of Citizenship, other than directing a prospective voter to

---

[131] *See Post-Election Audit Report* (Exhibit 2), at 3 (explaining that the NCSBE "initiates
investigations into possible cases of felons voting through a system of data audits
followed by investigator review, referrals from county boards of election and tips from
the public").

[132] *Registering as a Person in the NC Criminal Justice System*, *supra* note 90.

contact his or her "releasing officer."

89.     When an individual convicted of a felony in a North Carolina state court is "unconditionally discharge[d]," "[t]he agency, department or court having jurisdiction over the inmate, probationer, parolee or defendant at the time his rights of citizenship are restored" is supposed to "immediately issue a certificate or order . . . specifying the restoration of his rights of citizenship." N.C. GEN. STAT. § 13-2(a). Upon information and belief, this does not happen as statutorily mandated.

90.     No such certificates are automatically issued to individuals convicted of felonies in out-of-state courts or federal courts. To obtain a Certificate of Restoration of Forfeited Rights of Citizenship, an individual convicted of a federal or out-of-state felony must submit an application to "the clerk in the county where such person resides" along with "any paper writing from the agency of any other state or of the United States which had jurisdiction over such person, which shows that the conditions of [the Citizenship Restoration Law] have been met." N.C. GEN. STAT. § 13-2(b). The NCSBE Website provides no instructions for how and where individuals with federal or out-of-state felony convictions can apply.

91.     Individuals who have completed their sentences for felony convictions may not have a Certificate of Restoration of Forfeited Rights of Citizenship, either because they can no longer locate the certificate they received, or because they never received such a certificate in the first place. These individuals may not know how to obtain a Certificate of Restoration of Forfeited Rights of Citizenship and may be afraid to vote

51

without one, for fear of being challenged and potentially facing prosecution under the Strict Liability Voting Law.

92.     Individuals who have completed all aspects of their sentences for felony convictions except for the payment of fines, fees and/or restitution may still be afraid to vote, despite the North Carolina Superior Court's September 4, 2020 decision in *CSI*. Under North Carolina law, an individual may be on probation for the *sole* purpose of paying fines, fees and/or restitution. *See, e.g.*, N.C. GEN. STAT. § 15A-1342(a). The North Carolina Superior Court specifically enjoined the State defendants "from preventing a person convicted of a felony from registering to vote and exercising that person's right to vote if that person's only remaining barrier to obtaining an 'unconditional discharge' . . . is the payment of a monetary amount."[133] Even with this injunction in place, however, an individual who is on probation solely due to outstanding financial obligations may still not vote for fear of criminal prosecution under the Strict Liability Voting Law (which is vague and the ultimate source of confusion).

## V.     The Strict Liability Voting Law Impedes Plaintiffs' Efforts to Carry Out Their Missions.

93.     Plaintiffs' core missions include increasing political participation among the residents of North Carolina through voter registration and get-out-the-vote-activities. The specter of prosecution under the Strict Liability Voting Law has substantially impeded Plaintiffs' efforts to carry out this mission. Plaintiffs have had difficulty

---

[133] Order on Plaintiffs' Motion for a Preliminary Injunction, *supra* note 6, at 10.

persuading eligible North Carolina residents with criminal convictions to register to vote and vote, because of their fear of prosecution under the Strict Liability Voting Law.

94.     Plaintiffs fear encouraging individuals with felony convictions to register to vote and vote, because those individuals could potentially face criminal prosecution under the Strict Liability Voting Law if they are still serving some aspect of a felony sentence. Plaintiffs also fear incurring criminal liability themselves under N.C. GEN. STAT. § 163-275(13), which provides that it is a Class I felony "[f]or any person falsely to make or present any certificate or other paper to qualify any person fraudulently as a voter, or to attempt thereby to secure to any person the privilege of voting . . ." The intent requirement under this law is unclear. Depending on how the NCSBE and District Attorneys construe this law, Plaintiffs could potentially face prosecution under N.C. GEN. STAT. § 163-275(13) for attempting "to secure to any person the privilege of voting" if that person has not yet completed a felony sentence.

95.     The risk of criminal prosecution of prospective voters under the Strict Liability Voting Law, together with the potential for criminal liability for Plaintiffs themselves under N.C. GEN. STAT. § 163-275(13), has rendered it practically impossible for Plaintiffs to continue their efforts to engage in voter registration and get-out-the-vote activities with respect to individuals with felony convictions, and Plaintiffs' organizations' missions include serving historically-excluded and underserved communities such as those that have been previously involved with the criminal justice system. Moreover, Plaintiffs are not able to assist many individuals with felony

53

convictions with registering to vote because of these risks.

## CLAIMS

## <u>COUNT ONE</u>

**Void for Vagueness in Violation of the Due Process Clause
of the Fourteenth Amendment and 42 U.S.C. § 1983**

96.     Plaintiffs re-allege and reincorporate by reference all prior paragraphs of

this Complaint as though fully set forth herein.

97.     The Due Process Clause of the Fourteenth Amendment prohibits the

deprivation of "life, liberty or property, without due process of law." U.S. CONST. amend.

XIV. "The prohibition of vagueness in criminal statutes is a well-recognized requirement,

consonant alike with ordinary notions of fair play and the settled rules of law, and a

statute that flouts it violates the first essential of due process." *Johnson v. U.S.*, 576 U.S.

591, 595–96 (2015). When a criminal law imposes strict liability, even greater clarity is

necessary to satisfy the demands of due process. *See Colautti v. Franklin*, 439 U.S. 379,

395 (1979) ("This Court has long recognized that the constitutionality of a vague

statutory standard is closely related to whether that standard incorporates a requirement

of *mens rea*.").

98.     The Strict Liability Voting Law is unconstitutionally vague on its face

because it fails to provide individuals of ordinary intelligence fair notice of what conduct

is prohibited, and then subjects them to strict felony-level liability. The statute

criminalizes voting by "any person convicted of a crime, which excludes the person from

the right of suffrage, to vote at any primary or election without having been restored to

54

the right of citizenship in due course and by the method provided by law." N.C. GEN. STAT. § 163-275(5). The Strict Liability Voting Law neither defines which crimes "exclude[ ] the person from the right of suffrage," nor explains how an individual may be "restored to the right of citizenship."

99.     To learn which crimes "exclude[ ] the person from the right of suffrage," a prospective voter must turn to the North Carolina Constitution and the State law setting forth voter qualifications. *See* N.C. CONST., art. VI, § 2(3); N.C. GEN. STAT. § 163-55. Only then would a prospective voter learn that misdemeanors and other low level crimes do not disqualify an individual from voting.

100.     To attempt to understand how an individual may be "restored to the right of citizenship," a prospective voter must look outside the State's election laws to the Citizenship Restoration Law. That statute provides, *inter alia*, that "[a]ny person convicted of a crime, whereby the rights of citizenship are forfeited, shall have such rights automatically restored upon . . . [t]he *unconditional discharge* of an inmate, of a probationer, or of a parolee by the agency of the State having jurisdiction of that person or of a defendant under a suspended sentence by the court." N.C. GEN. STAT. § 13-1(1) (emphasis added). But neither the Citizenship Restoration Law nor any other North Carolina statute defines the term "unconditional discharge."

101.     The NCSBE and other State entities have concluded that an individual convicted of a felony does not regain the right to vote until sentence completion,

55

"including any probation, post-release supervision or parole."[134] But the NCSBE has not defined the term "unconditional discharge" in the State's Voter Registration Application or other commonly-referenced voting materials.

102.    Because of the vagueness of the Strict Liability Voting Law, some ineligible individuals have incurred criminal liability by mistakenly voting prior to sentence completion, while many other eligible voters have refrained from voting because of a fear of prosecution under the Strict Liability Voting Law. This law plainly does not pass constitutional muster under the Due Process Clause.

103.    In enforcing the Strict Liability Voting Law, Defendants have acted under color of state law.

104.    Defendants have deprived and will continue to deprive Plaintiffs and prospective voters in North Carolina of their right under the Due Process Clause to non-vague laws governing the prosecution of voting crimes.

## COUNT TWO

**Intentional Racial Discrimination in Violation of
the Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. § 1983**

105.    Plaintiffs re-allege and reincorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

---

[134] North Carolina Voter Registration Application, *supra* note 90.

56

106.    The Equal Protection Clause of the Fourteenth Amendment prohibits any State from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. A law originally enacted with racially discriminatory intent violates the Equal Protection Clause if (a) the law was never substantively amended, and (b) the law continues to have racially disproportionate effects. *See, e.g.*, *Hunter v. Underwood*, 471 U.S. 222, 233 (1985) ("[W]e simply observe that its original enactment was motivated by a desire to discriminate against [B]lacks on account of race and the section continues to this day to have that effect. As such, it violates [E]qual [P]rotection . . . ").

107.    The Strict Liability Voting Law was originally enacted with discriminatory intent in 1877, and was reenacted almost verbatim in 1899 in an effort to suppress the Black vote and reinstate white control throughout the state. The purpose of the Strict Liability Voting Law was to deter Black individuals with criminal convictions from ever attempting to vote.

108.    The North Carolina General Assembly has never amended the key features of the Strict Liability Voting Law. In substance, the Strict Liability Voting Law has remained unchanged since 1899.

109.    The Strict Liability Voting Law disproportionately affects Black North Carolinians, who constitute the overwhelming majority of individuals who were flagged by the NCSBE for voting in the 2016 election prior to sentence completion. Black individuals have also been disproportionately targeted in purported "voter fraud"

57

prosecutions under the Strict Liability Voting Law, despite unequivocal evidence that these individuals voted based on a good-faith belief that they were eligible to do so.

110.    The Strict Liability Voting Law also disproportionately affects eligible Black voters with past criminal convictions in North Carolina. These individuals disproportionately refrain from voting for fear of prosecution under the Strict Liability Voting Law.

111.    The Strict Liability Voting Law violates the Equal Protection Clause of the Fourteenth Amendment because it was originally enacted with racially discriminatory intent; its key features have never been substantively amended; and it continues to disproportionately impact Black North Carolinians.

112.    In enforcing the Strict Liability Voting Law, Defendants have acted under color of state law.

113.    Defendants have deprived and will continue to deprive Plaintiffs and Black voters in North Carolina of their right under the Equal Protection Clause to non-discriminatory laws governing the prosecution of voting crimes.

<b>PRAYER FOR RELIEF</b>

**WHEREFORE,** Plaintiffs respectfully request that this Court:

A.    Declare that the Strict Liability Voting Law violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution;

58

B.      Declare that Plaintiffs' rights will be irreparably harmed absent declaratory and injunctive relief from this Court;

C.      Permanently enjoin Defendants from enforcing the Strict Liability Voting Law;

D.      Grant Plaintiffs their reasonable costs and attorneys' fees incurred in bringing this suit pursuant to 42 U.S.C. § 1988 and 28 U.S.C. § 1920; and

E.      Grant such other relief as this Court deems just and proper.

Dated: February 23, 2021

By:    /s/ Mitchell D. Brown

SIMPSON THACHER & BARTLETT
LLP
Jonathan K. Youngwood (*specially
appearing*)
Nihara K. Choudhri (*specially appearing*)
Andrew B. Garber (*specially appearing*)
425 Lexington Avenue
New York, NY 10017
Tel: (212) 455-2000
Fax: (212) 455-2502
jyoungwood@stblaw.com
nchoudhri@stblaw.com
andrew.garber@stblaw.com

SOUTHERN COALITION FOR SOCIAL
JUSTICE
Allison J. Riggs (State Bar No. 40028)
Mitchell D. Brown (State Bar No. 56122)
1415 West Highway 54, Suite 101
Durham, NC 27707
Tel: (919) 323-3380
Fax: (919) 323-3942
allisonriggs@southerncoalition.org
mitchellbrown@scsj.org

*Attorneys for Plaintiffs*

60