# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

NORTH CAROLINA A. PHILIP RANDOLPH
INSTITUTE and ACTION NC,

    *Plaintiffs*,

       v.

THE NORTH CAROLINA STATE BOARD OF
ELECTIONS, et al.,

    *Defendants*.

Civil Action No.
1:20-cv-00876

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
## TO THE DISTRICT ATTORNEY DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

PROCEDURAL HISTORY ........................................................................................4

ARGUMENT ........................................................................................................6

I.    Article III's Standing Requirements Are Satisfied as to the District
      Attorneys ...................................................................................................6

      A.    Plaintiffs Have Established an Injury-in-Fact. .............................................6

      B.    The Traceability Requirement Is Satisfied. ...................................................9

      C.    The Redressability Requirement Is Met. .....................................................14

II.   The *Ex parte Young* Exception to Eleventh Amendment Immunity Applies
      With Respect to Plaintiffs' Claims Against the District Attorneys. ......................16

III.  Defendants' Motion to Dismiss for Failure to State a Claim Under Rule
      12(b)(6) Should Be Denied Because Plaintiffs Have Adequately Alleged
      that the Strict Liability Voting Law Violates the Constitution. .............................17

      A.    Plaintiffs have adequately alleged that the Strict Liability Voting
            Law is void for vagueness in violation of the Due Process Clause. ...........18

      B.    Plaintiffs Adequately Allege that the Strict Liability Voting Law
            Violates the Equal Protection Clause. .......................................................22

CONCLUSION....................................................................................................25

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Action NC v. Strach*,
216 F. Supp. 3d  597 (M.D.N.C. 2016) ................................................................6, 16

*Antrican v. Odom*,
290 F.3d 178 (4th Cir. 2002).......................................................................................16

*Common Cause Indiana v. Lawson*,
937 F.3d 944 (7th Cir. 2019).....................................................................................6, 8

*Cooksey v. Futrell*,
721 F.3d 226 (4th Cir. 2013)..................................................................................14, 15

*Democracy North Carolina v. North Carolina State Bd. of Elections*,
476 F. Supp. 3d 158 (M.D.N.C. 2020) ........................................................................6

*Doe v. Duling*,
782 F.2d 1202 (4th Cir. 1986).....................................................................................12

*Fair Fight Action, Inc. v. Raffensperger*,
413 F. Supp. 3d 1251 (N.D. Ga. 2019)..........................................................................8

*Georgia Latino Alliance for Human Rights v. Governor of Georgia*,
691 F.3d 1250 (11th Cir. 2012)....................................................................................13

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982)........................................................................................................6

*Hunter v. Underwood*,
471 U.S. 222 (1985)......................................................................................................22

*Hutton v. Nat'l Bd. of Examiners in Optometry, Inc.*,
892 F.3d 613 (4th Cir. 2018).........................................................................................9

*Jones v. Gov'r of Fla.*,
975 F.3d 1016 (11th Cir. 2020).....................................................................................15

*Kadel v. Folwell*,
446 F. Supp. 3d 1 (M.D.N.C. 2020). .............................................................................9

ii

*Lane v. Holder,*
    703 F.3d 668 (4th Cir. 2012).................................................................6

*Meredith v. Stein,*
    355 F. Supp. 3d 355 (E.D.N.C. 2018) ...............................................10

*Mobil Oil Corp. v. Att'y General of Va.,*
    940 F.2d 73 (4th Cir. 1991)...............................................................10

*North Carolina Right to Life, Inc. v. Bartlett,*
    168 F.3d 705 (4th Cir. 1999)............................................................10

*OCA-Greater Houston v. Texas,*
    867 F.3d 604 (5th Cir. 2017)...........................................................8, 9

*Sierra Club v. U.S. Dep't of the Interior,*
    899 F.3d 260 (4th Cir. 2018)..............................................................9

*SisterSong Women of Color Reproductive Justice Collective v. Kemp,*
    No. 1:19-cv-02973-SCJ, 2019 WL 5699622 (N.D. Ga. Oct. 24, 2019).....................11

*South Carolina Wildlife Fed'n v. Limehouse,*
    549 F.3d 324 (4th Cir. 2008)...........................................................16

*Universal Life Church Monastery Storehouse v. Nabors,*
    No. 2:19-cv-00049, 2020 WL 7632361 (M.D. Tenn. Dec. 22, 2020) ......................11

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.,*
    535 U.S. 635 (2002)........................................................................16

*Waste Mgmt. Holdings, Inc. v. Gilmore,*
    252 F.3d 316 (4th Cir. 2001)...........................................................16

**Statutes**

N.C.G.S. § 13-1.............................................................................20, 21

N.C.G.S. § 163-278........................................................................1, 17

N.C.G.S. § 163-275........................................................................1, 15

N.C.G.S. § 163-55.................................................................................3

iii

**Rules**

Rule 12(b)........................................................................................................5

**Constitutional Provisions**

N.C. Const. art. VI, § 2.................................................................................3

iv

Plaintiffs the North Carolina A. Philip Randolph Institute and Action NC (together, "Plaintiffs") respectfully submit this response in opposition to the District Attorney Defendants' Motion to Dismiss (the "Motion") in the above-captioned action. For the reasons set forth below, the Court should deny the Motion on the merits in its entirety.

## INTRODUCTION

This suit challenges the constitutionality of N.C.G.S. § 163-275(5) (the "Strict Liability Voting Law"), an unconstitutionally vague and racially discriminatory relic of the nineteenth century that imposes felony-level criminal penalties on North Carolina residents who vote while they are on parole, probation or post-release supervision for a felony conviction—*even if those individuals mistakenly believe they are eligible to vote*. The Attorney General and the NCSBE Defendants (together "Defendants") represented that the state's district attorneys have "exclusive authority to prosecute this crime." Dkt. 28 at 10; *see also* Dkt. 23 at 17:9-18; N.C.G.S. § 163-278 (empowering district attorneys to "initiate prosecution and prosecute any violations of" the Strict Liability Voting Law).

In 2018, the Alamance County District Attorney charged twelve individuals, nine of whom were Black, with violating the Strict Liability Voting Law. First Amended Complaint (Dkt. 36) ("Complaint") ¶ 51. In 2019, the Hoke County District Attorney charged four individuals, all of whom were Black, with violating the Strict Liability Voting Law. *Id.* ¶ 54. These individuals voted based on a good-faith belief that they were eligible to vote. *Id.* ¶¶ 51-52, 55, 109; Dkt. 23 at 43:8-22. Many of those prosecuted

1

never plan to vote again because of the harrowing experience of facing felony charges for inadvertently voting while ineligible. *Id.* at ¶¶ 57-60.

These high-profile prosecutions sparked fears of future enforcement of the Strict Liability Voting Law. Many *eligible* North Carolina voters with criminal convictions are now too scared to vote, for fear of unintentionally violating the Strict Liability Voting Law and facing felony charges. *Id.* at ¶¶ 4, 14-15, 79, 85. This chilling effect, which has been particularly pronounced in the state's Black and low-income communities, has frustrated Plaintiffs' mission of encouraging broad political participation by members of those communities. *Id.* at ¶¶ 6, 14-15, 80, 93, 110.

The District Attorney Defendants ("District Attorneys") move to dismiss Plaintiffs' claims on the grounds that Plaintiffs have suffered no injury as a result of the Strict Liability Voting Law. But the Court has already held that "Plaintiffs have established organizational injury for the purposes of standing" because their "efforts to carry out their missions have been impeded" by the Strict Liability Voting Law and "they have both been forced to divert resources to address fears surrounding the enforcement of" this law. Report & Recommendation (Dkt. 24) ("R&R") at 10, *adopted by* Dkt. 34.

The District Attorneys further contend that Plaintiffs' injuries are not traceable to them, and they lack the requisite "special relation" to the Strict Liability Voting Law for purposes of the *Ex parte Young* exception to sovereign immunity. These arguments are meritless because the District Attorneys have sole authority to prosecute violations of the Strict Liability Voting Law, and not one has disclaimed an intent to enforce the law. In

2

fact, all of the District Attorneys assert that the Strict Liability Voting Law "give[s] full effect [to] and enforce[s]" the state's criminal disenfranchisement law. Motion to Dismiss (Dkt. 47) ("Motion") at 2. Enjoining the District Attorneys from enforcing the Strict Liability Voting Law would substantially alleviate the fear of prosecution for mistakenly voting while ineligible that is the source of Plaintiffs' injuries. The requirements for standing and the *Ex parte Young* exception are thus easily satisfied here.

The District Attorneys also baselessly argue that "this action is a thinly veiled attempt to undermine felon disenfranchisement in North Carolina." *Id.* at 12. Yet there are no allegations in the Complaint challenging or even questioning the state's prohibition on voting by an individual convicted of a felony until he or she is "restored to the rights of citizenship in the manner prescribed by law." N.C.G.S. § 163-55(a)(2); *see also* N.C. Const. art. VI, § 2(3). There is also no merit to the District Attorneys' suggestion that the Strict Liability Voting Law is essential to the enforcement of the state's felony disenfranchisement scheme, as the District Attorneys themselves acknowledge that "[a] felon voting while disenfranchised may still be prosecuted under other" criminal statutes governing voting. Motion at 9. Plaintiffs do not challenge any of those other statutes because they do not criminalize *mistakenly* registering to vote or voting if an individual has a good-faith belief that he or she is eligible to vote.

Finally, the District Attorneys argue that Plaintiffs have failed to state a claim that the Strict Liability Voting Law violates either the Due Process Clause or the Equal Protection Clause of the Fourteenth Amendment. For the reasons set forth below, the

3

District Attorneys' motion to dismiss should be denied in its entirety.

## PROCEDURAL HISTORY

Plaintiffs originally filed suit against the NCSBE Defendants and the Attorney General. Contemporaneously with the filing of the complaint, Plaintiffs filed a motion for a preliminary injunction to enjoin enforcement of the Strict Liability Voting Law prior to the 2020 general election. Dkts. 2 & 3. Defendants, ironically given the present motion, opposed Plaintiffs' motion on the grounds that, *inter alia*, Plaintiffs should have brought suit against the State's district attorneys, whom Defendants characterized as "necessary parties" because the State's district attorneys "are authorized to prosecute … violations" of the Strict Liability Voting Law. Dkt. 16 at 2; *see also* Dkt. 23 at 22:4-8. Defendants further contended that "even if the Court entered an injunction against [them]," "[t]he alleged fear of prosecution [among eligible voters with criminal convictions] would continue unabated" because "district attorneys would remain free to continue prosecuting this crime." *Id.* at 20. Defendants asserted that "all of the district attorneys in the state of North Carolina would have to be brought in as defendants in order for [P]laintiffs … to obtain [t]he relief that they are seeking." Dkt. 23 at 30:3-22.

On November 4, 2020, Magistrate Judge Webster issued a Report and Recommendation recommending, *inter alia*, that the Court find that the requirements for Article III standing and the *Ex parte Young* exception are satisfied as to the NCSBE Defendants. R&R at 11-17. Judge Webster further recommended that this Court dismiss Plaintiffs' claims against the Attorney General, emphasizing that "[i]n fact, it is the State

4

district attorneys that have been conferred specific statutory to prosecute" violations of the Strict Liability Voting Law. *Id.* at 12. Finally, Judge Webster recommended that the Court deny Plaintiffs' motion for a preliminary injunction as the 2020 election had already taken place. Judge Webster observed that the 2020 election would "not be the last" and explained that "Plaintiffs efforts to encourage broad political participation by members of Black and low-income communities in North Carolina will be relevant to all upcoming elections." *Id.* at 20.[1] On January 15, 2021, the Court adopted the R&R in its entirety and dismissed the Attorney General from this action. Dkt. 34.

On February 23, 2021, with Defendants' consent, Plaintiffs filed an Amended Complaint ("Complaint") naming the NCSBE Defendants and the District Attorneys as defendants. The NCSBE Defendants answered the Complaint, but the District Attorneys moved to dismiss under Rules 12(b)(1) and 12(b)(6). The Court should deny the District Attorneys' motion for the reasons set forth below.

---

[1] Unless otherwise noted, internal quotation marks, alterations and citations are omitted throughout.

**ARGUMENT**

**I.      Article III's Standing Requirements Are Satisfied as to the District Attorneys**

To satisfy Article III's standing requirements, plaintiffs must demonstrate that they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 187 (4th Cir. 2018). Plaintiffs meet each of these requirements.

**A.      Plaintiffs Have Established an Injury-in-Fact.**

An organization is injured when a challenged law or practice "hamper[s] an organization's stated objectives" and "caus[es] the organization to divert its resources as a result." *Action NC v. Strach*, 216 F. Supp. 3d 597, 616 (M.D.N.C. 2016) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) and *Lane v. Holder*, 703 F.3d 668, 674 (4th Cir. 2012)). Under this well-established basis for organizational standing, voter advocacy organizations are injured when an unconstitutional voting law impedes their core mission and forces them to divert resources to address the impact of that law. *See id.* at 616-18 (voter advocacy organizations were injured by violations of the National Voter Registration Act); *Democracy North Carolina v. North Carolina State Bd. of Elections*, 476 F. Supp. 3d 158, 181-87 (M.D.N.C. 2020) (voter advocacy organizations were injured by the state's 25-day voter registration deadline in the context of the pandemic, as well as the lack of a curing mechanism for improperly-completed absentee ballots)); *see also Common Cause Ind. v. Lawson*, 937 F.3d 944, 952-53 (7th Cir. 2019)

6

(holding that voter advocacy organizations were injured by a voter purge law that had "thwarted" their missions by "creat[ing] a culture of voter confusion" and required the organizations to divert resources "to ameliorating the … effects of this law"; and collecting circuit court cases upholding standing where "voter-advocacy organizations … challenged election laws based on similar drains on their resources").

Here, Plaintiffs allege that the "specter of prosecution" under the Strict Liability Voting Law has "chilled countless *eligible* voters with criminal convictions from exercising their right to cast a ballot." Complaint ¶¶ 4, 6. This chilling effect frustrates Plaintiffs' core missions of encouraging broad political participation by members of Black and low-income communities in North Carolina. *Id.* at ¶¶ 14-15. To counteract this chilling effect, Plaintiffs have been forced to divert resources from their get-out-the-vote and voter registration activities to educate and reassure eligible voters with criminal convictions that they can safely vote without fear of prosecution under the Strict Liability Voting Law. *Id.* Based on these allegations, which were substantiated by declarations submitted by Plaintiffs in support of their motion for a preliminary injunction, *see* Dkt. 3-22 at ¶ 11; Dkt. 3-23 at ¶ 10, the Court held that "Plaintiffs have established organizational injury for the purposes of standing." R&R at 10, *adopted by* Dkt. 34.

Notwithstanding the Court's decision on standing, which the District Attorneys do not acknowledge in their Motion, the District Attorneys argue that counteracting the chilling effect of the Strict Liability Voting Law cannot constitute a diversion of resources because "Plaintiffs' core mission includes educating voters." Motion at 6. But

7

courts have held that voter advocacy organizations are injured when they are forced to divert resources to explain the provisions of a challenged voting law to prospective voters *even where* their missions include voter education. For instance, in *Common Cause Indiana v. Lawson*, the Eleventh Circuit held that organizations with "a specific mission" of "educating potential voters" were injured by "an election law with the alleged potential to confuse or disenfranchise voters" because they had to "undertake … extra efforts" to educate voters on the effects of that law, which diverted resources from activities such as "get-out-the vote efforts." 937 F.3d at 953-956; *see also OCA-Greater Houston v. Texas*, 867 F.3d 604, 610-12 (5th Cir. 2017) (organization with a "primary mission" of "voter outreach and civic education" was injured by "the additional time and effort spent explaining the Texas [voting] provisions at issue" to affected community members because it was "an undertaking that consumed its time and resources in a way they would not have been spent absent the Texas law"); *Fair Fight Action, Inc. v. Raffensperger*, 413 F. Supp. 3d 1251, 1267 (N.D. Ga. 2019) ("Even though Plaintiffs all have … voter education as part of their missions, they each allege that they have had to … redistribute resources from existing programs to ones specifically designed to address [d]efendants' challenged practices. The diversion of resources from general voting initiatives … satisfies the injury-in-fact prong."). Every hour Plaintiffs spend attempting to reassure an eligible voter with a criminal conviction that she need not fear prosecution under the Strict Liability Voting Law is an hour Plaintiffs cannot spend on other get-out-the-vote

8

activities.[2] This plainly satisfies the standard for an injury-in-fact, as the Court has already held.

## B. The Traceability Requirement Is Satisfied.

"[T]raceability merely requires a causal connection between the defendant's conduct and the plaintiff's injury, such that there is a genuine nexus between the two." *Kadel v. Folwell*, 446 F. Supp. 3d 1, 10 (M.D.N.C. 2020). It "is not equivalent to a requirement of tort causation." *Hutton v. Nat'l Bd. of Examiners in Optometry, Inc.*, 892 F.3d 613, 623 (4th Cir. 2018). Plaintiffs must simply show that the defendant's action or inaction "is in part responsible" for their injuries. *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 283-84 (4th Cir. 2018).

### 1. Plaintiffs Injuries Are Fairly Traceable to the District Attorneys Who Have Not Yet Prosecuted Violations of the Strict Liability Voting Law

The District Attorneys argue, incorrectly, that the traceability requirement is not satisfied as to the forty district attorneys who have not yet prosecuted individuals under the Strict Liability Voting Law. But the chilling effect that is the source of Plaintiffs' injuries is not solely traceable to *past* prosecutions by the district attorneys of Alamance and Hoke Counties. Rather, this chilling effect also stems from the fear of *future* enforcement of the Strict Liability Voting Law by the District Attorneys, each of whom is

---

[2] The necessary diversion of resources "need not be substantial; it need not measure more than an identifiable trifle. This is because the injury in fact requirement under Article III is qualitative, not quantitative, in nature." *OCA-Greater Houston*, 867 F.3d at 612 (recognizing that the organization's "injury was not large").

9

statutorily empowered to prosecute violations of the Strict Liability Voting Law. Complaint ¶¶ 4, 14-15, 79, 85. Indeed, Defendants acknowledged that the "threat of prosecution" under the Strict Liability Voting Law "comes from local district attorneys," and represented that all of the state's district attorneys must be named as defendants in order for Plaintiffs to obtain the relief sought. Dkt. 23 at 30: 3-22.

Although some District Attorneys have previously declined to prosecute violations of the Strict Liability Voting Law, not one has disclaimed an intent to enforce the law. *See generally North Carolina Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 710-11 (4th Cir. 1999) (plaintiff had a "reasonable fear" of facing "criminal penalties" under a challenged statute where the defendant provided "no guarantee" that it "might not tomorrow" decide to enforce the statute against plaintiff); *Mobil Oil Corp. v. Att'y General of Va.*, 940 F.2d 73, 76 (4th Cir. 1991) (finding an "actual and well-founded fear" of enforcement where the defendant had not "disclaimed any intention of exercising her enforcement authority" under the challenged statute); *Meredith v. Stein*, 355 F. Supp. 3d 355, 362-63 (E.D.N.C. 2018) (plaintiff had an "actual and well-founded fear" of prosecution where the district attorney had not "disclaimed the authority to prosecute" plaintiff under the challenged statute, which was not "an archaic, vestigial law which is rarely enforced"). Rather, all of the District Attorneys contend that the Strict Liability Voting Law "give[s] full effect [to] and enforce[s]" North Carolina's criminal disenfranchisement law. Motion at 2.

Any of these District Attorneys, including newly-elected District Attorneys in

10

North Carolina's recently-reconfigured prosecutorial districts,[3] or their successors could choose to bring charges under the law. *See*, *e.g.*, *Universal Life Church Monastery Storehouse v. Nabors*, No. 2:19-cv-00049, 2020 WL 7632361, at *13-14 (M.D. Tenn. Dec. 22, 2020) (denying motion to dismiss by district attorneys who had never brought prosecutions under the challenged statute, and reasoning that they had not made "any definitive disavowal of an intent to enforce" the challenged law and "could decide to enforce the law"); *SisterSong Women of Color Reproductive Justice Collective v. Kemp*, No. 1:19-cv-02973-SCJ, 2019 WL 5699622, at *2 (N.D. Ga. Oct. 24, 2019) (finding a "credible threat of prosecution" despite the district attorney's disavowal of any intent to enforce the challenged law because of "the prosecutorial discretion afforded" to the district attorney; and observing that the district attorney "(or her eventual successor) remains free to change her mind"). The possibility of future prosecution is far from speculative, as the North Carolina State Board of Elections referred for prosecution 26 cases of individuals voting before felony sentence completion during the 2020 election,[4] and "no statute of limitations" applies to prosecutions under the Strict Liability Voting

---

[3] *See* N.C.G.S. § 7A-60 (noting the reconfigured prosecutorial districts).

[4] 2015-2020 NCSBE Referred Cases, North Carolina State Board of Elections, *available at* https://s3.amazonaws.com/dl.ncsbe.gov/Investigations/NCSBE%20Referred%20Cases% 202015-2020.pdf.

11

Law. *State v. Taylor*, 713 S.E.2d 82, 90 (N.C. Ct. App. 2011).

Given the recent prosecutions under the Strict Liability Voting Law, there remains a reasonable fear among members of the communities Plaintiffs serve that any one of the District Attorneys might decide to enforce the Strict Liability Voting Law against individuals who mistakenly violate that statute. *Cf. Doe v. Duling*, 782 F.2d 1202, 1206 (4th Cir. 1986) (finding plaintiffs' "fears of prosecution" under the challenged statute were "imaginary or speculative" given "[t]he total absence of prosecutions in [the challenged] context"). This fear has chilled eligible voters with criminal convictions from exercising their fundamental right to vote, impeding Plaintiffs' missions and forcing Plaintiffs to divert resources to counteract this effect. Plaintiffs' injuries are unquestionably traceable to the District Attorneys, who are statutorily empowered to enforce the Strict Liability Voting Law. *See*, *e.g.*, *Meredith*, 355 F. Supp. 3d at 361 (fear of prosecution under the challenged statute was "fairly traceable" to the district attorney, who was "responsible for the criminal prosecution of individuals" who violate the statute).

2.    **Plaintiffs' Injuries Are Fairly Traceable to the Alamance and Hoke County District Attorneys Even Though Plaintiffs Were Not Themselves Charged with Violating the Strict Liability Voting Law.**

The District Attorneys contend that Plaintiffs' injuries are not traceable to the prosecutions under the Strict Liability Voting Law by the Alamance and Hoke County district attorneys because Plaintiffs themselves were not the target of those prosecutions.

12

In so arguing, the District Attorneys fail to recognize that an organization is injured when its core mission is impeded because those served by the organization have a fear of prosecution under a challenged criminal statute, and the organization diverts resources to counteract that fear of prosecution.

For example, in *Friendly House v. Whiting*, the District Court for the District of Arizona held that organizations whose "missions involve promoting and protecting immigrant and minority rights" were injured by criminal statutes targeting illegal immigrants where the organizations alleged that the law would "deter clients … from participating in the organizations' programs" and they had "diverted resources, in order to … address the fear and confusion created by" the law. No. 10-cv-1061-PHX-SRB, 2010 WL 11452277, at *5 (D. Ariz. Oct. 8, 2010). Similarly, in *Georgia Latino Alliance for Human Rights v. Governor of Georgia*, the Eleventh Circuit held that an organization that serves immigrants in the Latino community was injured by a state criminal law targeting illegal immigration, because it was forced to "divert volunteer time and resources to educating affected members of the community and fielding inquiries" about that criminal law. 691 F.3d 1250, 1260 (11th Cir. 2012).

The Court has already held that Plaintiffs have been injured because the chilling effect caused by fear of prosecution under the Strict Liability Voting Law has impeded Plaintiffs' missions of encouraging voting by members of North Carolina's Black and low-income communities, and required Plaintiffs to divert resources towards educating and reassuring eligible voters with criminal convictions that they may safely vote without

13

fear of prosecution under the Strict Liability Voting Law. These injuries are traceable to all of the District Attorneys, including the district attorneys of Alamance and Hoke Counties, because each has the authority to enforce the law. Plaintiffs do not have to separately demonstrate they themselves face a threat of prosecution under the Strict Liability Voting Law to meet the requirements of Article III standing.

### C. The Redressability Requirement Is Met.

The redressability "requirement is not onerous." *Deal*, 911 F.3d at 189. "Plaintiffs need not show that a favorable decision will relieve their every injury. Rather, plaintiffs need only show that they personally would benefit in a tangible way from the court's intervention." *Id.* "[T]he redressability requirement is satisfied where there is a non-speculative likelihood that the injury would be redressed by a favorable judicial decision." *Cooksey v. Futrell*, 721 F.3d 226, 238 (4th Cir. 2013).

The Court has already found that the redressability requirement is met as to the NCSBE Defendants, because "enjoining [them] from enforcement of [the Strict Liability Voting Law] would necessarily prohibit them from investigating or referring for prosecutions any violation of the statute." Dkt. 24 at 14, *adopted by* Dkt. 34. The Court noted that "there can be no question that enjoining the NCSBE Defendants would be a tangible benefit to Plaintiffs." *Id.* It necessarily follows from this holding that enjoining the District Attorneys from enforcing the Strict Liability Voting Law would also tangibly benefit Plaintiffs, as it would prohibit them from investigating or prosecuting violations under the statute. Such an injunction would substantially alleviate or even eliminate the

14

fear of prosecution by eligible voters with criminal convictions, and significantly reduce the resources that Plaintiffs must expend to educate and reassure eligible voters. *See generally Cooksey*, 721 F.3d at 238 ("chilling of speech and threat of prosecution" would be redressed by enjoining defendant responsible for enforcing the challenged statute).

The District Attorneys argue that the redressability requirement is not met because even if they are enjoined from enforcing the Strict Liability Voting Law, individuals with felony convictions who vote before sentence completion would still be subject to prosecution under other North Carolina statutes. But those statutes require fraudulent or deceptive intent, and thus do not threaten to ensnare individuals who *mistakenly* vote based on a good-belief of their eligibility to vote. For instance, the District Attorneys offer the example of N.C.G.S. § 163-275(4), which renders it a Class I felony "[f]or any person *knowingly* to swear falsely with respect to any matter pertaining to any primary or election." Other North Carolina criminal statutes governing voting have similar *mens rea* requirements. *See, e.g.*, N.C.G.S. §§ 163-275(6) (Class I felony "[f]or any person to take *corruptly* the oath prescribed for voters"), 163-275(7) (Class I felony "[f]or any person *with intent to commit a fraud* to … vote illegally at any primary or election") (emphasis added). Plaintiffs have not challenged these other statutes because they do not have the same chilling effect that the Strict Liability Voting Law has on eligible voters with criminal convictions who might otherwise fear prosecution for voting despite a good-faith belief in their eligibility to vote.. *Cf. Jones v. Gov'r of Fla.*, 975 F.3d 1016, 1047-48 (11th Cir. 2020) (noting that under Florida law, "no felon who honestly believes he has

15

completed the terms of his sentence commits a crime by registering and voting," and thus "at least 85,000 felons felt the law was clear enough for them to go ahead and register").

## II. The *Ex parte Young* Exception to Eleventh Amendment Immunity Applies With Respect to Plaintiffs' Claims Against the District Attorneys.

The *Ex parte Young* exception to Eleventh Amendment immunity allows plaintiffs "to petition a federal court to enjoin State officials in their official capacities from engaging in future conduct that would violate the Constitution." *Antrican v. Odom*, 290 F.3d 178, 184 (4th Cir. 2002). "Where a state law is challenged as unconstitutional, a defendant must have some connection with the enforcement of the act to properly be a party to the suit." *S.C. Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 332 (4th Cir. 2008). "This 'special relation' requirement … serve[s] as a measure of *proximity* to and *responsibility for* the challenged state action. This requirement ensures that a federal injunction will be effective with respect to the underlying claim." *Id.* at 332-33.

"To determine whether a suit falls within the *Ex parte Young* exception, the court applies a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of law and seeks relief properly characterized as prospective.'" *Action NC*, 216 F. Supp. 3d at 614 (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)). "The requirement that the violation of federal law be ongoing is satisfied when a state officer's enforcement of an allegedly constitutional state law is threatened, even if the threat is not yet imminent." *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 330 (4th Cir. 2001).

16

The District Attorneys clearly have a "special relation" to the enforcement of the Strict Liability Voting Law for purposes of the *Ex parte Young* exception. As the Court found, the District Attorneys "have been conferred specific statutory authority to prosecute under" the Strict Liability Voting Law. R&R at 12, *adopted by* Dkt. 34. Pursuant to N.C.G.S. § 163-278, the District Attorneys have a "duty… to investigate any violations" of the Strict Liability Voting Law; and are statutorily empowered to "initiate prosecution and prosecute any violations of" the Strict Liability Voting Law.

Moreover, there is a credible threat of enforcement by each of the District Attorneys, as none have disclaimed an intent to enforce the Strict Liability Voting Law. This is sufficient to establish an ongoing violation of federal law for *Ex parte Young* purposes. *See, e.g., Does 1-5 v. Cooper*, 40 F. Supp. 3d 657, 674-75 (M.D.N.C. 2014) (holding that the *Ex parte Young* exception applied as to all of the state's district attorneys, even though all but one had never "explicitly threatened any Plaintiffs with prosecution," because "the district attorneys each have the authority to prosecute individuals for violating the challenged statute").

## III. Defendants' Motion to Dismiss for Failure to State a Claim Under Rule 12(b)(6) Should Be Denied Because Plaintiffs Have Adequately Alleged that the Strict Liability Voting Law Violates the Constitution.

"[A] motion for dismiss for failure to state a claim should not be granted unless it appears certain that the plaintiff can prove no set of facts which would support its claim and would entitle it to relief." *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993); *see also DeSole v. United States*, 947 F.2d 1169, 1171 (4th Cir. 1991) (explaining

17

that "a [R]ule 12(b)(6) motion should be granted only in very limited circumstances"). "A dismissal under Rule 12(b)(6) is appropriate only when the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Action NC*, 216 F. Supp. 3d at 612. "Where, as here, the motion to dismiss involves 'a civil rights complaint, [courts] must be especially solicitous of the wrongs alleged and must not dismiss the complaint unless it appears to a certainty that the plaintiff would not be entitled to relief under any legal theory which might plausibly be suggested by the facts alleged." *Rios v. Veale*, 648 F. App'x 369, 370-71 (4th Cir. 2016) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999)).

Defendants' motion to dismiss under Rule 12(b)(6) should be denied because Plaintiffs have adequately alleged that the Strict Liability Voting Law (1) is void for vagueness in violation of the Due Process Clause of the Fourteenth Amendment; and (2) violates the Equal Protection Clause of the Fourteenth Amendment.

### A. Plaintiffs have adequately alleged that the Strict Liability Voting Law is void for vagueness in violation of the Due Process Clause.

To meet the demands of the Due Process Clause of the Fourteenth Amendment, "a statute must give a person of ordinary intelligence adequate notice of what conduct is prohibited and must include sufficient standards to prevent arbitrary and discriminatory enforcement." *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 272 (4th Cir. 2019). A law may be unconstitutionally vague even if it is not vague in all its applications. *Doe v. Cooper,* 842 F.3d 833, 842-843 (4th Cir. 2016) ("Supreme Court

18

precedent squarely contradicts the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp.").

Criminal statutes are subject to a "stricter standard" of clarity than laws imposing civil penalties. *Manning*, 930 F.3d at 272-73; *see also Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983) ("[W]here a statute imposes criminal penalties, the standard of certainty is higher."). "[T]he constitutionality of a vague statutory standard" in a criminal statute is closely related to whether the standard incorporates a requirement of *mens rea*." *Colautti v. Franklin*, 439 U.S. 379, 395 (1979) (recognizing that a vague criminal law with no scienter requirement can act as "a trap for those who act in good faith"). "Scienter requirements in criminal statutes 'alleviate vagueness concerns' because a *mens rea* element makes it less likely that a defendant will be convicted for an action committed by mistake." *U.S. v. Moyer*, 674 F.3d 192, 211-12 (3d Cir. 2012) (quoting *Gonzalez v. Carhart*, 550 U.S. 124, 149 (2007)); *see also Jones*, 975 F.3d at 1047-48 (finding the scienter requirement dispositive in rejecting a vagueness challenge to Florida laws criminalizing registering to vote and voting before felony sentence completion).

Greater clarity is also required if a law "threatens to inhibit the exercise of constitutionally protected rights," *Village of Hoffman Estates v. Flipside, Hoffman Estates., Inc.*, 455 U.S. 489, 498-99 (1982), because vague laws "inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked," *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972). A vague criminal law that both (1) "contains no *mens rea* requirement," and (2) "infringes on

19

constitutionally protected rights" cannot stand. *City of Chicago v. Morales*, 527 U.S. 41, 55 (1999).

Plaintiffs have adequately alleged that the Strict Liability Voting Law—a criminal statute with no scienter requirement punishable by up to two years in prison—is unconstitutionally vague in violation of the Due Process Clause. While the law criminalizes voting before an individual has "been restored to the right of citizenship," Plaintiffs allege that the law provides no guidance on when an individual regains his or her citizenship rights. Complaint ¶ 62. The Strict Liability Voting Law instead implicitly incorporates by reference N.C.G.S. § 13-1, which in turn provides that citizenship is restored upon an individual's "unconditional discharge." *See generally Manning,* 930 F.3d at 272-78 (finding a criminal statute unconstitutionally vague based on the vagueness of a term incorporated by reference). As the Court has recognized, "[t]he term 'unconditional discharge' is not defined in [N.C.G.S. § 13-1] nor is it defined in any other North Carolina statute." R&R at 4. The term is also "not defined in the Voter Registration Application or on the State Board's website." NCSBE Defendants' Answer (Dkt. 39) at ¶ 64.

The District Attorneys argue that "the phrase 'unconditional discharge' does not have to be defined by statute for an ordinary person to have fair notice of the phrase's meaning." Motion at 17. According to the District Attorneys, "[a] plain reading of N.C.G.S. § 13-1(1) can be understood as a person's rights of citizenship are automatically restored at the completion of their criminal sentence, including their release as an inmate

20

from prison, their release from supervised or unsupervised probation, or their release from parole." *Id.* The District Attorneys offer no explanation as to how an "ordinary person" would arrive at that definition from the complex structure and terminology of N.C.G.S. § 13-1, particularly since the key terms and phrases in their newly-drafted definition—including "*completion of [a] criminal sentence*," "*release ... from prison*," and "*release from supervised or unsupervised probation*"—appear nowhere in the statute. To arrive at this purportedly-obvious definition, the District Attorneys had to cobble together three separate, non-consecutive subsections of N.C.G.S. § 13-1.

The District Attorneys further argue that the Fourth Circuit has had "no difficulty" interpreting the term "unconditional discharge." Motion at 17-18. In support of this contention, the District Attorneys cite to two cases involving the restoration of rights to possess a firearm. *Id.* (citing *U.S. v. King*, 119 F.3d 290, 293 (4th Cir. 1997) and *U.S. v. Thomas*, 52 F.3d 82 (4th Cir. 1995)). Neither decision defines the term "unconditional discharge," nor addresses the restoration of voting rights. Notably, several other Fourth Circuit decisions suggest that an individual convicted of a felony regains the right to vote immediately upon release from prison, regardless of probation, parole or post-release supervision. *See U.S. v. Brady*, 438 F. App'x 191, 193 (4th Cir. 2011) (noting that "North Carolina law restores to convicted felons some civil rights upon release from imprisonment," and explaining that when the defendant was "released from prison," he "regained his rights of citizenship, including his right[ ] to vote") (citing N.C.G.S. § 13-1(1)); *U.S. v. Hairston*, 364 F. App'x 11, 13 (4th Cir. 2010) (same). An "ordinary person"

21

reading these decisions might mistakenly believe that he or she is eligible to vote once he or she is no longer incarcerated, even if he or she remains on probation, post-release supervision or parole.

Finally, while the District Attorneys argue that the state notifies individuals with felony convictions once their eligibility to vote is restored, they do not contend that the state informs such individuals that they are *ineligible* to vote after release from incarceration but prior to sentence completion. Plaintiffs have alleged that the state's notification procedures are grossly inadequate in this regard. Complaint ¶¶ 68-76. These allegations must be taken "as true" at the motion to dismiss stage. *See, e.g., Morton v. Town of Wagram*, No. 1:00-cv-00462, 2001 WL 68232, at *2 (M.D.N.C. Jan. 19, 2001).

## B. Plaintiffs Adequately Allege that the Strict Liability Voting Law Violates the Equal Protection Clause.

*Hunter v. Underwood* holds that a law originally enacted with discriminatory intent violates the Equal Protection Clause if (i) the law was never purged of its original discriminatory taint, and (ii) the law continues to have present-day disproportionate effects. 471 U.S. 222, 233 (1985).

Plaintiffs' allegations satisfy each of *Hunter*'s prongs. First, Plaintiffs allege that the Strict Liability Voting Law was originally enacted in 1877 and reenacted in 1899 with a specific intent to disenfranchise Black voters. Complaint ¶¶ 2, 28-29, 30-36, 107. Second, Plaintiffs allege that the Strict Liability Voting Law has never been purged of its original discriminatory taint because the key provisions of the Strict Liability Voting

22

Law—strict felony-level liability for voting after a felony conviction before restoration to citizenship—have remained unchanged since 1899. *Id.* ¶¶ 39-40, 42, 108. Third, Plaintiffs allege that the Strict Liability Voting Law bears more heavily on the Black community. *Id.* ¶¶ 109-10. Black individuals were disproportionately flagged by the NCSBE for violating the Strict Liability Voting Law in the 2016 election, and they have been disproportionately prosecuted for those violations. *Id.* at ¶¶ 4, 109.

The District Attorneys do not dispute that the key features of the Strict Liability Voting Law have remained intact since its reenactment in 1899. However, the District Attorneys nevertheless argue that Plaintiffs must demonstrate that the present-day version of the Strict Liability Voting Law was enacted with independent discriminatory intent. But this is not what the law requires.

When a racially-motivated law is reenacted with its key discriminatory features intact, that law retains its original discriminatory taint. Neither the "mere passage of time," *Chen v. City of Houston*, 206 F.3d 502, 518 (5th Cir. 2000), nor a "reenact[ment] … without significant change," *Hayden v. Paterson*, 594 F.3d 150, 167 (2d Cir. 2010), is sufficient to purge a discriminatory law of its original taint. Rather, only "substantial, race-neutral alterations in an old unconstitutional law may remove the discriminatory taint." *Veasey v. Abbott*, 888 F.3d 792, 802 (5th Cir. 2018).

The Supreme Court recently made this commonsense principle clear in *Ramos v. Louisiana*, which struck down a racially-motivated Louisiana law permitting non-

unanimous verdicts for the convictions of serious crimes.[5] Louisiana originally adopted the law following its 1898 constitutional convention, which aimed "to establish the supremacy of the white race." 140 S. Ct. 1390, 1394 (2020) (Gorsuch, J.). There was no dispute that "race was a motivating factor" in the law's original enactment. *Id.* Although Louisiana revised and "eventually recodified" the law "in new proceedings untainted by racism," *id.* at 1401 n.44, the law's key features—non-unanimous jury verdicts for serious offenses—remained unchanged. The *Ramos* Court placed great weight on the law's "racist history" in its constitutional analysis. *Id.*; *see also id.* at 1418 (Kavanaugh, J., concurring) (explaining that although "Louisiana's modern policy decision to retain non[-]unanimous juries … may have been motivated by neutral principles (or just by inertia)," "the Jim Crow origins and racially discriminatory effects (and the perception thereof) of non-unanimous juries in Louisiana … should matter and should count heavily in favor of" striking down the law).

Here, Plaintiffs have alleged that racial animus motivated the 1877 enactment and the 1899 reenactment of the Strict Liability Voting Law; and further allege that the key discriminatory features of the law have remained intact since then. This Court should therefore hold that Plaintiffs have adequately alleged that the Strict Liability Voting Law violates the Equal Protection Clause.

---

[5] The Court considered a challenge under the Sixth Amendment, not the Equal Protection Clause, but its reasoning is nonetheless relevant here.

**CONCLUSION**

For the foregoing reasons, this Court should deny the District Attorneys' Motion to Dismiss in its entirety on the merits.

25

Dated: May 10, 2021

By:     /s/ Mitchell D. Brown

SIMPSON THACHER & BARTLETT
LLP
Jonathan K. Youngwood (*specially appearing*)
Nihara K. Choudhri (*specially appearing*)
425 Lexington Avenue
New York, NY 10017
Tel: (212) 455-2000
Fax: (212) 455-2502
jyoungwood@stblaw.com
nchoudhri@stblaw.com

SOUTHERN COALITION FOR SOCIAL
JUSTICE
Allison J. Riggs (State Bar No. 40028)
Mitchell D. Brown (State Bar No. 56122)
1415 West Highway 54, Suite 101
Durham, NC 27707
Tel: (919) 323-3380
Fax: (919) 323-3942
allisonriggs@southerncoalition.org
mitchellbrown@scsj.org

*Attorneys for Plaintiffs*

## CERTIFICATE OF WORD COUNT

Pursuant to Local Rules 7.3(d)(1), the undersigned counsel hereby certifies that the foregoing Response in Opposition to the District Attorney Defendants' Motion to Dismiss contains 6227 words (including headings and footnotes) as measured by Microsoft Word.

/s/ Mitchell D. Brown
Mitchell D. Brown

27

## CERTIFICATE OF SERVICE

I certify that on the 10th day of May, 2021, the foregoing Response in Opposition to the District Attorneys Defendants' Motion to Dismiss was served by electronic mail to counsel for the District Attorney Defendants, Kathyrn H. Shields, Special Deputy Attorney General, at the address kshields@ncdoj.gov, and Elizabeth Curran O'Brian, Special Deputy General, at the address eobrien@ncdoj.gov; and to counsel for the NCSBE Defendants, Terence Steed, Special Deputy Attorney General, at the address tsteed@ncdoj.gov, with consent of all counsel to accept service in this manner.