# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| NORTH CAROLINA A. PHILIP RANDOLPH INSTITUTE and ACTION NC, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 1:20CV876 |
| THE NORTH CAROLINA STATE BOARD OF ELECTIONS, et al., | ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

This matter is before the Court on a motion to intervene by Philip E. Berger, President Pro Tempore of the North Carolina Senate, and Timothy K. Moore, Speaker of the North Carolina House of Representatives (collectively "Proposed Intervenors"), pursuant to Federal Rule of Civil Procedure 24. (Docket Entry 44.) Also before the Court is a motion by forty-two individually named district attorneys ("DA Defendants") seeking to dismiss Plaintiffs North Carolina A. Philip Randolph Institute ("NC APRI") and Action NC's (collectively "Plaintiffs") Amended Complaint (Docket Entry 36) pursuant to Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure. (Docket Entry 46.) After response and reply briefs were filed to said motions (*see* Docket Entries 48, 49, 52, 53), the Court held a hearing on the matter on January 12, 2022. (Minute Entry dated 1/12/2022.) For the following reasons, the Court recommends that the motion to intervene be denied, and the DA Defendants' motion to dismiss be denied.

1

# I. BACKGROUND

On September 24, 2020, Plaintiffs commenced this action against the North Carolina State Board of Elections ("NCSBE") and several of its officials (collectively "NCSBE Defendants"), along with North Carolina Attorney General Josh Stein alleging that N.C. Gen. Stat. § 163-275(5) (sometimes referred herein as "the challenged statute")[1] is unconstitutional under two theories: (1) the statute is void for vagueness in violation of the Due Process Clause of the Fourteenth Amendment; and (2) the statute constitutes intentional racial discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment. (*See generally,* Complaint, Docket Entry 1.) Plaintiffs simultaneously filed a motion for preliminary injunction (Docket Entry 2), which the original defendants opposed (Docket Entry 16). While filing their opposition brief to the preliminary injunction request, those defendants also filed a motion to dismiss for lack of jurisdiction and failure to state a claim. (*See* Docket Entry 18.)

In November 2020, the undersigned recommended Plaintiffs' motion for preliminary injunction be denied and further recommended that North Carolina Attorney General Josh Stein be dismissed from this action. (*See* Docket Entry 24.) The Court subsequently adopted the Recommendation over Plaintiffs' objections. (*See* Docket Entry 34.) Prior to the Court's adoption of the Recommendation, Plaintiffs filed a motion to amend the Complaint. (Docket Entry 29.) The motion sought to amend Plaintiffs' Complaint to name additional defendants including North Carolina's district attorneys and to make other changes, including adding more allegations concerning Defendants' role in the enforcement of the challenged statute.

---

[1] Plaintiffs' challenge is specifically to subsection 5 of N.C. Gen. Stat. § 163-275. Thus, references herein to the "challenged statute" refer only to that subsection.

(*See id.* at 4.)[2]  On February 8, 2021, by stipulation of the parties in the action at said time, the previously filed motion to dismiss was withdrawn and the Amended Complaint was filed.  (*See* Stipulation, Docket Entry 35; Am. Compl., Docket Entry 36.)[3]

Thereafter, summonses were issued for the newly added Defendants.  (Docket Entry 37.)[4]  On March 9, 2021, the NCSBE Defendants filed an answer to the Amended Complaint (Docket Entry 39.)  On April 19, 2021, the DA Defendants filed the pending motion to dismiss in response to the Amended Complaint.  (Docket Entry 46.)  In addition, the Proposed Intervenors filed their motion on the same day.  (Docket Entry 44.)

### Plaintiffs' Amended Complaint[5]

Plaintiffs are nonprofit, nonpartisan organizations whose missions are, in part, to increase voter participation among Black and low-income communities in North Carolina. (Am. Compl. ¶¶ 14-15.)  The NCSBE Defendants administer and investigate violations of North Carolina election laws.  (*Id.* ¶¶ 16-22.)  The DA Defendants are responsible for prosecuting "all criminal actions" and are also specifically empowered to "investigate . . . and

---

[2] Unless otherwise noted, all citations in this recommendation to documents filed with the Court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

[3] Plaintiff filed a notice explaining that the exhibits to the original Complaint were inadvertently excluded when the Amended Complaint was filed.  (*See* Docket Entry 50.)  As a result, each of the exhibits cited in the Amended Complaint refers to the correspondingly-numbered exhibit to the original Complaint.

[4] The newly added Defendants also included two additional members of the NCSBE, Stacy "Four" Eggers IV and Tommy Tucker.  (*See* Am. Compl. ¶¶ 20-21; *see also* Docket Entry 37 at 17, 37.)

[5] Plaintiffs reference and quote multiple sources that are affixed as footnotes throughout the Amended Complaint in electronic format.  (*See e.g.*, Am. Compl., Footnote 8 (providing digital link to 1840-41 N.C. Sess. Laws 68-69).)  Unless noted otherwise and for the sake of brevity, the Recommendation herein excludes citations to those digital sources.

prosecute any violations" of certain voting-related criminal statutes. (*Id.* ¶ 23 (quoting N.C. Gen. Stat. §§ 7A-61, 163-278).) The Amended Complaint further alleges that at least two of the DA Defendants have brought criminal charges pursuant to the challenged statute against individuals "who mistakenly voted in the 2016 election while still on probation or parole for a felony conviction." (*Id.*)

As presently constructed, the challenged statute makes it a Class I felony, regardless of intent, "[f]or any person convicted of a crime which excludes the person from the right of suffrage, to vote at any primary or election without having been restored to the right of citizenship in due course and by the method provided by law." (*See id.* ¶ 42 (quoting N.C. Gen. Stat. § 163-275(5) (alterations omitted)).) Violation of this statute while on parole, probation or post-release supervision for a felony conviction may result in imprisonment for up to two years. (*Id.* ¶ 46 (citing N.C. Gen. Stat. § 15A-1340.17 and Deposition of Karen Brinson Bell at 127:4-9, Docket Entry 1-1 at 34).)

Plaintiffs allege that the challenged statute was originally enacted with racially discriminatory intent, its key features have never been substantively amended, and it continues to disproportionately impact Black North Carolinians. (*See* Am. Compl. ¶¶ 24-60.) As such, Plaintiffs claim that it violates the Equal Protection Clause of the Fourteenth Amendment. (*Id.* ¶¶ 105-113.) In addition, the Amended Complaint alleges that the challenged statute fails to provide fair notice of criminal liability by failing to define which crimes "exclude[ ] the person from the right of suffrage," and not providing information on restoration of citizenship rights. (*Id.* ¶¶ 61-78.) Moreover, Plaintiffs allege that there is confusion caused by North Carolina's voting material which is "exacerbated by the State's inadequate procedures" for

4

providing notice to felons who are ineligible to vote. (*Id.* ¶ 68.) Plaintiffs also allege that the vagueness of the law, along with recent prosecutions, "have caused *eligible* individuals with criminal convictions to refrain from voting, for fear of unintentionally violating the law and triggering criminal charges." (*Id.* ¶ 79 (emphasis in original).) As a result, Plaintiffs claim that the challenged statute is void for vagueness in violation of the Due Process Clause of the Fourteenth Amendment. (*Id.* ¶¶ 96-104.)

Ultimately, Plaintiffs contend that the challenged statute impedes their efforts to carry out their missions. (*See id.* ¶¶ 93-95.) Thus, they seek a declaration that N.C. Gen. Stat. § 163-275(5) is unconstitutional and to permanently enjoin Defendants from enforcement of said statute. (*Id.* ¶ 7.)

## II. DISCUSSION

### 1. <u>Motion to Intervene</u>

The Proposed Intervenors move to intervene as defendants in this matter permissively pursuant to Rule 24(b) of the Federal Rules of Civil Procedure. (Docket Entry 44.) Under Rule 24(b), a court may permit intervention upon a timely motion of any party who "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). The decision to grant or deny a motion for permissive intervention "lies within the sound discretion of the trial court" although "some standards have been developed to guide the courts in making intervention determinations." *Hill v. W. Elec. Co. Inc.*, 672 F.2d 381, 386 (4th Cir. 1982). "In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3). However, "findings on those factors are not determinative of or sufficient

to decide a permissive intervention motion." *McHenry v. Comm'r*, 677 F.3d 214, 222 (4th Cir. 2012). "A court may grant or deny permissive intervention irrespective of what it concludes in its discussion of delay and prejudice." *Students for Fair Admissions Inc. v. Univ. of N. Carolina*, 319 F.R.D. 490, 494 (M.D.N.C. 2017) (citation omitted). Ultimately, Rule 24(b) affords the Court broad discretion and "a challenge to the court's discretionary decision to deny leave to intervene must demonstrate a *clear* abuse of discretion in denying the motion." *McHenry*, 677 F.3d at 219 (internal quotations and citations omitted).

Here, the Proposed Intervenors have attached their proposed Answer to the Amended Complaint (*see* Docket Entry 45-1). They contend that their motion is timely and that their defenses share common factual and legal issues with those of the current defendants. (Docket Entry 45 at 4-5.) The Proposed Intervenors also argue that the intervention sought will not delay nor prejudice the parties given the matter is still in early proceedings and they are not seeking to pursue cross-claims nor add counterclaims. (*Id.* at 5-6.) They further contend that the intervention will also have no effect on the Court's subject-matter jurisdiction in this case. (*Id.* at 6.)

Plaintiffs first oppose the motion as untimely. (Docket Entry 49 at 7-8.) They contend that the Proposed Intervenors delayed filing their motion until nearly seven months after this action commenced. (*Id.* at 8.) In addition, Plaintiffs argue that since this publicly known action was filed and considering the procedural events thus far, the Proposed Intervenors had not been involved, have no reason as to why they did not seek intervention sooner, and provide no explanation for the sudden need for intervention at this juncture. (*Id.*) Plaintiffs further argue that the intervention sought will unduly delay and prejudice their rights as the

6

Proposed Intervenors seek to raise some "unique defenses" delaying resolution of this matter. (*Id.* at 9.) Lastly, Plaintiffs contend that the Proposed Intervenors' rights are adequately represented by the current Defendants and denial of this motion does not foreclose the Proposed Intervenors of the opportunity to express views through submission of *amicus* briefs. (*Id.* at 11-13.)

Having considered the parties' arguments and relevant law, the Court concludes that the intervention sought should be denied. First, regarding timeliness, "[a] reviewing court should look at how far the suit has progressed, the prejudice which delay might cause other parties, and the reason for the tardiness in moving to intervene." *Gould v. Alleco, Inc.*, 883 F.2d 281, 286 (4th Cir. 1989). Here, although the action had been pending for nearly seven months, the Proposed Intervenors' request was sought just weeks after learning of the filing of the Amended Complaint. Procedurally, some meaningful activity has taken place in this matter, but it thus remains in the pleadings stage.

For the same reason, there is no prejudice related to the timing of the Proposed Intervenors' motion in light of the procedural posture of this action. *See Ohio Valley Env't Coal., Inc. v. McCarthy*, 313 F.R.D. 10, 17 (S.D.W. Va. 2015) ("[B]ecause the proceeding is in its infancy, no existing party has been prejudiced by the time it took for [movant] to file its motion to intervene."). As to the third factor, the procedural posture of this case again weighs in favor of a timeliness intervention motion. *See United States v. Virginia*, 282 F.R.D. 403, 405 (E.D. Va. 2012) ("Where a case has not progressed beyond the initial pleading stage, a motion to intervene is timely."). As such, the Court concludes that the motion is timely.

Despite the Court's conclusion that the motion to intervene is timely, the motion should nevertheless be denied because permitting the intervention sought will unduly delay the adjudication of Plaintiffs' rights and unnecessarily burden judicial resources. While the Proposed Intervenors have a "statutorily-vested, strong interest in being heard as to the constitutionality of the General Assembly's duly enacted statutes," they concede that the "current defendants in this action are fully able to defend" the statutory provision at issue. (Docket Entry 45 at 3.) Indeed, the NCSBE Defendants, who are already represented by the North Carolina Department of Justice, have been vigorously defending this action since it commenced, and the DA Defendants have filed the pending motion to dismiss. The Proposed Intervenors, also represented by the North Carolina Department of Justice, ultimately want to show that the challenged statute was not enacted with discriminatory intent, nor that it is unconstitutionally vague. However, it is simply unclear, particularly considering the Proposed Intervenors' own concession, how the current defendants have not, and are not currently, "zealously pursuing the same ultimate objectives" as the movants. *Stuart v. Huff*, 706 F.3d 345, 355 (4th Cir. 2013) (internal quotations and citation omitted).

Given such, the undersigned concludes that allowing the intervention sought in this action "will hinder, rather than enhance, judicial economy, and will unnecessarily complicate and delay the various stages of this case." *N. Carolina State Conf. of NAACP v. Cooper*, 332 F.R.D. 161, 172-73 (M.D.N.C. 2019) (internal quotations and citation omitted); *see also Bishop of Charleston v. Adams*, No. 2:21-CV-1093, 2021 WL 3146027, at *4 (D.S.C. July 26, 2021) (unpublished) ("[I]ntervention would unnecessarily complicate the case, hinder judicial economy, and detract from the timely resolution of the weighty issues implicated by this

matter."). As the Fourth Circuit has stated, "[a]dditional parties can complicate routine scheduling orders, prolong and increase the burdens of discovery and motion practice, thwart settlement, and delay trial." *Stuart*, 706 F.3d at 350. Moreover, "[a]s for the Court's resources, dealing with . . . extra part[ies] by its very nature requires additional court resources." *McCarthy*, 313 F.R.D. at 31. Particularly in this case, where the Proposed Intervenors themselves have conceded that the North Carolina Department of Justice is already zealously representing the interests of Defendants, "the Court fails to see any benefit that permitting intervention would provide which allowing the Proposed Intervenors the opportunity to participate as *amici curiae* would not." *Lee v. Virginia Bd. of Elections*, No. 3:15CV357-HEH, 2015 WL 5178993, at *5 (E.D. Va. Sept. 4, 2015) (unpublished). Indeed, "[w]hile a would-be intervenor may prefer party status to that of a friend-of-court, the fact remains that amici often make useful contributions to litigation." *Stuart*, 706 F.3d at 350.

Overall, at the Court's discretion the request for permissive intervention pursuant to Rule 24(b) should be denied. However, the Proposed Intervenors should be allowed, if they so desire, to present their views in support of the challenged statute through submission of an *amicus* brief at the appropriate time. *See e.g., Adams*, 2021 WL 3146027, at *4 (unpublished) ("[T]he Court concludes that Proposed Intervenors' participation as amici would satisfy their asserted need for intervention"); *Cooper*, 332 F.R.D. at 173 ("To the extent that Proposed Intervenors have special expertise they believe that they bring to the defense of [the challenged law], such expertise can be provided through the submission of *amicus* briefs."); *Lee*, 2015 WL 5178993, at *5 (allowing proposed intervenors to participate as *amici curiae*).

2. **DA Defendants' Motion to Dismiss**

Also before the Court is a motion to dismiss Plaintiffs' Amended Complaint on behalf of the forty-two individually named DA Defendants in this action. (Docket Entry 46.) As a threshold issue, the DA Defendants raise Article III standing and Eleventh Amendment immunity arguments invoking inquiries into this Court's subject-matter jurisdiction over this action. (*See* Docket Entry 47 at 3-11.) More specifically, the DA Defendants argue that Plaintiffs lack standing regarding the enforcement of the challenged statute because they have not suffered any injury-in-fact, have not alleged any injury traceable to the DA Defendants, and allege a remedy that does not address the alleged injuries. (*See id.*) The DA Defendants also argue that this action is barred under the Eleventh Amendment. (*Id.* at 10-11.) For the reasons stated herein, the Court concludes that Plaintiffs have established standing to bring this suit against the DA Defendants.

### Standing

Federal district courts exercise limited jurisdiction in that the court "possess only the jurisdiction authorized . . . by the United States Constitution and by federal statute." *United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347 (4th Cir. 2009) (citation omitted). Article III of the United States Constitution outlines the federal court's jurisdictional limits, which implicates certain doctrines including standing and ripeness. *See* U.S. Const., art. III, § 2; *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 & n.5 (2014). For any case or controversy to be justiciable in federal court, a plaintiff must allege "such a personal stake in the outcome of the controversy as to warrant his invocation of federal court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *White Tail Park, Inc. v. Stroube*, 413 F.3d 451,

458 (4th Cir. 2005) (quoting *Planned Parenthood of S.C. v. Rose*, 361 F.3d 786, 789 (4th Cir. 2004)).

Article III standing is "an integral component of the case or controversy requirement." *CGM, LLC v. BellSouth Telecomms., Inc.*, 664 F.3d 46, 52 (4th Cir. 2011) (quoting *Miller v. Brown*, 462 F.3d 312, 316 (4th Cir. 2006)). "[C]hallenges to constitutional standing are [generally] addressed pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction because Article III gives federal courts jurisdiction only over cases and controversies." *Midgett v. Cooper*, No. 1:20-CV-00941, 2021 WL 4973634, at *3 (M.D.N.C. Oct. 26, 2021) (unpublished) (internal quotations and citation omitted).

When assessing motion to dismiss under Rule 12(b)(1) for lack of subject-matter jurisdiction, the court may consider evidence outside the pleadings and should grant the motion "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp.*, 166 F.3d 642, 647 (4th Cir. 1999) (internal quotations and citation omitted). The burden of satisfying Article III's standing requirement lies with the party seeking to invoke the federal court's jurisdiction. *Miller*, 462 F.3d at 316. To establish constitutional standing, "(1) the plaintiff is required to have sustained an injury in fact; which (2) must be causally connected to the complained-of conduct undertaken by the defendant; and (3) will likely be redressed if the plaintiff prevails." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). Organizations may establish standing to bring suit on their own behalf and for injuries on behalf of their members. *See White Tail Park*, 413 F.3d at 458. Plaintiffs NC APRI and Action NC are both organizations bringing suit on behalf of themselves. (*See* Am. Compl. ¶¶ 14-15.) To bring suit on its own behalf an organization must meet the same standing requirements

11

that apply to individuals. *See S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 182 (4th Cir. 2013). The Court address each standing requirement in turn as it relates to the DA Defendants.

### 1. Injury-In-Fact

Injury in fact, the first component of standing, requires Plaintiffs to allege an actual or threatened injury. *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982). The DA Defendants contend that Plaintiffs cannot establish injury in fact because as organizations whose core missions include voter education, "it would necessarily follow that allocating resources to know and understand North Carolina's voting laws, and educate voters of the same, would be inherent in that mission, and not an impediment." (Docket Entry 47 at 6.) The undersigned finds this argument unpersuasive.

The Amended Complaint alleges that Plaintiffs' ability to carry out their mission of registering and encouraging African-Americans to vote has been substantially impeded by the "specter of prosecution" under N.C. Gen. Stat. § 163-275(5). (*See* Am. Compl. ¶ 6.) More specifically, it has "chilled countless *eligible* voters with criminal convictions from exercising their right to cast a ballot." (*Id.* ¶ 4 (emphasis in original).) The Amended Complaint further alleges that time, money and resources have been diverted from voter registration activities to educate volunteers on the potential risks of registering a felon to vote, and "to caution community members on the potential risks of voting after a felony conviction before sentence completion." (*Id.* ¶ 14.)

The undersigned previously addressed the issue of standing earlier in this action as to several other defendants. (*See* Docket Entry 24 at 8-15.) As previously stated regarding injury

in fact, "[t]he Supreme Court has held that if a defendant's practices have hampered an organization's stated objectives causing the organization to divert its resources as a result, then 'there can be no question that the organization has suffered injury in fact.'" *Action NC v. Strach*, 216 F. Supp. 3d 597, 616 (M.D.N.C. 2016) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)); *see also Lane v. Holder*, 703 F.3d 668, 674 (4th Cir. 2012) ("An organization may suffer an injury in fact when a defendant's actions impede its efforts to carry out its mission."). Here again, as Plaintiffs have alleged that their efforts to carry out their missions have been impeded, and because resources have been diverted to address fears surrounding the enforcement of N.C. Gen. Stat. § 163-275(5), the Court finds that Plaintiffs have established organizational injury for the purposes of standing at this juncture.[6] *See Democracy N. Carolina v. N. Carolina State Bd. of Elections*, 476 F. Supp. 3d 158, 182 (M.D.N.C. 2020) ("Organizational standing requires impaired ability to provide its intended services, including a drain of resources."), *reconsideration denied*, No. 1:20CV457, 2020 WL 6591396 (M.D.N.C. Sept. 30, 2020).

The DA Defendants contend that because Plaintiffs' core missions include educating voters, "it would necessarily follow that allocating resources to know and understand North

---

[6] In support of their motion for preliminary injunctive relief, Plaintiffs previously supported these same allegations as alleged in the Original Complaint with declarations by their executive directors. (*See* Melvin Montford Declaration ¶ 11, Docket Entry 3-22; Pat McCoy Declaration ¶ 10, Docket Entry 3-23.) The undersigned notes that even considering the Amended Complaint standing alone, the broad allegations of diverting resources are sufficient to establish organizational injury. *See Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040 (9th Cir. 2015) (citation omitted) ("The [Supreme] Court has . . . made clear that a diversion-of-resources injury is sufficient to establish organizational standing at the pleading stage, even when it is 'broadly alleged.'"); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (internal citations and quotations omitted) ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim.").

Case 1:20-cv-00876-LCB-JLW   Document 60   Filed 02/14/22   Page 13 of 32

Carolina's voting laws, and educate voters of the same, would be inherent in that mission, and not an impediment." (Docket Entry 47 at 6.) This argument is unpersuasive. "[H]aving general get-out-the-vote activities and voter-education programs as part of each Plaintiffs' mission does not undermine the Plaintiffs' ability to demonstrate standing." *Fair Fight Action, Inc. v. Raffensperger*, 413 F. Supp. 3d 1251, 1267 (N.D. Ga. 2019). Ultimately, the time and resources used to address fears surrounding the enforcement of the challenged statute is time away from Plaintiffs' get-out-the-vote activities. *See e.g., Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1165-66 (11th Cir. 2008) (finding that the plaintiff organizations reasonably anticipated diversion of time and resources to educating volunteers and voters on compliance with the challenged law and concluding that "resources would otherwise be spent on registration drives and election-day education and monitoring".).

Further, the DA Defendants point out that Plaintiffs have not asserted any cases in which eligible voters have been prosecuted under N.C. Gen. Stat. § 163-275(5), nor are there any known record of any persons actually being convicted under the statute. (Docket Entry 53 at 3.) This argument overlooks Plaintiffs' allegations of impediments to their core missions of registering and encouraging Blacks to vote, and the diversion of resources to address fears surrounding the enforcement of the challenged statute, which is sufficient to establish organizational injury in fact. *Democracy*, 476 F. Supp. 3d at 182; *Havens Realty*, 455 U.S. at 379. In sum, the undersigned concludes that the first prong of standing has been satisfied.

### 2. Traceability

The DA Defendants next argue that Plaintiffs do not meet the standing requirements because they cannot show that the organizational injury is traceable to an action by each

14

individually named DA Defendant. (Docket Entry 47 at 6-8.) The DA Defendants' position is based on the contention that Plaintiffs' allegations acknowledge that: (1) only two district attorneys (Hoke and Alamance counties) have ever brought charges under the challenged statute in the sixteen cases referenced in the Amended Complaint (*see id.* at 6 (citing Am. Compl. ¶ 23); *see also* Am. Compl. ¶¶ 51, 54); and (2) many district attorneys have summarily declined to bring charges under the challenged statute after concluding that there was insufficient evidence to prove that the individuals were ever notified regarding their ineligibility to vote (*see* Docket Entry 47 at 6 (citing Am. Compl. ¶ 50).) The DA Defendants further contend that there are no allegations that the remaining DA Defendants have previously prosecuted or are threatening to prosecute under the statute, nor any allegations that they "prosecuted or threatened to prosecute Plaintiffs." (Docket Entry 47 at 6-7.) Moreover, as Plaintiffs are organizations, the DA Defendants argue that they face no credible threat of prosecution. (*Id.* at 7-8.)

The causation element of standing requires "a causal connection between the injury and the conduct complained of[.]" *Cooksey v. Futrell*, 721 F.3d 226, 234 (4th Cir. 2013) (citation omitted). Furthermore, "the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id.* at 234-35 (citation omitted). "[T]he 'fairly traceable' standard is not equivalent to a requirement of tort causation." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 161 (4th Cir. 2000). However, there must be a "genuine nexus" between the defendant's conduct and the plaintiff's injury. *Kadel v. Folwell*, 446 F. Supp. 3d 1, 10 (M.D.N.C. 2020) (citing *Friends of the Earth,*, 204 F.3d at 161). "[A]t the pleading stage, general factual

15

allegations of injury resulting from the defendant's conduct may suffice to establish traceability." *Id.* (internal quotations and citation omitted).

Here, there is a causal connection between Plaintiffs' injury and the DA Defendants' conduct. As the Amended Complaint alleges, the DA Defendants have been conferred specific statutory authority to prosecute under N.C. Gen. Stat. § 163-275(5) (*see* Am. Compl. ¶ 23 (quoting N.C. Gen. Stat. § 163-278)), and at least two DA Defendants have brought criminal charges pursuant to the challenged statute (*see* Am. Compl. ¶ 23). Though many of the DA Defendants have summarily declined to bring charges under the challenged statute (*id.* ¶ 50), it does not negate their ability to do so. Indeed, the decisions were not based on a generally disclaimed authority to prosecute, but rather allegedly on a lack of sufficient evidence "to prove that the defendant [in those cases] was ever notified of his or her ineligibility to vote" (*id.* (citing Ex. 5 to Am. Compl., Docket Entry 1-5)).

In addition, although the DA Defendants point to the undersigned's previous finding that Plaintiffs as organizations face no threat of prosecution under the challenged statute (*see* Docket Entry 53 at 5), Plaintiffs allege that the fear of prosecution remains for those prospective eligible voters with felony convictions, frustrating Plaintiffs' core missions. (Am. Comp. ¶¶ 4, 14-15 ,79-95.) And this is despite the September 4, 2020 decision from the Wake County Superior Court which enjoined the NCSBE and others "from preventing a person convicted of a felony from registering to vote and exercising their right to vote if that person's only remaining barrier to" sentence completion is payment of monetary fees. (*See* Am. Compl. ¶ 5.) Plaintiffs allege that "[d]espite this injunction, . . . individuals with only outstanding financial obligations in connection with a felony conviction might and indeed will opt not to

16

vote because of the fear of criminal prosecution under" the challenged statute. (*Id.*) Ultimately, because Plaintiffs' core missions are impeded, and resources diverted, by the possibility of the DA Defendants exercising their authority to enforce the challenged statute against eligible voters with criminal convictions, the traceability requirement is met.

### 3. Redressability

Finally, the DA Defendants argue that Plaintiffs do not have standing because the injunction Plaintiffs seek does not redress their alleged injuries. (Docket Entry 47 at 8-10.) Redressability is satisfied "where there is a non-speculative likelihood that the injury would be redressed by a favorable judicial decision." *Cooksey*, 721 F.3d at 238 (internal quotations and citation omitted). The Fourth Circuit has recognized that a plaintiff "need not show that a favorable decision will relieve [their] every injury." *Sierra Club v. United States Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018) (citing *Larson v. Valente*, 456 U.S. 228, 242-44 & n.15 (1982)). Instead, Plaintiffs here "need only show that they 'personally would benefit in a tangible way from the court's intervention.'" *Id.* (quoting *Friends of the Earth*, 204 F.3d at 162). *See also Deal v. Mercer Cty. Bd. of Educ.*, 911 F.3d 183, 189-90 (4th Cir. 2018) (same).

Here, enjoining the DA Defendants along with the NCSBE Defendants from enforcement of the challenged statute would necessarily prohibit investigation and ultimate prosecutions of any violation of the statute, and substantially reduce the resources that Plaintiffs expend in their focus on eligible voters with criminal convictions who fear prosecution. The DA Defendants argue that Plaintiffs' missions will still demand that they educate volunteers and potential voters of criminal disenfranchisement in North Carolina, the NCSBE Defendants will still have statutorily mandated investigatory duties, and individuals

with felony convictions who vote before sentence completion would still be subject to prosecution pursuant to other North Carolina voting statutes, which their ignorance of the law does not give way to unlawful conduct. (Docket Entry 47 at 8-9.) However, these arguments miss the point. As the undersigned has previously noted, enjoining the NCSBE Defendants would be a tangible benefit to Plaintiffs as it would necessarily prohibit them from investigating or referring for prosecutions any violation of the statute. (*See* Docket Entry 24 at 14.) While the NCSBE Defendants would maintain investigatory duties in the administration of elections laws, the challenged statute would not be one of them. Further, enjoining the DA Defendants from investigating or prosecuting violations under N.C. Gen. Stat. § 163-275(5) would be a benefit to Plaintiffs as it would substantially reduce the resources that Plaintiffs must expend to educate and reassure eligible voters with criminal convictions who fear prosecution under the challenged statute. Thus, redressability is met.

## Eleventh Amendment Immunity

The DA Defendants also contend that they are immune from suit pursuant to the Eleventh Amendment. (Docket Entry 47 at 10-11.) Pursuant to the Eleventh Amendment, sovereign immunity prohibits actions in federal court by individuals against a state unless the state has consented to suit or unless Congress has lawfully abrogated the states' Eleventh Amendment immunity. *Ballenger v. Owens*, 352 F.3d 842, 844-45 (4th Cir. 2003). "However, the Supreme Court has also long recognized an exception to this general rule: state officials are stripped of immunity and subject to lawsuits for declaratory or injunctive relief, when these suits are based on the act of enforcing an allegedly unconstitutional state statute." *NC RSOL v. Boone*, 402 F. Supp. 3d 240, 255 (M.D.N.C. 2019) (citing *Ex parte Young*, 209 U.S. 123 (1908)).

However, this "exception does not permit federal courts to entertain claims seeking retrospective relief, either compensatory or other, for completed, not presently ongoing violations of federally protected rights." *Al-Deen v. Trustees of Univ. N.C., Wilmington*, 102 F. Supp. 3d 758, 764-65 (E.D.N.C. 2015) (quoting *Republic of Paraguay v. Allen*, 134 F.3d 622, 627 (4th Cir. 1998)). Rather, to determine whether the *Ex parte Young* exception applies, the Court "need only conduct a straightforward inquiry into whether the complaint [(1)] alleges an ongoing violation of federal law and [(2)] seeks relief properly characterized as prospective." *Constantine v. Rectors & Visitors George Mason Univ.*, 411 F.3d 474, 496 (4th Cir. 2005) (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n Md.*, 535 U.S. 635, 645 (2002)). "The requirement that the violation of federal law be ongoing is satisfied when a state officer's enforcement of an allegedly unconstitutional state law is threatened, even if the threat is not yet imminent." *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 330 (4th Cir. 2001) (citation omitted).

Here, Plaintiffs have alleged that N.C. Gen. Stat. § 163-275(5) is unconstitutional and are seeking to permanently enjoin Defendants from enforcement of the statute. The DA Defendants argue that there is no special relationship that supports implication of the *Ex parte Young* exception because Plaintiffs do not allege ongoing prosecutions or threats of prosecutions by the DA Defendants under the challenged statute, only that there are past prosecutions in two counties which did not result in convictions. (Docket Entry 47 at 11.) The undersigned disagrees. "Where a state law is challenged as unconstitutional, a defendant must have 'some connection with the enforcement of the act' in order to properly be a party to the suit." *South Carolina Wildlife Fed'n v. Limehouse,* 549 F.3d 324, 332 (4th Cir. 2008) (quoting *Lytle v. Griffith,* 240 F.3d 404, 409 (4th Cir. 2001)). This "special relation"

19

"requires *proximity to* and *responsibility for* the challenged state action." *Wright v. North Carolina*, 787 F.3d 256, 261-62 (4th Cir. 2015) (quotation omitted) (emphasis in original). Here, though two DA Defendants have initiated prosecutions under the challenged statute in past elections, all of them are statutorily authorized to do so and none have disclaimed intent. *See Does 1-5 v. Cooper*, 40 F. Supp. 3d 657, 674 (M.D.N.C. 2014) (holding that "District Attorneys each have the authority to prosecute individuals for violating the challenged statute" despite only one ever having "explicitly threatened any Plaintiffs with prosecution"). Thus, this sufficiently establishes a special relation required to invoke the *Ex parte Young* exception.

## Rule 12(b)(6) – Failure to State a Claim

The DA Defendants also argue that dismissal of Plaintiffs' Amended Complaint is warranted under Rule 12(b)(6) for failure to state a claim. A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) raises the question of whether the plaintiff's complaint or pleadings are legally sufficient. *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint may warrant Rule 12(b)(6) dismissal "by failing to state a valid legal cause of action, *i.e.*, a cognizable claim, or . . . by failing to allege sufficient facts to support a legal cause of action." *Joe Hand Promotions, Inc. v. Hayes*, No. 1:18CV531, 2019 WL 4246646, at *2 (M.D.N.C. Sept. 6, 2019) (unpublished) (internal citations omitted).

A 12(b)(6) motion tests the sufficiency of a complaint and "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party*

*of N.C. v. Martin,* 980 F.2d 943, 952 (4th Cir. 1992). Accordingly, a court should "assume the truth of all facts alleged in the complaint and the existence of any fact that can be proved, consistent with the complaint's allegations." *E. Shore Mkts. Inc. v. J.D. Assocs. Ltd. P'ship,* 213 F.3d 175, 180 (4th Cir. 2000). Although the truth of the facts alleged is assumed, courts are not bound by the "legal conclusions drawn from the facts" and "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Id.* Further, a court should not "conjure up questions never squarely presented." *Beaudett v. City of Hampton,* 775 F.2d 1274, 1278 (4th Cir. 1985).

## 1. Void for Vagueness Doctrine

The DA Defendants argue that Plaintiffs have not adequately alleged that the challenged statute is unconstitutionally vague in violation of the Due Process Clause. (Docket Entry 47 at 15-19.) "The void for vagueness doctrine is rooted in the Due Process Clause of the Fifth and Fourteenth Amendments." *Manning v. Caldwell for City of Roanoke,* 930 F.3d 264, 272 (4th Cir. 2019). It "addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *FCC v. Fox Television Stations, Inc.,* 567 U.S. 239, 253 (2012). The Fourth Circuit has stated that "[a] statute is unconstitutionally vague under the Due Process Clause if it 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" *Martin v. Lloyd,* 700 F.3d 132, 135 (4th Cir. 2012) (quoting *United States v. Williams,* 553 U.S. 285, 304 (2008)). In circumstances where "criminal penalties may be

imposed for violations of a law, a stricter standard is applied in reviewing the statute for vagueness." *Manning*, 930 F.3d at 272-73 (citation omitted).

Plaintiffs' Amended Complaint alleges that the challenged statute "does not define which crimes 'exclude[ ] the person from the right of suffrage,' nor does it provide any information concerning how an individual may be 'restored to the right of citizenship.' " (Am. Compl. ¶ 62.) Rather, Plaintiffs allege that a prospective voter must turn to N.C. Gen. Stat. § 163-55(a)(2) entitled, *Qualifications to vote; exclusion from electoral franchise*, to determine the classes of persons prohibited from voting. (*Id.*) It reads:

> [T]he following classes of persons shall not be allowed to vote in this State: . . . Any person adjudged guilty of a felony against this State or the United States, or adjudged guilty of a felony in another state that also would be a felony if it had been committed in this State, unless that person shall be first *restored to the rights of citizenship* in the manner prescribed by law.

N.C. Gen. Stat. § 163-55(a)(2) (emphasis added). Plaintiffs allege that "[t]o determine how to be 'restored to the rights of citizenship,' a prospective voter must" then turn outside North Carolina's election code to Chapter 13 of the North Carolina's General Statutes, entitled *Citizenship Restored*, to discover that an individual "regains citizenship rights upon his or her 'unconditional discharge.' " (Am. Compl. ¶ 63 (citing N.C. Gen. Stat. § 13-1 ("Citizenship Restoration Law")).)

In its entirety, the Citizenship Restoration Law reads:

> Any person convicted of a crime, whereby the rights of citizenship are forfeited, shall have such rights automatically restored upon the occurrence of any one of the following conditions:
>
> (1) The *unconditional discharge* of an inmate, of a probationer, or of a parolee by the agency of the State having jurisdiction of that

person or of a defendant under a suspended sentence by the court.

(2) The unconditional pardon of the offender.

(3) The satisfaction by the offender of all conditions of a conditional pardon.

(4) With regard to any person convicted of a crime against the United States, the *unconditional discharge* of such person by the agency of the United States having jurisdiction of such person, the unconditional pardon of such person or the satisfaction by such person of a conditional pardon.

(5) With regard to any person convicted of a crime in another state, the *unconditional discharge* of such person by the agency of that state having jurisdiction of such person, the unconditional pardon of such person or the satisfaction by such person of a conditional pardon.

N.C. Gen. Stat. § 13-1 (emphasis added). It is further alleged that this statute "nor any other North Carolina statute defines the term 'unconditional discharge[,]' " nor does "[t]he NCSBE . . . define the term . . . anywhere in the state's Voter Registration Application or on the section of the NCSBE's website entitled, *Registering as a Person in the Criminal Justice System*." (Am. Compl. ¶ 64.)

Plaintiffs also allege that North Carolina state court has construed the Citizenship Restoration Law as "preclud[ing] the restoration of citizenship rights until the completion of the sentence, including any period of parole, post-release supervision or probation." (*Id.* ¶ 65 (citation omitted).) However, "[p]arole was abolished in North Carolina in 1994" and "post-release supervision" was imposed for felons under the Structured Sentencing Act, though voter registration applications allegedly failed to mention post-release supervision "until a few months" prior to the filing of the Amended Complaint. (*Id.*) Moreover, "[t]he NCSBE's

script for poll workers to use when verifying voter eligibility also failed to mention post-release supervision." (*Id.* ¶ 66.) Further, the Amended Complaint alleges that "[t]he confusion caused by the State's voting materials is exacerbated by the State's inadequate procedures for notifying individuals with felony convictions that they are ineligible to vote." (*Id.* ¶ 68; *see also id.* ¶¶ 69-74.) Plaintiffs have noted changes since the 2016 post-election audit, including some improvements in the voter forms and the North Carolina Department of Public Safety's revised probation brochure concerning information on loss of voting rights. (*Id.* ¶ 75.) Nevertheless, they allege that "these changes still do not provide constitutionally-adequate notice" nor "do nothing to protect from criminal liability the individuals who voted in the 2016 election before sentence completion." (*Id.* ¶ 76.)

After review of the parties' arguments and relevant case law, the undersigned concludes that the allegations are sufficient to state a plausible claim under the void for vagueness doctrine. "[T]he Due Process Clause does not require that a statute be drafted with 'perfect clarity and precise guidance.' " *Little v. Dominion Transmission, Inc.,* 138 F. Supp. 3d 699, 705 (W.D. Va. 2015) (citing *Ward v. Rock Against Racism,* 491 U.S. 781, 794 (1989)). Indeed, "words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Michigan Dep't of Treasury,* 489 U.S. 803, 809 (1989). When "[a] statute that contains undefined terms or fails to explicitly state a standard [it] is not unconstitutionally vague *per se*; [rather,] where a statute fails to define a term, courts will simply give the terms their ordinary meaning." *United States v. Clarkson,* No. 5:18-CR-00026, 2020 WL 564039, at *2 (S.D.W. Va. Feb. 4, 2020) (citing *See United States v. Day,* 700 F.3d 713, 725 (4th Cir. 2012)). Ultimately, "the touchstone is whether the statute, either standing alone or as construed, made

24

it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 266 (1997).

Here, Plaintiffs' allegations go beyond the claim that the challenged statute has undefined terms. Essentially, it is the assertion that the challenged statute has undefined terms, which implicitly incorporates another statute, the Citizenship Restoration Law, which also itself has an undefined term, "unconditional discharge." Coupled with the State's construction of the Citizenship Restoration Law and the alleged inadequate notification procedures, these allegations form the basis of Plaintiffs' claim that a person of ordinary intelligence lacks adequate notice of his or her conduct in violation of N.C. Gen. Stat. § 163-275(5). (*See* Am. Compl. ¶¶ 96-104.) Taken as true, the Court concludes that the allegations in the Amended Complaint state a plausible claim under the void for vagueness doctrine of the Due Process Clause. Thus, the DA Defendants' motion should be denied as to this point.

2. Equal Protection Clause

The DA Defendants also move to dismiss Plaintiffs' claim under the Equal Protection Clause of the Fourteenth Amendment. (Docket Entry 47 at 19-22.) The Equal Protection Clause of the Fourteenth Amendment provides that no state shall prohibit "any person within its jurisdiction the equal protection of the laws." *Fisher v. King*, 232 F.3d 391, 399 (4th Cir. 2000) (quoting U.S. Const. amend. XIV, § 1). It "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Thus, no state can "purposely discriminat[e] between individuals on the basis of race" without conflicting with the Fourteenth Amendment. *Shaw v. Reno*, 509 U.S. 630, 642 (1993) (citing *Washington v. Davis*, 426 U.S. 229, 239 (1976)).

25

A facially-neutral law is in violation of the Equal Protection Clause if it is adopted with the intent to discriminate against a particular racial group. *Washington v. Davis*, 426 U.S. at 239. "This includes a criminal disenfranchisement law enacted with the intent to deprive one racial group of its right to participate in the political process." *Johnson v. Governor of State of Fla.*, 405 F.3d 1214, 1218 (11th Cir. 2005) (citation omitted). "Determining whether a statute was enacted with discriminatory intent is a factual question involving a two-step process." *N. Carolina State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 303 (4th Cir. 2020) (citing *Hunt v. Cromartie*, 526 U.S. 541, 549 (1999)). Plaintiffs must first demonstrate that racial discrimination was a " 'substantial' or 'motivating' factor behind enactment of the law[.]" *Hunter v. Underwood*, 471 U.S. 222, 228 (1985). In making that determination, the Supreme Court has set forth four factors to consider: "(1) historical background; (2) the specific sequence of events leading to the law's enactment, including any departures from the normal legislative process; (3) the law's legislative history; and (4) whether the law 'bears more heavily on one race than another.' " *Raymond*, 981 F.3d at 303 (4th Cir. 2020) (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-69 (1977)). "Once racial discrimination is shown to have been a substantial or motivating factor behind the enactment of the law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Hunter*, 471 U.S. at 228 (internal quotation marks and citation omitted). "Only the first step [of this process] is relevant at the Rule 12(b)(6) motion-to-dismiss stage, where the pleadings are under scrutiny." *Thompson v. Alabama*, 293 F. Supp. 3d 1313, 1321 (M.D. Ala. 2017).

Here, considering the DA Defendants' arguments and taking the allegations in light most favorable to Plaintiffs, the undersigned concludes that the Amended Complaint states a plausible claim for intentional discrimination under the Equal Protection Clause. Considering the factors under *Arlington Heights*, as to the challenged statute's disparate impact, Plaintiffs allege that African Americans have been disproportionally flagged by the NCSBE and subsequently charged for those violations. (*See* Am. Compl. ¶¶ 48-49 (NCSBE's audit of 2016 election determined that 441 individuals with felony convictions may have voted, 66% of which were Black; Am. Compl. ¶¶ 4, 51, 54 (though comprising less than 21% of the county's population, 9 of 12 individuals (75%) charged under N.C. Gen. Stat. § 163-275(5) in Alamance County in 2018 were Black; all 4 individuals charged in 2019 in Hoke County were Black).) This indicates that the statute "bears more heavily on one race than another." *Arlington Heights*, 429 U.S. at 266.

As to the historical background and events leading to the law's original enactments, Plaintiffs allege that before the Civil War, the North Carolina Constitution explicitly denied voting rights to freed Black men in State-based elections. (Am. Compl. ¶ 24 (citation omitted).) After the Civil War, Plaintiffs allege that "North Carolinians seized on the State's criminal disenfranchisement law to limit Black suffrage" (*id.* ¶ 26), and point to reports by Representative Thaddeus Stevens of Pennsylvania in 1867 who received information that in North Carolina "where punishment at the whipping-post deprives the person of the right to vote, they are now every day whipping negroes for a thousand and one trivial offenses." (*Id.* (citation omitted).) As further stated by Representative Stevens, in one county "they had whipped every adult male negro who they knew of. They were all convicted and sentenced at

once . . . for the purpose of preventing these negroes from voting under the bills which have been passed." (*Id.* (citation omitted).)

Plaintiffs allege that North Carolina then adopted a new constitution in 1868 that granted the right to vote, without regard to race, to all males, which did not include a criminal disenfranchisement provision. (*Id.* ¶ 27 (citation omitted).) "Black citizens participated in government in previously unprecedented numbers and roles" until 1875 when North Carolina amended its constitution to "frustrate and impede the influence of Black citizens." (*Id.* ¶¶ 27-28.) Plaintiffs allege that the "1875 constitutional amendments included a criminal disenfranchisement provision" which "was widely understood . . . would disproportionately impact Black North Carolinians." (*Id.* ¶ 28 (citation omitted).) These allegations set forth the historical perspective and events leading to the original enactment of N.C. Gen. Stat. § 163-275(5).

After the 1875 constitutional amendments, Plaintiffs allege the North Carolina Legislature enacted the first form of the challenged statute in 1877 through "a new law imposing strict criminal liability on individuals convicted of disenfranchising offenses who voted before they were restored to the rights of citizenship." (Am. Compl. ¶ 29 (citation omitted.) There was no "intent requirement" at that time. (*Id.*) Plaintiffs allege the North Carolina General Assembly reenacted the challenged statute with unequivocal discriminatory intent. (*Id.* ¶¶ 30-46.) More specifically, Plaintiffs point to the events leading up to the 1899 reenactment, including the actions of the State Democratic Executive Committee of North Carolina (the "Committee"). (*Id.* ¶¶ 30-34.) As further alleged, "[t]he Committee claimed that Black individuals engaged in widespread voting fraud, and specifically highlighted purported

voting by Black individuals with felony convictions." (*Id.* ¶ 32.) Plaintiffs then point to the Committee's contention that " 'this is a white man's country and white men must control and govern it' " and that " 'the special mission of the Democratic Party to rescue the white people of the east from the curse of negro domination.' " (*Id.* ¶ 33 (citation omitted.))

Plaintiffs allege that in the November 1898 election, the Democratic Party turned to the "threat of violence" and held rallies whereby large groups of men openly brandished weapons while riding "through predominantly African American neighborhoods in an effort to scare away potential Republican voters from the polls." (*Id.* ¶ 34 (citation omitted).) "The Democrats 'won a majority of the seats in the legislature and quickly began work on legislation that would effectively disenfranchise African American voters for decades to come.' " (*Id.* (citation omitted).)

Plaintiffs allege that similar to the version enacted in 1877, the 1899 version of the challenged statute was essentially verbatim and included no intent requirement. (*Id.* ¶ 36.) Again in 1931, the North Carolina General Assembly reenacted many of the voting crimes to include the challenged statute. (*Id.* ¶ 39.) Plaintiffs allege that while changes "provided uniform penalties for felony-level election crimes," "streamlined the language of the 1899 version of the challenged statute," and "specified that the law applied with equal force to primary elections," the "the key features of the 1931 version . . . were identical to the 1899 . . . . version." (*Id.* ¶¶ 39-40.) As alleged in the Amended Complaint, those key features were "voting while ineligible because of a prior felony conviction was itself a felony under North Carolina law, and one for which no intent element was required to prove culpability." (*Id.* ¶ 40.) Plaintiffs allege that because these key features of the challenged statute have never been

substantially amended, and it disproportionally impacts Black North Carolinians, it violates the Equal Protection Clause. (*Id.* ¶ 111.)

As to the legislative history, it "may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Arlington Heights*, 429 U.S. at 268. Although Plaintiffs' Amended Complaint is bare as to allegations of specific documents or statements made by members of the General Assembly at the time of the challenged statute's original enactment, this *Arlington Heights* factor, nor any other standing alone, is dispositive. *Arlington Heights*, 429 U.S. at 268 ("The foregoing summary identifies, without purporting to be exhaustive, subjects of proper inquiry in determining whether racially discriminatory intent existed."); *see also N. Carolina State Conf. of NAACP v. McCrory*, 831 F.3d 204, 229 (4th Cir. 2016) (noting that no *Arlington Heights* factor is dipositive on its own).

Having considered the factors in *Arlington Heights* "in the totality of the circumstances," *McCrory*, 831 F.3d at 233, the undersigned concludes that Plaintiffs adequately allege that racial discrimination was a substantial or motivating factor behind enactment of the challenged statute. Plaintiffs further allege that such statute has been "reenacted almost verbatim" and the General Assembly has never amended its key features. (Am. Compl. ¶¶ 107-08.) Having asserted "that its original enactment was motivated by a desire to discriminate against blacks on account of race and the section continues to this day to have that effect[,]" *Hunter*, 471 U.S. at 233, the undersigned finds that the allegations are sufficient to nudge Plaintiffs' Equal Protection claim "across the line from conceivable to plausible," *Twombly*, 550 U.S. at 570,

even if it appears "that a recovery is very remote and unlikely," *id.* at 556, (citations and internal quotation marks omitted).

The DA Defendants argue that Plaintiffs make conclusory allegations that criminal disenfranchisement under the North Carolina state constitution was enacted to frustrate the influence of Blacks, yet Plaintiffs don't challenge that provision of the state constitution. (Docket Entry 47 at 21.) In addition, the DA Defendants contend that the information upon which Plaintiff relies to evidence discriminatory intent is largely unconnected to the passage of the challenged statute and not indicative of legislative intent. (*Id.* at 22; Docket Entry 53 at 11.) The undersigned finds these arguments unpersuasive. First, while Plaintiffs make allegations regarding criminal disenfranchisement under the North Carolina state constitution, they do so in context to the narrowly focused challenge to N.C. Gen. Stat. § 163-275(5). Second, to the extent the DA Defendants challenge the information presented in support of Plaintiffs' claims, the undersigned as mentioned above has already concluded that Plaintiffs' allegations are sufficient to survive Rule 12(b)(6) dismissal.

In concluding such, the Court makes no final determination on whether Plaintiffs will be successful on either of their claims. Indeed, the Supreme Court has cautioned that "[i]nquiries into congressional motives or purposes are a hazardous matter." *United States v. O'Brien*, 391 U.S. 367 (1968); *see also Hunter*, 471 U.S. at 228 ("Proving the motivation behind official action is often a problematic undertaking."). The determination of "whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266. At this stage, however, the inquiry is focused on the allegations as alleged in the Amended

Complaint, which are "enough to raise a right to relief above the speculative level," *Twombly*, 550 U.S. 544, 570. Thus, the DA Defendants' motion to dismiss should be denied.

## III. CONCLUSION

For the reasons stated herein, **IT IS HEREBY RECOMMENDED** that Proposed Intervenors' Motion to Intervene (Docket Entry 44) be **DENIED** and that the Motion to Dismiss by the forty-two individually named District Attorneys (Docket Entry 46) be **DENIED**.

_____
Joe L. Webster
United States Magistrate Judge

February 14, 2022
Durham, North Carolina

32