EXHIBIT A:

SUPERIOR COURT FINAL ORDER

FILED

NORTH CAROLINA

COUNTY OF WAKE

2022 MAR 28  PM 4: 20

WAKE CO., C.S.C.

BY ___S C √___

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO. 19 CVS 15941

COMMUNITY SUCCESS INITIATIVE,
*et al.*,

     Plaintiffs,

v.

TIMOTHY K. MOORE, in his official
capacity as Speaker of the North Carolina
House of Representatives, *et al.*,

     Defendants.

**FINAL JUDGMENT AND ORDER**

## TABLE OF CONTENTS

Page

BACKGROUND ................................................................................. 3

LEGAL STANDARD ......................................................................... 5

FINDINGS OF FACT ........................................................................ 8

    **A.** The History and Intent of N.C.G.S. § 13-1 Are Rooted in Racial Discrimination Against African American People and Suppression of African American Political Power ...................... 8

        1. The 1800s ................................................................... 9

        2. 1897 to 1970 ............................................................ 16

        3. The Early 1970s ....................................................... 17

    **B.** Present Day Effect of N.C.G.S. § 13-1. ............................. 23

        1. Denial of the Franchise to Over 56,000 Persons on Community Supervision. .......................................... 24

        2. Racial Disparities in Felon Disenfranchisement ............. 25

    **C.** N.C.G.S. § 13-1 Denies the Franchise to Persons on Community Supervision Who Would Otherwise Register and Vote and Likely Affects the Outcome of Elections. ...................... 29

        1. Expected Voter Turnout Among People on Felony Supervision ............................................................... 30

        2. The Potential Impact on Elections ........................... 37

    **D.** N.C.G.S. § 13-1 Does Not Serve Any Legitimate State Interest and Causes Substantial Harm. .......................................... 39

        1. N.C.G.S. § 13-1 Does Not Serve Any Legitimate State Interest ....................................................................... 39

        2. N.C.G.S. § 13-1 Does Substantial Harm ................... 43

CONCLUSIONS OF LAW ............................................................... 55

**I.** N.C.G.S. § 13-1's Denial of the Franchise to Persons on Probation, Parole, or Post-Release Supervision Violates the North Carolina Constitution's Equal Protection Clause ...................... 55

    **A.** N.C.G.S. § 13-1 Impermissibly Discriminates Against African American People in Intent and Effect and Denies Substantially Equal Voting Power to African American People ...................... 56

      **B.**     **N.C.G.S. § 13-1 Impermissibly Deprives All Individuals on Felony Probation, Parole, or Post-Release Supervision of the Fundamental Right to Vote.** ............................................................ 57

      **C.**     **N.C.G.S. § 13-1's Violation of Article 1, § 19 Triggers Strict Scrutiny** ........................................................................................... 58

**II.**   **N.C.G.S. § 13-1's Denial of the Franchise to Individuals on Probation, Parole, or Post-Release Supervision Violates the North Carolina Constitution's Free Elections Clause** .......................................... 59

      **A.**     **N.C.G.S. § 13-1 Prevents Elections from Ascertaining the Will of the People** ......................................................................................... 59

      **B.**     **N.C.G.S. § 13-1's Interference with Free Elections Triggers Strict Scrutiny** ........................................................................... 60

**III.**  **N.C.G.S. § 13-1's Denial of the Franchise to Persons on Community Supervision Cannot Satisfy Strict or Any Scrutiny** ............................. 61

**IV.**  **The Constitutional Provision Regarding Felony Disenfranchisement Does Not Insulate N.C.G.S. § 13-1 From Constitutional Challenge** .... 63

**DISSENT** ....................................................................................................... 66

Exhibit A: Superior Court Final Order

This matter came on for trial in Wake County before the undersigned three-judge panel on August 16 through August 19, 2021. In this litigation, Plaintiffs seek a declaration that N.C.G.S. § 13-1, the North Carolina statute providing for the restoration of rights of citizenship—which includes the right to vote—for persons convicted of a crime, is facially unconstitutional and invalid under the North Carolina Constitution to the extent it prevents persons on probation, parole, or post-release supervision from voting in North Carolina elections. Plaintiffs also seek, in the alternative, injunctive relief. Specifically, Plaintiffs contend Section 13-1 of our General Statutes violates Article I, Sections 10, 11, 12, 14, and 19 of our Constitution.

## **BACKGROUND**

1.      Plaintiffs filed the initial complaint in this matter on November 20, 2019, and an amended complaint on December 3, 2019. Defendants filed answers to and motions to dismiss the amended complaint in January 2020; the motions to dismiss were subsequently withdrawn. On May 11, 2020, Plaintiffs filed a motion for summary judgment or, in the alternative, a preliminary injunction.

2.      On June 17, 2020, this action was transferred to a three-judge panel of Superior Court, Wake County, pursuant to N.C.G.S. § 1-267.1 and N.C.G.S. § 1A-1, Rule 42(b)(4). On June 24, 2020, the Chief Justice of the Supreme Court of North Carolina, pursuant to N.C.G.S. § 1-267.1, assigned the undersigned three-judge panel to preside over the facial constitutional challenges raised in this litigation.

3.      On September 4, 2020, a majority of the undersigned panel granted in part and denied in part Plaintiffs' motion for summary judgment, granted summary

judgment in part to Defendants, and granted a preliminary injunction. The preliminary injunction was granted with respect to Plaintiffs' claims under Article I, §§ 11 and 19 for those persons convicted of a felony and, as a result, made subject to property qualifications.

4. The following three claims remained for trial following the preliminary injunction and summary judgment:

    a. that N.C.G.S. § 13-1 violates the Equal Protection Clause of the North Carolina Constitution by depriving all persons with felony convictions subject to probation, parole, or post-release supervision, who are not incarcerated, of the right to vote;

    b. that N.C.G.S. § 13-1 violates the Equal Protection Clause of the North Carolina Constitution by depriving the African American community of substantially equal voting power; and

    c. that N.C.G.S. § 13-1 violates the Free Elections Clause of the North Carolina Constitution.

5. Trial on these claims was held in Wake County before the three-judge panel on August 16, 2021, through August 19, 2021. On August 19, 2021, the panel issued a clarifying ruling from the bench pertaining to the language on the forms promulgated by the State Board of Elections regarding voter eligibility in light of the September 4, 2020, preliminary injunction.

6. On August 23, 2021, the panel orally issued an amended preliminary injunction expanding the injunction entered on September 4, 2020, to enjoin

Defendants from denying voter registration to any convicted felon who is on community supervision, whether probation, post-release supervision, or parole. This Order applied to individuals convicted in North Carolina state court and those individuals convicted in federal courts. The amended preliminary injunction was filed on August 27, 2021.

## LEGAL STANDARD

### A. Facial Constitutional Challenges

7.     "It is well settled in North Carolina that the courts have the power, and it is their duty in proper cases, to declare an act of the General Assembly unconstitutional—but it must be plainly and clearly the case. If there is any reasonable doubt, it will be resolved in favor of the lawful exercise of their powers by the representatives of the people." *City of Asheville v. State*, 369 N.C. 80, 87-88, 794 S.E.2d 759, 766 (2016)(quoting *Glenn v. Bd. of Educ.*, 210 N.C. 525, 529-30, 187 S.E. 781, 784 (1936)); *State ex rel. Martin v. Preston*, 325 N.C. 438, 449, 385 S.E.2d 473, 478 (1989).

### B. Equal Protection

8.     *Village of Arlington Heights v. Metro Hous. Dev. Corp.* sets out the appropriate framework by which to analyze whether an official action was motivated by discriminatory purpose. 429 U.S. 252 (1977). The North Carolina Court of Appeals discussed this framework in *Holmes v. Moore*, 270 N.C. App. 7, 16, 840 S.E.2d 244, 254 (2020). "[P]roof of a racially discriminatory intent or purpose" will show "a violation of the Equal Protection Clause." *Id.*

9.     *Arlington Heights* laid out a non-exhaustive list of factors for courts to consider. *Id.* at 18, 840 S.E.2d 244 at 254 (2020). Those factors include: (1) the law's historical background, (2) the specific sequence of events leading to the law's enactment, including any departure from the normal procedural sequence, (3) the legislative history of the decision, and (4) the impact of the law and whether it bears more heavily on one race than another. *Arlington Heights*, 429 U.S. at 266-68.

10.     Plaintiffs "need not show that discriminatory purpose was the 'sole[ ]' or even a 'primary' motive for the legislation, just that it was 'a motivating factor.'" *Holmes*, 270 N.C. App. at 16–17 (*quoting Arlington Heights*).

11.     "Once racial discrimination is shown to have been a substantial or motivating factor behind enactment of the law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor. Although . . . North Carolina caselaw generally gives acts of the General Assembly great deference, such deference is not warranted when the burden shifts to a law's defender after a challenger has shown the law to be the product of a racially discriminatory purpose or intent." *Holmes*, 270 N.C. App. at 19 (quotation marks and citations omitted).

12.     The injury in an equal protection claim lies in the denial of equal treatment itself, not the ultimate inability to obtain the benefit. *Holmes*, 270 N.C. App. at 14 n. 4. The fact that Plaintiffs may ultimately be able to comply with the requirements of N.C.G.S. § 13-1 and vote is not determinative of whether

Exhibit A: Superior Court Final Order

compliance with the requirements of N.C.G.S. § 13-1 results in an injury to Plaintiffs. *See id.*

13.    Further, North Carolina's Equal Protection Clause expansively protects "the fundamental right of each North Carolinian to substantially equal voting power." *Stephenson v. Bartlett*, 355 N.C. 354, 379, 562 S.E.2d 377, 394 (2002). "It is well settled in this State that the right to vote on equal terms is a fundamental right." *Id.* at 378, 562 S.E.2d at 393 (internal quotation marks omitted).

14.    If a statute interferes with the exercise of a fundamental right, strict scrutiny applies even if the affected group is not a suspect class. *Stephenson*, 355 N.C. at 379, 562 S.E.2d at 394; *Northampton Cnty. Drainage Dist. No. One v. Bailey*, 326 N.C. 742, 747, 392 S.E.2d 352, 356 (1990).

## C. Free Elections Clause

15.    The Free Elections Clause, Art. I, § 10, mandates that elections must be conducted freely and honestly, to ascertain, fairly and truthfully, the will of the people.

16.    Our Supreme Court has elevated this principle to the highest legal standard, noting that it is a "compelling interest" of the State "in having fair, honest elections." *State v. Petersilie*, 334 N.C. 169, 184, 432 S.E.2d 832, 840 (1993).

17.    North Carolina's Free Elections Clause dates back to the North Carolina Declaration of Rights of 1776. *Harper v. Hall,* 2022-NCSC-17, P134 (2022). The framers of the Declaration of Rights modeled it on a provision in the 1689

English Bill of Rights stating that "election of members of parliament ought to be free." *Id.* (quoting Bill of Rights 1689, 1 W. & M. c. 2 (Eng.)).

18.     As the Supreme Court of North Carolina explained 145 years ago, "[o]ur government is founded on the will of the people," and "[t]heir will is expressed by the ballot." *People ex rel. Van Bokkelen v. Canaday*, 73 N.C. 198, 220 (1875)). A "free" election, therefore, must reflect to the greatest extent possible the will of *all* people living in North Carolina communities. *Id.* at 222-23 (the franchise belongs to "every" resident, as "government affects his business, trade, market, health, comfort, pleasure, taxes, property and person").

## FINDINGS OF FACT

### A.     The History and Intent of N.C.G.S. § 13-1 Are Rooted in Racial Discrimination Against African American People and Suppression of African American Political Power

19.     Plaintiffs' expert Dr. Vernon Burton serves as the Judge Matthew J. Perry Distinguished Professor of History at Clemson University. 8/16/21 Trial Tr. 64:16-17; PX-27 at 1 (Burton Report); PX-28 (Burton CV). The Court accepted Dr. Burton as an expert in American history with a particular focus on the American South, race relations and racial discrimination in the American South, the Civil War and Reconstruction, and the civil rights movement. 8/16/21 Trial Tr. 76:8-23. Dr. Burton described the history and intent behind North Carolina's felony disenfranchisement and rights restoration provisions. The Court credits Dr. Burton's testimony, as well as the materials on which he relied, and accepts his findings and conclusions.

### 1. The 1800s

20. Between 1835 and 1868, North Carolina's Constitution forbid African Americans, including free African Americans, from voting. During this period, North Carolina did not have a disenfranchisement provision specific to felons, but rather excluded "infamous" persons from suffrage. N.C. Const. Art. I, § 4, pt. 4 (1776, amended in 1835) (authorizing the legislature to pass laws for restoration of rights to "infamous" persons). Infamy could result either from a conviction for an infamous crime such as treason, bribery, or perjury, or from the receipt of an infamous punishment such as whipping. 8/16/21 Trial Tr. 82:2-16; Joint Stipulation of Facts ("Fact Stip.") ¶ 21 (attached as Exhibit 1 to the parties' Proposed Joint Pre-Trial Order).

21. In 1868, after the Civil War, North Carolina adopted a new Constitution as a condition of rejoining the Union. Approximately 15 of the 120 delegates to the 1868 Convention were African American, and others were prominent advocates for equality. 8/16/21 Trial Tr. 97:4-15. The 1868 Constitution provided for universal male suffrage, eliminated property requirements to vote, and abolished slavery. N.C. Const. of 1868, art. I, § 33; *id.* art. VI, § 1; Fact Stip. ¶ 24. The 1868 Constitution did not contain a felony disenfranchisement provision. 8/16/21 Trial Tr. 97:23-25.

22. The 1868 Constitution, particularly its universal suffrage provision, provoked a violent backlash by White supremacists, called the Kirk Holden War. *Id.* at 98:1-25. The Ku Klux Klan murdered African American elected officials and

Exhibit A: Superior Court Final Order

White Republicans and engaged in a campaign of fraud and violent intimidation of African American voters. *Id.*; PX-27 at 24-26.

23.    As part of this backlash against African American suffrage, in the late 1860s, White former Confederates in North Carolina conducted an extensive campaign of convicting African American men of petty crimes *en masse* and whipping them to disenfranchise them "in advance" of the Fifteenth Amendment. 8/16/21 Trial Tr. 83:22-93:2; PX-27 at 19-22. Contemporary newspapers acknowledged that the goal of this whipping campaign was to take advantage of North Carolina's law in existence at the time that disenfranchised anyone subject to a punishment of whipping. A January 1867 article in the National Anti-Slavery Standard explained that "in all country towns the whipping of Negroes is being carried on extensively," that the "real motive … is to guard against their voting in the future, there being a law in North Carolina depriving those publicly whipped of the right to vote," and that "the practice was carried on upon such a scale at Raleigh that crowds gathered every day at the courthouse to see the Negroes whipped." PX-161. An 1867 article in *Harper's Weekly* described "the public whipping of colored men as fast as they were convicted and sentenced to be whipped by the court," taking place "every day during about a month," and explained the purpose: "even if the suffrage were extended to colored men," those punished by a whipping "are disqualified in advance." PX-158; *see also* PX-159 (March 1867 Atlantic Monthly article recounting same). Rep. Thaddeus Stevens described this vicious campaign on the floor of the U.S. House of Representatives, explaining that "in one county …

Exhibit A: Superior Court Final Order

they whipped *every adult male* negro whom they knew of. They were all convicted and sentenced at once, and [the Freedmen's Bureau official] ascertained by intermingling with the people that it was for the purpose of preventing these negroes from voting." PX-160 (emphasis added). Stevens understood that this tactic would continue unless Congress stepped in and accordingly proposed a federal law banning disenfranchisement "for any crime other than for insurrection or treason," *id.*, but it did not become law.

24. As a consequence of their campaign to disenfranchise African American men, White Democrats regained control of the General Assembly in 1870 and, by 1875, further gains enabled them to call a constitutional convention to amend the 1868 Constitution. The "overarching aim" of those amendments was to "instill White supremacy and particularly to disenfranchise African-American voters." 8/16/21 Trial Tr. 100:2-6; *see id.* at 104:10-105:14. The amendments were ratified in 1876 and included provisions banning interracial marriage and requiring segregation in public schools. 1875 Amendments to the N.C. Const. of 1868, Amends. XXVI & XXX; Fact Stip. ¶ 25. Another amendment stripped counties of the ability to elect their own local officials, including judges, giving that power instead to the General Assembly. Amend. XXV; Fact Stip. ¶ 25. The purpose of this amendment was to prevent African Americans from electing African American judges, or judges who were likely to support equality. PX-27 at 31; 8/16/21 Trial Tr. 104:10-105:14.

25.     Notably, the 1876 constitutional amendments also disenfranchised everyone "adjudged guilty of felony." 1875 Amendments to the N.C. Const. of 1868, Amend. XXIV. The amendment further provided that such persons would be "restored to the rights of citizenship in a mode prescribed by law." *Id.* This was the first time in North Carolina's history that the State allowed for the disenfranchisement of all persons convicted of any type of felony.

26.     In 1877, in the first legislative session after the 1876 constitutional amendments were ratified, the General Assembly enacted a law implementing the felony disenfranchisement constitutional provision. Fact Stip. ¶ 26. The 1877 law barred all people with felony convictions from voting unless their rights were restored "in the manner prescribed by law." *Id.*; PX-52 at 519-20 (1876-77 Sess. Laws 519, Ch. 275, § 10); 8/16/21 Trial Tr. 108:19-110:6.

27.     For the method of rights restoration, the 1877 disenfranchisement statute incorporated a preexisting statute from 1840 that governed rights restoration for individuals convicted of the most heinous crimes—treason and other "infamous" crimes. Fact Stip. ¶¶ 23, 27. The 1877 statute took all of the onerous requirements for rights restoration that had previously applied only to people convicted of treason and for the first time extended them to anyone convicted of any felony. 8/16/21 Trial Tr. 112:20-113:10, 165:15-18.

28.     The 1877 law did not just disenfranchise people with felony convictions, it also continued that disenfranchisement even after those individuals were released from incarceration and living in North Carolina communities.

29. Extending the 1840 statute to apply to felonies meant that individuals had to wait four years from the date of their felony conviction to file the petition seeking rights restoration. They also had to secure the testimony of "five respectable witnesses who have been acquainted with the petitioner's character for three years next preceding the filing of the petition, that his character for truth and honesty during that time has been good." Fact Stip. ¶ 23. The witness requirement meant that no one could petition for rights restoration until at least three years had elapsed since their release from prison. 8/16/21 Trial Tr. 112:8-19. In addition, the extension of the 1840 statute meant that anyone convicted of a felony was required to individually petition a judge for the restoration of voting rights, and the judge had unfettered discretion to reject the petition. Fact Stip. ¶ 23. Likewise, anyone convicted of a felony was required to post their petition for rights restoration on the courthouse door for a 3-month period before their hearing, and anyone from the community could come in to oppose the petition. *Id.* Until 1877, these requirements applied only to people convicted of the most egregious crimes against the community, like treason.

30. The 1877 implementing legislation also created harsh new penalties for voting before one's rights were restored. PX-52 at 537 (1876-77 N.C. Sess. Laws., Ch. 275, § 62). The legislation provided that a person who voted before their rights were restored after a felony conviction "shall be punished by a fine not exceeding one thousand dollars, or imprisonment at hard labor not exceeding two years, or both." *Id.* Dr. Burton described that penalty as "extraordinary for the time,"

particularly in light of the fact that the per capita income of African American people in the South at the time was just $40.01. 8/16/201 Trial Tr. 113:12-114:2; PX-27 at 36. These penalties carry through to this day. Under current North Carolina law, illegally voting while on probation, parole, or post-release supervision is a felony that carries a maximum sentence of two years in prison. N.C.G.S. §§ 163-275, 15A-1340.17.

31. The goal of the felony disenfranchisement regime established in 1876 and 1877, including the 1877 expansion of the onerous 1840 rights restoration regime to apply to all felonies, was to discriminate against and disenfranchise African American people. 8/16/21 Trial Tr. 114:10-19; PX-27 at 24-37.

32. White Democrats drew on the success of the whipping campaign, when they for the first time realized that they could use crime-based disenfranchisement as a tool to suppress African American votes and African American political power. *Id.* at 95:16-96:2. The idea was to accomplish indirectly what the Fifteenth Amendment prohibited North Carolina from doing directly. The state constitutional amendment was proposed by Colonel Coleman, a former Confederate who had been instructed by his nominating county to lead a "crusade" against the "radical civil rights officers' holders party," *i.e.*, the party that supported equal rights for African American people. *Id.* at 100:25-102:5. The committee that prepared the 1877 implementing legislation was chaired by Colonel John Henderson, another former Confederate who later would preside over the lynching of three African Americans. *Id.* at 105:18-106:12.

Exhibit A: Superior Court Final Order

Case 1:20-cv-00876-LCB-JLW   Document 70-2   Filed 04/22/22   Page 16 of 72

33.     The disenfranchisement regime capitalized on Black Codes that North Carolina had enacted in 1866, which allowed sheriffs to charge African American people with crimes at their discretion, thus disenfranchising them. 8/16/21 Trial Tr. 82:17-83:21.

34.     All the African American delegates at the 1876 convention voted against felony disenfranchisement; one explained that the "measure was intended to disenfranchise his people." *Id.* at 103:15-104:9. A contemporary North Carolina newspaper advocating for the provision stated in 1876 that "the great majority of the criminals are Negroes" and that felony disenfranchisement would therefore tend to "restrain their race from crime." PX-162; PX-27 at 31. White North Carolinians declared that "all Negroes are natural born thieves." PX-27 at 33-34. Other Democrats used coded language, like asserting that felony disenfranchisement was needed to ensure the "purity of the ballot box," signaling to all that their efforts targeted African American voters. *Id.* at 25, 29-31.

35.     The 1877 law's adoption of the requirement to petition an individual judge for restoration had a particularly discriminatory effect against African American people considering the contemporaneous 1876 constitutional amendment stripping African American communities of the ability to elect local judges. The judges appointed by the Democrat-controlled legislature in the 1870s were White Democrats who were committed to White supremacy and were unlikely to grant a petition to restore an African American person's voting rights. 8/16/21 Trial Tr. 111:12-112:7.

Exhibit A: Superior Court Final Order

36.     Legislative Defendants conceded at trial that the goal of the 1870s

legislative enactments was to discriminate against African Americans:

> So now I'm going to turn to the second -- the second claim
> -- the second claim of plaintiffs that 13-1 has this
> impermissible intent and purpose of discriminating
> against African American voters.  The plaintiffs here
> presented a lot of evidence; much of it, if not all of it, all of
> it, troubling and irrefutable.  You can't -- I can't say
> anything about a newspaper report that says what it says.
> I can't say anything about the history that is in the -- in
> the archives.  What I can say is that the evidence that Dr.
> Burton presented certainly demonstrates a shameful
> history of our state's use of laws, and with regard to
> voting in particular, to suppress the African American
> population.  That I can't -- I can't contest that.  We never
> tried to contest that.

8/19/21 Trial Tr. 176:19-177:7.

37.     The Court reiterates its finding in the expanded preliminary injunction

order: "As acknowledged by Legislative Defendants at trial, there is no denying the

insidious, discriminatory history surrounding voter disenfranchisement and efforts

for voting rights restoration in North Carolina." 8/27/21 Order on Am. Prelim. Inj.

("Am. PI Order") at 8.

38.     North Carolina's decision in 1877 to disenfranchise people with felony

convictions even after they are released from incarceration and are living in the

community has remained unchanged to this day.

## 2.      1897 to 1970

39.     Between 1897 and 1970, the legislature made various small

adjustments to the procedure for restoration of rights and recodified that law at

N.C.G.S. § 13-1, but the substance of the law was largely unchanged. Individuals

Exhibit A: Superior Court Final Order

convicted of felonies were still required to petition individual judges for the restoration of their voting rights.

40.   In 1933, a change in the law instituted a requirement that felons wait "two years from the date of discharge" instead of four years from the date of conviction before they were eligible to petition for voting rights restoration. 8/16/21 Trial Tr. 121:1-12; LDX-46. And petitioners were still required to present five witnesses who had been acquainted with them for the three years directly preceding the restoration petition. LDX-1 (1969 version of N.C.G.S. § 13-1). Though the requirements for rights restoration were slightly relaxed in certain ways during this period, none of those changes were likely to help African American people, who had been "effectively" disenfranchised by this time "by other means," including North Carolina's poll tax and literacy test established in 1899. 8/16/21 Trial Tr. 173:13-174:1; PX-27 at 41.

**3.      The Early 1970s**

41.   In the early 1970s, the only African American legislators in the General Assembly—two of them in 1971, and three in 1973—tried to amend section 13-1 to eliminate its denial of the franchise to people who had finished serving their prison sentence. As Senator Mickey Michaux explained, the African American legislators' priority at that time, and the "priority" of the North Carolina NAACP, was "automatic restoration applicable across the board—at the least, the restoration of your citizenship rights after you completed imprisonment." PX-156 ¶ 15 (Michaux Affidavit).

42.     In 1971, Reps. Joy Johnson and Henry Frye proposed a bill amending section 13-1 to eliminate the petition and witness requirement and to "automatically" restore citizenship rights to anyone convicted of a felony "upon the full completion of his sentence." PX-55 at 1; 8/16/21 Trial Tr. 132:2-133:16. But their proposal was rejected. Their proposed bill was amended to retain section 13-1's denial of the franchise to people living in North Carolina's communities. In particular, the African American legislators' 1971 proposal was successfully amended in committee to specifically require the completion of "any period of probation or parole"—words that had not appeared in Rep. Johnson and Frye's original proposal—and then successfully amended again to require "two years [to] have elapsed since release by the Department of Corrections, including probation or parole." PX-55 at 2 (Committee Substitute); *id.* at 6 (Odom Amendment); 8/16/21 Trial Tr. 134:10-135:12. The amendments also deleted the word "automatically" and added a requirement to take an oath before a judge to obtain rights restoration. PX-55 at 2 (Committee Substitute). The 1971 revision to section 13-1 passed as amended. It thus required people with felony convictions to wait two years from the date of the completion of their probation or parole, and then to go before a judge and take an oath to secure their voting rights. LDX-2 (1971 session law).

43.     Rep. Frye explained on the floor of the North Carolina House of Representatives in July 1971 that "he preferred the bill's original provisions which called for automatic restoration of citizenship when a felon had finished his prison sentence, but he would go along with the amendment if necessary to get the bill

Exhibit A: Superior Court Final Order

passed." PX-56 ("Felon Citizenship Bill Gets House Approval," *The News & Observer* (Raleigh, NC), July 8, 1971); *see* 8/16/21 Trial Tr. 138:14-19.

44. In 1973, the three African American legislators were able to convince their 167 White colleagues to further amend the law to eliminate the oath requirement and to eliminate the two-year waiting period after completion of probation and parole, but they were not able to reinstate voting rights upon release from incarceration. LDX-6. Senator Michaux explained, with respect to the 1973 revision, that "[o]ur aim was a total reinstatement of rights, but we had to compromise to reinstate citizenship voting rights only after completion of a sentence of parole or probation." PX-156 ¶ 16 (Michaux Affidavit); PX-175 at 85:22-24 (Michaux Deposition). "To achieve even that victory, we vehemently argued and appealed to our colleagues that if you had served your time, you were entitled to your rights. Ultimately, what we achieved was a compromise." PX-156 ¶ 16.

45. The record evidence is clear and irrefutable that the goal of these African American legislators and the NC NAACP was to eliminate section 13-1's denial of the franchise to persons released from incarceration and living in the community, but that they were forced to compromise in light of opposition by their 167 White colleagues to achieve other goals, such as eliminating the petition requirement. Both Henry Frye's statement on the House floor and Senator Michaux's affidavit makes clear that the African American legislators wanted disenfranchisement to end at the conclusion of "prison" or "imprisonment." PX-56; PX-156 ¶¶ 15-17. But as Senator Michaux explained: "We understood at the time

that we would have to swallow the bitter pill of the original motivations of the law—the disenfranchisement at its core was racially motivated—to try to make the system practiced in North Carolina somewhat less discriminatory and to ease the burdens placed on those who were disenfranchised by the state." PX-156 ¶ 18.

46.     Defendants have argued that the original 1971 bill proposed by the African American legislators was ambiguous because it referred to restoration after completion of a "sentence," and did not use the word prison. The Court rejects this argument. Henry Frye's statement on the House floor made clear that that term referred to a "prison" sentence, and there would have been no need to amend the bill to add "probation or parole" on Legislative Defendants' theory. Defendants nonetheless suggest that the addition of the words "probation or parole" in amendments to the 1971 bill simply "clarified" what the original bill meant all along. The Court does not find this persuasive in light of Henry Frye's contemporaneous statement that he *opposed* the amendments and preferred the original language which he said he understood to mean the completion of a "prison" sentence. PX-56.

47.     In support of this argument, Defendants also point to a single ambiguous sentence from Senator Michaux's deposition. 8/16/21 Trial Tr. 199:5-200:4. When read as a whole, Senator Michaux's deposition and affidavit contradict Defendants' arguments. The deposition and affidavit conclusively establish—consistent with the official legislative records and contemporaneous news report—that the African American legislators intended and in fact initially proposed a bill to

eliminate the disenfranchisement of people on felony supervision. *Id.* at 200:9-20; PX-56; PX-156 ¶¶ 15-16 (Michaux Affidavit); PX-175 (Michaux Deposition).

48.     It was well understood and plainly known in the 1970s that the historical and original motivation for denial of the franchise to persons on community supervision in the post-reconstruction era had been to attack and curb the political rights of African Americans. PX-56 ¶ 14. It was also clear that section 13-1's implementation was mostly focused on and intended to negatively affect African Americans' political participation. *Id.* Indeed, the reason the NC NAACP made a push to amend the statute was precisely because the law was having a major impact on African American's registration opportunities. *Id.* No Defendant disputed during trial that the legislators in the 1970s understood the law's racist origins and discriminatory effects, nor did Defendants introduce any contrary evidence.

49.     Rep. Jim Ramsey, who chaired the House Committee offering the committee substitute adding back in the words "probation and parole," openly acknowledged in 1971 that the provision governing restoration of voting rights was "archaic and inequitable." PX-56. Rep. Ramsey provided no explanation for the Committee's decision to nonetheless preserve the existing law's disenfranchisement of people after their release from any incarceration.

50.     Defendants presented no evidence at any time during trial advancing any race-neutral explanation for the legislature's decision in 1971 and 1973 to

Exhibit A: Superior Court Final Order

preserve, rather than eliminate, the 1877 bill's denial of the franchise to persons on community supervision.

51.     There was no independent justification or race-neutral explanation for retaining the rule from 1877 that denied the franchise to individuals after release from incarceration in the 1971 and 1973 amendments to section 13-1. 8/16/21 Trial Tr. 148:10-18. That provision was added back without explanation.

52.     As Legislative Defendants acknowledged at trial, racism against African Americans remained rife in North Carolina, including in the General Assembly, in the 1970s. There were 3 African American legislators and 167 White ones. PX-56 ¶ 10. Many of the White legislators openly held racist views. *Id.* Legislators used racial slurs to refer to then-Reps. Johnson, Frye, and Michaux. *Id.* ¶ 11. The Ku Klux Klan was active, arch-segregationist George Wallace won North Carolina's presidential primary in 1972, and Jesse Helms was elected to the U.S. Senate. *Id.* ¶ 6; PX-27 at 47, 59; 8/16/21 Trial Tr. 128:15-16. An effort to repeal North Carolina's racist literacy test failed in 1970.

53.     The "Law and Order" movement of the 1960s and 1970s painted African American individuals as criminals and focused on increasing the severity of criminal punishments. 8/16/21 Trial Tr. 123:1-125:25; 126:25-127:19. As explained by the News & Observer in 1968 that, "[t]o many North Carolinians, law and order means keep the [n-word] in their place." PX-168.

54.     North Carolinians clearly associated the expansion of voting rights for people with felony convictions with the expansion of voting rights for African

Exhibit A: Superior Court Final Order

Americans, even during the 1960s and 1970s. 8/16/21 Trial Tr. 128:17-129:6. A piece in the Asheville Citizen Times warned against the passage of federal "voting rights legislation" on the ground that it would enable "unconfined felons" to vote, *i.e.*, people with felony convictions who were living in the community on probation, parole, or supervision. *Id.* The Chairman of North Carolina's Board of Elections issued a statement in 1970 warning against amendments to the Voting Rights Act on the ground that it would enable felons to vote. *Id.* at 129:7-22. Even in the 1970s, people in North Carolina understood that maintaining felony disenfranchisement "is one way of … keeping African-American people from voting." *Id.* at 130:7-16.  .

55.     The 1971 and 1973 revisions to section 13-1 carried forward three key elements of the original, racist 1877 legislation: the disenfranchisement of all people with any felony conviction, not just a subset; the criminal penalty for voting before a person's voting rights are restored; and the denial of the franchise to persons living in the community after release from any term incarceration. *Id.* at 148:16-149:6. The current version of section 13-1 continues to carry over and reflect the same racist goals that drove the original 19th century enactment. *Id.* at 149:7-15.

### B.     Present Day Effect of N.C.G.S. § 13-1.

56.     Plaintiffs' expert Dr. Frank Baumgartner serves as the Richard J. Richardson Distinguished Professorship in Political Science at the University of North Carolina at Chapel Hill.  PX-1 at 1 (Baumgartner Report); PX-2 at 1 (Baumgartner CV). The Court accepted Dr. Baumgartner as an expert in political science, public policy, statistics, and the intersection of race and the criminal justice system. 8/18/21 Trial Tr. 9:22-10:7. Dr. Baumgartner addressed, among other

issues, the number of persons denied the franchise due to felony probation, parole, or post-release supervision in North Carolina, as well as the racial demographics of such persons, at both the statewide and county levels. All parties stipulated to Dr. Baumgartner's main findings regarding the number of people on felony probation, parole, or post-release supervision, and many of his findings regarding the extreme racial disparities in disenfranchisement among African American and White North Carolinians. Fact Stip. ¶¶ 40-42, 46-56. The Court credits Dr. Baumgartner's testimony and accepts his conclusions.

1.      **Denial of the Franchise to Over 56,000 Persons on Community Supervision.**

57.      At least 56,516 individuals in North Carolina are denied the franchise due to probation, parole, or post-release supervision from a felony conviction in North Carolina state or federal court. 8/18/21 Trial Tr. 14:25-20:6; PX-3; Fact Stip. ¶¶ 40-42. Of these persons, 51,441 are on probation or post-release supervision from a felony conviction in North Carolina state court—40,832 are on probation and 12,376 are on parole or post-release supervision, with some persons being on both probation and post-release supervision simultaneously. PX-3; Fact Stip. ¶ 40. Based on data published by the federal government, 5,075 individuals are denied the franchise due to probation from a felony conviction in North Carolina federal court. PX-3; Fact Stip. ¶ 42 (data as of December 31, 2019); *see also* Fact Stip. ¶ 41 (5,064 individuals as of June 30, 2020).

58.      In individual counties, the overall rate of disenfranchisement ranges from 0.25% to roughly 1.4% of the voting-age population. *Id.* at 20:19-22:16.

59.     25 counties in North Carolina have an overall disenfranchisement rate lower than 0.48% (the 25th percentile and below); 50 counties have an overall disenfranchisement rate from 0.48% to 0.83% (the 25th to 75th percentile); and 25 counties have an overall disenfranchisement rate higher than 0.83% (the 75th percentile and above). 8/18/21 Trial Tr. 23:4-22. These numerical cutoffs at 0.48% to 0.83% can be used generally to designate counties as having "low," "medium," and "high" rates of disenfranchisement. *Id.* at 23:23-24:3.

60.     In 9 counties—Cleveland, McDowell, Pamlico, Beaufort, Madison, Sampson, Duplin, Lincoln, and Scotland Counties—more than 1% of the entire voting-age population is denied the franchise due to felony probation, parole, or post-release supervision. 8/18/21 Trial Tr. at 24:4-25; PX-1 at 10; PX-7; Fact Stip. ¶ 46.

## 2.     Racial Disparities in Felon Disenfranchisement

61.     North Carolina's denial of the franchise on felony probation, parole, or post-release supervision disproportionately affects African Americans by wide margins at both the statewide and county levels. 8/18/21 Trial Tr. 12:16-19; PX-1 at 3-4.  African Americans comprise 21% of North Carolina's voting-age population, but over 42% of those denied the franchise due to felony probation, parole, or post-release supervision from a North Carolina state court conviction alone. 8/18/21 Trial Tr. 27:20-28:14; PX-4; Fact Stip. ¶ 47. African American men are 9.2% of the voting-age population, but 36.6% of those denied the franchise. PX-1 at 7; Fact Stip. ¶ 50. In comparison, White people comprise 72% of the voting-age population, but only

52% of those denied the franchise. 8/18/21 Trial Tr. 27:20-28:14; PX-4. These numbers are the very definition of a racial disparity. 8/18/21 Trial Tr. 28:3-4.

62.     In total, 1.24% of the entire African American voting-age population in North Carolina are denied the franchise due to felony probation, parole, or post-release supervision, whereas only 0.45% of the White voting-age population are denied the franchise. 8/18/21 Trial Tr. 28:15-29:12; PX-4; PX-6; Fact Stip. ¶ 48. The African American population is therefore denied the franchise at a rate 2.76 times as high as the rate of the White population. 8/18/21 Trial Tr. 29:13-22; PX-4. If there were no racial disparity in the impact of section 13-1, that ratio would be 1.0. The African American-White disenfranchisement ratio of 2.76 shows a very high degree of racial disparity in disenfranchisement among African American and White North Carolinians. 8/18/21 Trial Tr. 29:20-30:2.

63.     Although more White people are denied the franchise due to felony post-release supervision than African American people in aggregate, this does not affect the finding that African American people are disproportionately affected by section 13-1. *Id.* at 30:3-17. There are nearly 6 million voting-age White people in North Carolina, compared to fewer than 1.8 million voting-age African American people. PX-4. Thus, to determine whether racial disparities exist, it is necessary to compare African American and White rates of disenfranchisement, rather than aggregate numbers of disenfranchised African American and White people. 8/18/21 Trial Tr. 30:3-17.

26

64.     The statewide data reveal an extremely high degree of racial disparity, with African American people denied the franchise due to felony probation, parole, or post-release supervision at a much higher rate than White people. *Id.* at 34:24-35:9.

65.     Extreme racial disparities in denial of the franchise to persons on community supervision also exist at the county level. PX-1 at 9-20. In 77 counties, the rate of African Americans denied the franchise due to felony probation, parole, or post-release supervision is high (more than 0.83% of the African American voting-age population), whereas there are only 2 counties where the rate of African American disenfranchisement is low (less than 0.48% of the African American voting-age population).  8/18/21 Trial Tr. 37:8-17; PX-8. In comparison, the rate of White disenfranchisement is high in only 10 counties, while the rate of White disenfranchisement is low in 53 counties. 8/18/21 Trial Tr. 36:21-37:7; PX-8. These numbers show the extreme racial disparities in denial of the franchise to persons on community supervision. 8/18/21 Trial Tr. 37:18-38:7.

66.     In 19 counties, more than 2% of the entire African American voting-age population are denied the franchise due to felony probation, parole, or post-release supervision. 8/18/21 Trial Tr. 44:10-15; PX-9; Fact Stip. ¶ 49. In 4 counties, more than 3% of the African American voting-age population are denied the franchise. 8/18/21 Trial Tr. 44:21-24. In 1 county, more than 5% of the African American voting-age population are denied the franchise, meaning that 1 in every 20 African American adult residents of that county cannot vote due to felony probation, parole,

or post-release supervision. *Id.* at 44:24-45:21. In comparison, the highest rate of White disenfranchisement in any county in North Carolina is 1.25%. *Id.* at 40:18-41:11, 45:22-25; Fact Stip. ¶ 49. These numbers, too, show the extreme racial disparities in denial of the franchise to persons on community supervision. 8/18/21 Trial Tr. 46:3-17.

67.     In 44 counties, the percentage of the African American voting-age population that is denied the franchise due to probation, parole, or post-release supervision from a felony conviction in North Carolina state court is more than three times greater than the comparable percentage of the White population. Fact Stip. ¶ 51.

68.     Among the 84 counties where there is sufficient data for comparison, African Americans are denied the franchise due to felony probation, parole, or post-release supervision at a higher rate than White people in every single county. *Id.* at 53:4-9; PX-1 at 15; PX-11. There is not a single county where the White disenfranchisement rate is greater than the African American rate, and there are only 2 counties where the rates are close.  8/18/21 Trial Tr. 53:10-16.  In 24 counties, the African American disenfranchisement rate is at least four times greater than the White rate. *Id.* at 54:2-14. In 8 counties, the African American disenfranchisement rate is at least five times greater than the White rate. *Id.* at 56:3-19.

69.     In sum, North Carolina's denial of the franchise to persons on felony probation, parole, or post-release supervision has an extreme disparate impact on

Exhibit A: Superior Court Final Order

African American people. At both the statewide level and the county, African American people are disproportionately denied the franchise by wide margins. 8/18/21 Trial Tr. 78:2-22. As Dr. Baumgartner aptly put it, "We find in every case that it works to the detriment of the African American population." *Id.* at 78:21-22.

70. Legislative Defendants' expert Dr. Keegan Callanan opined that there is no racial disparity in denial of the franchise to persons on community supervision because "100% of felons of every race in North Carolina" are disenfranchised. LDX-13 at 3; PX-177 (Callanan Dep.). In its September 2020 summary judgment order, the Court found that Dr. Callanan's report was entitled to "no weight" because it was "unpersuasive in rebutting the testimony of Plaintiffs' experts, was flawed in some of its analysis and, while Dr. Callanan is an expert in the broad field of political science, his experience and expertise in the particular issues before this panel are lacking." MSJ Order at 8. Dr. Callanan's opinions still are entitled to no weight.

C. **N.C.G.S. § 13-1 Denies the Franchise to Persons on Community Supervision Who Would Otherwise Register and Vote and Likely Affects the Outcome of Elections.**

71. Of the 56,000-plus people denied the franchise due to felony supervision, a substantial percentage of them—thousands of people—would register and vote if they were not denied the franchise. Given how close elections often are in North Carolina, excluding such large numbers of would-be voters from the electorate has the potential to affect election outcomes.

1.	**Expected Voter Turnout Among People on Felony Supervision**

72.	Plaintiffs' expert Dr. Traci Burch is an Associate Professor of Political Science at Northwestern University and a Research Professor at the American Bar Foundation. PX-30 (Burch CV); PX-29 at 1 (Burch Report); 8/17/21 Trial Tr. 7:5-8. The Court accepted Dr. Burch as an expert in political science, public policy, statistics, and racial disparities in political participation. 8/17/21 Trial Tr. 13:20-14:10. Dr. Burch analyzed, among other issues, voter turnout and registration for persons who have been denied the franchise in North Carolina due to felony probation, parole, or post-release supervision. *Id.* at 14:12-15:2; PX-29 at 3. The Court credits Dr. Burch's testimony and accepts her conclusions.

73.	Section 13-1 prevents thousands of people living in North Carolina communities from voting who would vote if not for the disenfranchisement. PX-29 at 4; 8/17/21 Trial Tr. 15:16-22. It would be reasonable to expect that at least 38.5% of this population under felony supervision would register to vote, and that at least 20% of them would vote in the next presidential election if they were not denied the franchise due to section 13-1. Many subgroups, including older voters, African American voters, and women voters, may vote at rates higher than 30%. PX-29 at 20-21; 8/17/21 Trial Tr. 37:6-38:3.

74.	To examine the recent voter registration and turnout statistics of people in North Carolina with felony convictions, Dr. Burch matched data on felony offenders from the North Carolina Department of Public Safety ("DPS") to voter registration and history data containing information on all registered voters from the North Carolina State Board of Elections. PX-29 at 8; 8/17/21 Trial Tr.17:10-22.

75.    38.5% of North Carolinians currently on felony supervision had registered to vote in the past, and about 20.1% of otherwise eligible voters now on felony supervision, who were over the age of 18 and were not serving a sentence for a felony conviction in 2016, voted in the 2016 presidential election. PX-31; 8/17/21 Trial Tr. 20:11-17.

76.    39.8% of African Americans currently on felony supervision, and 38.5% of Whites, had ever registered to vote. Voter turnout was also similar between the two groups: 20.3% of African Americans currently on felony supervision, and 21.3% of Whites, voted in the 2016 general election. PX-32; 8/17/21 Trial Tr. 21:7-24.

77.    Despite these similar registration and turnout rates, about 1.5 million African Americans were registered to vote in North Carolina in 2016, compared with 4.8 million Whites. The number of African American individuals on community supervision that are denied the franchise under section 13-1 relative to the overall number of African American registered voters is almost three times as high as number of White individuals on community supervision that are denied the franchise under section 13-1. PX-29 at 12; 8/17/21 Trial Tr. 22:2-11.

78.    Despite roughly similar turnout in the past among African Americans and Whites on felony supervision, the denial of the franchise to persons under community supervision has a greater impact on African American voter turnout than White voter turnout because African Americans are a smaller percentage of the total voting-age population. PX-29 at 12; 8/17/21 Trial Tr. 22:2-11.

79.     Dr. Burch also analyzed gender differences in the voting behavior of
the community supervised population. Her methodology likely produced
underestimates for turnout among women primarily because the matching
approach will underestimate voter registration and turnout among women who
change their names because of entering or leaving a marriage. PX-29 at 13; 8/17/21
Trial Tr. 24:4-8.

80.     Women registered in the past at higher rates than men: 43.1% of
women currently on felony supervision had registered to vote in the past, compared
with only 37.3% of men. Turnout rates in the presidential election were also higher:
21.8% of women currently on felony supervision voted in the 2016 general election,
compared with 19.6% of men. PX-32; 8/17/21 Trial Tr. 24:9-21.

81.     The pattern of voting participation by age largely mirrors that of the
broader population: older individuals vote at higher rates than younger individuals
and voting among younger cohorts in the community supervised population lags
significantly behind voting among older people on felony supervision. PX-29 at 14;
8/17/21 Trial Tr. 27:17-25.

82.     Among people currently on felony supervision who were ages 18 to 29
at the time of the 2016 general election (about 39% of the community supervised
population), 36.1% had ever registered to vote and 15.1% voted in the 2016 general
election. PX-34; 8/17/21 Trial Tr. 25:19-23. Among those ages 30 to 44 at the time of
the election, 40% had ever registered to vote and 21% voted in the 2016 general
election.  PX-34; 8/17/21 Trial Tr. 26:6-9. Among those ages 45 to 60 at the time of

the election, 48.2% had ever registered to vote and 30% turned out to vote in 2016. Those over the age of 61 at the time of the election reported the highest participation: 50% of these older persons had ever registered and 36% voted in the 2016 general election. PX-34; 8/17/21 Trial Tr. 26:10-25, 27:1-16.

83.     The type of punishment a person received also impacted the voting behavior of people under felony supervision. Among the overall community supervised population, there is some small participation differences between people who have served time in prison for a felony conviction and those who have not. PX-29 at 15; 8/17/21 Trial Tr. 26:10-25, 27:1-16. Among those currently on felony supervision who have never served time in prison for a felony conviction, 40.5% have registered to vote in the past and 20.6% voted in the 2016 general election. PX-29 at 15; 8/17/21 Trial Tr. 28:19-25. In comparison, among those who have served time in prison for a felony conviction in the past, 37.0% have registered to vote in the past and 19.7% voted in the 2016 general election. PX-29 at 15-16; 8/17/21 Trial Tr. 29:4-10.

84.     Of the 372,422 eligible North Carolina voters who have completed their felony probation, parole, or post-release supervision at the time of the 2016 general election, 103,130 or 27.69% voted in the 2016 general election. PX-35; 8/17/21 Trial Tr. 32:7-19.

85.     Turnout among the group of people who had completed their felony supervision at the time of the 2016 general election varied by demographic characteristics. African Americans in this cohort voted at a slightly higher rate than

Whites (29.8% to 26.3%). Turnout among those under age 30 was lower (13.1%) than that of the oldest group of voters (35.46%). PX-35; 8/17/21 Trial Tr. 33:10-35. People who had served only felony supervision without time in prison voted at a slightly higher rate than those who had served some time in prison (28.5 to 27.3%). PX-29 at 17; 8/17/21 Trial Tr. 34:5-13.

86.    A substantial number of the 34,644 people who were eligible voters at the time of the 2016 general election and experienced their first felony conviction and disenfranchisement after the election—20.4%—voted in the 2016 general election. PX-29 at 18; PX-36; 8/17/21 Trial Tr. 34:14-20, 35:16-20. Turnout rates among this group were lower than the population who had finished serving their felony sentences at the time of the 2016 general election because this group was disproportionately younger, with half of them under age 30 at the time of the 2016 general election. PX-36; 8/17/21 Trial Tr. 35:21-36:1-4. Among this group, those who experienced their first felony conviction after age 61 voted at nearly three times the rate of those under age 30 at the time of the 2016 general election. PX-36; 8/17/21 Trial Tr. 36:14-21.

87.    There is also a large disparity in turnout rates across punishment type. Only 17.7% of people who would eventually serve time in prison voted in the 2016 general election, compared with 22.7% of those would serve only a felony supervision sentence with no time in prison. PX-29 at 20; 8/17/21 Trial Tr. 36:22-37:1-5.

88. The Court accepts Dr. Burch's conclusion that, based on her analyses, at least 20% of persons on felony supervision in North Carolina would vote in upcoming elections if they were not denied the franchise. The Court further accepts Dr. Burch's conclusion that important subgroups of this class of voters—including women, African Americans, and older people—would vote at even higher rates. PX-39 at 2; 8/17/21 Trial Tr. 39:1-14, 40:10-16.

89. The Court agrees that Dr. Burch's 20% estimate is conservative for several reasons: (1) the process of matching DPS files with election records underestimates the registration and turnout of women because they may change their names due to marriage, divorce, or other life events; (2) the process relies on exact matching so typographical and other errors will cause false negatives; and (3) some individuals may have moved out of state and thus are no longer eligible voters in North Carolina, or may have lived and voted in different states prior to their North Carolina conviction. PX-39 at 2; 8/17/21 Trial Tr. 39:15-40:1-9.

90. Both voter turnout and voter registration are indications of future voting behavior, and political scientists sort voters into two categories: "core voters"—people who vote consistently in every election—and "peripheral voters"—people who vote episodically in elections of high interest. PX-39 at 3; 8/17/21 Trial Tr. 41:12-42:1-3.

91. Looking at only 2016 turnout data might accurately capture the voting behavior of "core voters," but ignoring registration rates and other data would underestimate the extent to which "peripheral voters" might participate in a given

Exhibit A: Superior Court Final Order

election if they were not denied franchise due to being on community supervision. PX-39 at 3; 8/17/21 Trial Tr. 42:12-43:1.

92.     Additionally, 22.6% of people currently on felony supervision who were eligible during the 2012 general election voted. PX-39 at 4; 8/17/21 Trial Tr. 43:16-21.

93.     When Dr. Burch combined the data from the 2012 and 2016 elections, she observed that the North Carolina felony supervision population is split into core and peripheral voters. PX-39 at 4; 8/17/21 Trial Tr. 43:22-45:2. 18% of the eligible population voted in only one of the 2012 and 2016 general elections, but not both. These are peripheral voters. PX -40; 8/17/21 Trial Tr. 44:16-19. Additionally, 13.7% of the people on felony supervision voted in both 2012 and 2016 elections. These are core voters. PX-40; 8/17/21 Trial Tr. 44:20-23.

94.     31.7% of people currently under felony supervision voted in one *or* both of the 2012 and 2016 presidential elections. At least 20% of those currently on felony supervision would vote in upcoming elections if they were not disenfranchised. PX-40; 8/17/21 Trial Tr. 45:3-17, 45:18-46:1-4.

95.     People convicted of felonies who later completed a felony supervision sentence in North Carolina have turnout rates at or above 20% over the last three presidential elections. PX-39 at 6; 8/17/21 Trial Tr. 46:20-48:19. At least 20% of those currently on felony supervision would vote in upcoming elections if they were not disenfranchised.

Exhibit A: Superior Court Final Order

## 2.        The Potential Impact on Elections

96.        To evaluate whether the denial of the franchise to persons on community supervision may affect election outcomes in North Carolina, Plaintiffs' expert Dr. Baumgartner analyzed recent statewide and county elections in which the vote margin in the election was less than the number of disenfranchised persons in the relevant geographic area. 8/18/21 Trial Tr. 89:4-17; PX-1 at 26. The Court credits Dr. Baumgartner's testimony and accepts his conclusions.

97.        In 2018 alone, there were 16 different county elections where the margin of victory in the election was less than the number of people denied the franchise due to felony supervision in that county. 8/18/21 Trial Tr. 91:19-92:3; PX-21; Fact Stip. ¶ 57. For instance, the Allegheny County Board of Commissions race was decided by only 6 votes, whereas 68 people in Allegheny County are denied the franchise due to felony supervision—more than eleven times the vote margin. 8/18/21 Trial Tr. 92:5-93:5. The Ashe County Board of Education race was decided by only 16 votes, whereas 125 people in Ashe County are denied the franchise due to felony supervision—nearly eight times the vote margin. *Id.* at 93:21-94:2. The Beaufort County Board of Commissioners race was decided by only 63 votes, whereas 457 people in Beaufort County are denied the franchise due to felony supervision—more than seven times the vote margin. *Id.* at 94:3-11.

98.        The number of African Americans denied the franchise due to being on felony supervision exceeds the vote margin in some elections.  For instance, the number of African Americans denied the franchise in Beaufort County (235) exceeds the vote margin in the Beaufort County Board of Commissioners race (63).  *Id.* at

94:12-95:10. The number of African Americans denied the franchise in Columbus County (143) exceeds the vote margin in the Columbus County Sheriff's race (43). *Id.* at 95:11-96:2. The number of African Americans denied the franchise in Lee County (152) exceeds the vote margin in the Lee County Board of Education race (78). *Id.* at 96:15-97:1.

99. People living in the community on felony supervision have an interest in the outcome of county elections, as does everyone. *Id.* at 93:6-20. That is especially true of a county sheriff's race. As Dr. Baumgartner explained:

> [W]e all have an interest in every race. Democracy matters, but people in this case and the people in this category have a particular interest in the criminal justice actors, district attorney, sheriffs, judges, but they have an interest in everything, but certainly a County Sheriff, you know, runs the jail. That's an important function in criminal justice, so people certainly have an interest in those races in particular, the people of this cat- -- the people that we're talking about who are disenfranchised under these policies.

*Id.* at 96:3-14. This Court agrees.

100. Legislative Defendants' expert Dr. Callanan attempted to offer some criticisms of Dr. Baumgartner's analysis regarding the potential impact on election outcomes. Dr. Baumgartner explained why those criticisms are incorrect, *id.* at 97:4-100:17; PX-25, and the Court once again concludes that Dr. Callanan's report is entitled to no weight.

101. In addition to county-level elections, there are statewide races where the vote margin in the election was less than the number of people denied the franchise due to being on community supervision statewide. *Id.* at 100:18-22. For

instance, the 2016 Governor's race was decided by just over 10,000 votes, far less

than the 56,000-plus people denied the franchise statewide. *Id.* at 100:23-101:13. In

2020, two prominent statewide races were decided by vote margins that are only a

fraction of the number of persons denied the franchise statewide. *Id.* at 101:14-22.

102.    There are also many 2018 state House and state Senate races that had

a vote margin of less than 100 votes. *Id.* at 101:23-102:6; PX-22. Dr. Baumgartner

did not receive data that would have allowed him to calculate the number of

disenfranchised persons in each of these House or Senate districts. 8/18/21 Trial Tr.

102:17-103:1. Nevertheless, the closer the margin of any election, the greater the

chance that North Carolina's denial of the franchise to over 56,000 persons on

felony supervision could affect the outcome of the election. *Id.* at 103:2-20.

**D.     N.C.G.S. § 13-1 Does Not Serve Any Legitimate State Interest and Causes Substantial Harm.**

**1.      N.C.G.S. § 13-1 Does Not Serve Any Legitimate State Interest**

103.    As the Court noted in September 2020, in its interrogatory responses,

Defendants initially put forward "numerous" possible state interests that section

13-1 might be thought to serve. 9/4/20 Order of Inj. Relief ("PI Order") at 9; *see* LDX-

144; SDX-146. The Court at that time accordingly denied summary judgment and a

preliminary injunction on Plaintiffs' broader claims concerning the denial of the

franchise to all persons on felony supervision, noting that Defendants should have

the opportunity to offer "facts or empirical evidence" supporting those purported

state interests. PI Order at 9.

104.    Nevertheless, at trial in August 2021, Defendants failed to introduce any evidence supporting a view that section 13-1's denial of the franchise to people on felony supervision serves any valid state interest today.

105.    The State Board's Executive Director testified that the State Board is *not* asserting those interests to justify enforcing the challenged law today. PX-176 (excerpts from Bell 30(b)(6) Dep.). The State Board Defendants' interrogatory response identified interests including "regulating, streamlining, and promoting voter registration and electoral participation among North Carolinians convicted of felonies who have been reformed"; "simplifying the administration of the process to restore the rights of citizenship to North Carolinians convicted of felonies who have served their sentences"; "avoiding confusion among North Carolinians convicted of felonies as to when their rights are restored"; "eliminating burdens on North Carolinians convicted of felonies to take extra steps to have their rights restored after having completed their sentences"; "encouraging compliance with court orders." *Id.* at 176:20-206:15. The Executive Director testified that the State Board is not asserting that the denial of the franchise to people on felony supervision serves any of these interests as a factual matter in the present day, and she admitted that the State Board is unaware of any evidence that denying the franchise to such people advances any of these interests. *Id.*

106.    Indeed, the State Board's Executive Director conceded that *striking down* section 13-1's denial of the franchise to people on felony supervision would "promote their voter registration and electoral participation." *Id.* at 182:17-22.

40                          Exhibit A: Superior Court Final Order

107.    The State Board Defendants did not introduce facts or empirical evidence at trial supporting any assertion that section 13-1's denial of the franchise to persons on felony supervision serves *any* legitimate governmental interest.

108.    The Legislative Defendants did not introduce facts or empirical evidence at trial supporting any assertion that section 13-1's denial of the franchise to people on felony supervision serves *any* legitimate governmental interest.

109.    In closing argument, Legislative Defendants asserted that section 13-1 serves an interest in "creat[ing] . . . the finish line for when . . . the loss of rights is finished, when it terminates." 8/19/21 Trial Tr. 166:2-10. The Court does not find this alleged interest persuasive or legitimate.

110.    Legislative Defendants also asserted in closing argument that section 13-1 serves an interest in "t[ying] the restoration to the completion of the sentence," including the completion of any period of supervision. *Id.* at 166:11-22. But Defendants did not support this circular logic with any evidence to justify why it is a legitimate interest.

111.    To the extent Defendants still contend that the challenged scheme serves interests "requiring felons to complete all conditions of probation, parole, and post-trial supervision," as they did in interrogatory responses, those interests are tautological.  Nor have Defendants introduced any evidence that withholding the franchise encourages completion of post-release and probationary conditions, and there is no empirical evidence to support such a claim in any of the scholarly literature. PX-29 at 22-34 (Burch Report).

Exhibit A: Superior Court Final Order

112. To the extent Defendants still contend that the challenged scheme serves an interest in withholding restoration of voting rights from people with felony convictions who do not abide by court orders, they have introduced no evidence that the prospect of disenfranchisement results in higher rates of compliance with court orders, and there is no support in the scholarly literature for such a claim. *Id.* at 32. In any event, section 13-1 denies the franchise to people on felony supervision *regardless* of whether they are complying with court orders and the conditions of their supervision.

113. Defendants have argued that the changes to section 13-1 in the early 1970s served a valid state interest in eliminating onerous procedural requirements for rights restoration, such as a requirement to petition a court with supporting witnesses or swear an oath before a judge. *See, e.g.*, 8/19/21 Trial Tr. 166:23-167:18, 169:17-22. But those procedural requirements are not at issue in this case. Plaintiffs instead challenge section 13-1's denial of the franchise to people on felony supervision.

114. In any event, while the final decision to restore a person's voting rights is no longer left to the discretion of a judge, there remains a number of discretionary decisions, especially in sentencing, but also in whether to charge an individual, what offenses to charge, whether to reduce charges, and whether a plea offer is extended, that have a direct effect upon when a person's right to vote is restored. Am. PI Order at 5. Section 13-1's denial of the franchise to people on probation, parole, or post-release supervision exacerbates the inequitable effects of that

Exhibit A: Superior Court Final Order

judicial discretion, because judges retain discretion in deciding the length of probation and whether to terminate a person's probation. Pursuant to N.C.G.S. § 15A-1342(a), a court may place a convicted person on probation for the appropriate period as specified in N.C.G.S. § 15A-1343.2(d), not to exceed a maximum of five years. And pursuant to N.C.G.S. § 15A-1342(b), a court has discretion to terminate an individual's probation "at any time … if warranted by the conduct of the defendant and the ends of justice." *See also* Fact Stip. ¶ 44. The median duration of probation for persons sentenced to felony probation in North Carolina state court is thirty months. *Id.* ¶ 43.

## 2. N.C.G.S. § 13-1 Does Substantial Harm

115. In contrast to the absence of evidence that section 13-1's denial of the franchise to people on felony supervision serves any valid state interest today, the evidence establishes that such denial of the franchise causes serious harm to individuals and communities, and in fact undermines important state interests including several of the interests put forward by Defendants.

### a. Testimony of Plaintiffs' Expert Dr. Burch

116. Section 13-1's denial of the franchise to persons on felony supervision does not advance those interests put forward by the State and instead causes only harm.[1]

---

[1] Much of Dr. Burch's analysis of potential state interests in her report concerned the effect of conditioning rights restoration on the satisfaction of financial conditions of supervision, which was no longer relevant at trial given the Court's September 2020 summary judgment order.

Exhibit A: Superior Court Final Order

117.    The scholarly literature does not support the claim that section 13-1 "eliminat[es] burdens" in ways that "promote the voter registration and electoral participation of people who completed their sentences." In fact, section 13-1 may even decrease turnout. PX-29 at 36-37; 8/17/21 Trial Tr. 58:4-13.

118.    Turnout among people aged 18-29 who had been convicted but completed supervision by 2016 (13.01%) was several percentage points lower than turnout of people in 2016 who were later convicted of their first felony (15.7%). PX-29 at 39; 8/17/21 Trial Tr. 60:2-18. In other words, the experience of being denied the franchise decreases turnout among an otherwise similarly situated population. 8/17/21 Trial Tr. 64:8-65:2.

119.    People who served probation sentences for misdemeanors are 15% less likely to vote following their sentence, whereas people who served probation sentences for felony convictions (and thus were denied the franchise) are 40% less likely to vote following their sentence. This 25% differential in turnout rates can be attributed to the experience of felony disenfranchisement. PX-39 at 9-10; 8/17/21 Trial Tr. 63:9-64:5.

120.    The scholarly literature shows that the existence of felony disenfranchisement laws themselves lead to widespread confusion and misunderstandings among people with felony convictions about whether they can vote, even in states with automatic restoration. Audit studies have shown that, despite official policies, local bureaucrats themselves can contribute to confusion

about voting rights by failing to respond to questions or by answering questions incorrectly. PX-29 at 37; 8/17/21 Trial Tr. 58:14-59:1-5.

121.    A 2014 peer-reviewed study of North Carolina's re-enfranchisement notification procedures concluded that those procedures have no effect on registration and turnout among people who have finished serving their sentences, including probation and parole. 8/17/21 Trial Tr. 59:6-60:1. The researchers concluded that North Carolina's forms and guidance "lacked clarity" and that the information tended to be lost or crowded out. *Id.* Although Defendants asserted that the documents provided to people ending probation have changed since 2014, they did not introduce any evidence that the documents used today are any clearer than those used at the time of the 2014 study.

122.    Continued denial of the franchise to persons on community supervision has a stigmatizing effect, and the scholarly literature concludes that felony disenfranchisement hinders the reintegration of people convicted of felonies into society. *Id.* at 65:13-66:18. Felony disenfranchisement is among a long list of stigmatizing and wide-ranging collateral consequences for people convicted of felonies, including civil restrictions on voting, officeholding, and jury service; employment and occupational licensing, and even economic exclusions from welfare, housing, and other public benefits. There are more than 35,000 such penalties in state and federal law across the United States. *Id.* at 65:13-66:1; PX-29 at 40.

123.    Denial of the franchise to people on felony supervision reduces political opportunity and the quality of representation across entire communities in North

Carolina. The population of people on felony supervision who are denied the franchise in North Carolina is highly concentrated into particular neighborhoods. 8/17/21 Trial Tr. 67:3-23. Felony disenfranchisement rates of young adults living in certain neighborhoods in North Carolina is as high as 18 to 20 percent. *Id.* Such a high level of communal denial of the franchise can discourage other young people from voting, because voting is a social phenomenon. Indeed, turnout among eligible voters is lower in communities with higher rates of denial of the franchise among people living in those communities. *Id.* at 67:24-68:15. These communities are less likely to be the subject of voter mobilization efforts by political parties, have less turnout, and have less political power and political equality as a consequence of the denial of the franchise to people on felony supervision. *Id.* at 66:22-67:23, 68:16-69:17; PX-29 at 43.

124. Denial of the franchise to persons on felony supervision harms individuals, families, and communities for years even after such supervision ends. PX-29 at 45; 8/17/21 Trial Tr. 69:18-70:6.

> **b.** **Testimony from the Department of Public Safety**

125. DPS documents given to impacted individuals about their voting rights are unclear and can easily lead to confusion. It is critically important for DPS documents to inform people about their voting rights in simple, clear, plain English terms, and it is critically important to confirm that affected individuals have received, read, and clearly understood any written materials provided to them about their voting rights. 8/19/21 Trial Tr. 70:1-20. But the DPS forms are not simple or

Exhibit A: Superior Court Final Order

clear, and they do not speak in plain English about the basic question of whether the person is permitted to vote.

126. One DPS form contains multiple lists of things that people on probation are and are not permitted to do, but not one of those lists mentions voting. *Id.* at 75:20-78:10 (discussing SDX-28). The form further states that "upon completion of your sentence," your voting rights are restored," but the "sentence" referred to there is different than the "active sentence" referred to earlier on the same page; one refers to probation and the other refers to incarceration. *Id.* at 79:21-80:16. DPS does not have any policy directing probation offers to explain to people on probation receiving this form that the reference to a "sentence" at the end of the form is different than the "active sentence" referred to earlier on the same page. *Id.* at 80:25-81:8. While this form may be clear to someone who has spent decades working as a probation officer and top DPS official focused on community supervision, it could easily confuse a person on probation.

127. Another DPS form designed to inform people about the restoration of their voting rights does not even use any iteration of the word "vote." *Id.* at 90:15-91:14 (discussing SDX-15).

128. DPS does not provide any information about voting rights to people being transferred from supervised to unsupervised probation. *Id.* at 93:20-94:4. Nor does DPS provide people with any information about voting rights (or anything else) upon completion of their unsupervised probation. *Id.* at 94:9-22. Despite her many years of experience at DPS working on community supervision, Maggie Brewer.

DPS's Deputy Director of Community Supervision, testified that she does not even know whether people on unsupervised probation are permitted to vote. *Id.* at 87:18-24, 94:5-8.

129. Section 13-1's denial of the franchise to people on felony supervision does not avoid confusion, but instead engenders it. If section 13-1 applied only to people who were incarcerated, all people with felony convictions could simply be told upon their release from prison that they are eligible to vote.

### c.    Testimony from the State Board of Elections

130. In addition to confirming that the State Board is not advancing state interests in support of the denial of the franchise to persons on felony supervision today, the State Board's Executive Director also made it clear that such denial of the franchise is very difficult to administer and leads to material errors and problems.

131. For instance, according to a 2016 audit titled "Post-Election Audit Report," in a data-matching process used by the State Board, 100 out of 541 individuals who were initially identified as having voted illegally due to a felony conviction were in fact eligible voters, based on further investigation. PX-50 at 408; 8/18/21 Trial Tr. 194:2-22. That is a false positive rate of nearly 20%. *Id.*

132. The State Board uses a related data-matching process to identify people convicted of felonies in North Carolina state courts who are registered voters, and these individuals' registrations are then canceled. But when a voter is identified by this data-matching process as being ineligible to vote based on a felony conviction, the State Board does not conduct any further investigation to determine

the accuracy of the persons identified in the data match as ineligible based on a felony conviction. 8/18/21 Trial Tr. 195:5-23.

133.    Voter registration application materials used by the State Board of Elections as recently as February of 2020 explained to voters that: "if [you were] previously convicted of a felony, you must have completed your sentence, including probation and/or parole" but did not include the words "post-release supervision" anywhere on the form. 8/18/2021 Trial Tr. 197:7-25; 198:1-11 (discussing PX-43 at 352). Multiple State Board guides providing instructions to poll workers from as recently as the 2020 elections likewise mention "probation or parole" but not "post-release supervision." *Id.* at 201:1-25; 202:1-24; 203:1-3 (discussing PX-51 at 557, 559); 8/18/21 Trial Tr. 204: 24-25; 205:1-20 (discussing PX-46 at 256). The State Board's Executive Director acknowledged that if a person on post-release supervision asked a poll worker, "I finished serving my jail sentence or prison sentence but I'm on post-release supervision. Can I vote?" the poll worker might consult the State Board's instructions and conclude, incorrectly, that the answer was "yes." 8/18/21 Trial Tr. 203:20-25; 204:1-3.

134.    A person on post-release supervision could truthfully answer the question poll workers are trained to ask, "Are you currently on probation or parole for a felony conviction?" with the answer: "no." Based on their "no" answer, that person would be permitted to cast a ballot. Notwithstanding the voter's honest answer, the person could then be prosecuted for the crime of voting illegally.  8/18/21 Trial Tr. 205:17-25; 206:1-7.

### d. Testimony of the Organizational Plaintiffs

135. The Organizational Plaintiffs' testimony further demonstrates the harms caused by section 13-1's denial of the franchise to people living in the community on felony supervision.

136. There is rampant confusion among persons on felony supervision about their voting rights. For example:

    a. Dennis Gaddy, the Executive Director of Community Success Initiative, testified that CSI's clients are often confused about whether they are allowed to vote. 8/16/2021 Trial Tr. 53:8-9, 56:21-57:1-21. He further testified that when clients are disenfranchised due to felony supervision, they cannot effectively advocate for themselves, their families, or their communities. *Id.* at 58:16-59:16. Mr. Gaddy testified that during his seventeen years of educating people convicted of felonies about their voting rights, he has witnessed how not being able to vote causes many people to lose hope, and not being able to vote means that you do not have a civic voice. Mr. Gaddy lamented that clients often feel frustrated on being required to pay taxes but not being allowed to vote. *Id.* at 59:10-60:4.

    b. Diana Powell, the Executive Director of Justice Served NC, testified that section 13-1 is confusing, that many impacted community members are afraid to vote, and that due to frequent address changes, many people are never informed that their rights are

Exhibit A: Superior Court Final Order

restored. She testified that most people are unsure as to whether they have a felony or misdemeanor conviction and are afraid of being rearrested for voting. 8/17/21 Trial Tr. 163:21-165:7.

c. Corey Purdie, the Executive Director of Wash Away Unemployment, testified that it is difficult to discuss voting with impacted community members because it is difficult to convince them that they are legally able to participate in the process. 8/19/21 Trial Tr. 45:3-7. In his interactions with impacted community members, Mr. Purdie finds that people are in fear of voting after incarceration due to the confusing nature of the law, and many fear being charged with another felony and facing even more prison time for mistakenly voting under this law. *Id.* at 45:10- 46:2. Mr. Purdie testified that in his community outreach, he finds that people are confused and scared to vote "all the time." *Id.* at 46:3

d. Rev. T. Anthony Spearman, President of the North Carolina NAACP, testified that he explains the current felony disenfranchisement law to NC NAACP members "all the time"; and that the individuals he speaks to are often confused about whether they are eligible to vote under N.C.G.S. 13-1. *Id.* at 20:15-23. He testified that "the NAACP is very much concerned about helping these persons be the best somebodies they can be, and they cannot do that...without being mentored to know what their rights are."

*Id.* at 20:08-12. Rev. Spearman further testified that "the vote is one of the most powerful nonviolent change agents in the world, and to rob a man or woman of their right to vote ... it's just hard to conceive of, that we would do that." *Id.* at 23:09-16.

    e.   Individual Plaintiff Timmy Locklear also testified that confusion about his eligibility to vote has kept him from voting in past elections. *Id.* at 30:18-30:23.

137.    Section 13-1's denial of the franchise to people on felony supervision also harms the Organizational Plaintiffs themselves, forcing them to divert scarce resources and interfering with the missions of their organizations. Fact Stip. ¶¶ 3-15; 8/16/21 Trial Tr. 58:4-59:16 (Mr. Gaddy); 8/17/21 Trial Tr. 165:23-166:7, 167:4-13 (Ms. Powell); 8/19/21 Trial Tr. 46:23-48:4 (Mr. Purdie); 8/19/21 Trial Tr. 17:23-20:19, 22:8-23:8 (Rev. Spearman).

138.    Mr. Gaddy also testified movingly about the devastating impact that disenfranchisement had on him personally after he was released from incarceration and living in the community on felony supervision. After release from incarceration, Mr. Gaddy could not vote for another seven years because he was on probation. He lamented that he missed a lot of elections over those seven years and was particularly devastated to miss the election of the first African American President in 2008. 8/16/2021 Trial Tr. 60:5-61:1-24.

139.    Mr. Purdie had a similar experience. He testified that the fear and confusion created by this law, combined with the carceral experience, creates a

Exhibit A: Superior Court Final Order

feeling of hopelessness. 8/19/21 Trial Tr. 36:23-37:16 (Purdie). This law has a silencing affect, making impacted people feel as if their voice does not matter. *Id.* at 49:22-50:10. Mr. Purdie testified that to restore a sense of hope, we must unmute our impacted community members—we must restore their voice. *Id.* at 51:16-21.

### e. Testimony of the Individual Plaintiffs

140. The testimony of two Individual Plaintiffs fully demonstrated the profound damage that section 13-1 does to people living in communities across North Carolina.

141. Timmy Locklear, a 58-old member native of Lumberton, North Carolina, now lives in Wilmington. 8/19/21 Trial Tr. 25:14-22. Since his release from prison in October 2019, he has worked directing traffic at the New Hanover County Landfill, and he never had any violations of the conditions of his post-release supervision. *Id.* at 28:11-19. Before his 2018 felony conviction, he participated in North Carolina elections, and he testified that he would have voted in the March 2020 primary elections if he were not disenfranchised due to post-release supervision. *Id.* at 30:6-31:1. When Mr. Locklear completed his post-release supervision in July 2020, his probation officer did not talk to him about his voting rights or give him a voter-registration form, and they never sent him any forms in the mail about voting. *Id.* at 29:1-30:5. Mr. Locklear nevertheless re-registered to vote and voted in the November 2020 elections. *Id.* at 31:2-8. When asked why it was important for him to vote, he testified: "It felt good. I hadn't voted in a long time." *Id.* at 31:9-11.

142.    Shakita Norman lives in Wake County, where she works as an Assistant General Manager at Jiffy Lube, takes care of her five children, and pays her taxes. 8/17/21 Trial Tr. 148:16-149:14, 154:20-23. She wants to vote, particularly for members of the school board because all of her children attend Wake County Public Schools. *Id.* at 148:25-149:5, 153:16-22. But she cannot vote because, due to a felony conviction in 2018, she has been stuck on "special probation" for 2.5 years running. *Id.* at 152:9-25.  To complete her special probation, she must serve a total of 200 more days of "weekend jail."  *Id.* at 151:02-13.  But she has not been able to serve any weekend jail since March 2020 because the jails are closed due to the pandemic.  *Id.* at 151:18-152:5. Ms. Norman has now been on probation and thus prohibited from voting for nearly three years, even though she has had no probation violations. *Id.* at 152:9-25. Ms. Norman does not know when she will be able to complete her required weekend jail days, or when she will be off probation and able to vote again.  *Id.* at 152:6-8, 154:14-16. She voted in North Carolina elections before her conviction, and she testified that she would have voted in the March and November 2020 elections if she were not disenfranchised. *Id.* at 153:3-154:5. When asked why she believes that people on felony supervision should have the right to vote, she testified:

> Well, most people that's like me, even though I'm on probation, I still pay taxes, I go to work every day, I take care of my family.  I should -- I should be able to have that, to have that moment.  I should be able to say something, and I want people that's in the future that's in the situation that I'm in to be able to have that voice and be able to say something and it gets heard.

*Id.* at 154:17-155:2.

Exhibit A: Superior Court Final Order

Based on the foregoing Findings of Fact, the Court makes the following:

## CONCLUSIONS OF LAW

**I.**   **N.C.G.S. § 13-1's Denial of the Franchise to Persons on Probation, Parole, or Post-Release Supervision Violates the North Carolina Constitution's Equal Protection Clause**

1.     The Equal Protection Clause of the North Carolina Constitution guarantees that "[n]o person shall be denied the equal protection of the laws; nor shall any person be subjected to discrimination by the State because of race, color, religion, or national origin." N.C. Const., art. I, § 19.

2.     It is well-established that North Carolina's Equal Protection Clause provides greater protection for voting rights than federal equal protection provisions. *Stephenson v. Bartlett*, 355 N.C. 354, 377-81 & n.6, 562 S.E.2d 377, 393-96 & n.6 (2002); *Blankenship v. Bartlett*, 363 N.C. 518, 522-28, 681 S.E.2d 759, 763-66 (2009)). North Carolina courts have repeatedly applied this broader protection for voting rights to strike down election laws under Article I, § 19. *Stephenson*, 355 N.C. at 377-81 & n.6, 562 S.E.2d at 393-95 & n.6; *Blankenship*, 363 N.C. at 522-24, 681 S.E.2d at 762-64.

3.     Section 13-1's denial of the franchise to people on felony supervision violates North Carolina's Equal Protection Clause both because it discriminates against African Americans and because it denies all people on felony supervision the fundamental right to vote.

## A. N.C.G.S. § 13-1 Impermissibly Discriminates Against African American People in Intent and Effect and Denies Substantially Equal Voting Power to African American People

4. Section 13-1's denial of the franchise to people on felony supervision has the intent and effect of discriminating against African Americans, and unconstitutionally denies substantially equal voting power on the basis of race.

5. To prevail on a race discrimination claim under Article I, § 19, a plaintiff "need not show that discriminatory purpose was the sole or even a primary motive for the legislation, just that it was a motivating factor." *Holmes v. Moore*, 270 N.C. App. 7, 16, 840 S.E.2d 244, 254-55 (2020) (internal quotation marks omitted). "Discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another." *Id.* (internal quotation marks omitted).

6. The legislature cannot purge through the mere passage of time an impermissibly racially discriminatory intent. *See Hunter v. Underwood*, 471 U.S. 222 (1985) (striking down a felony disenfranchisement law originally passed with the intent to target African Americans); *see also Ramos v. Louisiana*, 140 S. Ct. 1390, 1410 (2020) (Sotomayor, J., concurring) ("[W]here a legislature actually confronts a law's tawdry past in reenacting it[,] the new law may well be free of discriminatory taint," but "[t]hat cannot be said of the laws at issue here.").

7. The legislature's decision in the 1970s to preserve section 13-1's denial of the franchise to people living in the community was itself independently motivated by racism.

8.      There is no evidence to demonstrate that N.C.G.S. § 13-1 would have been enacted without a motivation impermissibly based on race discrimination, and the Court concludes that it would not have been.

9.      Section 13-1's denial of the franchise to people living in the community on felony supervision was enacted with the intent of discriminating against African American people and has a demonstrably disproportionate and discriminatory impact.

**B.      N.C.G.S. § 13-1 Impermissibly Deprives All Individuals on Felony Probation, Parole, or Post-Release Supervision of the Fundamental Right to Vote.**

10.      N.C.G.S. § 13-1 interferes with the fundamental right to vote on equal terms as it prohibits people with felony convictions from regaining the right to vote even while they are living in communities in North Carolina, so long as they have not completed probation, parole, or post-release supervision. *See Stephenson*, 355 N.C. at 378, 562 S.E.2d at 393.

11.      People on felony supervision share the same interest as, and are "similarly situated" to, North Carolina residents who have not been convicted of a felony or who have completed their supervision. "The right to vote is the right to participate in the decision-making process of government" among all those "sharing an identity with the broader humane, economic, ideological, and political concerns of the human body politic." *Texfi Indus., Inc. v. City of Fayetteville*, 301 N.C. 1, 13, 269 S.E.2d 142, 150 (1980). North Carolinians on felony supervision share in the State's "public [burdens]" and "feel an interest in its welfare." *Roberts v. Cannon,* 20 N.C. 398, 4 Dev. & Bat. (Orig. Ed.) 256, 260-61 (1839).

Exhibit A: Superior Court Final Order

12.    As the Court held in its preliminary injunction order in September

2020, under Article I, § 19, when legislation is enacted that restores the right to

vote, thereby establishing terms upon which certain persons are able to exercise

their right to vote, such legislation must not do so in a way that imposes unequal

terms. As allowed by Article VI, § 2(3), of our Constitution, the legislature has

chosen to restore citizen rights—specifically here, the right to vote—to those with

felony convictions. But in N.C.G.S. § 13-1, it has done so on unequal terms in

violation of Article I, § 19.

### C.    N.C.G.S. § 13-1's Violation of Article 1, § 19 Triggers Strict Scrutiny

13.    Under Article I, § 19, strict scrutiny applies where either: (1) a

"classification impermissibly interferes with the exercise of a fundamental right," or

(2) a statute "operates to the peculiar disadvantage of a suspect class." *Stephenson*,

355 N.C. at 377, 562 S.E.2d at 393 (internal quotation marks omitted); *accord*

*Northampton Cnty. Drainage Dist. No. One v. Bailey*, 326 N.C. 742, 746, 392 S.E.2d

352, 355 (1990). Thus, if a statute interferes with the exercise of a fundamental

right, strict scrutiny applies even if the affected group is not a suspect class.

*Stephenson*, 355 N.C. at 379, 562 S.E.2d at 394; *Northampton County*, 326 N.C. at

747, 392 S.E.2d at 356.

14.    N.C.G.S. § 13-1 both interferes with the exercise of the fundamental

right of voting and operates to disadvantage a suspect class. Therefore, it is subject

to strict scrutiny.

II.     **N.C.G.S. § 13-1's Denial of the Franchise to Individuals on Probation, Parole, or Post-Release Supervision Violates the North Carolina Constitution's Free Elections Clause**

   A.     **N.C.G.S. § 13-1 Prevents Elections from Ascertaining the Will of the People**

   15.     The Free Elections Clause of the North Carolina Constitution declares that "[a]ll elections shall be free." N.C. Const., art. I, § 10. It mandates that elections in North Carolina faithfully ascertain the will of the people. This clause has no federal counterpart.

   16.     N.C.G.S. § 13-1's denial of the franchise to people on community supervision violates the Free Elections Clause by preventing elections that ascertain the will of the people.

   17.     North Carolina's elections do not faithfully ascertain the will of the people when such an enormous number of people living in communities across the State—over 56,000 individuals—are prohibited from voting.

   18.     Section 13-1's denial of the franchise to persons on community supervision strikes at the core of the Free Elections Clause, moreover, because of its grossly disproportionate effect on African American people. Elections cannot faithfully ascertain the will of *all* of the people when the class of persons denied the franchise due to felony supervision is disproportionately African Americans by wide margins at both the statewide and county levels.

   19.     Nor do North Carolina elections faithfully ascertain the will of the people when the vote margin in both statewide and local elections is regularly less than the number of people disenfranchised in the relevant geographic area.

Exhibit A: Superior Court Final Order

Elections do not ascertain the will of the people when the denial of the franchise to such a large number of people has the clear potential to affect the outcome of numerous close elections.

20.　　N.C.G.S. § 13-1 prevents thousands of people living in North Carolina communities who would otherwise vote from casting ballots, potentially preventing the will of the people from prevailing in elections that affect every aspect of daily life.

**B.　　N.C.G.S. § 13-1's Interference with Free Elections Triggers Strict Scrutiny**

21.　　Because the right to free elections is a fundamental requirement of the North Carolina Constitution, *Harper*, 2022-NCSC-17, P139, N.C.G.S. § 13-1's abridgment of that right triggers strict scrutiny. *See Northampton*, 326 N.C. at 747, 392 S.E.2d at 356. That is so regardless of the General Assembly's intent in passing the law. When statutes implicate state constitutional provisions concerning the right to vote, "it is the effect of the act, and not the intention of the Legislature, which renders it void." *People ex rel. Van Bokkelen v. Canaday*, 73 N.C. 198, 225-26 (1875). The effect of section 13-1 is to deny the franchise to over 56,000 people, disproportionately African Americans.

22.　　In any event, strict scrutiny would apply here even if the General Assembly's intent were relevant in evaluating a Free Elections Clause claim. In manipulating the electorate by disenfranchising groups of voters perceived as undesirable, N.C.G.S. § 13-1 resembles the very English laws that were the impetus for North Carolina's original free elections clause.

Exhibit A: Superior Court Final Order

23.     Section 13-1's denial of the franchise to persons on felony supervision is therefore subject to strict scrutiny.

## III.  N.C.G.S. § 13-1's Denial of the Franchise to Persons on Community Supervision Cannot Satisfy Strict or Any Scrutiny

24.     For the reasons set forth above, section 13-1's denial of the franchise to persons on community supervision is subject to strict scrutiny under both the Equal Protection Clause and the Free Elections Clause. To satisfy strict scrutiny, Defendants must establish that this provision furthers a compelling government interest and is narrowly tailored to do so. *Northampton Cnty.*, 326 N.C. at 747; *DOT v. Rowe*, 353 N.C. 671, 675, 549 S.E.2d 203, 207 (2001). Defendants failed to make such a showing on all claims.

25.     At a minimum, section 13-1's denial of the franchise is subject to intermediate scrutiny. The Supreme Court has consistently applied intermediate scrutiny where the government's discretion to regulate in a particular field had to be balanced against other constitutional protections. Under intermediate scrutiny, the government must show that the challenged law "advance[s] important government interests" and is not more restrictive "than necessary to further those interests." *Id.* Defendants have failed to establish that section 13-1's denial of the franchise to people on felony supervision advances any "important" government interest, much less in an appropriately tailored manner.

26.     Furthermore, because N.C.G.S. § 13-1 does not withstand an intermediate level of scrutiny, it fails strict scrutiny as well. *See M.E. v. T.J.,* 275

Exhibit A: Superior Court Final Order

N.C. App. 528, 559, 854 S.E.2d 74, 101 (2020*)* (articulating intermediate scrutiny as a less restrictive standard than strict scrutiny).

27.     Under any level of scrutiny, Defendants must show that the challenged law adequately serves sufficient state interests today, not just that the law served some state interest in the past. A "classification must substantially serve an important governmental interest *today*, for . . . new insights and societal understandings can reveal unjustified inequality that once passed unnoticed and unchallenged." *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1690 (2017) (internal quotation marks omitted) (emphasis original)).  Defendants failed to do so.

28.     Section 13-1's denial of the franchise to people on felony supervision does not advance any valid state interest. Further, much of the evidence presented demonstrates that section 13-1 causes grave harm and undermines important state interests such as voter participation.

29.     N.C.G.S. § 13-1's denial of the franchise to persons on community supervision violates North Carolina's Equal Protection Clause, Article I, § 19, and the Free Elections Clause, N.C. Const., art. I, § 10 and does not satisfy strict scrutiny.

Exhibit A: Superior Court Final Order

## IV. The Constitutional Provision Regarding Felony Disenfranchisement Does Not Insulate N.C.G.S. § 13-1 From Constitutional Challenge

30.     Defendants argue that Article VI, § 2, cl. 3 of the North Carolina Constitution precludes Plaintiffs from challenging the manner of rights restoration set forth in N.C.G.S. § 13-1. That is incorrect.

31.     The Court rejected this argument from Defendants in its preliminary injunction order in September 2020 and rejects it again today.

32.     Article VI, § 2, cl. 3 reflects a delegation of authority to the General Assembly to "prescribe[] by law" the contours of the restoration of the franchise, and legislation enacted by the General Assembly pursuant to this delegation must comport with all other provisions of the North Carolina Constitution.  Because "all constitutional provisions must be read *in pari materia*," a constitutional provision "cannot be applied in isolation or in a manner that fails to comport with other requirements of the State Constitution." *Stephenson*, 355 N.C. at 377-78, 562 S.E.2d at 392, 394.

33.     The Court recognizes that Article VI, § 2(3) of our Constitution grants the General Assembly the authority to restore citizen rights to persons convicted of felonies. As discussed above, however, Article I, § 19 of our Constitution forbids the General Assembly from interfering with the right to vote on equal terms, and Article I, § 10 requires that elections be free so as to ascertain the will of the people. Accordingly, when the General Assembly prescribes by law the manner in which a convicted felon's right to vote is restored, it must do so on equal terms and in a manner that ensures elections ascertain the will of the people.

34.     "A court should look to the history" in interpreting a constitutional

provision, *N.C. State Bd. of Educ. v. State*, 255 N.C. App. 514, 529, 805 S.E.2d 518,

527 (2017), *aff'd*, 371 N.C. 149, 814 S.E.2d 54 (2018), and throughout its history

Article VI, § 2, cl. 3 has *always* been accompanied by implementing legislation.  As

explained above, the General Assembly enacted a statutory scheme providing for

felony disenfranchisement and rights restoration in 1877, in the very first

legislative session after ratification of the 1876 constitutional amendment.  At no

point in the 144 years since its adoption has Article VI, § 2, cl. 3 ever operated by its

own force without implementing legislation.

35.     In any event, implementing legislation *has* been enacted, and any

statute enacted by the General Assembly must comport with all provisions of the

North Carolina Constitution. As concluded above, section 13-1 fails, beyond all

reasonable doubt, to do so.

**It is therefore ORDERED, ADJUDGED, AND DECREED THAT:**

1.      N.C.G.S. § 13-1's denial of the franchise to persons on felony probation,

        parole, or post-release supervision violates the North Carolina

        Constitution's Equal Protection Clause and Free Elections Clause.

2.      Defendants, their agents, contractors, servants, employees, and

        attorneys, and any persons in active concert or participation with

        them, are hereby enjoined from preventing any person convicted of a

        felony from registering to vote or voting due to probation, parole, or

        post-release supervision.

3.  For the avoidance of doubt, under this injunction, if a person otherwise eligible to vote is not in jail or prison for a felony conviction, they may lawfully register and vote in North Carolina.

SO ORDERED, this the 28th day of March, 2022.

_____
Lisa C. Bell, Superior Court Judge

_____
3/28/22

Keith O. Gregory, Superior Court Judge

*as a majority of this Three Judge Panel*

65

## DISSENT

Judge Dunlow dissents from the majority's decision and order.

For the reasons specified in my dissent to the majority's Order on Summary Judgment, I dissent from the final order of the majority issued today.

This Court would make the following:

## FINDINGS OF FACT

1. Article VI, Section 2, Part 3 of the North Carolina Constitution provides:

   **Disqualification of felon.** No person adjudged guilty of a felony against this State or the United States, or adjudged guilty of a felony in another state that also would be a felony if it had been committed in this State, shall be permitted to vote unless that person shall be first restored to the rights of citizenship in the manner prescribed by law.

2. The Plaintiffs in this action do not challenge the provisions of Article VI, Section 2, Part 3 of the North Carolina Constitution.

3. Because the provisions of Article VI, Section 2, Part 3 of the North Carolina Constitution are not challenged in this litigation, this Court must, in analyzing this facial challenge, begin with the assumption that all convicted felons who have not had their rights of citizenship restored are properly and lawfully disenfranchised pursuant to Article VI, Section 2, Part 3 of the North Carolina Constitution.

4. The manner prescribed by law for the restoration to the rights of citizenship is found at N.C.G.S. § 13-1.

5. In the present action, Plaintiffs make a facial challenge to N.C.G.S. § 13-1 (the restoration provision), requesting this Court, "Declare that N.C.G.S. § 13-1's disenfranchisement of individuals while on probation, parole, or suspended sentence is facially unconstitutional and invalid . . . ."

6. The particular provision being challenged in this action is N.C.G.S. § 13-1(1) which provides:

   Any person convicted of a crime, whereby the rights of citizenship are forfeited, shall have such rights automatically restored upon the occurrence of any one of the following conditions:

66                                                Exhibit A: Superior Court Final Order

(1)  The unconditional discharge of an inmate, of a probationer, or of a parolee by the agency of the State having jurisdiction of that person or of a defendant under a suspended sentence by the court.

7.  N.C.G.S. § 13-2(a) provides:

The agency, department, or court having jurisdiction over the inmate, probationer, parolee or defendant at the time his rights of citizenship are restored under the provisions of N.C.G.S. § 13-1(1) shall immediately issue a certificate or order in duplicate evidencing the offender's unconditional discharge and specifying the restoration of his rights of citizenship.

8.  There has been no evidence presented that any agency, department or court having jurisdiction over an inmate, probationer, parolee or defendant at the time his rights of citizenship are restored under the provisions of N.C.G.S. § 13-1(1) has failed to immediately issue a certificate or order in duplicate evidencing the offender's unconditional discharge and specifying the restoration of his rights of citizenship.

9.  Each and every individual who is disqualified from voting under the provisions of Article VI, Section 2, Part 3 of the North Carolina Constitution is automatically restored the right to vote under the provision of N.C.G.S. § 13-1(1).[2]

10. The Plaintiffs have offered, and the Court received, a myriad of testimony, statistical analysis and evidence relating to the impact the provision of Article VI, Section 2, Part 3 of the North Carolina Constitution (felon disenfranchisement) has on the African American population.

11. The Plaintiffs have offered no testimony, statistical analysis or evidence relating to the impact, if any, N.C.G.S. § 13-1 has on the African American population or any other suspect class.

12. "[F]elons do not enjoy the same measure of constitutional protections . . . as do citizens who have not been convicted of a felony." *State v. Grady*, 372 N.C. 509, 567, 831 S.E.2d 542, 582 (2019). As a result of their own conduct, felons are subject to these reduced constitutional protections, which "society . . . recognize[s] as legitimate." *See id.* at 555, 831 S.E.2d at 575.  Our courts have recognized that there is a dividing line, for constitutional rights, between those who have "served [their] sentence[s], paid [their] debt[s] to society, and had [their] rights restored," and those who have not. *Id.* at 534, 831 S.E.2d at 561.

---

[2] The Court will take judicial notice that the only prerequisite for an individual to have their citizenship rights restored automatically is that the individual live long enough to complete the term of their sentence, probation, parole and/or post-release supervision.

Exhibit A: Superior Court Final Order

13. Establishing a process by which convicted felons can regain their citizenship rights, including the right to vote, is a valid and legitimate governmental interest.

14. Establishing a restoration process that requires convicted felons to complete their terms of imprisonment, probation, parole or post-release supervision before regaining their citizenship rights, including the right to vote, is a valid and legitimate governmental interest.

15. The Free Elections Clause of the North Carolina Constitution mandates that elections in North Carolina faithfully ascertain the will of the people. The people whose will is to be faithfully ascertained are the persons who are lawfully permitted to vote in North Carolina elections.

16. Because convicted felons, who have not had their citizenship rights restored, are not lawfully permitted to vote in North Carolina elections, the Free Elections Clause has no application to those persons.

Based on the foregoing findings of fact, this Court would make the following:

## **CONCLUSIONS OF LAW**

1. The Court has jurisdiction over the parties and subject matter.

2. N.C.G.S. § 13-1 does not bear more heavily on one race than another.

3. N.C.G.S. § 13-1 does not have the intent nor the effect of discriminating against African Americans.

4. The intent of the legislature in enacting N.C.G.S. § 13-1 was to, "substantially relax the requirements necessary for a convicted felon to have his citizenship restored." *State v. Currie*, 284 N.C. 562, 565, 202 S.E.2d 153, 155 (1974).

5. N.C.G.S. § 13-1 does not interfere with the exercise of a fundamental right.

6. N.C.G.S. § 13-1 does not operate to the peculiar disadvantage of a suspect class.

7. Because N.C.G.S. § 13-1 does not interfere with the exercise of a fundamental right nor does it operate to the peculiar disadvantage of a suspect class, the appropriate level of review to apply in this facial challenge is rational-basis review.

8. N.C.G.S. § 13-1 bears a rational relationship to valid and legitimate governmental interests.

9. The Plaintiffs have failed to meet their heavy burden of showing that N.C.G.S. § 13-1 bears no rational relationship to any legitimate government interest.

10. N.C.G.S. § 13-1 does not violate the Equal Protection Clause of the North Carolina Constitution.

11. N.C.G.S. § 13-1 does not violate the Free Elections Clause of the North Carolina Constitution.

Based on the foregoing findings of fact and conclusions of law, this Court would:

## ORDER, ADJUDGE and DECREE

1. The Plaintiffs' prayers for relief are DENIED, and the Plaintiffs' complaint is hereby DISMISSED.

This the _25_ day of _March_, 2022.

_John M. Dunlow_
John M. Dunlow
Superior Court Judge

Exhibit A: Superior Court Final Order

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was served on the persons indicated

below, pursuant to the Court's July 15, 2020 Case Management Order, via e-mail transmission,

addressed as follows:

Daryl Atkinson
Whitley Carpenter
daryl@forwardjustice.org
wcarpenter@forwardjustice.org
*Counsel for Plaintiffs*

Orlando L. Rodriguez
114 W. Edenton St.
Raleigh, NC 27603
orodriguez@ncdoj.gov
*Counsel for Legislative Defendants*

R. Stanton Jones*
Elisabeth S. Theodore*
stanton.jones@arnoldporter.com
elisabeth.theodore@arnoldporter.com
*Counsel for Plaintiffs*

Terence Steed
114 W. Edenton St.
Raleigh, NC 27603
tsteed@ncdoj.gov
*Counsel for State Board Defendants*

Farbod K. Faraji*
Aditi Juneja*
farbod.faraji@protectdemocracy.org
aditi.juneja@protectdemocracy.org
*Counsel for Plaintiffs*

*Admitted pro hac vice

This the 28th day of March 2022.

Kellie Z. Myers
Trial Court Administrator
10th Judicial District
kellie.z.myers@nccourts.org