**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| NORTH CAROLINA A. PHILIP RANDOLPH INSTITUTE and ACTION NC, <br><br> *Plaintiffs*, <br><br> v. <br><br> THE NORTH CAROLINA STATE BOARD OF ELECTIONS, et al., <br><br> *Defendants*. | Civil Action No. 1:20-cv-00876 <br><br> **ORAL ARGUMENT REQUESTED** |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR <u>SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

FACTUAL BACKGROUND ................................................................................. 3

    A.    The Strict Liability Voting Law Was Enacted With Discriminatory Intent In 1877 .......................................................................... 3

    B.    The Strict Liability Voting Law Was Reenacted With Discriminatory Intent In 1899 ........................................................ 5

    C.    The Key Features Of The Strict Liability Voting Law Have Remained Intact Since 1899 ............................................................. 6

    D.    The Strict Liability Voting Law Does Not Define Which Prospective Voters Are Subject To Potential Punishment ................................... 8

    E.    The Strict Liability Voting Law Became A Renewed Focus Of Investigation And Enforcement Actions In 2016 .......................... 11

    F.    The Strict Liability Voting Law Has Been Inconsistently Enforced By The NCSBE And State DAs ................................................ 12

    G.    The Strict Liability Voting Law Has Had A Disproportionate Effect On Black Voters ........................................................................ 13

QUESTIONS PRESENTED ............................................................................... 15

ARGUMENT ...................................................................................................... 15

I.    THE STRICT LIABILITY VOTING LAW VIOLATES THE EQUAL PROTECTION CLAUSE ........................................................................... 15

    A.    The Strict Liability Voting Law's Discriminatory Taint Has Never Been Cleansed ............................................................................ 16

    B.    The Strict Liability Voting Law Disproportionately Impacts Black Voters ................................................................................. 19

II.    THE STRICT LIABILITY VOTING LAW VIOLATES THE DUE PROCESS CLAUSE ............................................................................... 20

i

A.    The Strict Liability Voting Law Fails To Provide Adequate Notice
      Of The Prohibited Conduct ............................................................................. 21

B.    The Strict Liability Voting Law Fails To Provide Clear Standards To
      Prevent Arbitrary Enforcement ..................................................................... 23

CONCLUSION ................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez*,
 138 S. Ct. 2305 (2018) ................................................................................. 16

*Carolina Youth Action Project; D.S. by & through Ford v. Wilson*,
 60 F.4th 7701(4th Cir. 2023) ................................................................. passim

*Chen v. City of Houston*,
 206 F.3d 502 (5th Cir. 2000) ....................................................................... 16

*Cmty. Success Initiative v. Moore*,
 886 S.E.2d 16 (N.C. 2023) ..................................................................... passim

*Colautti v. Franklin*,
 439 U.S. 379 (1979) ..................................................................................... 20

*Cunney v. Bd. of Trs. of Grand View*,
 660 F.3d 612 (2d Cir. 2011) ........................................................................ 23

*Doe v. Cooper*,
 842 F.3d 833 (4th Cir. 2016) ................................................................. 21, 22

*Gingles v. Edmisten*,
 590 F. Supp. 345 (E.D.N.C. 1984) ................................................................ 5

*Grayned v. City of Rockford*,
 408 U.S. 104 (1972) ..................................................................................... 20

*Hayden v. Paterson*,
 594 F.3d 150 (2d Cir. 2010) ........................................................................ 16

*Hill v. Colorado*,
 530 U.S. 703 (2000) ..................................................................................... 21

*Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*,
 790 F.3d 532 (4th Cir. 2015) ......................................................................... 3

*Hunter v. Underwood*,
 471 U.S. 222 (1985) ................................................................................ 16, 20

iii

*Johnson v. United States*,
    576 U.S. 591 (2015) ...................................................................................20

*Jones v. Governor of Fla.*,
    975 F.3d 1016 (11th Cir. 2020) ...................................................................21

*Kolender v. Lawson*,
    461 U.S. 352 (1983)...................................................................................23

*Konikov v. Orange Cnty.*,
    410 F.3d 1317 (11th Cir. 2005) ..............................................................23, 25

*Lo v. Cnty. of Siskiyou*,
    2022 WL 1505909 (E.D. Cal. May 12, 2022) ...........................................16

*Manning v. Caldwell*,
    930 F.3d 264 (4th Cir. 2019) ......................................................................21

*Martin v. Lloyd*,
    700 F.3d 132 (4th Cir. 2012) ......................................................................20

*N. Carolina State Conf. of NAACP v. McCrory*,
    831 F.3d 204 (4th Cir. 2016) ..................................................................3, 11

*N.C. A. Philip Randolph Inst. v. N.C. State Bd. of Elections*,
    2022 U.S. Dist. LEXIS 27365 (M.D.N.C. Feb. 14, 2022).........................15

*Ramos v. Louisiana*,
    140 S. Ct. 1390 (2020)...............................................................................17

*Shelby Cnty. v. Holder*,
    570 U.S. 529 (2013)...................................................................................11

*Tom v. Hosp. Ventures LLC*,
    980 F.3d 1027 (4th Cir. 2020) ....................................................................15

*United States v. Aggison*,
    2023 WL 2250313 (N.D. Ga. Feb. 27, 2023) ...........................................22

*United States v. Shrader*,
    675 F.3d 300 (4th Cir. 2012) ......................................................................21

*Veasey v. Abbott*,
    888 F.3d 792 (5th Cir. 2018) ................................................................16, 18

iv

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ............................................................................. 15, 16

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests.*,
    455 U.S. 489 (1982) ................................................................................ 20

**Statutes and Rules**

Fed. R. Civ. P. 56 ......................................................................................... 15

N.C.G.S. § 13-1 ............................................................................................. 9

N.C.G.S. § 15A-1342 .................................................................................... 9

N.C.G.S. § 15A-1343 .................................................................................... 9

N.C.G.S. § 15A-1344 .................................................................................... 9

N.C.G.S. § 15A-1368 .................................................................................... 9

N.C.G.S. § 15A-1374 .................................................................................... 9

N.C.G.S. § 163-275(5) ............................................................................... 7, 8

N.C.G.S. § 163-55 ......................................................................................... 8

v

Plaintiffs North Carolina A. Philip Randolph Institute and Action NC respectfully submit this Memorandum in support of their motion for summary judgment.

## INTRODUCTION

The Court should invalidate North Carolina General Statute § 163-275(5) because it violates both the Equal Protection and Due Process Clauses of the Fourteenth Amendment. Section 163-275(5) (the "Strict Liability Voting Law" or the "Law") imposes strict-liability, felony-level criminal penalties on citizens who vote while on parole, probation, or post-release supervision for a felony conviction—*even if they mistakenly believe they are eligible to vote*. The Law cannot withstand Fourteenth Amendment scrutiny.

*First*, the Strict Liability Voting Law violates the Equal Protection Clause. There is no dispute that the Strict Liability Voting Law was originally enacted in 1877, and reenacted in 1899, with the discriminatory intent to exclude Blacks from voting. The State Board Defendants concede that discriminatory animus drove the General Assembly to adopt the Law in 1877. The Law was then reenacted in 1899 following a constitutional convention called to address the so-called "threat" of "negro domination." Since then, the Law has remained substantively unchanged, and nothing has purged its discriminatory history. Because the Law's discriminatory taint has never been removed, and it continues to have a disproportionate impact on Black voters, it cannot withstand Equal Protection scrutiny.

*Second*, the Strict Liability Voting Law is unconstitutionally vague. The Law

1

does not provide adequate notice of the prohibited conduct and lacks sufficient clarity to prevent arbitrary enforcement.  As the Fourth Circuit recently emphasized, laws that impose criminal liability and threaten to impede the exercise of constitutionally-protected rights are subject to a stricter standard of clarity.  *Carolina Youth Action Project; D.S. by & through Ford v. Wilson*, 60 F.4th 770, 781 (4th Cir. 2023).  The Strict Liability Voting Law prohibits an individual with a felony conviction from voting before the individual is "restored to the right of citizenship."  But the Law provides no guidance on when or how that right is restored.  Instead, the Law implicitly (and not explicitly) looks to a separate statute, codified in a different chapter, which provides that citizenship is restored upon an individual's "unconditional discharge."  And that term is not defined anywhere.  In the face of this uncertainty, the Law imposes strict liability if a prospective voter mistakenly votes on the good-faith belief of eligibility.

The Strict Liability Voting Law is an unconstitutional trap for the unwary.  In fact, the State Board's designee conceded at his deposition that "it's absolutely possible" prospective voters could be confused.  The undisputed record also shows that county prosecutors have interpreted and enforced the Law inconsistently.  While some prosecutors have charged individuals who mistakenly voted before completing their post-release supervision, others have declined to prosecute individuals where there was no evidence of intent.  The Law should be struck down as void for vagueness under the Due Process Clause.

2

# FACTUAL BACKGROUND

## A.     The Strict Liability Voting Law Was Enacted With Discriminatory Intent In 1877

North Carolina's "long history of race discrimination generally and race-based vote suppression in particular" is undisputed. *N. Carolina State Conf. of NAACP v. McCrory*, 831 F.3d 204, 223 (4th Cir. 2016). The North Carolina Supreme Court recently summarized the State's "profoundly troubling portrait of a legal system used time and again to deny African Americans a voice in government by banning or restricting their participation in elections." *Cmty. Success Initiative v. Moore*, 886 S.E.2d 16, 38 (N.C. 2023) ("*CSI*").

After the Civil War, white Conservatives rushed to forestall Black citizens' newly-gained voting rights by, among other things, seizing on the state's criminal disenfranchisement law. Ex. 1, Expert Report of Professor James L. Leloudis II ("Leloudis Report") at 8.[1] In 1875, Conservatives called a constitutional convention to limit Black civil rights and political participation. *Id.* at 17. Thirty constitutional amendments were proposed, including a prohibition on interracial marriages and a mandate that public schools be segregated by race. *Id.* at 18. "Other amendments that did not mention race had the deliberate effect of reducing the political influence of

---

[1] This Memorandum summarizes the historical facts in Professor Leloudis' report. Professor Leloudis has affirmed his report (Ex. 1) and the Court may consider it at summary judgment. *See, e.g.*, *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 539 (4th Cir. 2015).

3

African Americans." *CSI*, 886 S.E.2d at 25.  One amendment made it a crime for "any person who, upon conviction or confession in open Court, shall be adjudged guilty of a felony, or of any other crime infamous by the laws of [the] State . . . unless such a person shall be restored to the rights of citizenship in a mode prescribed by law."  Leloudis Report at 18.  The convention understood that this criminal disenfranchisement provision would disproportionately impact Blacks, since "nearly every man convicted of a felony is a negro."  *Id.* at 20.  All of the proposed amendments were ratified in 1876.  *Id.* at 18.

In 1877, the General Assembly adopted the Strict Liability Voting Law:

> If a person be challenged as being convicted of any crime which excludes him from the right of suffrage, he shall be required to answer any questions in relation to such alleged conviction; but his answer to such questions shall not be used against him in any criminal prosecution, <u>but if any person so convicted shall vote at any election, without having been legally restored to the rights of citizenship, he shall be deemed guilty of an infamous crime, and, on conviction thereof, shall be punished by a fine not exceeding one thousand dollars, or imprisonment at hard labor not exceeding two years, or both</u>.

Ex. 2 at § 62 (emphasis added).  The Law did not require intent.  Instead, criminal liability attached even if the individual was not aware that he was ineligible to vote.  The lack of an intent requirement set the Strict Liability Voting Law apart from other offenses adopted in the 1877 law, including the swearing of a false oath, registering in more than one precinct, impersonating a legally-registered voter, and voting more than once in a single election, which all required fraudulent intent.  Leloudis Report at 19-20.

The Strict Liability Voting Law provided a means for the 1877 General Assembly

4

to restore the "purity of the ballot" and discriminate "not against [an individual] Negro directly but against certain characteristics of his race"—all in a manner that was designed to escape scrutiny under the Fourteenth and Fifteenth Amendments. *Id.* at 20. The State Board Defendants have admitted that they "do not possess any information, knowledge or documents at this time with which to dispute" that the Strict Liability voting Law was enacted with racially discriminatory intent in 1877. Ex. 3 (NCSBE Interrogatory Responses) at 3.

## B. The Strict Liability Voting Law Was Reenacted With Discriminatory Intent In 1899

Notwithstanding systematic efforts by Conservatives to curtail Black political participation, Black individuals slowly gained political influence in the 1890s. In response, Conservatives stoked racial tensions by making the threat of "negro domination" their rallying cry. Leloudis Report at 29. When Conservatives regained power in 1898, they sought to restore white rule. *Id.* at 30.

In 1899, the General Assembly drafted an amendment to the state constitution to effectively strip Black men of their voting rights. *Id.* The amendment included a literacy test, but exempted anyone who was eligible to vote before the first Reconstruction Act restored Black citizens' voting rights, and a poll tax. *Id.* at 30-31. The amendment was "specifically designed to disenfranchise [B]lack voters." *Gingles v. Edmisten*, 590 F. Supp. 345, 359 (E.D.N.C. 1984), *aff'd in part, rev'd in part sub nom. Thornburg v. Gingles*, 478 U.S. 30 (1986).

5

The General Assembly also reenacted the Strict Liability Voting Law almost verbatim:

> If any person be challenged as being convicted of any crime which excludes him from the right of suffrage, he shall be required to answer any questions in relation to such alleged convictions; but his answer to such questions shall not be used against him in any criminal prosecution, <u>but if any person so convicted shall vote at the election, without having been restored to the rights of citizenship he shall be guilty of an infamous crime and punished by a fine not exceeding one thousand dollars or imprisoned at hard labor not exceeding two years or both</u>.

Ex. 4 (1899 N.C. Sess. Laws) at 681 (emphasis added). Like the 1877 version before it, the 1899 version did not require intent. While the 1899 Act imposed felony-level criminal penalties on individuals with felony convictions who voted without any fraudulent intent, the Act established only misdemeanor-level penalties for active interference with elections through, for example "break[ing] up or stay[ing] any election" by "force or violence" or "attempt[ing] to intimidate any qualified voter of this state because of the vote such voter may or may not have cast." *See id.* at 676-77. The State Board Defendants admit that they "do not possess any information, knowledge or documents at this time with which to dispute" that the Strict Liability Voting Law was reenacted with racially discriminatory intent in 1899. *See* Ex. 3 at 3.

## C. The Key Features Of The Strict Liability Voting Law Have Remained Intact Since 1899

It is undisputed that "the scienter or mens rea requirement" and the "acts subject to prosecution" under the Strict Liability Voting Law have never been amended since the

6

Law was reenacted in 1899, and that the offense level "remains substantially the same." *See* Ex. 3 at 5, 11; *see also id.* at 12 (admitting that that neither the law enacted in 1899 nor the currently codified statute "has a mens rea requirement, and both penalize the same conduct," while stating that other features "are slightly different").

In 1931, the General Assembly reenacted the Strict Liability Voting Law, streamlined its language, and clarified that it applied to primary elections. Ex. 5 at Ch. 348, §§ 9(3, 4, 6) & § 10(5). But the Law's key features remained unchanged. Since 1931, the General Assembly has only changed one word, replacing "him" with "the person." *Compare id.*, *with* N.C.G.S. § 163-275(5).

In 1968, a State Constitution Study Commission presented proposed revisions to the state constitution. With respect to Article VI—"Suffrage and Eligibility to Office"— the Commission noted that its "substantive changes proposed . . . are few." Ex. 6 at NCSBE_0685. The felony disenfranchisement provision was expanded to include persons who had been convicted of federal crimes or felonies committed in another state. The proposed language read:

> <u>Disqualification of felon</u>. No person adjudged guilty of a felony against this State or the United States, or adjudged guilty of a felony in another state that also would be a felony if it had been committed in this State, shall be permitted to vote unless that person shall be first restored to the rights of citizenship in the manner prescribed by law.

*Id.* at NCSBE_0655. In 1971, the State adopted an amended constitution with that provision, which remains in effect today. Ex. 7. In 1973, the General Assembly revised

the election laws, and codified the revised felony disenfranchisement provision of the State Constitution, N.C.G.S. § 163-55(a), but did not modify the Strict Liability Voting Law, N.C.G.S. § 163-275(5). *See* Exs. 8-10.

### D. The Strict Liability Voting Law Does Not Define Which Prospective Voters Are Subject To Potential Punishment

The Strict Liability Voting Law makes it a felony "[f]or any person convicted of a crime which excludes the person from the right of suffrage, to vote at any primary or election without having been restored to the right of citizenship in due course and by the method provided by law." N.C.G.S. § 163-275(5). But it does not define which crimes "exclude[] the person from the right of suffrage" or how "the right of citizenship" may be restored.

To understand who is "exclude[d] . . . from the right of suffrage," a prospective voter must look to N.C.G.S. § 163-55(a)(2):

> [T]he following classes of persons shall not be allowed to vote in this State: . . . Any person adjudged guilty of a felony against this State or the United States, or adjudged guilty of a felony in another state that also would be a felony if it had been committed in this State, unless that person shall be first restored to the rights of citizenship in the manner prescribed by law.

To determine how to be "restored to the right of citizenship," a prospective voter must look to N.C.G.S. § 13-1 (the "Citizenship Restoration Law"):

> Any person convicted of a crime, whereby the rights of citizenship are forfeited, shall have such rights automatically restored upon the occurrence of any one of the following conditions:
>
> (1) The ***unconditional discharge*** of an inmate, of a probationer, or

8

of a parolee by the agency of the State having jurisdiction of that
person or of a defendant under a suspended sentence by the court . . .

(4) With regard to any person convicted of a crime against the
United States, the ***unconditional discharge*** of such person by the
agency of the United States having jurisdiction of such person . . .

(5) With regard to any person convicted of a crime in another state,
the ***unconditional discharge*** of such person by the agency of that
state having jurisdiction of such person[.]

N.C.G.S. § 13-1 (emphasis added).  Neither the Citizenship Restoration Law nor any

other statute defines the term "unconditional discharge."  Nor has any court decision

defined the term.  The State Board also does not use or define the term "unconditional

discharge" in the current Voter Registration Application, Ex. 11, or on the section of its

website entitled *Registering as a Person in the Criminal Justice System*, Ex. 12 (last

accessed June 15, 2023).  In addition, the N.C.G.S. requires that people with felony

convictions pay court costs, fees, and restitution as "conditions" of their probation,

parole, or post-release supervision.  *See* N.C.G.S. §§ 15A-1343(b)(9) (probation), 15A-

1374(b)(11a)-(11b) (parole), 15A-1368(e)(11)-(12) (post-release supervision).  Courts

may extend probation to five years based on failure to pay these amounts. *Id.* §§ 15A-

1342(a), 15A-1344(a)(d).  Individuals may not realize that the period before their voting

rights are restored under the Citizenship Restoration Law and Strict Liability Voting Law

may be extended if they fail to pay these costs and fees.

Prospective voters with felony convictions have been confused as to when their

voting rights are restored.  *See, e.g.*, Ex. 13 (noting "a pattern of confusion on the part of

9

several felons with respect to their understanding concerning their eligibility to vote");
Ex. 14 (describing notice issues in that voters "did not understand or were not informed
that their citizenship rights had not been restored pursuant to their felony convictions").
The NCSBE's general counsel, testifying as a Rule 30(b)(6) designee, conceded during
his deposition that "it's absolutely possible that someone could be confused about how
rights are restored following a felony conviction in North Carolina." Ex. 15 (Cox) 58:3-
9; *see also id.* 88:6-7 (describing a "general understanding that people could be confused
about" their voting rights).

While the NCSBE has taken steps to educate individuals with felony convictions
on when they regain the right to vote, its general counsel testified he had "serious doubts"
as to whether those measures have "removed all instances where a voter will
unknowingly commit [the] crime" of voting before sentence completion. *Id.* 54:9-12; *see
also id.* 56:19-25 ("I have serious doubts as to whether every person who is advised of
their rights about voting or not while serving a felony sentence . . . fully internalizes that
when they're advised of that and can act accordingly and can remember that . . . a year
down the road when they're still on a probation sentence."). In fact, records from the
investigations and prosecutions brought under the Law (*see infra* Section F) include
extensive evidence of voter confusion and demonstrate that his "serious doubts" are
justified.

### E. The Strict Liability Voting Law Became A Renewed Focus Of Investigation And Enforcement Actions In 2016

In 2013, the U.S. Supreme Court struck down Section 5 of the Voting Rights Act, which had required "preclearance" of voting procedures in North Carolina counties covered by judicial review. *Shelby Cnty. v. Holder*, 570 U.S. 529 (2013). Within hours of the ruling, the General Assembly began to modify the procedures for registering and voting through an omnibus election bill that significantly restricted access to the ballot box. Leloudis Report at 46. In 2016, the Fourth Circuit invalidated the resulting law because it had "target[ed] African Americans with almost surgical precision." *McCrory*, 831 F.3d 204, 214 (4th Cir. 2016).

Following the *McCrory* decision and the 2016 election, the number of NCSBE investigations of potential violations of the Strict Liability Voting Law sharply increased. The State Board conducted an election audit, which the NCSBE acknowledged was "in part a response to political pressure." Ex. 15 (Cox) 59:9-10. The audit identified 441 individuals with felony convictions who were suspected of voting before sentence completion. Ex. 17. Sixty-eight percent of the individuals investigated were Black. Ex. 18. The number of cases the NCSBE referred to county district attorneys ("DAs") for prosecution increased from 9 cases in 2015, to 422 cases in 2017. Ex. 16.

In hindsight, the NCSBE concluded the 2016 audit resulted in "significant collateral impact" in that "a lot of people [were] caught up in the investigation and referred for prosecution, when, as the audit makes quite plain, a lot of these folks didn't

11

realize they were doing anything wrong." Ex. 15 (Cox) 68:4-69:16. The audit report

recognized the violations were often unintentional, and "education and understanding of

state law appear to be the primary problem." Ex. 17. The NCSBE's general counsel also

admitted that "the focus on felon voting investigations could result in people who have a

felony record but are nonetheless eligible to vote may be confused about their rights and

whether they could be prosecuted for voting." Ex. 15 (Cox) 86:5-15.

The NCSBE continues to investigate and refer cases for prosecution under the

Strict Liability Voting Law. *Id.* 43:2-10. The NCSBE investigates all potential

violations, and the Board's legal team has advised that every case meeting the statutory

requirements should be referred for prosecution. Ex. 19 (Martucci) 59:11-13; Ex. 15

(Cox) 82:14-20. There is no dispute that the NCSBE has referred cases where there was

"no evidence the voter acted knowingly in violation of the Strict Liability Voting Law."

Ex. 19 (Martucci) 201:15-21.

### F. The Strict Liability Voting Law Has Been Inconsistently Enforced By The NCSBE And State DAs

The Strict Liability Voting Law has not been enforced in a uniform or consistent

manner. While the statute does not include an intent element, certain NSCBE

investigators and DAs have declined to prosecute voters based on their conclusion that a

violation requires evidence of intentional conduct. On at least two occasions, the NCSBE

declined to refer voters for prosecution because it concluded the voters had not acted with

intent due to a cognitive impairment. Ex. 20 (Marshall) 21:17-23. In other instances,

12

however, the NCSBE has referred cases notwithstanding evidence that the voters suffered from cognitive impairments. *Id.* 36:25-37:12. Moreover, the NCSBE has referred several cases where the investigators did not identify any evidence of intent. Ex. 19 (Martucci) 64:9-14.

In addition, several DAs have declined to prosecute voters where there was no evidence of intent. For example, the DA for Durham County wrote in a declination letter to the NCSBE that he believed "charges would require some showing of knowledge that . . . [the] individual's right to vote had been suspended." Ex. 21. Similarly, the DA for Bladen, Brunswick, and Columbus Counties refused to prosecute seven cases and "question[ed] the wisdom of prosecuting offenders who lack the requisite criminal intent, most of whom were operating in good faith." Ex. 13. The DA for Buncombe County reached the same conclusion "[i]n that this NCSBE investigation does not include documentation that the subject had actual knowledge that his voting privileges were suspended while on probation" and there was "little chance the State would be able to satisfy its burden of proof at trial." Ex. 22; *see also* Ex. 21 at 5, 7-9 (declining prosecutions for same reasons). In other instances, however, DAs have charged voters who "said their votes were an unwitting mistake" and "a product of not understanding the voter forms they signed and not knowing the law." *See* Ex. 23.

### G. The Strict Liability Voting Law Has Had A Disproportionate Effect On Black Voters

In 2018, the Alamance County DA charged twelve individuals with violating the

13

Strict Liability Voting Law. Ex. 24 at 129:24-131:2. Nine of the 12 were Black. *Id.* In 2019, the DA of Hoke County charged four individuals with violating the Law. *Id.* All four were Black. *Id.*

Approximately 22% of North Carolina's general population is Black. Ex. 25. By contrast, Black citizens represent 63.6% of all individuals investigated by the NCSBE under the Strict Liability Voting Law between 2015-2022. *See* Exs. 18, 26. In 2015-2016 and 2018-2022, Black citizens represented 56.3% of the individuals referred for prosecution. *See* Ex. 26.[2]

Black citizens are also overrepresented in the NCSBE's investigations compared to the overall percentage of Black inmates in state and federal prisons in North Carolina, 50% and 51%, respectively. *See* Exs. 27-28. Black voters are similarly overrepresented in NCSBE investigations compared to the percentage of individuals on probation or under post-release supervision—the individuals most at risk of prosecution under the Law. Just over 40% of individuals in this group are Black. Ex. 29; *CSI*, 886 S.E.2d at 35 (42% of individuals on felony supervision are African American).

Matthew Martucci, the chief investigator of the NCSBE's investigations unit, acknowledged the disproportionate representation of Black voters in the investigations:

> Q. So if the general breakdown of the population of North Carolina includes approximately 22 percent individuals who are identified as Black, then do you consider the difference between that number and the percentage of individuals who are Black who have been investigated for potential violations of the Strict

---

[2]  The NCSBE did not provide referral data for the cases it investigated in 2017.

Liability Voting Law [from 2015 to 2022] to be significant?
. . .
A. It's significant.

Ex. 19 (Martucci) 161:6-21.

## QUESTIONS PRESENTED

Whether the Court should grant summary judgment that the Strict Liability Voting Law violates the Equal Protection and Due Process Clauses.

## ARGUMENT

Summary judgment should be granted because "there is no genuine dispute as to any material fact" and Plaintiffs are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020).

## I. THE STRICT LIABILITY VOTING LAW VIOLATES THE EQUAL PROTECTION CLAUSE

"A facially-neutral law is in violation of the Equal Protection Clause if it is adopted with the intent to discriminate against a particular racial group." *N.C. A. Philip Randolph Inst. v. N.C. State Bd. of Elections*, 2022 U.S. Dist. LEXIS 27365, at *34 (M.D.N.C. Feb. 14, 2022). Determining intent requires a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). The discriminatory purposes need only be "a motivating factor," and not the "sole[]" or "primary" motive for the legislation. *Id.* at 265-66. Relevant considerations include "[t]he historical background of the" challenged law; "[t]he specific sequence of events leading up to the challenged" law; and whether the challenged law "bears more heavily on one race than

15

another." *Id.* at 266-67.  A law that was originally enacted with racial animus violates the

Equal Protection Clause if the law (i) was never purged of its original discriminatory

taint, and (ii) continues to have present-day disproportionate effects.  *Hunter v.*

*Underwood*, 471 U.S. 222, 233 (1985).

### A. The Strict Liability Voting Law's Discriminatory Taint Has Never Been Cleansed

A racially-motivated law that is reenacted with its key discriminatory features

intact retains its original discriminatory taint.  *Hunter*, 471 U.S. at 233.  Neither the

"mere passage of time," *Chen v. City of Houston*, 206 F.3d 502, 518 (5th Cir. 2000), nor

a "reenact[ment] . . . without significant change," *Hayden v. Paterson*, 594 F.3d 150, 167

(2d Cir. 2010), is sufficient to purge a discriminatory law of its original taint.  *See also,*

*e.g.*, *Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018) (merely "prun[ing]" the list of

qualifying offenses under the law originally enacted with discriminatory intent "did not

alter the intent with which the article, including the parts that remained, had been

adopted"); *Lo v. Cnty. of Siskiyou*, 2022 WL 1505909, at *8 (E.D. Cal. May 12, 2022)

("the passage of time" had not "erased . . . the concerning language County officials used

to describe their purposes" in enacting facially neutral ordinance that disproportionately

impacted minority community).  Only "substantial, race-neutral alterations in an old

unconstitutional law may remove the discriminatory taint."  *Veasey v. Abbott*, 888 F.3d

792, 802 (5th Cir. 2018).

16

The Supreme Court recently endorsed this common-sense principle in *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020), which struck down a racially-motivated law permitting non-unanimous jury verdicts for serious crimes. Like the historical events in North Carolina, Louisiana adopted the jury law following a constitutional convention in 1898 that aimed to "establish the supremacy of the white race," and "the resulting document included many of the trappings of the Jim Crow era: a poll tax, a combined literacy and property ownership test, and a grandfather clause that in practice exempted white residents from the most onerous of these requirements." *Id.* at 1394. While the law was "eventually recodified" in "new proceedings untainted by racism," *id.* at 1401 n.44, its key features remained unchanged and the reenactment did not purge its "racist history." *Id.*; *see also id.* at 1418 (Kavanaugh, J., concurring) ("the Jim Crow origins and racially discriminatory effects" of the law outweighed any possibility the modern policy "may have been motivated by neutral principles").[3]

Defendants do not dispute that the Strict Liability Voting Law was originally enacted in 1877 and reenacted in 1899 with discriminatory intent. *See* Ex. 3 at 3, 5; *supra* pages 3-6. Moreover, Defendants have conceded that the key features of the Strict Liability Voting Law—serious criminal penalties for voting before sentence completion with no scienter requirement—have remained intact. *See* Ex. 3 at 5, 11 (admitting that

---

[3]     While the *Ramos* Court considered a Sixth Amendment challenge and not an Equal Protection claim, its reasoning is applicable here.

17

"the scienter or mens rea requirement" and the "acts subject to prosecution" have never been amended); *id.* at 12 (admitting that neither the law enacted in 1899 nor the currently codified statute "has a mens rea requirement, and both penalize the same conduct"). Because there have been no "substantial, race-neutral" amendments to the Strict Liability Voting Law since 1899, the Law's original discriminatory taint has never been purged. *Veasey*, 888 F.3d at 802.

The North Carolina Supreme Court's recent decision in *CSI* is not to the contrary. There, the court addressed the constitutionality of the Citizenship Restoration Law, which was enacted to replace a prior statutory scheme in 1971 and amended in 1973. The Court found that the trial court erred in relying on North Carolina's pre-1971 history of racial discrimination in striking down the law. 886 S.E.2d at 38. The Court distinguished the Supreme Court's decision in *Hunter* because the case before it did "not concern the constitutionality of a now 122-year-old provision adopted at a proceeding held for the avowed purpose of ensuring white supremacy." *Id.* The Court emphasized that "the General Assembly in 1971 repealed Chapter 13 of the General Statutes 'in its entirety' and enacted 'a new Chapter 13' with a new [Citizenship Restoration Law]" that was designed to "ma[k]e it easier for eligible felons of all races to regain their voting rights." *Id.* at 23. Here, by contrast, the General Assembly has never "repealed" the Strict Liability Voting Law or "replaced [it] with a substantially different statutory scheme." *Id.* at 38. For more than 120 years, the key features of the Law have remained unchanged.

18

**B. The Strict Liability Voting Law Disproportionately Impacts Black Voters**

The Strict Liability Voting Law's disproportionate impact on Black voters is striking:

- While only 22% of North Carolina's citizens are Black, Black citizens represent 63.6% of all cases investigated for potential violations of the Strict Liability Voting Law between 2015-2022. The NCSBE's chief investigator acknowledged this disparity was "significant." Ex. 19 (Martucci) 161:6-21.

- Similarly, 56.3% of all cases referred for prosecution in 2015-2016 and 2018-2022 involved Black voters. *See* Exs. 18, 26. In 2017, Black voters constituted 68% of the 441 cases investigated as a result of the 2016 general election audit, "most" of which were referred for potential prosecution. Ex. 19 (Martucci) 288:11-13.

- Black citizens are also overrepresented in the NCSBE's investigations compared to the overall percentage of Black inmates in state (50%) and federal (51%) prisons in North Carolina. *See* Exs. 27-28. Moreover, only about forty percent of individuals on post-release supervision are Black. Ex. 29; *CSI*, 886 S.E.2d at 35.

Because (i) the Strict Liability Voting Law's "original enactment was motivated by a desire to discriminate against [B]lacks on account of race," (ii) it has never been purged

19

of its original discriminatory taint, and (iii) it "continues to this day to" disproportionately impact Black individuals, the Strict Liability Voting Law violates the Equal Protection Clause. *Hunter*, 471 U.S. at 233.

## II. THE STRICT LIABILITY VOTING LAW VIOLATES THE DUE PROCESS CLAUSE

"The prohibition of vagueness in criminal statutes is a well-recognized requirement," and "a statute that flouts it violates the first essential of due process." *Johnson v. United States*, 576 U.S. 591, 595 (2015). While "less clarity is required in purely civil statutes," "laws imposing criminal penalties or threatening to inhibit the exercise of constitutionally protected rights are subject to a stricter standard." *Carolina Youth Action Project*, 60 F.4th at 781; *see also Vill. of Hoffman Ests. v. Flipside, Hoffman Ests.*, 455 U.S. 489, 499 (1982). The Supreme Court has recognized that more precision is required in the context of constitutionally-protected rights, *id.* at 499, because vague laws "inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972). Where a statute imposes criminal penalties, it can be invalidated on its face "even where it could conceivably have . . . some valid application." *Martin v. Lloyd*, 700 F.3d 132, 135 (4th Cir. 2012). Even greater clarity is required when a criminal law imposes strict liability because it may act as "a trap for those who act in good faith." *Colautti v. Franklin*, 439 U.S. 379, 395 (1979); *cf. Hoffman Ests.*, 455 U.S. at 498 ("[A] scienter requirement may mitigate a law's vagueness[.]");

20

*Jones v. Governor of Fla.*, 975 F.3d 1016, 1047 (11th Cir. 2020) (rejecting a vagueness challenge to a law criminalizing voting by ineligible individuals with felony convictions because of the law's scienter requirement); *United States v. Shrader*, 675 F.3d 300, 311 (4th Cir. 2012) ("Given that the government must prove both intent and effect, we need not worry that the statute sets an unclear trap for the unwary.").

The Strict Liability Voting Law violates the Due Process Clause because it does not provide adequate notice to prospective voters, and its inherent vagueness has resulted in inconsistent and racially-disproportionate enforcement. *See Hill v. Colorado*, 530 U.S. 703, 732 (2000).

### A.    The Strict Liability Voting Law Fails To Provide Adequate Notice Of The Prohibited Conduct

A statute is unconstitutionally vague if "neither an ordinary citizen nor a law enforcement officer could reasonably determine what activity [is] criminalized by" it. *Doe v. Cooper*, 842 F.3d 833, 844 (4th Cir. 2016). When a statute includes an undefined term and the "statutes and case law fail to provide any standards of what is meant by the term," this "compels the conclusion that use of the term in the challenged scheme is unconstitutionally vague," *Manning v. Caldwell*, 930 F.3d 264, 274 (4th Cir. 2019), particularly if the statute includes no scienter requirement. *See, e.g.*, *Carolina Youth Action Project*, 60 F.4th at 786 (voiding strict liability law criminalizing "disorderly" or "boisterous" student conduct because it did not require intent, the terms were undefined and no court had "provided a limiting construction"); *United States v. Aggison*, 2023 WL

21

2250313, at *5 (N.D. Ga. Feb. 27, 2023) ("This dearth of analysis, along with the absence of a mens rea element, only adds to the uncertainty of the applicability of this regulation to the alleged conduct.").

The Strict Liability Voting Law criminalizes voting before an individual has "been restored to the right of citizenship" but does not provide any guidance on when or how an individual regains those rights. Instead, the Law only *implicitly* references the Citizenship Restoration Law, which provides that citizenship is restored upon an individual's "unconditional discharge"—a term that is not defined in the statutes or the case law. Because of the lack of clarity in the Law, well-intended individuals with felony convictions may mistakenly vote before sentence completion, unknowingly risking felony charges under the Strict Liability Voting Law.

The Law is so difficult to understand that the NCSBE's general counsel conceded that "people could be confused about" their rights under the statute. *See* Ex. 15 (Cox) 58:6-9. In *Doe v. Cooper*, the Fourth Circuit found an analogous admission "confirm[ed]" the statute violated the Due Process Clause. 842 F.3d at 843. Moreover, as Plaintiffs and other nonprofit organizations operating in North Carolina have affirmed, these concerns are far from hypothetical: through their work, these organizations repeatedly encounter eligible voters who are scared to vote for fear that they may be prosecuted under the Law. *See* Exs. 30 (Montford) ¶¶ 10-11; 31 (McCoy) ¶ 10; 32 (Zimmer) ¶ 8-10.

22

The Strict Liability Voting Law suffers from the same constitutional infirmities as the "disturbing schools law" recently struck down by the Fourth Circuit in *Carolina Youth Action Project*. Like the law in that case, the Strict Liability Voting Law uses undefined terms that fail to give "fair warning about what is prohibited" and "lacks [the] clarifying feature[]" of a "scienter standard." 60 F.4th at 787-88. And this Court should likewise declare the Law unconstitutional.

**B.** **The Strict Liability Voting Law Fails To Provide Clear Standards To Prevent Arbitrary Enforcement**

While the Due Process Clause demands that a law provide adequate notice of prohibited conduct, "the more important aspect of the vagueness doctrine is . . . the requirement that a legislature establish minimal guidelines to govern law enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983). "Statutes must provide explicit standards for those who apply them to avoid resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Cunney v. Bd. of Trs. of Grand View*, 660 F.3d 612, 621 (2d Cir. 2011). When considering the risks of arbitrary enforcement, courts place great weight on inconsistent interpretations by those charged with enforcing it. *See, e.g.*, *id.* at 622 ("Defendants' various interpretations of [ordinance's] requirements serve only to reinforce our view that the ordinance's vagueness authorizes arbitrary enforcement."); *Konikov v. Orange Cnty.*, 410 F.3d 1317, 1330-31 (11th Cir. 2005) (testimony demonstrating that "members of the Code Enforcement division differed in their opinion of what [conduct] would trigger a

23

violation" provided "evidence that the Code has an inherent risk of discriminatory enforcement" and "established the vagueness of the Code").

Here, the undisputed record shows inconsistent enforcement by the DAs who enforce the Strict Liability Voting Law. Some DAs have interpreted the Law to include an implicit scienter requirement, and have declined to prosecute violations where there was no evidence that the voter acted with fraudulent intent. These DAs have expressed their "belief that charges would require some showing of *knowledge* that . . . [the] individual's right to vote had been suspended." Ex. 21 (emphasis added). Of the cases referred from the 2016 general election audit, several were "summarily declined because the [DAs] for those counties determined there was insufficient evidence to prove that the defendant was ever notified of his or her ineligibility to vote." *Id.* By contrast, other DAs, including in Alamance and Hoke Counties, have prosecuted voters who voted before felony-sentence completion based on a mistaken belief that they were eligible to vote and without any evidence of intent. *See* Exs. 23-24.

The NSCBE has also interpreted and applied the Law inconsistently. In some cases, the NCSBE has declined to refer cases for prosecution where the individuals had cognitive impairments that rendered it unlikely they voted with fraudulent intent. *See* Ex. 20 (Marshall) 21:17-23. But in other cases, the NCSBE has referred cases even when it was clear that the individual voted in good faith. Ex. 19 (Martucci) 64:9-14.

As in *Carolina Youth Action Project*, the vagueness of the Strict Liability Voting Law has "generate[d] starkly disparate outcomes" in the Law's enforcement. 60 F.4th at

24

784 n.10.  The record shows that the individuals referred for prosecution under the Law, and those who have faced charges, have been disproportionately Black.  *See supra* pages 14-15, 20-21.  The Fourth Circuit unequivocally found that "[t]he Constitution prohibits this type of inequitable, freewheeling approach."  *Carolina Youth Action Project*, 60 F.4th at 784; *see also Konikov*, 410 F.3d at 1330-31.

## CONCLUSION

The Court should grant summary judgment for Plaintiffs on both counts in the Complaint.

25

Dated: June 15, 2023

By:   /s/ *Jeffrey Loperfido*

SIMPSON THACHER & BARTLETT
LLP
Jonathan K. Youngwood (*specially appearing*)
David Elbaum (*specially appearing*)
Nihara K. Choudhri (*specially appearing*)
Jacob Lundqvist (*specially appearing*)
425 Lexington Avenue
New York, NY 10017
Tel: (212) 455-2000
Fax: (212) 455-2502
jyoungwood@stblaw.com
delbaum@stblaw.com
nchoudhri@stblaw.com
jacob.lundqvist@stblaw.com

SOUTHERN COALITION FOR SOCIAL
JUSTICE
Jacob H. Sussman (State Bar No. 31821)
Jeffrey Loperfido (State Bar No. 52939)
Mitchell D. Brown (State Bar No. 56122)
1415 West Highway 54, Suite 101
Durham, NC 27707
Tel: (919) 323-3380
Fax: (919) 323-3942
jsussman@scsj.org
jeffloperfido@scsj.org
mitchellbrown@scsj.org

*Attorneys for Plaintiffs*

26

## CERTIFICATE OF WORD COUNT

Pursuant to Local Rules 7.3(d)(1), the undersigned counsel hereby certifies that the foregoing Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment contains 6,225 words (including headings and footnotes) as measured by Microsoft Word.

/s/ *Jeffrey Loperfido*
Jeffrey Loperfido

## CERTIFICATE OF SERVICE

I certify that on the 15th day of June, 2023, the foregoing Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment was served through the ECF system to all counsel of record, with consent of all counsel to accept service in this manner.

/s/ *Jeffrey Loperfido*
Jeffrey Loperfido