Exhibit 15

```
 1            IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
 2
 3    NORTH CAROLINA A. PHILIP RANDOLPH
      INSTITUTE and ACTION NC,
 4
                  Plaintiff,
 5
      vs.           CASE NO. 1:20-cv-00876
 6
      THE NORTH CAROLINA STATE BOARD OF
 7    ELECTIONS, et al.,
 8                  Defendants.
 9
      VTC 30(b)(6)
10    DEPOSITION OF:   THE NORTH CAROLINA STATE BOARD OF
                       ELECTIONS
11                     BY:  PAUL COX
                       (Appearing by VTC)
12
      DATE:            May 8, 2023
13
      TIME:            11:05 a.m.
14
      LOCATION:        Raleigh, NC
15
      TAKEN BY:        Counsel for the Plaintiff
16
      REPORTED BY:     Susan M. Valsecchi, Registered
17                     Professional Reporter, CRR
                       (Appearing by VTC)
18    _____
19
20
21
22
23
24
25
```

```
1   APPEARANCES OF COUNSEL:
2   ATTORNEYS FOR PLAINTIFF
        NORTH CAROLINA A. PHILIP RANDOLPH
3   INSTITUTE and ACTION NC:
4   SIMPSON THACHER & BARTLETT LLP
        BY:  JACOB LUNDQVIST
5       (Appearing by VTC)
        425 Lexington Avenue
6   New York, NY  10017
        (212) 455-2000
7   jacob.lundqvist@stblaw.com
    - and -
8   SOUTHERN COALITION FOR SOCIAL JUSTICE
        BY:  JACOB H. SUSSMAN
9       JEFFREY LOPERFIDO
        (Appearing by VTC)
10  1415 West Highway 54
        Suite 101
11  Durham, North Carolina 27707
        (919) 323-3380
12  jsussman@scsj.org
        jeffloperfido@scsj.org
13
14  ATTORNEYS FOR DEFENDANT
        THE NORTH CAROLINA STATE BOARD OF
15  ELECTIONS:
16  NORTH CAROLINA DEPARTMENT OF JUSTICE
        BY:  TERENCE STEED
17      MARY CARLA BABB
        (Appearing by VTC)
18  SPECIAL DEPUTY ATTORNEYS GENERAL
        SPECIAL LITIGATION
19  114 W. Edenton Street
        Raleigh, NC  27603
20  (919) 716-6567
        tsteed@ncdoj.gov
21  mcbabb@ncdoj.gov
22
23
24
25
```

```
1       THE COURT REPORTER:  The attorneys
2   participating in this deposition acknowledge
3   that I am not physically present in the
4   deposition room and that I will be reporting
5   this deposition remotely.
6       They further acknowledge that in lieu
7   of an oath administered in person, I will
8   administer the oath remotely.
9       The parties further agree that if the
10  witness is testifying from a state where I
11  am not a notary that the witness may be
12  sworn in by an out-of-state notary.
13      If any party has an objection to this
14  manner of reporting, please state it now.
15      [NO RESPONSE]
16      THE COURT REPORTER:  Hearing none, I
17  will proceed.
18      Mr. Cox, would you please raise your
19  right hand to be sworn.  Do you solemnly
20  swear to tell the truth, the whole truth,
21  and nothing but the truth, so help you God?
22      THE WITNESS:  I do.
23          PAUL COX
24  being first duly sworn, testified as follows:
25          EXAMINATION
```

```
1   ATTORNEYS FOR THE DISTRICT ATTORNEY
        DEFENDANTS:
2
        NORTH CAROLINA DEPARTMENT OF JUSTICE
3   OFFICE OF THE ATTORNEY GENERAL
        BY:  KATHRYN H. SHIELDS
4       (Appearing by VTC)
        SPECIAL DEPUTY ATTORNEY GENERAL
5   SERVICES TO STATE AGENCIES SECTION
        114 West Edenton Street
6   Raleigh, North Carolina 27603
        (919) 716-6755
7   kshields@ncdoj.gov
8
9
        ALSO PRESENT VIA VTC:
10      Candace Marshall
11
12
13  (INDEX AT REAR OF TRANSCRIPT)
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1   BY MR. LUNDQVIST:
2       Q.  Good morning, Mr. Cox.
3       A.  Good morning.
4       Q.  I'm Jacob Lundqvist.  I'm with Simpson,
5   Thacher, and Bartlett, and we, along with cocounsel
6   from the Southern Coalition for Social Justice,
7   represent Plaintiffs in this action.
8       Could you please state your full name
9   and address for the record.
10      A.  Paul Cox, 316 North Boundary Street,
11  Raleigh, North Carolina.
12      Q.  And Mr. Cox, have you ever been deposed
13  before?
14      A.  Nope.
15      Q.  It's an exciting day for all of us.
16  I'm going to go through a few ground rules.  I
17  suspect they will sound familiar, but just bear
18  with me.
19      Mr. Cox, you just took an oath to tell
20  the truth today, which has the same effect and
21  potential penalties as if you were testifying in a
22  court before a judge or a jury.
23      Do you understand that?
24      A.  Yes.
25      Q.  I will ask you questions, and you
```

1  should answer to the best of your ability. If
2  there's anything I ask that you do not understand,
3  please let me know, and I will rephrase the
4  question; otherwise, I will assume that you have
5  understood the question as posed.
6      Does that make sense?
7      A.  Yes.
8      Q.  At some point during the deposition
9  your counsel may object. It's for the record. And
10  you should still answer the question unless you're
11  specifically instructed not to by your counsel.
12      Do you understand that?
13      A.  Yes.
14      Q.  And if you would like to take a break,
15  just let me know, and we'll certainly accommodate
16  that; if there is a question pending, I'll just
17  ask for an answer to that question before we take
18  that break.
19      Does that make sense?
20      A.  Yes.
21      Q.  Is there any reason why you can't give
22  truthful and complete testimony today, sir?
23      A.  No.
24      MR. LUNDQVIST: Great. I am going to
25      mark an exhibit as Exhibit 1. It should be

1      available. It is a Notice of Deposition.
2      (EXHIBIT 1, April 19, 2023, Notice of
3      Deposition, was marked for identification.)
4  BY MR. LUNDQVIST:
5      Q.  Do you have that in front of you, sir?
6      A.  Yes.
7      Q.  Is this the notice pursuant to which
8  you are appearing here today?
9      A.  Yes.
10      MR. LUNDQVIST: And I am going to
11      quickly introduce a second exhibit. It
12      should be available. It is a 10-page
13      document.
14      (EXHIBIT 2, Testimony Topics, was
15      marked for identification.)
16  BY MR. LUNDQVIST:
17      Q.  Do you have that in front of you, sir?
18      A.  Yes.
19      Q.  Mr. Cox, do you understand that this
20  document reflects the scope of testimony you have
21  been asked to provide here as negotiated between
22  counsel for Plaintiffs and counsel for Defendants?
23      A.  Yes.
24      Q.  And what I did for simplicity is I
25  added in, after these few pages with tracked

1  changes, a clean version. I will be referring to
2  the topics as set forth on Page 6 and thereafter.
3      Does that make sense?
4      A.  Yes.
5      Q.  And before we dive into the topics
6  specifically, Mr. Cox, I want to ask what did you
7  do to prepare for today's deposition?
8      A.  I spoke with the other members of the
9  legal team at the State Board of Elections. I
10  spoke with Mr. Martucci, the chief investigator for
11  the State Board. I spoke briefly with the
12  executive director, Karen Brinson Bell. I spoke
13  with former general counsel Josh Lawson by phone.
14  I spoke with former general counsel Katelyn Love by
15  phone.
16      I got a readout of notes of the
17  conversation that counsel had -- counsel and
18  Mr. Martucci had with Brad Neesby, the former chief
19  information officer for the State Board of
20  Elections.
21      I reviewed a number of documents,
22  including the State Board's investigations policy,
23  the 2017 audit report, a number of other documents
24  related to audits that the State Board conducts as
25  a routine matter.

1      I reviewed some pages of a transcript
2  of a deposition that the executive director gave in
3  the Community Success Initiative case.
4      That covers most of the waterfront,
5  that I recall.
6      Q.  Okay, I understood.
7      What did you discuss with Mr. Martucci?
8      A.  Discussed his conversation with
9  Mr. Neesby. I discussed the investigations policy,
10  practices of the State Board regarding
11  investigations, discussed records pertaining to the
12  audit following the 2016 election and activities
13  that were part of that audit and followed that
14  audit.
15      Q.  And what did you discuss with
16  Ms. Brinson Bell?
17      A.  I discussed the State Board's policies
18  with respect to audits in light of the 2017 audit
19  report and whatever the State Board would be
20  deciding to do about matters such as that going
21  forward.
22      Q.  How long would you say that discussion
23  was, approximately?
24      A.  Five minutes.
25      Q.  What about Mr. Lawson, what did you

3 (Pages 6 - 9)

1  discuss with Mr. Lawson?
2      A.  Oh, I also spoke, on a different
3  occasion, with Ms. Brinson Bell about the
4  organizational structure of the State Board.  That
5  conversation probably lasted 10 minutes.
6      Q.  Okay, thank you for that.
7          Mr. Lawson, what did you discuss with
8  Mr. Lawson?
9      A.  The lead-up to the 2017 audit report
10  and the -- what transpired after the 2017 audit
11  report, the State Board practices with regard to
12  data matching, policies with regard to
13  investigations, priorities, actual investigations
14  that were occurring between 2016 and 2019.  That's
15  what I can recall.
16     Q.  And what about Ms. McLove?  Do I have
17  that right?
18     A.  Love, Katelyn Love.
19     Q.  Love, sorry.  Okay.  What did you
20  discuss with Ms. Love?
21     A.  Similar topics.  There probably would
22  have been a pretty significant overlap because she
23  overlapped with Mr. Lawson.  She was deputy general
24  counsel before becoming general counsel when
25  Mr. Lawson left in 2019.  I spoke with her also

1  about the investigations priorities policy and
2  practices with regard to investigating and
3  referring cases under the strict liability law.
4      Q.  Okay.  I believe that covers everyone
5  you spoke to.  Is there anyone I've omitted from my
6  questioning?
7      A.  No.
8      Q.  Okay.  And Mr. Cox, you are currently
9  the general counsel of the State Board, correct?
10     A.  Yes.
11     Q.  And you understand, when I'm referring
12  to the State Board, I'm referring to the North
13  Carolina State Board of Elections?
14     A.  Yes.
15     Q.  Okay, great.  How long have you served
16  in that position, sir?
17     A.  Since last fall.  I don't recall
18  exactly when my official start date was.  I want to
19  say it was the beginning of October, maybe.
20     Q.  And what was your position prior to
21  that?
22     A.  Associate general counsel for the State
23  Board of Elections.
24     Q.  And for how long were you an associate
25  counsel with the State Board?

1      A.  I joined staff in 2021.  I don't
2  exactly recall when it was.  It was somewhere in
3  the middle of 2021.
4      Q.  Understood.  And what was your role
5  prior to becoming associate counsel with the State
6  Board in 2021?
7      A.  Terence's.  I was deputy -- I was a
8  special deputy attorney general at the Attorney
9  General's Office.
10     Q.  Understood.  So you joined the State
11  Board in 2021 at some point; that's fair to say?
12     A.  That's right.
13     Q.  Okay, understood.
14         You mentioned some documents that you
15  reviewed in advance of today, including the
16  investigations policy, some pages from a transcript
17  of the deposition of Ms. Brinson Bell.
18         Are there other documents you reviewed
19  in advance of today?
20     A.  Other than the ones that I've already
21  mentioned, I reviewed some web pages, the State
22  Board's web pages regarding post-election audits.
23         I reviewed a declaration filed by
24  Katelyn Love in a federal case concerning subpoenas
25  issued by the U.S. Attorney's Office that related

1  to the State Board's 2016 and '17 investigation of
2  potential illegal voting.
3          I can't think of anything else right
4  now.
5      Q.  As part of your preparation, did you
6  take any notes?
7      A.  Yes.
8      Q.  Where are those notes now?
9      A.  In my office.
10     Q.  Are those notes related to specific
11  conversations you had, or just general notes that
12  you scribbled as part of your preparation?
13     A.  The only notes that I took that I
14  recall are notes that I took when I spoke with
15  Mr. Lawson on the phone.
16     Q.  And Mr. Lawson is no longer a State
17  Board employee, correct?
18     A.  That's correct.
19     Q.  And that is as of when?
20     A.  Early 2019.
21     Q.  Okay, understood.  Who do you succeed
22  in your current position, sir?
23     A.  Katelyn Love.
24     Q.  Katelyn Love.  So fair to stay that she
25  is no longer a State Board employee as of last

4 (Pages 10 - 13)

Veritext Legal Solutions
212-267-6868                www.veritext.com                516-608-2400
Case 1:20-cv-00876-LCB-JLW   Document 89-5   Filed 06/15/23   Page 5 of 56

1  year?
2      A.  That's right.
3      Q.  So based on everything we've just
4  walked through, Mr. Cox, how much time would you
5  say you've spent, approximately, preparing for your
6  deposition here today?
7      A.  To include sitting in on Mr. Martucci's
8  deposition, somewhere around 10 hours.
9      Q.  So that would be approximately 7 hours
10  consisting of Mr. Martucci's deposition, and then
11  in addition to that, approximately 3 hours; is that
12  fair to say?
13      A.  Well, now that you break it down, it's
14  probably more than that.  It's probably more like
15  12 hours.  I would say 5 hours outside of
16  Mr. Martucci's deposition.
17      Q.  Okay.
18      A.  At least, I believe.  Somewhere between
19  5 and 7 hours outside of that deposition.
20      Q.  Understood.
21          And, generally, how much of that
22  time -- I know you gave me specifics with respect
23  to the conversations with Ms. Brinson Bell, but how
24  much time would you approximate you spent of those
25  5 to 7 hours speaking to others as part of your

1  preparation?
2      A.  4 to 5 hours.
3      Q.  Okay, understood.
4          And so the rest would be made up of
5  reviewing documents; is that fair to say?
6      A.  That's right.
7      Q.  And, Mr. Cox, you are an attorney,
8  correct?
9      A.  Yes.
10      Q.  Okay.  You have a J.D.?
11      A.  Yes.
12      Q.  Okay.  Where do you have a J.D. from?
13      A.  UC Berkeley.
14      Q.  Okay.  And what year did you graduate,
15  sir?
16      A.  2014.
17      Q.  And you are barred in the state of
18  North Carolina?
19      A.  Yes.
20      Q.  Anywhere else?
21      A.  Not anymore.  I was barred in
22  California for a few years.
23      Q.  Do you have any other professional
24  licenses, anything like that?
25      A.  No.

1      Q.  Mr. Cox, I want to start with Topic 1,
2  so I'm referring back to what I marked as
3  Exhibit 2.  Do you have that in front of you, sir?
4      A.  Yes.
5      Q.  Specifically with respect to this
6  topic, what did you do to prepare?
7      A.  I spoke with Executive Director Karen
8  Brinson Bell.  Also present in that conversation
9  was Deputy General Counsel Lindsey Wakely, who has
10  within the State Board for a number of years and
11  could fill in some gaps and details about the
12  organizational structure.  I reviewed a couple of
13  organizational charts.
14          I spoke -- oh, there's one other person
15  I spoke with.  I spoke with Sanford Chancellor, who
16  was the chief operating officer of the State Board,
17  and also the HR director, about, you know, the
18  existence of organizational charts, and, you know,
19  whatever details he could fill in that I didn't get
20  from my other conversations.  I spoke with Katelyn
21  Love, as I mentioned earlier.
22      Q.  And, I'm sorry, that was Mr. Samford --
23      A.  Sanford, S-A-N-F-O-R-D.
24      Q.  Uh-huh.
25      A.  Last name Chancellor.

1      Q.  Understood.
2          Okay.  Mr. Cox, could you please
3  describe the State Board's general organization?
4      A.  So it's -- there's a governing board of
5  five members appointed by the governor and the
6  administrative side of the agency operates
7  underneath that governing board.
8          The executive director is the chief
9  administrator of the office.  Under the executive
10  director, there are between four and six sort of
11  division heads.  There is the general counsel
12  heading up the legal team and the investigations
13  division.  There's the chief information officer
14  who oversees the IT division and its various
15  functions and offices.
16          There is the chief operating officer
17  and HR director, which oversees, you know,
18  budgeting, accounting, human resources, operations,
19  and document management for the agency.
20          There is the deputy director.  The
21  deputy director oversees the elections
22  administration and campaign finance divisions of
23  the agency, as well as the voting systems division.
24          I think I've covered everybody
25  currently.

1      Q.   Does the general counsel's team have
2   touchpoints with respect to all of the other
3   divisions you just mentioned?
4      A.   Yes.
5      Q.   And are you in your role as general
6   counsel responsible for overseeing activities in
7   those divisions as well?
8      A.   No, not really overseeing them.  We --
9   so the general counsel of the legal team obviously
10   provides legal advice throughout the agency to all
11   divisions of the agency.
12          The way that sort of the management
13   structure works is that the -- well, as the current
14   executive director has put it together, is that
15   there is a sort of top-level management structure
16   of the agency where, you know, the general counsel
17   and the heads of the other division and the
18   executive director meet regularly to make
19   consensus-based decisions about direction of the
20   agency and its staff.
21      Q.   Understood.
22          But is it fair to say that the general
23   counsel oversees the investigations unit?
24      A.   Yes.
25      Q.   And that supervision is carried out

1   through the legal team as well as the general
2   counsel himself?
3      A.   Yes.  The technical reporting structure
4   is that the deputy general counsel reports to the
5   general counsel, the chief investigator reports to
6   the deputy general counsel, who then reports to the
7   general counsel, as I mentioned.
8      Q.   And if I have it -- sorry, go ahead.
9      A.   The other investigators report to the
10   senior investigator.
11      Q.   And so if I have it right, the chief
12   investigator is Mr. Martucci, correct?
13      A.   Yes.
14      Q.   And the deputy general counsel is
15   Ms. Wakely?
16      A.   That's right.
17      Q.   And Ms. Wakely reports to you with
18   respect to the investigation unit's activities; is
19   that fair to say?
20      A.   Yeah.  And to complete that answer,
21   Candace Marshall, who is sitting behind me, as
22   associate general counsel, is the legal team's -- I
23   don't want to call it liaison, but she is fairly
24   embedded within the investigations division and
25   supporting their work and providing them counsel on

1   a day-to-day basis.  So the -- she also reports to
2   Ms. Wakely, who reports to me, and I'm in regular
3   communication with both of those members of the
4   legal team.
5      Q.   So on a day-to-day basis, the members
6   of the investigations unit, to the extent they need
7   legal advice, will be reaching out first and
8   foremost to Ms. Marshall; is that fair to say?
9      A.   Yes.
10      Q.   And are you familiar with meetings
11   between the investigations unit and the legal team
12   conducted approximately every other two weeks?
13      A.   Every two weeks, yes.
14      Q.   Yeah.  Who from the legal team
15   participates in those meetings?
16      A.   I do, Lindsey Wakely, and Candace
17   Marshall.
18      Q.   What type of report or summary, if any,
19   is prepared of those meetings?
20      A.   There's no report that is specifically
21   prepared out of the meetings as a sort of separate
22   individual outcome of the meetings.
23          The investigations division maintains
24   tracker spreadsheets of all of its case files, and
25   the meetings progress through a review of case

1   files that need discussion that are part of that
2   tracker.  And the investigators are, you know,
3   taking notes of decision points from those
4   meetings.  Mr. Martucci, as the sort of -- you
5   know, the keeper of those files -- is making sure
6   that that tracker is updated with any decision
7   points from those meetings.
8          So to answer your question, the
9   trackers would -- could reflect some outcomes from
10   the meeting, as could individual investigator's
11   notes when we're talking about an individual
12   investigator's case, and those notes would be kept
13   in their case file.
14      Q.   Okay.  But I take it there are no
15   minutes of these meetings, for example.
16      A.   No.
17      Q.   Is there any type of report or summary
18   prepared for Ms. Brinson Bell coming out of these
19   meetings?
20      A.   No.  Whenever there's an issue that may
21   rise to the level of needing to brief Ms. Brinson
22   Bell, it would be during an oral brief.
23      Q.   Are you aware of any such briefs having
24   been conducted with respect to the strict liability
25   voting law?

6 (Pages 18 - 21)

1     A.  Not on individual cases.
2     Q.  And just so there's no confusion, sir,
3  you understand when I'm referring to a strict
4  liability voting law, that I'm referring to NCGS
5  Section 163-275, Subparagraph 5?
6     A.  Yes.
7     Q.  Great.  What are the qualifications of
8  the members of the investigative unit?
9         MS. BABB:  Objection, vague.
10        THE WITNESS:  Well, they must apply
11        through the -- you know, the -- through the
12        procedures prescribed under state personnel
13        acts and through hiring procedures that are
14        fairly uniform across the state for career
15        state employees.
16        They would have to submit
17        qualifications and be interviewed for the
18        position.  There's not a -- there are not
19        specifically a law enforcement background
20        requirement for being a member of the
21        investigations division.
22        It just so happens that three of the --
23        two of the three on the investigations
24        division have a law enforcement background.
25        And before that it was, you know, people who

1     were on the division and then left that also
2     had law enforcement backgrounds.
3  BY MR. LUNDQVIST:
4     Q.  But I take it no current member of the
5  investigations unit is a trained lawyer; is that
6  fair to say?
7     A.  None of the investigators, or the chief
8  investigator, are a trained lawyer.  Ms. Marshall
9  works very closely with them, and she is a trained
10 lawyer.
11    Q.  And who is that?  I'm sorry.
12    A.  Ms. Marshall.
13    Q.  Understood, understood.
14        Is the legal team -- well, scratch
15 that.  Let me ask you this.  As part of its
16 investigations, does the investigative unit conduct
17 any form of legal analysis?
18    A.  Not legal analysis in the sense of, you
19 know, needing to research case law, but the
20 investigations division is going to be determining
21 whether elements of a crime been met.
22    Q.  And is the legal team required to
23 review that analysis to confirm that the
24 conclusions reached by the investigators is sound?
25    A.  That is part of our biweekly case

1  review.  The investigators would report out what
2  the investigations have found for a particular
3  case, and the legal staff would have input on
4  whether there needs to be a different analysis on a
5  particular case.  And then, of course, Ms. Marshall
6  would have regular contact with investigators
7  should any questions about whether the legal
8  elements of a crime have been met.
9     Q.  Does the legal team analyze whether the
10 cases presented during these meetings every two
11 weeks qualify for a referral for potential
12 prosecution?
13    A.  Can you ask that question again?
14    Q.  Sure.  Does the legal team analyze
15 whether the cases presented during the meetings
16 that are held every other two weeks with the
17 investigations unit, whether those cases qualify
18 for referral for potential prosecution?
19    A.  Yes.
20    Q.  Okay.  And how so?
21    A.  Well, when we arrive at a particular
22 case during the case review meeting, there would be
23 a discussion about what the investigation has
24 resulted in, the evidence.  And then the
25 investigator, or the chief investigator, would

1  discuss the investigative recommendation as to
2  whether to refer.
3         And if there is any contrary views on
4  that or any discussion that needed to be had from
5  the legal side, that's where that would occur.
6     Q.  Okay.  Fair to say that for the
7  recommendation presented by the investigations team
8  as to whether or not to refer a case, there needs
9  to be agreement from the legal team as to that
10 decision?
11        MS. BABB:  Objection as to form.
12        THE WITNESS:  As I understand your
13        question, yes, for a case to be referred,
14        and as discussed as the case review
15        meetings, then there would be a meeting of
16        the minds between the investigator
17        recommending whether to refer a case and the
18        legal team.
19 BY MR. LUNDQVIST:
20    Q.  Is the opposite true as well, that a
21 decision not to refer a case requires the legal
22 team sign-off?
23    A.  Yes, the legal team would be consulted
24 on a decision.  Generally, we -- the legal team
25 would generally be consulted on a decision not to

7 (Pages 22 - 25)

1  refer a case.
2      Now, you know, if it's just an obvious
3  issue where the elements aren't met, then, you
4  know, there won't be very much discussion involved.
5  If it's -- you know, you don't -- you don't need my
6  sign-off to not refer a case that's not a crime.
7      Q.  Okay, understood.
8      But fair to say -- and I should make
9  clear as to time period.  We're talking from 2014
10 through present day, okay?  So I just want to make
11 sure that none of these practices have changed over
12 time, in which case we can discuss that.
13     But --
14     A.  Well, yeah, the practices -- the
15 organizational structure and those practices have
16 changed.
17     Prior to 2019, the investigations
18 division did not report to the general counsel, it
19 reported directly to the executive director.  And
20 the general counsel would -- as with all other
21 divisions in the agency -- would have a role in
22 advising the investigations division, but the
23 ultimate decision point as to whether to refer or,
24 you know, how to prioritize investigations, would
25 typically have taken place between the chief

1  investigator and the executive director --
2      Q.  Okay.
3      A.  -- prior to 2019.
4      Q.  Understood.  Are you aware of whether
5  or not there were regular meetings, such as the
6  ones currently being conducted between the legal
7  team and the investigations unit, to discuss
8  whether or not to refer cases in that time period
9  prior to 2019?
10     A.  There were not regular meetings as
11 such.  I do know that the general counsel, prior to
12 2019, would have had some meetings with the
13 executive director and the chief investigator of
14 the agency, but I would not characterize them as
15 regular meetings similar to the ones that we
16 conduct now.
17     Q.  So fair to say that not every case
18 being investigated and potentially referred would
19 have been discussed in such meetings with the
20 general counsel prior to 2019?
21     A.  I'm not entirely sure, but I think
22 that's right.
23     Q.  Generally, without getting into
24 specifics of any single case, what factors does the
25 legal team consider in reviewing a potential

1  referral of a strict liability voting law case?
2      A.  Whether the evidence meets the elements
3  of the crime.
4      Q.  Has the legal team instructed the
5  members of the investigations unit with respect to
6  the required elements of a breach of the strict
7  liability voting law?
8      A.  I don't know that there's been
9  instruction specifically as to the elements of the
10 strict liability voting law.  It's fairly
11 straightforward.
12     And Ms. Marshall may have more
13 background on this, but there could have been
14 situations where there was a question as to whether
15 a person who had some interaction with the criminal
16 justice system actually is serving a felony
17 sentence and therefore would not be eligible to
18 vote.  And in circumstances like that, the legal
19 staff -- legal team -- would provide guidance to
20 the investigators about that.  I believe
21 Mr. Martucci testified about deferred prosecutions;
22 that would be an example of that.  There could be
23 other -- other statuses that are not, you know,
24 disqualifying statuses.
25     Q.  And since you touched on the deposition

1  testimony of Mr. Martucci, I want to ask, as it
2  relates to the topics you are giving testimony on
3  today, is there anything in Mr. Martucci's
4  deposition that you observed that you disagreed
5  with?
6      A.  In his first day of deposition
7  testimony, he was answering questions about the
8  priorities policy, and I believe he suggested that
9  investigations of the strict liability law fit
10 under -- I don't know if it's the fifth or sixth
11 priority under the investigations priority policy.
12 I would not characterize it as such, so -- yeah.
13     Q.  How would you characterize it, sir?
14     A.  When a case of felon voting comes in to
15 the investigations team, typically, in a
16 run-of-the-mill case, you're going to have all of
17 the elements of the crime present when you have
18 that case that comes in, as an initial matter.
19     So, you know, the investigations
20 priority policy is designed to provide direction as
21 to what are going to be the agency's priorities to
22 devote investigative resources when a case comes
23 into the door and you need to determine how to --
24 what level of priority to give it for an
25 investigation.

1    The issue with felon voting is that,
2  like I said, when it comes into the door, you
3  almost always have the elements of the crime
4  already met. So it -- it's -- to sort of put it in
5  lay terms, it skips that initial phase of
6  prioritization because you basically have a
7  violation in front of you then. You know, there
8  are some investigative steps that need to take
9  place so that -- so that all of the evidence is
10 gathered, but I would say that it doesn't fit
11 within -- well, it may or may not fit within the
12 priorities.
13    And the reason I say it may or may not
14 is because, you know, when a case of voting while
15 serving a felony sentence comes in, you know, it
16 could quite possibly be intentional. Now that's
17 not a requirement of the statute, but it is a --
18 you know, one of our priorities is to investigate
19 intentional violations of the law, of the election
20 laws. And you don't know, when a felon voting case
21 comes in, whether it was intentional. So that's
22 why I said it may or may not fit the priorities.
23    But regardless of that, it is -- it
24 typically -- when it typically comes in, the
25 elements are met, so there's very little

1  investigation that has to be done to refer that to
2  a prosecutor, as we're required to do under
3  163-22(d).
4    Q.  And why is it one of the State Board's
5  priorities to investigate intentional violations of
6  the election laws?
7    A.  It reflects the level of seriousness of
8  a crime when there's culpability involved, when
9  there is an understanding that the person is doing
10 something wrong.
11    Q.  So an understanding by the person who
12 potentially committed the violation that he or she
13 did something wrong is an element that factors into
14 the State Board's analysis as to how to prioritize
15 and allocate resources; is that fair to say?
16    A.  Yes.
17    Q.  Does the legal team interact with
18 prosecutors regarding referred cases?
19    A.  Yes, sometimes.
20    Q.  And how so?
21    A.  It would typically be Ms. Marshall
22 having back-and-forth with district attorneys or
23 assistant district attorneys.
24    Q.  And what does that back-and-forth
25 involve?

1    A.  E-mails, meetings.
2    Q.  And topics-wise, what's discussed?
3    A.  Individual cases.
4    Q.  What specifically with respect to
5  individual cases?
6    A.  The evidence gathered, the methods for
7  gathering the evidence, whether other investigative
8  tactics or strategies could or should be employed.
9    Q.  Are you aware of such discussions with
10 respect to potential violations of the strict
11 liability voting law?
12    A.  Not really.
13    Q.  So fair to say that members of the
14 legal team have never discussed the intent
15 requirement, or lack thereof, under the strict
16 liability voting law with prosecutors?
17    A.  No, I wouldn't say that's fair to say.
18 You know, I'm sort of keeping two things in mind
19 here. One is that there is a -- there is
20 correspondence that takes place between DAs and the
21 State Board of Elections, which would typically be
22 directed toward the investigators but may involve
23 our legal staff as well, and some of that
24 correspondence could touch on issues of intent with
25 respect to the strict liability law.

1    Q.  Are you aware of such communications in
2  which the prosecutor to which the case was referred
3  declined prosecution because of his or her belief
4  that evidence of intent was required under the
5  statute?
6        MS. BABB:  Objection, form.
7        THE WITNESS:  I don't know if that's
8      true. I know that there have been cases
9      where a prosecutor has indicated to us that
10     they have declined to -- they're declining
11     to prosecute because of a lack of intent.
12     Now, whether the prosecutor thought that
13     intent was required as a legal matter, I
14     don't know.
15 BY MR. LUNDQVIST:
16    Q.  In such instances where prosecutors
17 have indicated that they're declining to prosecute
18 because of a lack of intent, has the legal team
19 from the State Board ever conducted any follow-up
20 conversations with those prosecutors about such
21 cases?
22    A.  I don't know.
23    Q.  Has the legal team ever prepared any
24 written analysis of the strict liability voting
25 law?

9 (Pages 30 - 33)

1    A.  Can you get me another -- can you maybe
2  rephrase the question or give me a little detail of
3  exactly what you're asking about?
4    Q.  Sure.  I'm just trying to understand --
5  for example, we've established previously that
6  members of the investigations team are not lawyers,
7  right?
8    A.  Yes.
9    Q.  And I'm trying to understand if, for
10  example, the legal team has prepared any type of
11  instructions or guidelines with respect to the
12  strict liability voting law and shared that with
13  the investigations unit.
14    A.  I don't know.  I mean, we -- it's not
15  like -- I'm not aware of any, you know, memos that
16  specifically address a legal analysis of the strict
17  liability voting law.
18    Now, has the legal staff advised
19  individual investigators on a particular case?
20  Sure.
21    Q.  And just so we have this clear, from
22  the State Board's legal team's perspective, a
23  showing of intent is not required under the strict
24  liability voting law, correct?
25    A.  That's correct.  It is not required for

1  prosecution or for a conviction.
2    Q.  Okay.  Is the legal team familiar with
3  the historical origins of the strict liability
4  voting law?
5    A.  I have general familiarity with it.
6    Q.  And what is your general familiarity?
7    A.  Well, I used to be in Terence's shoes,
8  and I remember reviewing some materials in this
9  case about it.  It's been a couple years now, so I
10  don't have a strong recollection of it.
11    Q.  Does the legal team analyze whether the
12  laws the State Board is tasked with enforcing
13  reflect the discriminatory intent?
14    MS. BABB:  Objection, form.
15    THE WITNESS:  As a general matter, does
16    the legal --
17    MS. BABB:  Uh --
18    THE WITNESS:  Are you still there?
19    MR. LUNDQVIST:  I'm still here.  I can
20    hear you.
21    THE WITNESS:  Okay.  Can I ask you to
22    ask that again?  Sorry.
23  BY MR. LUNDQVIST:
24    Q.  Yeah, sure.
25    I asked, does the legal team analyze

1  whether the laws the State Board is tasked with
2  enforcing reflect discriminatory intent?
3    A.  Not typically, no.
4    Q.  What about in an atypical situation,
5  has such an analysis ever been undertaken?
6    A.  Not that I'm aware of.
7    Q.  And just so we're clear, is it your
8  testimony and based on your knowledge as a 30(b)(6)
9  representative here today, that such an analysis of
10  whether or not the strict liability voting law
11  reflects a discriminatory intent has not been
12  conducted?
13    A.  Such analysis, to my knowledge, has not
14  been undertaken by the State Board's in-house legal
15  team.
16    Q.  Are you aware of other legal teams
17  affiliated with the State Board that have
18  undertaken such an analysis?
19    MS. BABB:  Objection to the extent it
20    would be privileged.
21    THE WITNESS:  Yeah, the only answer I
22    could provide on that could possibly be
23    privileged.
24  BY MR. LUNDQVIST:
25    Q.  I guess I'm just asking you if you're

1  aware of whether or not there are teams that have
2  conducted such an analysis and not with respect to
3  any such team's conclusions.
4    A.  So, you know, we have counsel
5  representing us in this case, and, you know, my
6  agency is a defendant in the case; so the counsel
7  representing us as a defendant in the case would
8  obviously have to analyze legal issues in the case.
9    Q.  Separate and apart from this case, are
10  you aware of any analysis of the kind we just
11  discussed having been undertaken by legal teams
12  associated with the State Board?
13    MS. BABB:  Same objection.
14    THE WITNESS:  No.
15  BY MR. LUNDQVIST:
16    Q.  Who from the legal team interacts with
17  the executive director today?
18    A.  The entire legal team interacts with
19  the executive director.
20    Q.  Formal meetings, or more informal?
21    A.  Both.  I -- the general counsel and the
22  deputy general counsel have the most, sort of,
23  regular formal interactions with the executive
24  director.  And other members of the legal team
25  would have, you know, more interactions on an

10 (Pages 34 - 37)

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Case 1:20-cv-00876-LCB-JLW   Document 89-5   Filed 06/15/23   Page 11 of 56

1 as-needed basis or informal interactions.
2     Q. Are you aware of any discussions
3 between the legal team and Ms. Brinson Bell
4 regarding the strict liability voting law?
5     A. Yes.
6     Q. Any such discussions unrelated to the
7 specifics of this case?
8     A. I'm not sure.
9     Q. Does Ms. Brinson Bell receive updates
10 with respect to the investigation unit's activities
11 as it relates to the strict liability voting law?
12     A. Not -- not updates that are
13 specifically, you know, categorized as such.
14     Q. What types of updates does she receive?
15     A. So, as you understand, the State Board
16 has a number of statutes and criminal statutes that
17 it investigates. So if I or the investigations
18 staff or other members of the legal team were to
19 brief Ms. Brinson Bell on investigative activities,
20 you know, in a general matter, it's possible that,
21 you know, some case or two involving the strict
22 liability law could be mentioned. I doubt it,
23 actually. But, you know, generally, we keep her
24 aware of the activities of investigations.
25     Q. And why do you doubt that?

1     A. Because individual cases of the strict
2 liability law are fairly straightforward. There's
3 not a lot of, you know, decision-making, executive
4 decision-making, that would need to be brought into
5 your run-of-the-mill case of someone voting while
6 serving a felony sentence.
7     Q. So are there instances in which
8 potential voting felonies or violations have been
9 investigated but the executive director is
10 consulted with respect to what action to take
11 related to those kinds of matters?
12     MS. BABB: Objection as to form.
13     THE WITNESS: Not that I'm aware of
14     with respect to individual cases. So, you
15     know, I'm separating that out from a sort of
16     general policy determination, which is
17     reflected in the 2019 investigations
18     priority policy.
19 BY MR. LUNDQVIST:
20     Q. But fair to say that the executive
21 director does not need to sign off on a decision
22 whether or not to refer a strict liability voting
23 law case for a potential prosecution?
24     A. That is correct.
25     Q. Did the executive director approve the

1 investigations guidelines that the investigation
2 unit currently follows?
3     A. Yes.
4     Q. Okay, how?
5     A. The investigations priorities policy
6 was put before the State Board of Elections at the
7 governing board, five-member board, in 2019. Any
8 such policies or documents that would be put before
9 the board would be approved by the executive
10 director before that happens.
11     Q. Has the legal team ever participated in
12 discussions regarding potential amendments to the
13 investigations guidelines?
14     A. Not that I recall.
15     Q. Is it your understanding that the State
16 Board has access to racial data related to
17 individuals who are investigated?
18     A. The State Board has access to racial
19 data as it is reported on an individual voter's
20 voter registration. The investigations may or may
21 not, you know, have documents involved in the
22 evidence collection that referred to the
23 individual's race. So, for example, if it included
24 the voter registration form, yeah, or if it
25 included an investigator looking at the person's

1 record, the voter's record, in our statewide
2 election management system, the race would be there
3 because it was entered into the voter registration
4 application, but it's not necessarily the case that
5 that would be true. You know, when an
6 investigation comes in, when a referral comes in,
7 you know, the race is not needed. It's not
8 something that, you know, the investigators are
9 making sure they gather as part of evidence
10 gathering. So that would be two different things.
11     Yes, for voter registration and our --
12 our database on voter records, race is an element
13 and not always included, but often included, in
14 a -- in a person's record. But for investigations,
15 it's not a factor.
16     Q. Has that racial data been analyzed in
17 any way as it relates to investigations and
18 referrals under the strict liability voting law?
19     A. Other than in response to the
20 Plaintiff's request for information in this case,
21 not that I'm aware of.
22     Q. Okay.
23     A. I'll clarify one aspect of that, is
24 that in 2017, when the post 2016 election audit was
25 undertaken, I am aware that the data team, in

11 (Pages 38 - 41)

Veritext Legal Solutions
212-267-6868        www.veritext.com        516-608-2400
Case 1:20-cv-00876-LCB-JLW   Document 89-5   Filed 06/15/23   Page 12 of 56

1  conducting that, in compiling that report, did
2  cross-reference the voter file with records of
3  people being investigated for the various crimes
4  that were mentioned in that audit report. And in
5  an appendix to that audit report, there's a -- you
6  know, a sorting of the political party affiliation
7  with respect to various crimes. In order to get
8  that, the data team would have had access to
9  race. Now, I don't know that there was an analysis
10 at the time of, you know, race with respect to each
11 of the crimes that were discussed in that audit
12 report. But because it's pulling from the same
13 database -- that is, the database containing party
14 registration and race on the voter registration
15 file -- that data would be there.
16     Q.  Understood.
17         As part of the meetings currently being
18 conducted between the legal team and the
19 investigations unit, are you familiar with cases
20 being investigated under the strict liability
21 voting law?
22     A.  Individual cases?
23     Q.  Yeah.
24     A.  Not really. I mean, I could not -- I
25 could not mention a particular case today sitting

1  before you.
2      Q.  Say within the last year, are you aware
3  of cases that have been brought up for discussion
4  at these meetings with the legal team that involved
5  potential violations of the strict liability voting
6  law?
7      A.  Oh, yeah.
8      Q.  Are you aware of such cases also having
9  been referred for potential prosecution?
10     A.  Yes.
11     Q.  And are you aware of cases within that
12 category that were referred and did not include any
13 evidence that the voter acted knowingly or
14 intentionally?
15     A.  I don't know. The reason I don't know
16 is because, you know, one could say there is
17 circumstantial evidence.
18         There -- after 2017 -- after the audit
19 of 2017, our state's Department of Public Safety
20 worked with the State Board of Elections to better
21 inform people who were outside of -- well, both
22 people who were leaving incarceration and also
23 people who were entering into some sort of felony
24 supervision, probation, potentially supervision, or
25 parole, and to better inform them of their voting

1  rights at the initiation of that supervision and at
2  the conclusion of that supervision. So, you know,
3  and that is documented by the probation and parole
4  officers, in the supervisee's file.
5          Also, you know, we, after 2017, really
6  made sure that the voter forms that a voter would
7  sign when they're registering, updating their voter
8  registration, and are checking in to vote or
9  submitting an absentee ballot, all of those very
10 clearly articulate the rules about whether you can
11 vote while serving a felony sentence.
12         So all that is to say that typically a
13 case of felon voting, after it gets investigated,
14 is going to have those types of documents in the
15 investigative file. So it would be -- one could
16 say that those types of documents provide
17 circumstantial evidence of intent, or knowledge,
18 but you could also have evidence to the contrary in
19 the file, but that would typically come from
20 interviews with probation/parole officers, or with
21 the voter themselves.
22         So that's a long way of answering your
23 question, which is, am I aware of cases being
24 referred that lack intent for the strict liability
25 law? And I guess the short answer is I'm not sure

1  because of those pieces of circumstantial evidence.
2      Q.  Is it the legal team's position that
3  such forms having been filled out and signed and
4  acknowledged by an ex-felon provides circumstantial
5  evidence of intent?
6      A.  Yes.
7      Q.  And is it fair to say that the legal
8  team's position on this matter reflects the State
9  Board's position?
10     A.  As --
11         (Technical difficulties.)
12         (Internet connection lost and
13         discussion held off the record.)
14 BY MR. LUNDQVIST:
15     Q.  So Mr. Cox, is it fair to say that the
16 legal team's position on this matter reflects the
17 State Board's position?
18     A.  I believe my answer was the legal
19 team's position reflects the administrative
20 agency's position on this legal matter, but the
21 State Board, as a governing body of five members,
22 has never opined on this particular issue.
23     Q.  In the last year, are you aware of
24 cases involving potential violations of the strict
25 liability voting law having been discussed between

12 (Pages 42 - 45)

1  the investigative unit and the legal team in which
2  the interviews conducted with the potential
3  violators indicated that they did not act knowingly
4  or intentionally?
5          MS. BABB: Objection as to form.
6          THE WITNESS: In the past year, I'm not
7      sure one way or the other.
8  BY MR. LUNDQVIST:
9      Q. How about in the past two years?
10     A. Past two years...
11         Again, I'm not sure one way or the
12  other. I know that -- I'll give it five years. I
13  know that in the past five years, there -- that is
14  the case, yes. There have been some, yes.
15     Q. Okay. And that is after these
16  additional measures with respect to having
17  ex-felons signing certain documents were put in
18  place; is that fair to say?
19     A. Can you complete the whole -- what
20  is -- what is it -- can you ask the question in a
21  full form so I know exactly what I'm saying has
22  happened in the last three years?
23     Q. Sure. You testified that in the last
24  five years there have been cases discussed between
25  the legal team and the investigative unit in which

1  interviews conducted with the potential violators
2  indicated that they did not act knowingly or
3  intentionally; is that correct?
4      A. That's right.
5      Q. Okay. And that time period within the
6  last five years is after these additional measures
7  to have ex-felons sign certain documents were put
8  in place; is that fair to say?
9      A. Some of them, but not necessarily all
10  of them.
11     Q. Okay. And what are the most recent
12  such additional requirements with respect to having
13  ex-felons sign documents related to their rights to
14  vote that you are aware of?
15         MS. BABB: Objection, confusing.
16         THE WITNESS: Taking your question to
17     mean, you know, when did the State Board
18     and/or other state agencies work to put
19     forms in place most recently to make
20     citizens aware of their voting rights while
21     serving a felony sentence, that would have
22     been in 2017 midway to the year -- to the
23     fall -- where the State Board worked on
24     making sure that all of its voter-facing
25     forms included the correct attestation

1  language, and worked, as well, with the
2  Department of Public Safety to ensure that
3  forms that were provided to supervisees and
4  to people leaving incarceration included
5  warnings; or advisements, I should say.
6      I mean, these forms get updated every
7  year. This aspect -- the fact that this
8  sort of warning or this particular language
9  that we're talking about has been included
10  in these forms, that's been fairly constant.
11     But there has been some revision to the
12  forms about the particular language, owing
13  principally to court cases that have changed
14  the felon eligibility requirements.
15         MR. LUNDQVIST: Understood.
16         THE WITNESS: So the last time these
17     forms was updated was, you know, a week ago.
18  BY MR. LUNDQVIST:
19     Q. Correct, correct.
20     Is the State Board aware of cases in
21  which prosecutors have taken the same position as
22  the State Board is taking with respect to
23  circumstantial evidence of intent, as you've just
24  described here today?
25     A. I'm not sure.

1      Q. Okay. You haven't discussed that with
2  prosecutors; that is, whether or not a felon
3  signing certain forms and acknowledging certain
4  warnings can provide circumstantial evidence of
5  intent?
6      A. I have not, no, and I am not sure
7  whether other members of the legal staff have.
8          MR. LUNDQVIST: I am about to switch to
9      a new topic. If everyone is okay to
10     proceed, I'm happy to do it, or we can --
11         MS. BABB: We're good.
12         MR. LUNDQVIST: Okay, Great.
13  BY MR. LUNDQVIST:
14     Q. So Mr. Cox, going back to Exhibit
15  Number 2, I'd like to direct your attention to
16  Topic Number 6.
17     Do you have that in front of you, sir?
18     A. Yes.
19     Q. Specifically with respect to this
20  topic, what did you do to prepare?
21     A. I spoke with legal staff, spoke with
22  outside counsel, with the Attorney General's
23  Office. I spoke with former General Counsel
24  Katelyn Love. I reviewed documents that reflect
25  our post-election audit procedures.

13 (Pages 46 - 49)

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Case 1:20-cv-00876-LCB-JLW   Document 89-5   Filed 06/15/23   Page 14 of 56

1    Q.  Which documents in particular are you
2  referring to?
3    A.  The post-election audit report from
4  2017, the State Board's web page that discusses
5  post-election audits, the post-election audit
6  reports from the most recent general elections.
7  That's all I can think of right now.
8    Q.  When you say the most recent general
9  elections, are you referring to an audit of the
10  general elections in 2022?
11    A.  Yeah, so the State Board conducts
12  post-election audits after each election.
13    Q.  And are they all made public?
14    A.  Yes.
15    Q.  Can you just, in a general matter,
16  describe the State Board's policies with respect to
17  post-election audits?
18    A.  So the State Board conducts a series of
19  post-election audits or reviews generally designed
20  to ensure the accuracy of the election results.
21        By law, the one audit that's required
22  is a random selection of voting -- a random
23  selection of ballots in the counties that must be
24  compared to the tabulation -- a hand count of those
25  ballots that must be compared to the machine

1  tabulation that was done on those ballots.
2        And that is to determine whether the
3  voting equipment accurately reported the results of
4  the election.
5        There is a -- it's called a provisional
6  audit -- where various data reviews are programmed
7  into our statewide election management system to
8  flag potentially incorrect determinations by a
9  category of elections as to whether a provisional
10  ballot should be counted or not.
11        There is the -- what's called the voter
12  history audit, another -- all of these happen,
13  like, in the immediate days following an election,
14  by the way.
15        So the voter history audit would
16  compare the data on voters that get checked in at a
17  particular voting site or voting method or absentee
18  voting, compare that against the counts of the
19  results, the numbers of ballots to determine that
20  you can reconcile the people who get checked in
21  with the number of ballots that you have for
22  various voting methods, and, you know, batches of
23  tabulation, to put it in lay terms.
24        That is -- that is determined whether,
25  you know, you have, in a worst case, like ballot

1  box stuffing or something like that, you know, you
2  can't reconcile why you have, you know, a certain
3  number of ballots when you can't, you know, compare
4  a similar number of voter check-ins.
5        There is something called a close
6  contest audit that we do.  That's kind of tied in
7  with the other audits I already mentioned.  So we
8  will look and see whether there are any contests,
9  from the top all the way down to the ballot in
10  every county, that has a margin of victory that is
11  so small that any discrepancy in one of the other
12  audits might be large enough to, you know, meet
13  that margin of victory.  So that's another check
14  that we do.  Those are the standard ones.
15        Recently, there was a pilot program we
16  did in 2021 for a risk-limiting audit, which is
17  similar to the voting machine tabulation audit
18  where you are hand counting -- hand-to-eye
19  counting -- ballots and comparing those to the
20  reported results through a proven statistical
21  method to determine the degree of confidence in the
22  accuracy of the results.
23        I think I've exhausted the topic.
24    Q.  Thank you.
25        Do the regular policies with respect to

1  post-election audits followed by the State Board
2  include a particular review of potential felony
3  voting?
4    A.  No.
5    Q.  Okay.  And why is that?
6    A.  Since 2017, the State Board, and in
7  conjunction with the state Department of Public
8  Safety, have really attempted to improve the
9  process of informing voters who are convicted of a
10  felony and ensuring that our list of eligible
11  voters is maintained and updated to reflect people
12  who have become ineligible due to a felony
13  conviction.
14        So the idea is that -- you know, and
15  notice of those processes have improved in
16  efficiency and in accuracy and in, you know,
17  uniform implementation.
18        So the idea behind this is that we want
19  to make sure that, on the front end, people do not
20  commit this crime, because they can't, because
21  they're not registered voters if they're
22  ineligible, and/or that people who would be
23  ineligible are better aware of the fact that they
24  cannot vote.
25    Q.  Do you believe that those measures that

14 (Pages 50 - 53)

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Case 1:20-cv-00876-LCB-JLW   Document 89-5   Filed 06/15/23   Page 15 of 56

1  you just described have removed all instances in
2  which voters potentially violated the strict
3  liability voting law despite not knowing they
4  weren't allowed to vote?
5      MS. BABB: Objection, speculation.
6      THE WITNESS: Just knowing -- how do I
7  phrase this? I -- I've done no study --
8  we've done no study to determine whether
9  that's the case. I have serious doubts as
10  to whether that has removed all such
11  instances where a voter will unknowingly
12  commit this crime.
13      THE COURT REPORTER: That's --
14  BY MR. LUNDQVIST:
15      Q. And why do you have such serious
16  doubts?
17      THE WITNESS: Did the court reporter
18  just jump in?
19      THE COURT REPORTER: Yeah, I just
20  wanted to make sure that last objection -- I
21  can't really see you, Ms. Babb, is that you
22  objecting?
23      MS. BABB: Yes, it is.
24      THE COURT REPORTER: Thank you, just
25  wanted to confirm. All good.

1      THE WITNESS: Can you ask your question
2  again?
3  BY MR. LUNDQVIST:
4      Q. Yeah, sure.
5      So you testified, Mr. Cox, that you had
6  serious doubts as to whether or not the measures
7  that have -- actually, let me just collect my
8  thoughts here for a second.
9      My follow-up question was why do you
10  have such serious doubts? But let me just try to
11  read back, so we have a clear record.
12      I asked whether you believe that the
13  measures you described that have been put in place
14  to reduce instances of potential violations of the
15  strict liability voting law have removed all
16  instances in which voters potentially violated that
17  law despite not knowing they weren't allowed to
18  vote.
19      Do you recall that question being
20  asked, sir?
21      A. Yes.
22      Q. And your answer was, "I've done no
23  study -- we've done no study to determine whether
24  that's the case. I have serious doubts as to
25  whether that has removed all such instances where a

1  voter will unknowingly commit this crime."
2      Do you recall that testimony, sir?
3      A. Yes.
4      Q. And my follow-up question was, And why
5  do you have such serious doubts?
6      A. Because you're dealing with a large
7  population of people. I don't know the total
8  population of people who are serving a current
9  felony conviction in North Carolina, but I know
10  that the population of people serving a felony
11  sentence in North Carolina under the state system,
12  outside of prison or jail, is somewhere between 40
13  and 50,000. You know, just in recognition of
14  the -- of human frailty and understanding, and, you
15  know, various abilities to understand the law in a
16  complicated world, especially when you're faced
17  with the complications of complying with the
18  various requirements of the criminal justice
19  system, I have serious doubts as to whether every
20  person who is advised of their rights about voting
21  or not while serving a felony sentence, you know,
22  fully internalizes that when they're advised of
23  that and can act accordingly and can remember that,
24  you know, a year down the road when they're still
25  on a probation sentence.

1      So, you know, it's not based upon any
2  sort of official data or analysis, just based upon
3  a general understanding of human frailty.
4      Q. Understood, understood.
5      And you mentioned previously, Mr. Cox,
6  that the State Board has not undertaken any
7  specific study in this area, but let me ask you
8  this: Has the State Board ever studied whether or
9  not the strict liability voting law, as it remains
10  on the books, has a deterrent effect on ex-felons
11  who are, in fact, eligible to vote and has kept
12  them away from the ballot box?
13      A. So the question is whether the strict
14  liability law has a deterrent effect on voters who
15  have a felony conviction in their past but have now
16  become eligible to vote?
17      Q. Correct.
18      A. No, there's been no study of that --
19      Q. Okay --
20      A. -- at the State Board.
21      Q. Okay. I'm sorry, what was the last
22  thing you said?
23      A. There's been no study of that at the
24  State Board.
25      Q. Are you aware of any such studies other

1 than at the State Board?
2     A. No.
3     Q. Do you believe any such deterrent
4 effect may exist?
5     MS. BABB: Objection, speculation.
6     THE WITNESS: I believe it's absolutely
7     possible that someone could be confused
8     about how rights are restored following a
9     felony conviction in North Carolina.
10 BY MR. LUNDQVIST:
11     Q. Understood.
12     And I briefly took us aside from
13 Topic 6 here, but I want to come back to it, sir.
14     So in order for there to be an audit, a
15 post-election audit, who needs to approve that?
16     A. Ultimately, the executive director of
17 the State Board.
18     Q. Is it an election-by-election-type
19 approval process, or are there standing procedures
20 after every election such that these audits are
21 just conducted in the ordinary course?
22     A. It's the latter, it's that there's a
23 standard set of audits that get -- that are
24 undertaken after each election.
25     The exception to that was the pilot

1 program we did in 2021 of the risk-limiting audit,
2 but other than that, the same post-election audit
3 procedures that have been in place since I guess --
4 I suppose the municipal elections in 2017 -- have
5 been in place since that time.
6     Q. Has the State Board ever undertaken a
7 post-election audit in response to political
8 pressure?
9     A. The 2017 audit was in part a response
10 to political pressure.
11     Q. And what type of political pressure,
12 more specifically?
13     A. Following the 2016 general election,
14 the president-elect and then the president and his
15 team were making broad accusations about the
16 integrity of election results across the country.
17     That also -- I don't know if it is, you
18 know, a cause-and-effect relationship, but it was a
19 relationship nonetheless. I do know that members
20 of the General Assembly of North Carolina were also
21 making statements about wanting to investigate the
22 accuracy of election results and whether, you know,
23 illegal votes contributed to the election results
24 in 2016.
25     Q. Was there direct outreach by either of

1 those groups to the State Board to encourage it to
2 undertake a post-election audit?
3     A. I don't know specifically. I know that
4 generally the State Board staff felt like they were
5 under pressure to conduct some sort of audit to let
6 the public and the members of the General Assembly
7 know, you know, whether and to what extent illegal
8 voting occurred.
9     I don't know about specific direct
10 communications. I do know there was -- the most
11 specific I could get -- and this is based upon Josh
12 Lawson's recollection -- is that the elections
13 committee in the legislature was indicating a
14 willingness to impose certain post-election review
15 or audit procedures on the State Board of
16 Elections.
17     And part of the rationale for
18 conducting the audit in 2017 was to get ahead of
19 that and to, you know, do it all on the State
20 Board's own terms, you know, not -- not be told how
21 you're going to do an investigation, but do an
22 investigation that is -- and to contextualize
23 properly that investigation so that the public and
24 leaders would understand, you know, that illegal
25 voting does occur, but it does not occur anywhere

1 near the amount that would call into question the
2 results of elections.
3     Q. Okay. Are you familiar with the
4 post-election review or audit procedures that the
5 elections committee was contemplating imposing on
6 the State Board?
7     A. No.
8     Q. How are you aware that members of the
9 State Board were feeling the pressure you just
10 described?
11     A. In conversations with Josh Lawson.
12     Q. And what specifically did he describe
13 in that respect?
14     A. Basically everything I've just
15 described, that there was -- you know, that the
16 incoming president in 2016 and early 2017 was
17 making broad accusations about the accuracy of the
18 vote and whether, you know, a number of illegal
19 votes have been cast and that there were, you know,
20 also statements from political leaders in the state
21 in that regard.
22     Q. Was there pressure to come up with a
23 large number of irregularities?
24     A. Not that I'm aware of. And that was
25 not indicated to me in my conversations with former

16 (Pages 58 - 61)

Veritext Legal Solutions
212-267-6868    www.veritext.com    516-608-2400
Case 1:20-cv-00876-LCB-JLW   Document 89-5   Filed 06/15/23   Page 17 of 56

1 general counsel.
2    Q.  Was there pressure to specifically
3 audit and investigate potential felony voting?
4    A.  I don't know.  I will say that the
5 focus of the, you know, national leaders seemed to
6 be more on noncitizen voting.  I don't know, when
7 it came to state leaders, whether that was, you
8 know, the focus or not.
9    Q.  And prior to this -- are you aware of
10 any other instances, prior to the 2016 general
11 election audit, in which felony voting was
12 specifically audited?
13    A.  I believe there was some data review,
14 perhaps, in the 2014 election, perhaps the 2015
15 municipal elections, I'm not sure.
16    I do know that after -- you know,
17 around about 2012, 2013, there was -- there was a
18 pretty significant change in the law -- in the laws
19 governing elections in North Carolina.  We called
20 it VIVA, the Voter Information Verification Act, or
21 something like that.  It included a lot of
22 different changes to the voting laws in North
23 Carolina, and it was subject to significant
24 litigation as well.  Some provisions were
25 ultimately adjoined, but not all.

1    Hand and hand with that, large overall
2 voting laws, was additional appropriations to the
3 State Board for investigators, along with other
4 appropriations to carry out the provisions of that
5 law.
6    Once there were more investigators at
7 the State Board and with -- my understanding is
8 with -- with the understanding that the legislative
9 direction was to conduct more data-based analysis
10 of voting, there were such analyses that took
11 place, nothing that I'm aware of that reached --
12 that was to the extent of what happened in the post
13 2016 election time period, but I'm generally aware
14 that there was some data matching that was done
15 prior to that.
16    Q.  Okay.  And was the State Board
17 encouraged or pressured to increase its focus on
18 that type of data matching in conducting the 2016
19 general election audit?
20    A.  I don't know specifically whether --
21 whether the data matching was specifically
22 encouraged by -- by anyone outside the agency.
23 Yeah.
24    Q.  Are you familiar with any other
25 communications from external players as it relates

1 to including felony voting as part of the 2016
2 general election audit?
3    MS. BABB:  Objection, vague.
4    THE WITNESS:  Not -- not specifically
5    with respect to felon voting, no.  I was
6    going to mention that there was -- there
7    was -- you know, so the incoming president
8    tapped the vice president to, you know, put
9    together this commission on voting
10    irregularities -- or I don't know exactly
11    what they called it.  So that was in
12    formation.  And there was a lot of media
13    attention to that at the time.
14    My recollection of the sequence of
15    events is that it wasn't until after the
16    State Board released its post-election audit
17    report that there was any sort of formal
18    request made by that commission to the State
19    Board, but that -- so that was after the
20    fact.  I don't believe that that had
21    formally come down.
22    Q.  Okay.  Are you familiar with those
23 requests made to the State Board by the commission?
24    A.  Generally.
25    Q.  And what were they?

1    A.  I believe the commission made a request
2 of every chief election officer -- official -- in
3 the country -- at the state level, at least -- for
4 voting data.  It was a lot of voting data of a lot
5 of -- some data that would have included
6 confidential information, or information that state
7 laws made confidential for voters.
8    And I don't think it was like, you
9 know, Give us ballots.  I think it was more like,
10 you know, voter dates of birth, which North
11 Carolina law makes confidential, Social Security
12 numbers, and that sort of thing.
13    Q.  Understood.
14    But as far as you recall, those
15 requests -- those specific requests came after the
16 audit had already been conducted by the State
17 Board?
18    A.  That's my recollection of the sequence
19 of the history.
20    Q.  Any other specific requests from the
21 state legislature with respect to the 2016 general
22 audit report?
23    A.  Not that I could recall or that prior
24 general counsel could recall.
25    Q.  I think we've touched on a lot of it,

17 (Pages 62 - 65)

Veritext Legal Solutions
212-267-6868            www.veritext.com            516-608-2400
Case 1:20-cv-00876-LCB-JLW   Document 89-5   Filed 06/15/23   Page 18 of 56

1 Mr. Cox, but I want to direct your attention to
2 Topic 7(b).
3     A. Can we take a three-minute recess?
4     MR. LUNDQVIST: Yeah, of course. Let's
5 go off the record.
6     (A brief recess was held.)
7 BY MR. LUNDQVIST:
8     Q. Mr. Cox, before we took a quick break,
9 I directed your attention to Topic 7(b).
10     Do you have that in front of you, sir?
11     A. Yes.
12     Q. Specifically for this topic, what did
13 you do to prepare?
14     MS. BABB: Did you read all of that?
15     Sorry, it's on two pages, so we're
16 going to --
17     MR. LUNDQVIST: Yeah, yeah.
18     THE WITNESS: Yes. You know, reading
19 the audit report itself from 2017,
20 discussing with counsel, discussing with
21 current staff who were -- current legal
22 staff who were there, and Mr. Martucci, at
23 the time of the audit, briefly discussing
24 with Ms. Brinson Bell, you know, the policy
25 direction after the audit, discussing with

1 former General Counsel Josh Lawson and
2 former General Counsel Katelyn Love the
3 facts surrounding the audit and what
4 transpired afterwards.
5     I have -- I have my own level of
6 understanding about the things that occurred
7 after the audit based on having represented
8 the State Board as outside counsel in other
9 cases and having interacted with folks in
10 the Department of Public Safety and staff at
11 the State Board of Elections on, you know,
12 the sort of administrative items that were
13 undertaken to try to minimize the chances
14 for felon voting.
15 BY MR. LUNDQVIST:
16     Q. And with respect to your discussions
17 with Ms. Brinson Bell regarding the policy
18 direction after the audit, what did you discuss in
19 that regard?
20     A. I just wanted to confirm with her my
21 understanding of the policy direction after the
22 2017 audit. We, you know, discussed the fact that
23 that audit, you know, while -- although it may have
24 had sort of good motives behind it, which were to
25 try to create a, you know, clear record for the

1 public to understand the level of illegal voting
2 that may occur and the fact that it does not
3 compromise the integrity of elections, while that
4 goal may have been laudatory, you know, there was
5 significant collateral impact to the -- anybody who
6 was subject to investigation and prosecution as a
7 result of it and that the -- going forward, the
8 direction of the State Board with respect to
9 potential cases of voting while serving a felony
10 sentence would be to concentrate resources and
11 practices to avoid it occurring to begin with,
12 rather than waiting until after an election to
13 determine whether the crime occurred.
14     Now, that's not to say that when we get
15 evidence that the crime has occurred that we do not
16 investigate and refer, but that, you know, the
17 effort would be more focused on the front end to
18 avoid the crime occurring, you know, instead of
19 sort of the data-driven audit activity that would
20 lead to identifications of felon voters.
21     Q. Okay. And you mentioned collateral
22 impact. What do you mean by that?
23     A. Well, through the data audit, hundreds
24 of people were identified as voting while serving a
25 felony sentence. And most of those, I believe,

1 were referred to prosecution. And, you know, it
2 was the first of its kind, so it was a pretty
3 significant referral. It was a pretty significant
4 drain on agency resources. Not just that, but also
5 the noncitizen aspect of that 2017 audit. And I
6 could go into lots of details about the drain on
7 agency resources and the problems that created
8 with respect to federal subpoenas from the U.S.
9 Attorney's Office.
10     But your question was regarding
11 collateral impacts. Yeah, so it was, you know, the
12 fact that the audit did result in a lot of people
13 being caught up in the investigation and referred
14 for prosecution, when, as the audit makes quite
15 plain, a lot of these folks didn't realize they
16 were doing anything wrong.
17     Q. Do you believe that this change in
18 policy direction after this audit has, in fact,
19 been implemented?
20     A. Yes.
21     Q. And how so?
22     A. As I've testified to earlier, there
23 have been a lot of changes in the administrative
24 practices, in the list maintenance practices, the
25 voting list maintenance practices, at the State

18 (Pages 66 - 69)

Veritext Legal Solutions
212-267-6868      www.veritext.com      516-608-2400
Case 1:20-cv-00876-LCB-JLW   Document 89-5   Filed 06/15/23   Page 19 of 56

1    Board, a closer relationship with the Department of
2    Public Safety, now the Department of Adult
3    Corrections, to get the daily refreshed information
4    about the population of people serving a felony
5    sentence to ensure that anyone who is ineligible
6    for that reason is not on the voter rolls, to the
7    extent that we can.
8         And, you know, better information on
9    our -- on our website about voting while being
10   involved in the criminal justice system, better
11   information, clearer information on our
12   voter-facing forms about the eligibility
13   requirements to vote in North Carolina, including
14   the requirements with respect to felon status. And
15   I will incorporate anything else I mentioned as
16   well.
17        Q.  Yeah, okay, but have the practices from
18   once a potential strict liability voting law comes
19   through the door and is reviewed by the State Board
20   at the initial stage through investigation and
21   potential referral changed as a result of the 2016
22   general election audit?
23        A.  On a case-by-case basis, whether -- is
24   your question about any changes to how the State
25   Board conducts an individual investigation of

1    alleged voting while serving a felony sentence?
2         Q.  Correct.  And I will just add to that
3    how it conducts an investigation, but also what
4    decision the State Board takes with respect to
5    referral.
6         A.  So -- so on the front end, a change
7    that's been made is that, you know, you don't have
8    this large influx through -- through a data match
9    of -- of cases.  That was a, you know, in-house
10   generated group of cases to investigate.
11        Largely, the cases that we get of felon
12   voting now are through referrals, mostly from the
13   county boards of elections.  So a county board of
14   election will determine, oh, you know, I think it
15   can have the most -- I don't know if I would say
16   most frequently -- but it could commonly occur in
17   the same-day registration window of early voting
18   where, you know, you don't have -- you don't
19   necessarily have the wherewithal on the spot to
20   determine whether someone applying to register to
21   vote at the voting site is serving a felony
22   sentence.
23        But that can be checked, and it is
24   checked, after the person registers at the early
25   voting site.  And then, at that point, you know,

1    the county board would have knowledge of that to
2    forward it on to the State Board, also take action
3    to challenge that vote based upon ineligibility.
4         So the front-end has -- the front-end
5    process has changed in the sense that, you know, it
6    changes the way cases get initiated.
7         The actual investigative process, you
8    know, from a case getting initiated through
9    referral, I guess the main change, I would say,
10   would be that it's pretty much the standard
11   practice to interview the voter and to interview
12   their supervising agency, whether it's probation,
13   parole, or whatever else it may be, before a
14   referral is made for prosecution to develop the
15   record of the investigation.
16        Q.  So what happens?
17        A.  My understanding is that was not a -- a
18   standard practice prior to the audit, but it is
19   now.
20        Q.  And why has it become a standard
21   practice?
22        A.  Because it's -- it's relevant
23   information for the prosecuting authority.
24        Q.  How so, with respect to the strict
25   liability voting law?

1         A.  Well, I don't mean to speak for any
2    prosecutors, I mean, but based upon feedback we've
3    gotten -- and you've gone through it in some
4    correspondence in Mr. Martucci's deposition -- you
5    know, there have been decisions from prosecutors to
6    decline to prosecute a particular case, despite the
7    fact that the evidence shows that the violation may
8    have occurred, because there is evidence to
9    question whether it was done intentionally, the
10   crime was committed intentionally, or knowingly.
11        And, you know, that, based upon
12   conversations and based upon those records, that,
13   you know, it appears clear that a prosecutor is
14   going to want to know that to determine whether to
15   move forward with a prosecution, because it's going
16   to factor into whether the ends of justice are
17   going to be served by a particular prosecution.
18        Q.  In connection with the potential strict
19   liability voting law cases that were investigated
20   following the 2016 general election audit, are you
21   aware of instances in which an interview was not
22   conducted?
23        A.  Yes.
24        Q.  Okay.  Why were interviews not
25   conducted?

1    A.  My understanding is that, because of
2  the volume of investigations of felon voting in
3  2017, there came a time when it was -- the
4  investigative -- there weren't enough investigative
5  resources to conduct the, you know, full work-up of
6  these cases.  So at a certain point, I believe the
7  decision was made to just refer the cases based
8  upon the evidence that demonstrated the elements
9  were met and to, you know, allow the prosecutors to
10 determine whether to move forward with those.
11   Q.  Who signed off on that decision not to
12 conduct interviews?
13   A.  That, I don't know.  I mean, at the
14 time, 2017, you know, the investigation division
15 wasn't under the legal counsel.  The investigation
16 division, obviously, it was -- it was under Joan
17 Fleming, who reported directly to the executive
18 director, who at the time wasn't Kim Strach.  And the
19 decision would have been made between the two of
20 them or perhaps just with Ms. Fleming.
21     But I do know, just from conversations
22 with former General Counsel Josh Lawson that, you
23 know, the investigations division thought they were
24 being bogged down by the -- the number of these
25 cases and that they weren't able to focus on other

1  priority items.
2     You know, one -- one -- just to name an
3  example, there was, you know, an election fraud --
4  there -- there were election fraud allegations
5  coming out of Bladen County, North Carolina, in
6  2016.
7     And, you know, an investigation into
8  election fraud, as opposed to voter fraud or the,
9  you know, one-off case of illegal voting, you know,
10 they're pretty intensive investigations.  They
11 require a lot of work.
12     And, so, you know, I don't -- I don't
13 think that, like, you know, the one-off felon
14 voting cases were -- the -- well, I'll say that
15 there were things that were a higher priority for
16 the agency, even at that time, that, you know,
17 could have suffered if staff were to --
18 investigative staff were to continue to spend all
19 of their time on felon voting cases --
20   Q.  Okay.
21   A.  -- and -- well, not just felon voting
22 cases but noncitizen voting cases, which were
23 all -- which were more -- I would say, probably
24 more resource intense to investigate than the felon
25 cases.

1    Q.  Understood, thank you.
2     Has the State Board undertaken any
3  analysis comparing the outcome in cases referred
4  where an interview was conducted, compared to cases
5  in which no interview was conducted?
6    A.  No.
7     MR. LUNDQVIST:  I'm going to introduce
8  another exhibit.  It should be available.
9  It's Exhibit 3.  It's a document titled the
10 Post-Election Audit Report, and it's dated
11 April 21st of 2017.
12     (EXHIBIT 3, April 21, 2017,
13     Post-Election Audit Report; Bates
14     NCSBE_00098, was marked for identification.)
15 BY MR. LUNDQVIST:
16   Q.  Do you see that document, Mr. Cox?
17   A.  Yes.
18   Q.  Is this the post-election audit report
19 of the 2016 general election that we have been
20 discussing here today?
21   A.  Yes.
22   Q.  Who prepared this document?
23   A.  Staff at the State Board of Elections.
24 I believe it would have been -- the ultimate
25 sign-off preparer -- not the ultimate sign-off, but

1  the ultimate preparer would have been general
2  counsel and staff and the legal staff.
3    Q.  Okay.  Who approved the publication of
4  this document?
5    A.  I mean, it would have ultimately been
6  the executive director at the time and the general
7  counsel.
8    Q.  So if we look in the document itself,
9  you see the first page begins with a background
10 section.  Do you see that, sir?
11   A.  Yes.
12   Q.  And thereafter there is a summary page.
13 Do you see that?
14   A.  Yes.
15   Q.  And the following page -- or I should
16 stay on this page.
17     Do you see the first bullet where it
18 says, "441 open cases of voting by suspected active
19 felons"?
20   A.  Yes.
21   Q.  Okay.  And you see there are subsequent
22 bullets that mention potential voting violations
23 that fall into other categories, correct?
24   A.  Yes.
25   Q.  Do you do know why the 441 open cases

20 (Pages 74 - 77)

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Case 1:20-cv-00876-LCB-JLW   Document 89-5   Filed 06/15/23   Page 21 of 56

1 of voting by suspected active felons was
2 highlighted at the top of this list?
3     A.   No.
4     Q.   Okay.  Do you have any idea as to how
5 the structure of the report itself was decided
6 upon?
7     A.   No.
8     Q.   The document also discusses some next
9 steps.  It begins on the page Bates-stamped ending
10 in 105.  Do you see that, sir?
11     MS. BABB:  We're getting there.
12     THE WITNESS:  Yes, I see it.
13 BY MR. LUNDQVIST:
14     Q.   And the first paragraph next to that
15 heading, towards the middle, there is a sentence
16 that begins, "For example, because this agency
17 knows that many irregularities occurred, because of
18 a lack of information and education, we know to
19 direct our efforts to better educate registrants
20 and those who help citizens register to vote."
21     Do you see that, sir?
22     A.   Yes.
23     Q.   Do you believe such efforts have been
24 put in place following the 2016 general election
25 audit?

1     A.   Yes.
2     Q.   And if we scroll up a little bit to
3 Page 4, it's Bates-stamped ending in 102.
4     Do you have that in front of you,
5 Mr. Cox?
6     A.   Yes.
7     Q.   Okay.  There is a second bullet.  And
8 toward the very end of that second bullet, there is
9 a sentence that begins with "Fixing the gap."
10     Do you see that?
11     A.   Yes.
12     Q.   It says, "Fixing the gap and educating
13 affected voters will reduce the opportunity for
14 unintentional violations.  It will also improve the
15 likelihood of successful prosecutions against
16 willful offenders."
17     Do you see that?
18     A.   Yes.
19     Q.   Do you agree that the measures taken
20 following the 2016 general election audit have
21 improved the likelihood of successful prosecutions
22 against willful offenders?
23     A.   I'm not sure.  You know, in an abstract
24 sense, it should, but I'm not sure -- I don't have
25 any data to say one way or the other.

1     Q.   And does the State Board maintain any
2 type of breakdown of cases involving the strict
3 liability voting law where there is evidence from
4 the voter, him or herself, that he or she acted
5 knowingly, and instances showing the opposite,
6 meaning that the voter did not act knowingly?
7     MS. BABB:  Objection, form.
8     THE WITNESS:  So there's no
9     categorization -- I take that to be what
10     your question means.  There's no particular
11     categorization of such investigations one
12     way or the other.
13     The information -- the evidence going
14     toward knowledge or intent would be gathered
15     as part of the investigative process, so
16     that evidence would be part of the
17     investigative file.
18 BY MR. LUNDQVIST:
19     Q.   Are you aware, at the time the 2016
20 general election audit was conducted, was there
21 anyone at the State Board who disagreed with
22 respect to whether violations of the strict
23 liability voting law should have been included in
24 the audit?
25     A.   I don't know.

1     Q.   How about subsequently to the audit
2 being conducted, are you aware of anyone
3 disagreeing with the audit's focus on potential
4 violators of the strict liability voting law?
5     A.   So subsequent to the audit, just
6 generally, the -- I don't know -- I can't speak for
7 general counsel, but I can speak for my immediate
8 predecessor, Katelyn Love, and the executive
9 director, Karen Brinson Bell, being of the opinion
10 that an audit such as this shouldn't be repeated in
11 the normal course, that especially with respect
12 to -- well, yeah, especially with respect to felon
13 voting, that the agency's efforts should be
14 targeted -- better targeted toward avoiding
15 instances of the crime occurring to begin with.
16     Q.   And that is based on your discussions
17 with Ms. Brinson Bell prior to your deposition here
18 today?
19     A.   With her and with Katelyn Love.
20     Q.   Okay, understood.
21     Have you discussed with Ms. Brinson
22 Bell, separate from the question as to whether an
23 audit focused on felony voting should be conducted,
24 whether or not instances of potential felony voting
25 should be investigated and potentially referred for

21 (Pages 78 - 81)

Veritext Legal Solutions
212-267-6868                www.veritext.com                516-608-2400
Case 1:20-cv-00876-LCB-JLW   Document 89-5   Filed 06/15/23   Page 22 of 56

1 prosecution?
2   A.  Yes, and the consensus, based upon
3 guidance from legal counsel, has been that when
4 such cases are referred to the State Board,
5 that they need to be referred to prosecution under
6 163-22(b).
7   Q.  Okay.  And why is that?
8   A.  The language in that statute uses the
9 term shall, I believe.  So it's been interpreted by
10 our legal staff as a mandatory requirement to refer
11 any case of a violation of election laws under the
12 jurisdiction of the State Board where the elements
13 have been met.
14   Q.  So even if a State Board investigator
15 did not agree or was inclined not to refer a case
16 involving the strict liability voting law, the
17 guidance from the legal team would be that, as long
18 as it meets the requirements of the statute, it
19 should be referred; is that correct?
20   A.  Yes.
21   Q.  Okay, understood.
22      I want to direct your attention,
23 Mr. Cox, to the last topic for which I believe you
24 have been designated.  It is Topic 8(c).  Do you
25 have that in front of you, sir?

1      MS. BABB:  Do you want me to show him
2    that?
3      MR. LUNDQVIST:  Yeah, that would be
4    great.  Thank you.
5      THE WITNESS:  Okay.
6 BY MR. LUNDQVIST:
7   Q.  Do you have that in front of you?
8   A.  Yes.
9   Q.  So I believe this overlaps with what
10 we've already discussed with respect to your
11 discussions with Ms. Brinson Bell and Ms. Love; but
12 just for the record, what did you do to prepare for
13 this topic, Mr. Cox?
14   A.  I spoke with Katelyn Love and spoke
15 with Karen Brinson Bell.
16   Q.  What did you specifically discuss with
17 Ms. Brinson Bell?
18   A.  As I mentioned earlier, just confirming
19 that the policy was not to repeat the audit that
20 occurred in 2017.
21   Q.  Okay.  Is that a formal policy?  Has it
22 been memorialized somewhere?
23   A.  No.
24   Q.  Okay.  It's just a guideline from
25 Ms. Brinson Bell; is that fair to say?

1   A.  And the general counsel.
2   Q.  Okay.  So you, separate and apart from
3 the conversation you had -- well, strike that.
4      Was that policy agreed between your
5 predecessor, Ms. Love, and Ms. Brinson Bell?
6   A.  Yes.
7   Q.  Okay, understood.
8      And you, in your current capacity, sir,
9 have not seen any reason to revisit that policy; is
10 that fair to say?
11   A.  No.  It's fair to say I have not seen
12 any reason to revisit that policy.
13   Q.  Understood, thank you.
14      So fair to say, then, that no
15 post-election audit conducted since 2017 has
16 involved felony voting?
17   A.  Correct.  There hasn't been -- as part
18 of our standard audits -- well, as part of any of
19 the audits after 2017, after an election, there has
20 not been an effort to identify felon voting.
21   Q.  Is the State Board aware of voter fraud
22 allegations in connection with the general election
23 in 2020?
24   A.  Yes.
25   Q.  Was there any pressure on the State

1 Board to conduct an audit of potential felony
2 voting at or around the time of that election?
3   A.  Not that I'm aware of.
4   Q.  How about in subsequent elections after
5 2020?
6   A.  No.
7   Q.  Who would be involved in deciding
8 whether or not -- well, strike that.
9      If the State Board were to decide to
10 conduct an audit that included potential felony
11 voting violations, whose decision would that be?
12   A.  It could either be a decision to change
13 general investigative focus or general audit focus
14 by the executive director in consultation with the
15 general counsel at the investigations division.
16      It could also be the State Board
17 itself, the governing body deciding that.
18   Q.  Okay.  Are you aware of any discussions
19 having been conducted by the governing body,
20 regarding whether or not to conduct a felony voting
21 audit?
22   A.  No.
23   Q.  Just one more question, Mr. Cox.  When
24 you mentioned the collateral impact of having
25 conducted the 2016 audit, has the State Board also

22 (Pages 82 - 85)

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Case 1:20-cv-00876-LCB-JLW   Document 89-5   Filed 06/15/23   Page 23 of 56

1 considered collateral impact beyond the individuals
2 who were specifically investigated and potentially
3 referred for violations of the strict liability
4 voting law?
5 A. Yeah, I would say that, among the
6 general counsel and the executive director, there
7 was also a concern about the -- a concern about
8 whether the focus on felon vote investigations
9 could result in people who have a felony record but
10 are nonetheless eligible to vote may be confused
11 about their rights and whether they could be
12 prosecuted for voting.
13 Q. And that was a concern shared by
14 Ms. Brinson Bell and Ms. Love; is that fair to say?
15 A. And me, yes.
16 Q. And has the State Board undertaken any
17 type of analysis or research to understand whether
18 or not there is, in fact, such confusion among
19 ex-felons who are, in fact, eligible to vote under
20 the strict liability voting law?
21 MS. BABB: Objection, vague.
22 THE WITNESS: No.
23 BY MR. LUNDQVIST:
24 Q. Are you aware of any other research or
25 findings in that regard, whether or not it's been

1 compiled by the State Board itself?
2 A. No. And I should say, you know, it's
3 not -- I think anecdotally, we've become aware of
4 reports that voters lack information about voting
5 rights as it pertains to felon status.
6 And I should say that, you know, it's
7 not clear whether the post-election audit in
8 2017 -- we don't have evidence that it would
9 contribute to confusion.
10 It's just that, you know,
11 highlighting -- highlighting the consequences for
12 voting with a felony status could be interpreted by
13 people who don't -- misunderstand their rights
14 already and -- I'll just leave it there.
15 Q. But the State Board has not considered
16 or put out any form of communication to try to
17 offset that impression that may have been given by
18 the 2016 general election report; is that fair to
19 say?
20 A. So the State Board has definitely
21 undertaken some efforts to try to clarify to the
22 voting public what the rules are for voting while
23 serving a felony sentence, has worked with the
24 Department of Public Safety in this regard, and has
25 attempted to work with the Administrative Office of

1 the Courts in this regard.
2 I don't want to tie that directly to,
3 you know, potential confusion that may have
4 resulted. I don't know that I accept the premise
5 to that question. I just -- just to say that
6 there's, you know, a general understanding that
7 people could be confused about this and that the --
8 you know, the direction of the agency has been to
9 try to, as much as we can, clarify what voters'
10 rights are at what stages of interaction with the
11 criminal justice system, you know, and that
12 includes all the things I mentioned before,
13 including clear information on our website,
14 forms -- all voter-facing forms, and the like.
15 Q. Other than speaking to Ms. Brinson Bell
16 about this topic in preparation for your deposition
17 here today, have you had other conversations with
18 Ms. Brinson Bell about this topic?
19 A. Can you tell me exactly what the topic
20 is?
21 Q. Well, generally the concerns you've
22 described Ms. Brinson Bell having with respect to
23 potential confusion on the part of voters that was
24 shared by Ms. Love and by you, yourself, per your
25 testimony.

1 I'm wondering if you have had any
2 conversations discussing that concern other than in
3 preparation for your deposition here today.
4 A. I can't answer that question because of
5 attorney/client privilege.
6 Q. Is it your position, sir, that the fact
7 of whether or not you have had such discussions is
8 a privileged matter?
9 A. I interpret your question to be asking
10 the content of a communication between a client and
11 an attorney.
12 Q. Let me see if I can try to avoid that.
13 Have you discussed the findings of the
14 2016 general election audit, as represented in a
15 public document, with Ms. Brinson Bell?
16 A. The findings of the audit report?
17 Q. Correct.
18 A. Not specifically.
19 MR. LUNDQVIST: Mr. Cox, subject to
20 whatever your counsel may ask you, I have no
21 further questions for you at this time.
22 Thank you.
23 MS. BABB: Thank you, Jacob.
24 Kathryn, do you have any questions?
25 Maybe not? I don't have any questions of

23 (Pages 86 - 89)

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400
Case 1:20-cv-00876-LCB-JLW   Document 89-5   Filed 06/15/23   Page 24 of 56

1  Mr. Cox.
2      MR. LUNDQVIST: Okay. Should we go off
3  the record quickly?
4      MS. SHIELDS: I'm sorry.
5      MR. LUNDQVIST: Oh, sorry.
6      MS. SHIELDS: I have no questions. I
7  was trying to talk and was muted. I have
8  multiple screens going. I apologize.
9      MS. BABB: That's okay. Thank you.
10  Sorry about that.
11      MR. LUNDQVIST: Thank you again,
12  Mr. Cox. Why don't we go off the record.
13      (The witness, after having been advised
14  of his right to read and sign this
15  transcript, does not waive that right.)
16      (The deposition was concluded at 1:26
17  p.m.)
18
19
20
21
22
23
24
25

1              I N D E X
2
3                  Page    Line
4
5  PAUL COX               4      23
6  EXAMINATION                 4      25
7  BY MR. LUNDQVIST
8  CERTIFICATE OF REPORTER        91
9
10
11            E X H I B I T S
12
13                  Page    Line
14  EXHIBIT 1 , April 19, 2023,     7      2
15  Notice of Deposition
16  EXHIBIT 2 , Testimony Topics    7      14
17  EXHIBIT 3 , April 21, 2017,     76     12
18  Post-Election Audit Report;
19  Bates NCSBE_00098
20
21
22
23
24
25

1          CERTIFICATE OF REPORTER
2
3      I, Susan M. Valsecchi, Registered
4  Professional Reporter and Notary Public for
5  the State of North Carolina at Large, do
6  hereby certify that the foregoing transcript
7  is a true, accurate, and complete record.
8      I further certify that I am neither
9  related to nor counsel for any party to the
10  cause pending or interested in the events
11  thereof.
12      Witness my hand, I have hereunto
13  affixed my official seal this 21st day of
14  May, 2023, at Charlotte, Mecklenburg County,
15  North Carolina.
16
17
18
19
20
21
22
23      Susan M. Valsecchi, RPR, CRR
       My Commission expires
       June 30, 2024
24
25

1  TERENCE STEED
2  tsteed@ncdoj.gov
3      May 22, 2023
4  RE: N.C. Philip Randolph Institute v. N.C. State Board Of Elections
5  5/8/2023, Paul Cox (#5908348)
6    The above-referenced transcript is available for
7  review.
8    Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  CS-NY@veritext.com
16
17  Return completed errata within 30 days from
18  receipt of testimony.
19    If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22      Yours,
23      Veritext Legal Solutions
24
25

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Case 1:20-cv-00876-LCB-JLW   Document 89-5   Filed 06/15/23   Page 25 of 56

1  N.C. A. Philip Randolph Institute v. N.C. State Board Of Elections
2  Paul Cox (#5908348)
3         E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____  _____
24 Paul Cox              Date
25

1  N.C. A. Philip Randolph Institute v. N.C. State Board Of Elections
2  Paul Cox (#5908348)
3         ACKNOWLEDGEMENT OF DEPONENT
4     I, Paul Cox, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11 _____  _____
12 Paul Cox              Date
13 *If notary is required
14         SUBSCRIBED AND SWORN TO BEFORE ME THIS
15         _____ DAY OF _____, 20___.
16
17
18         _____
19         NOTARY PUBLIC
20
21
22
23
24
25

25 (Pages 94 - 95)

Veritext Legal Solutions
212-267-6868              www.veritext.com              516-608-2400
Case 1:20-cv-00876-LCB-JLW   Document 89-5   Filed 06/15/23   Page 26 of 56

| & | | | |
|---|---|---|---|

**&**   2:4

**0**

**00098**   76:14
  92:19
**00876**   1:5

**1**

**1**   6:25 7:2 16:1
  92:8,14
**10**   7:12 10:5
  14:8
**10017**   2:6
**101**   2:10
**102**   79:3
**105**   78:10
**114**   2:19 3:5
**11:05**   1:13
**12**   14:15 92:17
**14**   92:16
**1415**   2:10
**163-22**   31:3
  82:6
**163-275**   22:5
**17**   13:1
**19**   7:2 92:14
**19729**   91:20
**1:20**   1:5

**2**

**2**   7:14 16:3
  49:15 92:14,16
**20**   95:15
**2012**   62:17
**2013**   62:17

**2014**   15:16
  26:9 62:14
**2015**   62:14
**2016**   9:12
  10:14 13:1
  41:24 59:13,24
  61:16 62:10
  63:13,18 64:1
  65:21 70:21
  73:20 75:6
  76:19 78:24
  79:20 80:19
  85:25 87:18
  89:14
**2017**   8:23 9:18
  10:9,10 41:24
  43:18,19 44:5
  47:22 50:4
  53:6 59:4,9
  60:18 61:16
  66:19 67:22
  69:5 74:3,14
  76:11,12 83:20
  84:15,19 87:8
  92:17
**2019**   10:14,25
  13:20 26:17
  27:3,9,12,20
  39:17 40:7
**2020**   84:23
  85:5
**2021**   12:1,3,6
  12:11 52:16
  59:1

**2022**   50:10
**2023**   1:12 7:2
  91:14 92:14
  93:3
**2024**   91:23
**21**   76:12 92:17
**212**   2:6
**21st**   76:11
  91:13
**22**   93:3
**23**   92:5
**25**   92:6
**27603**   2:19 3:6
**27707**   2:11

**3**

**3**   14:11 76:9,12
  92:17
**30**   1:9 36:8
  91:23 93:17
**316**   5:10
**323-3380**   2:11

**4**

**4**   15:2 79:3
  92:5,6
**40**   56:12
**425**   2:5
**441**   77:18,25
**455-2000**   2:6

**5**

**5**   14:15,19,25
  15:2 22:5
**5/8/2023**   93:5
**50,000**   56:13

**54**   2:10
**5908348**   93:5
  94:2 95:2

**6**

**6**   1:9 8:2 36:8
  49:16 58:13

**7**

**7**   14:9,19,25
  66:2,9 92:14
  92:16
**716-6567**   2:20
**716-6755**   3:6
**76**   92:17

**8**

**8**   1:12 82:24

**9**

**91**   92:8
**919**   2:11,20 3:6

**a**

**a.m.**   1:13
**abilities**   56:15
**ability**   6:1
**able**   74:25
**above**   93:6
  95:7
**absentee**   44:9
  51:17
**absolutely**   58:6
**abstract**   79:23
**accept**   88:4
**access**   40:16,18
  42:8

accommodate 6:15
accounting 17:18
accuracy 50:20 52:22 53:16 59:22 61:17 93:9
accurate 91:7
accurately 51:3
accusations 59:15 61:17
acknowledge 4:2,6
acknowledged 45:4
acknowledge... 95:3
acknowledging 49:3
acknowledg... 93:12
act 46:3 47:2 56:23 62:20 80:6
acted 43:13 80:4
action 1:3 2:3 5:7 39:10 72:2
active 77:18 78:1
activities 9:12 18:6 19:18 38:10,19,24

activity 68:19
acts 22:13
actual 10:13 72:7
actually 28:16 38:23 55:7
add 71:2
added 7:25
addition 14:11
additional 46:16 47:6,12 63:2
additions 95:6
address 5:9 34:16
adjoined 62:25
administer 4:8
administered 4:7
administration 17:22
administrative 17:6 45:19 67:12 69:23 87:25
administrator 17:9
adult 70:2
advance 12:15 12:19
advice 18:10 20:7
advised 34:18 56:20,22 90:13

advisements 48:5
advising 26:22
affected 79:13
affiliated 36:17
affiliation 42:6
affixed 91:13
agencies 3:5 47:18
agency 17:6,19 17:23 18:10,11 18:16,20 26:21 27:14 37:6 63:22 69:4,7 72:12 75:16 78:16 88:8
agency's 29:21 45:20 81:13
ago 48:17
agree 4:9 79:19 82:15
agreed 84:4
agreement 25:9
ahead 19:8 60:18
al 1:7
allegations 75:4 84:22
alleged 71:1
allocate 31:15
allotted 93:20
allow 74:9
allowed 54:4 55:17

amendments 40:12
amount 61:1
analyses 63:10
analysis 23:17 23:18,23 24:4 31:14 33:24 34:16 36:5,9 36:13,18 37:2 37:10 42:9 57:2 63:9 76:3 86:17
analyze 24:9,14 35:11,25 37:8
analyzed 41:16
anecdotally 87:3
answer 6:1,10 6:17 19:20 21:8 36:21 44:25 45:18 55:22 89:4
answering 29:7 44:22
anybody 68:5
anymore 15:21
apart 37:9 84:2
apologize 90:8
appearances 2:1
appearing 1:11 1:17 2:5,9,17 3:4 7:8
appears 73:13

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Case 1:20-cv-00876-LCB-JLW   Document 89-5   Filed 06/15/23   Page 28 of 56

**appended** 95:7
**appendix** 42:5
**applicable** 93:8
**application** 41:4
**apply** 22:10
**applying** 71:20
**appointed** 17:5
**appropriations** 63:2,4
**approval** 58:19
**approve** 39:25 58:15
**approved** 40:9 77:3
**approximate** 14:24
**approximately** 9:23 14:5,9,11 20:12
**april** 7:2 76:11 76:12 92:14,17
**area** 57:7
**arrive** 24:21
**articulate** 44:10
**aside** 58:12
**asked** 7:21 35:25 55:12,20
**asking** 34:3 36:25 89:9
**aspect** 41:23 48:7 69:5
**assembly** 59:20 60:6

**assistant** 31:23
**associate** 11:22 11:24 12:5 19:22
**associated** 37:12
**assume** 6:4
**attached** 93:11
**attempted** 53:8 87:25
**attention** 49:15 64:13 66:1,9 82:22
**attestation** 47:25
**attorney** 3:1,3 3:4 12:8,8 15:7 49:22 89:5,11 93:13
**attorney's** 12:25 69:9
**attorneys** 2:2 2:14,18 3:1 4:1 31:22,23
**atypical** 36:4
**audit** 8:23 9:12 9:13,14,18 10:9,10 41:24 42:4,5,11 43:18 49:25 50:3,5,9,21 51:6,12,15 52:6,16,17 58:14,15 59:1 59:2,7,9 60:2,5

60:15,18 61:4 62:3,11 63:19 64:2,16 65:16 65:22 66:19,23 66:25 67:3,7 67:18,22,23 68:19,23 69:5 69:12,14,18 70:22 72:18 73:20 76:10,13 76:18 78:25 79:20 80:20,24 81:1,5,10,23 83:19 84:15 85:1,10,13,21 85:25 87:7 89:14,16 92:18
**audit's** 81:3
**audited** 62:12
**audits** 8:24 9:18 12:22 50:5,12,17,19 52:7,12 53:1 58:20,23 84:18 84:19
**authority** 72:23
**available** 7:1 7:12 76:8 93:6
**avenue** 2:5
**avoid** 68:11,18 89:12
**avoiding** 81:14
**aware** 21:23 27:4 32:9 33:1 34:15 36:6,16

37:1,10 38:2 38:24 39:13 41:21,25 43:2 43:8,11 44:23 45:23 47:14,20 48:20 53:23 57:25 61:8,24 62:9 63:11,13 73:21 80:19 81:2 84:21 85:3,18 86:24 87:3

**b**

**b** 1:9 36:8 66:2 66:9 82:6 92:11
**babb** 2:17 22:9 25:11 33:6 35:14,17 36:19 37:13 39:12 46:5 47:15 49:11 54:5,21 54:23 58:5 64:3 66:14 78:11 80:7 83:1 86:21 89:23 90:9
**back** 16:2 31:22,24 49:14 55:11 58:13
**background** 22:19,24 28:13 77:9
**backgrounds** 23:2

Veritext Legal Solutions
212-267-6868    www.veritext.com    516-608-2400
Case 1:20-cv-00876-LCB-JLW   Document 89-5   Filed 06/15/23   Page 29 of 56

**ballot** 44:9
51:10,25 52:9
57:12
**ballots** 50:23
50:25 51:1,19
51:21 52:3,19
65:9
**barred** 15:17
15:21
**bartlett** 2:4 5:5
**based** 14:3
18:19 36:8
57:1,2 60:11
63:9 67:7 72:3
73:2,11,12
74:7 81:16
82:2
**basically** 30:6
61:14
**basis** 20:1,5
38:1 70:23
**batches** 51:22
**bates** 76:13
78:9 79:3
92:19
**bear** 5:17
**becoming**
10:24 12:5
**beginning**
11:19
**begins** 77:9
78:9,16 79:9
**belief** 33:3
**believe** 11:4
14:18 28:20

29:8 45:18
53:25 55:12
58:3,6 62:13
64:20 65:1
68:25 69:17
74:6 76:24
78:23 82:9,23
83:9
**bell** 8:12 9:16
10:3 12:17
14:23 16:8
21:18,22 38:3
38:9,19 66:24
67:17 81:9,17
81:22 83:11,15
83:17,25 84:5
86:14 88:15,18
88:22 89:15
**berkeley** 15:13
**best** 6:1
**better** 43:20,25
53:23 70:8,10
78:19 81:14
**beyond** 86:1
**birth** 65:10
**bit** 79:2
**biweekly** 23:25
**bladen** 75:5
**board** 1:6,10
2:14 8:9,11,19
8:24 9:10,19
10:4,11 11:9
11:12,13,23,25
12:6,11 13:17
13:25 16:10,16

17:4,7 32:21
33:19 35:12
36:1,17 37:12
38:15 40:6,7,7
40:9,16,18
43:20 45:21
47:17,23 48:20
48:22 50:11,18
53:1,6 57:6,8
57:20,24 58:1
58:17 59:6
60:1,4,15 61:6
61:9 63:3,7,16
64:16,19,23
65:17 67:8,11
68:8 70:1,19
70:25 71:4,13
72:1,2 76:2,23
80:1,21 82:4
82:12,14 84:21
85:1,9,16,25
86:16 87:1,15
87:20 93:4
94:1 95:1
**board's** 8:22
9:17 12:22
13:1 17:3 31:4
31:14 34:22
36:14 45:9,17
50:4,16 60:20
**boards** 71:13
**body** 45:21
85:17,19
**bogged** 74:24

**books** 57:10
**boundary** 5:10
**box** 52:1 57:12
**brad** 8:18
**breach** 28:6
**break** 6:14,18
14:13 66:8
**breakdown**
80:2
**brief** 21:21,22
38:19 66:6
**briefly** 8:11
58:12 66:23
**briefs** 21:23
**brinson** 8:12
9:16 10:3
12:17 14:23
16:8 21:18,21
38:3,9,19
66:24 67:17
81:9,17,21
83:11,15,17,25
84:5 86:14
88:15,18,22
89:15
**broad** 59:15
61:17
**brought** 39:4
43:3
**budgeting**
17:18
**bullet** 77:17
79:7,8
**bullets** 77:22

| c | | | |
|---|---|---|---|
| **c** 82:24 | 34:19 35:9 | **caught** 69:13 | **checking** 44:8 |
| **california** | 37:5,6,7,8,9 | **cause** 59:18 | **chief** 8:10,18 |
| 15:22 | 38:7,21 39:5 | 91:10 | 16:16 17:8,13 |
| **call** 19:23 61:1 | 39:23 41:4,20 | **certain** 46:17 | 17:16 19:5,11 |
| **called** 51:5,11 | 42:25 44:13 | 47:7 49:3,3 | 23:7 24:25 |
| 52:5 62:19 | 46:14 51:25 | 52:2 60:14 | 26:25 27:13 |
| 64:11 | 54:9 55:24 | 74:6 | 65:2 |
| **campaign** | 70:23,23 72:8 | **certainly** 6:15 | **circumstances** |
| 17:22 | 73:6 75:9 | **certificate** 91:1 | 28:18 |
| **candace** 3:10 | 82:11,15 | 92:8 | **circumstantial** |
| 19:21 20:16 | **cases** 11:3 22:1 | **certify** 91:6,8 | 43:17 44:17 |
| **capacity** 84:8 | 24:10,15,17 | **challenge** 72:3 | 45:1,4 48:23 |
| **career** 22:14 | 27:8 31:18 | **chancellor** | 49:4 |
| **carla** 2:17 | 32:3,5 33:8,21 | 16:15,25 | **citizens** 47:20 |
| **carolina** 1:1,3,6 | 39:1,14 42:19 | **chances** 67:13 | 78:20 |
| 1:10 2:2,11,14 | 42:22 43:3,8 | **change** 62:18 | **clarify** 41:23 |
| 2:16 3:2,6 5:11 | 43:11 44:23 | 69:17 71:6 | 87:21 88:9 |
| 11:13 15:18 | 45:24 46:24 | 72:9 85:12 | **clean** 8:1 |
| 56:9,11 58:9 | 48:13,20 67:9 | 94:4,7,10,13,16 | **clear** 26:9 |
| 59:20 62:19,23 | 68:9 71:9,10 | 94:19 | 34:21 36:7 |
| 65:11 70:13 | 71:11 72:6 | **changed** 26:11 | 55:11 67:25 |
| 75:5 91:5,15 | 73:19 74:6,7 | 26:16 48:13 | 73:13 87:7 |
| **carried** 18:25 | 74:25 75:14,19 | 70:21 72:5 | 88:13 |
| **carry** 63:4 | 75:22,22,25 | **changes** 8:1 | **clearer** 70:11 |
| **case** 1:5 9:3 | 76:3,4 77:18 | 62:22 69:23 | **clearly** 44:10 |
| 12:24 20:24,25 | 77:25 80:2 | 70:24 72:6 | **client** 89:5,10 |
| 21:12,13 23:19 | **cast** 61:19 | 93:10 95:6 | **close** 52:5 |
| 23:25 24:3,5 | **categories** | **characterize** | **closely** 23:9 |
| 24:22,22 25:8 | 77:23 | 27:14 29:12,13 | **closer** 70:1 |
| 25:13,14,17,21 | **categorization** | **charlotte** 91:14 | **coalition** 2:8 |
| 26:1,6,12 | 80:9,11 | **charts** 16:13,18 | 5:6 |
| 27:17,24 28:1 | **categorized** | **check** 52:4,13 | **cocounsel** 5:5 |
| 29:14,16,18,22 | 38:13 | **checked** 51:16 | **collateral** 68:5 |
| 30:14,20 33:2 | **category** 43:12 | 51:20 71:23,24 | 68:21 69:11 |
| | 51:9 | | 85:24 86:1 |

collect 55:7
collection
  40:22
come 44:19
  58:13 61:22
  64:21
comes 29:14,18
  29:22 30:2,15
  30:21,24 41:6
  41:6 70:18
coming 21:18
  75:5
commission
  64:9,18,23
  65:1 91:23
commit 53:20
  54:12 56:1
committed
  31:12 73:10
committee
  60:13 61:5
commonly
  71:16
communication
  20:3 87:16
  89:10
communicati...
  33:1 60:10
  63:25
community 9:3
compare 51:16
  51:18 52:3
compared
  50:24,25 76:4

comparing
  52:19 76:3
compiled 87:1
compiling 42:1
complete 6:22
  19:20 46:19
  91:7 95:8
completed
  93:17
complicated
  56:16
complications
  56:17
complying
  56:17
compromise
  68:3
concentrate
  68:10
concern 86:7,7
  86:13 89:2
concerning
  12:24
concerns 88:21
concluded
  90:16
conclusion 44:2
conclusions
  23:24 37:3
conduct 23:16
  27:16 60:5
  63:9 74:5,12
  85:1,10,20
conducted
  20:12 21:24

27:6 33:19
  36:12 37:2
  42:18 46:2
  47:1 58:21
  65:16 73:22,25
  76:4,5 80:20
  81:2,23 84:15
  85:19,25
conducting
  42:1 60:18
  63:18
conducts 8:24
  50:11,18 70:25
  71:3
confidence
  52:21
confidential
  65:6,7,11
confirm 23:23
  54:25 67:20
confirming
  83:18
confused 58:7
  86:10 88:7
confusing
  47:15
confusion 22:2
  86:18 87:9
  88:3,23
conjunction
  53:7
connection
  45:12 73:18
  84:22

consensus
  18:19 82:2
consequences
  87:11
consider 27:25
considered
  86:1 87:15
consisting
  14:10
constant 48:10
consultation
  85:14
consulted
  25:23,25 39:10
contact 24:6
containing
  42:13
contemplating
  61:5
content 89:10
contest 52:6
contests 52:8
contextualize
  60:22
continue 75:18
contrary 25:3
  44:18
contribute 87:9
contributed
  59:23
conversation
  8:17 9:8 10:5
  16:8 84:3
conversations
  13:11 14:23

16:20 33:20
61:11,25 73:12
74:21 88:17
89:2
**convicted** 53:9
**conviction** 35:1
53:13 56:9
57:15 58:9
**copies** 93:14
**correct** 11:9
13:17,18 15:8
19:12 34:24,25
39:24 47:3,25
48:19,19 57:17
71:2 77:23
82:19 84:17
89:17 95:8
**corrections**
70:3 95:6
**corresponden...**
32:20,24 73:4
**counsel** 1:15
2:1 6:9,11 7:22
7:22 8:13,14
8:17,17 10:24
10:24 11:9,22
11:25 12:5
16:9 17:11
18:6,9,16,23
19:2,4,5,6,7,14
19:22,25 26:18
26:20 27:11,20
37:4,6,21,22
49:22,23 62:1
65:24 66:20

67:1,2,8 74:15
74:22 77:2,7
81:7 82:3 84:1
85:15 86:6
89:20 91:9
93:14
**counsel's** 18:1
**count** 50:24
**counted** 51:10
**counties** 50:23
**counting** 52:18
52:19
**country** 59:16
65:3
**counts** 51:18
**county** 52:10
71:13,13 72:1
75:5 91:14
**couple** 16:12
35:9
**course** 24:5
58:21 66:4
81:11
**court** 1:1 4:1
4:16 5:22
48:13 54:13,17
54:19,24
**courts** 88:1
**covered** 17:24
**covers** 9:4 11:4
**cox** 1:11 4:18
4:23 5:2,10,12
5:19 7:19 8:6
11:8 14:4 15:7
16:1 17:2

45:15 49:14
55:5 57:5 66:1
66:8 76:16
79:5 82:23
83:13 85:23
89:19 90:1,12
92:5 93:5 94:2
94:24 95:2,4
95:12
**create** 67:25
**created** 69:7
**crime** 23:21
24:8 26:6 28:3
29:17 30:3
31:8 53:20
54:12 56:1
68:13,15,18
73:10 81:15
**crimes** 42:3,7
42:11
**criminal** 28:15
38:16 56:18
70:10 88:11
**cross** 42:2
**crr** 1:17 91:22
**cs** 93:15
**culpability**
31:8
**current** 13:22
18:13 23:4
56:8 66:21,21
84:8
**currently** 11:8
17:25 27:6
40:2 42:17

**cv** 1:5

**d**

**d** 16:23 31:3
92:1
**daily** 70:3
**das** 32:20
**data** 10:12
40:16,19 41:16
41:25 42:8,15
51:6,16 57:2
62:13 63:9,14
63:18,21 65:4
65:4,5 68:19
68:23 71:8
79:25
**database** 41:12
42:13,13
**date** 1:12 11:18
94:24 95:12
**dated** 76:10
**dates** 65:10
**day** 5:15 20:1,1
20:5,5 26:10
29:6 71:17
91:13 95:15
**days** 51:13
93:17
**dealing** 56:6
**decide** 85:9
**decided** 78:5
**deciding** 9:20
85:7,17
**decision** 21:3,6
25:10,21,24,25
26:23 39:3,4

39:21 71:4
74:7,11,19
85:11,12
**decisions** 18:19
73:5
**declaration**
12:23
**declare** 95:4
**decline** 73:6
**declined** 33:3
33:10
**declining** 33:10
33:17
**deemed** 95:6
**defendant** 2:14
37:6,7
**defendants** 1:8
3:1 7:22
**deferred** 28:21
**definitely** 87:20
**degree** 52:21
**demonstrated**
74:8
**department**
2:16 3:2 43:19
48:2 53:7
67:10 70:1,2
87:24
**deponent** 93:13
95:3
**deposed** 5:12
**deposing** 93:13
**deposition** 1:10
4:2,4,5 6:8 7:1
7:3 8:7 9:2

12:17 14:6,8
14:10,16,19
28:25 29:4,6
73:4 81:17
88:16 89:3
90:16 92:15
**deputy** 2:18 3:4
10:23 12:7,8
16:9 17:20,21
19:4,6,14
37:22
**describe** 17:3
50:16 61:12
**described**
48:24 54:1
55:13 61:10,15
88:22
**designated**
82:24
**designed** 29:20
50:19
**despite** 54:3
55:17 73:6
**detail** 34:2
**details** 16:11
16:19 69:6
**determination**
39:16
**determinations**
51:8
**determine**
29:23 51:2,19
52:21 54:8
55:23 68:13
71:14,20 73:14

74:10
**determined**
51:24
**determining**
23:20
**deterrent** 57:10
57:14 58:3
**develop** 72:14
**devote** 29:22
**different** 10:2
24:4 41:10
62:22
**difficulties**
45:11
**direct** 49:15
59:25 60:9
66:1 78:19
82:22
**directed** 32:22
66:9
**direction** 18:19
29:20 63:9
66:25 67:18,21
68:8 69:18
88:8
**directly** 26:19
74:17 88:2
**director** 8:12
9:2 16:7,17
17:8,10,17,20
17:21 18:14,18
26:19 27:1,13
37:17,19,24
39:9,21,25
40:10 58:16

74:18 77:6
81:9 85:14
86:6
**disagreed** 29:4
80:21
**disagreeing**
81:3
**discrepancy**
52:11
**discriminatory**
35:13 36:2,11
**discuss** 9:7,15
10:1,7,20 25:1
26:12 27:7
67:18 83:16
**discussed** 9:8,9
9:11,17 25:14
27:19 32:2,14
37:11 42:11
45:25 46:24
49:1 67:22
81:21 83:10
89:13
**discusses** 50:4
78:8
**discussing**
66:20,20,23,25
76:20 89:2
**discussion** 9:22
21:1 24:23
25:4 26:4 43:3
45:13
**discussions**
32:9 38:2,6
40:12 67:16

Veritext Legal Solutions
212-267-6868 www.veritext.com 516-608-2400
Case 1:20-cv-00876-LCB-JLW Document 89-5 Filed 06/15/23 Page 34 of 56

81:16 83:11
85:18 89:7
**disqualifying**
28:24
**district** 1:1,1
3:1 31:22,23
**dive** 8:5
**division** 17:11
17:13,14,23
18:17 19:24
20:23 22:21,24
23:1,20 26:18
26:22 74:14,16
74:23 85:15
**divisions** 17:22
18:3,7,11
26:21
**document** 7:13
7:20 17:19
76:9,16,22
77:4,8 78:8
89:15
**documented**
44:3
**documents**
8:21,23 12:14
12:18 15:5
40:8,21 44:14
44:16 46:17
47:7,13 49:24
50:1
**doing** 31:9
69:16
**door** 29:23
30:2 70:19

**doubt** 38:22,25
**doubts** 54:9,16
55:6,10,24
56:5,19
**drain** 69:4,6
**driven** 68:19
**due** 53:12
**duly** 4:24
**durham** 2:11

**e**

**e** 32:1 92:1,11
94:3,3,3
**earlier** 16:21
69:22 83:18
**early** 13:20
61:16 71:17,24
**edenton** 2:19
3:5
**educate** 78:19
**educating**
79:12
**education**
78:18
**effect** 5:20
57:10,14 58:4
59:18
**efficiency**
53:16
**effort** 68:17
84:20
**efforts** 78:19,23
81:13 87:21
**either** 59:25
85:12

**elect** 59:14
**election** 9:12
12:22 30:19
31:6 41:2,24
49:25 50:3,5,5
50:12,12,17,19
50:20 51:4,7
51:13 53:1
58:15,18,18,20
58:24 59:2,7
59:13,16,22,23
60:2,14 61:4
62:11,14 63:13
63:19 64:2,16
65:2 68:12
70:22 71:14
73:20 75:3,4,8
76:10,13,18,19
78:24 79:20
80:20 82:11
84:15,19,22
85:2 87:7,18
89:14 92:18
**elections** 1:7,10
2:15 8:9,20
11:13,23 17:21
32:21 40:6
43:20 50:6,9
50:10 51:9
59:4 60:12,16
61:2,5 62:15
62:19 67:11
68:3 71:13
76:23 85:4
93:4 94:1 95:1

**element** 31:13
41:12
**elements** 23:21
24:8 26:3 28:2
28:6,9 29:17
30:3,25 74:8
82:12
**eligibility** 48:14
70:12
**eligible** 28:17
53:10 57:11,16
86:10,19
**embedded**
19:24
**employed** 32:8
**employee** 13:17
13:25
**employees**
22:15
**encourage** 60:1
**encouraged**
63:17,22
**ends** 73:16
**enforcement**
22:19,24 23:2
**enforcing**
35:12 36:2
**ensure** 48:2
50:20 70:5
**ensuring** 53:10
**entered** 41:3
**entering** 43:23
**entire** 37:18
**entirely** 27:21

Veritext Legal Solutions
212-267-6868     www.veritext.com     516-608-2400
Case 1:20-cv-00876-LCB-JLW   Document 89-5   Filed 06/15/23   Page 35 of 56

equipment
  51:3
errata  93:11,13
  93:17
especially
  56:16 81:11,12
established
  34:5
et  1:7
events  64:15
  91:10
everybody
  17:24
evidence  24:24
  28:2 30:9 32:6
  32:7 33:4
  40:22 41:9
  43:13,17 44:17
  44:18 45:1,5
  48:23 49:4
  68:15 73:7,8
  74:8 80:3,13
  80:16 87:8
ex  45:4 46:17
  47:7,13 57:10
  86:19
exactly  11:18
  12:2 34:3
  46:21 64:10
  88:19
examination
  4:25 92:6
example  21:15
  28:22 34:5,10
  40:23 75:3

  78:16
exception
  58:25
exciting  5:15
executive  8:12
  9:2 16:7 17:8,9
  18:14,18 26:19
  27:1,13 37:17
  37:19,23 39:3
  39:9,20,25
  40:9 58:16
  74:17 77:6
  81:8 85:14
  86:6
exhausted
  52:23
exhibit  6:25,25
  7:2,11,14 16:3
  49:14 76:8,9
  76:12 92:14,16
  92:17
exist  58:4
existence  16:18
expires  91:23
extent  20:6
  36:19 60:7
  63:12 70:7
external  63:25
eye  52:18

## f

f  16:23
faced  56:16
facing  47:24
  70:12 88:14

fact  48:7 53:23
  57:11 64:20
  67:22 68:2
  69:12,18 73:7
  86:18,19 89:6
factor  41:15
  73:16
factors  27:24
  31:13
facts  67:3
fails  93:19
fair  12:11
  13:24 14:12
  15:5 18:22
  19:19 20:8
  23:6 25:6 26:8
  27:17 31:15
  32:13,17 39:20
  45:7,15 46:18
  47:8 83:25
  84:10,11,14
  86:14 87:18
fairly  19:23
  22:14 28:10
  39:2 48:10
fall  11:17 47:23
  77:23
familiar  5:17
  20:10 35:2
  42:19 61:3
  63:24 64:22
familiarity
  35:5,6
far  65:14

federal  12:24
  69:8
feedback  73:2
feeling  61:9
felon  29:14
  30:1,20 44:13
  45:4 48:14
  49:2 64:5
  67:14 68:20
  70:14 71:11
  74:2 75:13,19
  75:21,24 81:12
  84:20 86:8
  87:5
felonies  39:8
felons  46:17
  47:7,13 57:10
  77:19 78:1
  86:19
felony  28:16
  30:15 39:6
  43:23 44:11
  47:21 53:2,10
  53:12 56:9,10
  56:21 57:15
  58:9 62:3,11
  64:1 68:9,25
  70:4 71:1,21
  81:23,24 84:16
  85:1,10,20
  86:9 87:12,23
felt  60:4
fifth  29:10
file  21:13 42:2
  42:15 44:4,15

44:19 80:17
**filed** 12:23
**files** 20:24 21:1
21:5
**fill** 16:11,19
**filled** 45:3
**finance** 17:22
**findings** 86:25
89:13,16
**first** 4:24 20:7
29:6 69:2 77:9
77:17 78:14
**fit** 29:9 30:10
30:11,22
**five** 9:24 17:5
40:7 45:21
46:12,13,24
47:6
**fixing** 79:9,12
**flag** 51:8
**fleming** 74:17
74:20
**focus** 62:5,8
63:17 74:25
81:3 85:13,13
86:8
**focused** 68:17
81:23
**folks** 67:9
69:15
**follow** 33:19
55:9 56:4
**followed** 9:13
53:1

**following** 9:12
51:13 58:8
59:13 73:20
77:15 78:24
79:20
**follows** 4:24
40:2
**foregoing** 91:6
95:5
**foremost** 20:8
**form** 23:17
25:11 33:6
35:14 39:12
40:24 46:5,21
80:7 87:16
**formal** 37:20
37:23 64:17
83:21
**formally** 64:21
**formation**
64:12
**former** 8:13,14
8:18 49:23
61:25 67:1,2
74:22
**forms** 44:6 45:3
47:19,25 48:3
48:6,10,12,17
49:3 70:12
88:14,14
**forth** 8:2 31:22
31:24
**forward** 9:21
68:7 72:2
73:15 74:10

**found** 24:2
**four** 17:10
**frailty** 56:14
57:3
**fraud** 75:3,4,8
75:8 84:21
**frequently**
71:16
**front** 7:5,17
16:3 30:7
49:17 53:19
66:10 68:17
71:6 72:4,4
79:4 82:25
83:7
**full** 5:8 46:21
74:5
**fully** 56:22
**functions** 17:15
**further** 4:6,9
89:21 91:8

**g**

**gap** 79:9,12
**gaps** 16:11
**gather** 41:9
**gathered** 30:10
32:6 80:14
**gathering** 32:7
41:10
**general** 2:18
3:3,4 8:13,14
10:23,24 11:9
11:22 12:8
13:11 16:9
17:3,11 18:1,5

18:9,16,22
19:1,4,5,6,7,14
19:22 26:18,20
27:11,20 35:5
35:6,15 37:21
37:22 38:20
39:16 49:23
50:6,8,10,15
57:3 59:13,20
60:6 62:1,10
63:19 64:2
65:21,24 67:1
67:2 70:22
73:20 74:22
76:19 77:1,6
78:24 79:20
80:20 81:7
84:1,22 85:13
85:13,15 86:6
87:18 88:6
89:14
**general's** 12:9
49:22
**generally** 14:21
25:24,25 27:23
38:23 50:19
60:4 63:13
64:24 81:6
88:21
**generated**
71:10
**getting** 27:23
72:8 78:11
**give** 6:21 29:24
34:2 46:12

65:9
**given** 87:17
95:9
**giving** 29:2
**go** 5:16 19:8
66:5 69:6 90:2
90:12
**goal** 68:4
**god** 4:21
**going** 5:16 6:24
7:10 9:20
23:20 29:16,21
44:14 49:14
60:21 64:6
66:16 68:7
73:14,15,17
76:7 80:13
90:8
**good** 5:2,3
49:11 54:25
67:24
**gotten** 73:3
**governing** 17:4
17:7 40:7
45:21 62:19
85:17,19
**governor** 17:5
**graduate** 15:14
**great** 6:24
11:15 22:7
49:12 83:4
**ground** 5:16
**group** 71:10
**groups** 60:1

**guess** 36:25
44:25 59:3
72:9
**guidance** 28:19
82:3,17
**guideline** 83:24
**guidelines**
34:11 40:1,13

**h**

**h** 2:8 3:3 92:11
94:3
**hand** 4:19
50:24 52:18,18
63:1,1 91:12
**happen** 51:12
**happened**
46:22 63:12
**happens** 22:22
40:10 72:16
**happy** 49:10
**heading** 17:12
78:15
**heads** 17:11
18:17
**hear** 35:20
**hearing** 4:16
**held** 24:16
45:13 66:6
**help** 4:21 78:20
**hereto** 95:7
**hereunto** 91:12
**higher** 75:15
**highlighted**
78:2

**highlighting**
87:11,11
**highway** 2:10
**hiring** 22:13
**historical** 35:3
**history** 51:12
51:15 65:19
**hours** 14:8,9,11
14:15,15,19,25
15:2
**house** 36:14
71:9
**hr** 16:17 17:17
**huh** 16:24
**human** 17:18
56:14 57:3
**hundreds**
68:23

**i**

**idea** 53:14,18
78:4
**identification**
7:3,15 76:14
**identifications**
68:20
**identified**
68:24
**identify** 84:20
**illegal** 13:2
59:23 60:7,24
61:18 68:1
75:9
**immediate**
51:13 81:7

**impact** 68:5,22
85:24 86:1
**impacts** 69:11
**implementati...**
53:17
**implemented**
69:19
**impose** 60:14
**imposing** 61:5
**impression**
87:17
**improve** 53:8
79:14
**improved**
53:15 79:21
**incarceration**
43:22 48:4
**inclined** 82:15
**include** 14:7
43:12 53:2
**included** 40:23
40:25 41:13,13
47:25 48:4,9
62:21 65:5
80:23 85:10
**includes** 88:12
**including** 8:22
12:15 64:1
70:13 88:13
**incoming** 61:16
64:7
**incorporate**
70:15
**incorrect** 51:8

increase  63:17
index  3:13
indicated  33:9
  33:17 46:3
  47:2 61:25
indicating
  60:13
individual
  20:22 21:10,11
  22:1 32:3,5
  34:19 39:1,14
  40:19 42:22
  70:25
individual's
  40:23
individuals
  40:17 86:1
ineligibility
  72:3
ineligible  53:12
  53:22,23 70:5
influx  71:8
inform  43:21
  43:25
informal  37:20
  38:1
information
  8:19 17:13
  41:20 62:20
  65:6,6 70:3,8
  70:11,11 72:23
  78:18 80:13
  87:4 88:13
informing  53:9

initial  29:18
  30:5 70:20
initiated  72:6,8
initiation  44:1
initiative  9:3
input  24:3
ins  52:4
instances  33:16
  39:7 54:1,11
  55:14,16,25
  62:10 73:21
  80:5 81:15,24
institute  1:3
  2:3 93:4 94:1
  95:1
instructed  6:11
  28:4
instruction
  28:9
instructions
  34:11
integrity  59:16
  68:3
intense  75:24
intensive  75:10
intent  32:14,24
  33:4,11,13,18
  34:23 35:13
  36:2,11 44:17
  44:24 45:5
  48:23 49:5
  80:14
intentional
  30:16,19,21
  31:5

intentionally
  43:14 46:4
  47:3 73:9,10
interact  31:17
interacted  67:9
interaction
  28:15 88:10
interactions
  37:23,25 38:1
interacts  37:16
  37:18
interested
  91:10
internalizes
  56:22
internet  45:12
interpret  89:9
interpreted
  82:9 87:12
interview  72:11
  72:11 73:21
  76:4,5
interviewed
  22:17
interviews
  44:20 46:2
  47:1 73:24
  74:12
introduce  7:11
  76:7
investigate
  30:18 31:5
  59:21 62:3
  68:16 71:10
  75:24

investigated
  27:18 39:9
  40:17 42:3,20
  44:13 73:19
  81:25 86:2
investigates
  38:17
investigating
  11:2
investigation
  13:1 19:18
  24:23 29:25
  31:1 38:10
  40:1 41:6
  60:21,22,23
  68:6 69:13
  70:20,25 71:3
  72:15 74:14,15
  75:7
investigations
  8:22 9:9,11
  10:13,13 11:1
  12:16 17:12
  18:23 19:24
  20:6,11,23
  22:21,23 23:5
  23:16,20 24:2
  24:17 25:7
  26:17,22,24
  27:7 28:5 29:9
  29:11,15,19
  34:6,13 38:17
  38:24 39:17
  40:1,5,13,20
  41:14,17 42:19

Veritext Legal Solutions
212-267-6868                www.veritext.com                516-608-2400
Case 1:20-cv-00876-LCB-JLW   Document 89-5   Filed 06/15/23   Page 39 of 56

74:2,23 75:10
80:11 85:15
86:8
**investigative**
22:8 23:16
25:1 29:22
30:8 32:7
38:19 44:15
46:1,25 72:7
74:4,4 75:18
80:15,17 85:13
**investigator**
8:10 19:5,10
19:12 23:8
24:25,25 25:16
27:1,13 40:25
82:14
**investigator's**
21:10,12
**investigators**
19:9 21:2 23:7
23:24 24:1,6
28:20 32:22
34:19 41:8
63:3,6
**involve** 31:25
32:22
**involved** 26:4
31:8 40:21
43:4 70:10
84:16 85:7
**involving** 38:21
45:24 80:2
82:16

**irregularities**
61:23 64:10
78:17
**issue** 21:20
26:3 30:1
45:22
**issued** 12:25
**issues** 32:24
37:8
**items** 67:12
75:1

**j**

**j.d.** 15:10,12
**jacob** 2:4,8 5:4
89:23
**jacob.lundqvist**
2:7
**jail** 56:12
**jeffloperfido**
2:12
**jeffrey** 2:9
**joan** 74:16
**joined** 12:1,10
**josh** 8:13 60:11
61:11 67:1
74:22
**jsussman** 2:12
**judge** 5:22
**jump** 54:18
**june** 91:23
**jurisdiction**
82:12
**jury** 5:22
**justice** 2:8,16
3:2 5:6 28:16

56:18 70:10
73:16 88:11

**k**

**karen** 8:12 16:7
81:9 83:15
**katelyn** 8:14
10:18 12:24
13:23,24 16:20
49:24 67:2
81:8,19 83:14
**kathryn** 3:3
89:24
**keep** 38:23
**keeper** 21:5
**keeping** 32:18
**kept** 21:12
57:11
**kim** 74:18
**kind** 37:10 52:6
69:2
**kinds** 39:11
**know** 6:3,15
14:22 16:17,18
17:17 18:16
21:2,5 22:11
22:25 23:19
26:2,4,5,24
27:11 28:8,23
29:10,19 30:7
30:14,15,18,20
32:18 33:7,8
33:14,22 34:14
34:15 37:4,5
37:25 38:13,20
38:21,23 39:3

39:15 40:21
41:5,7,8 42:6,9
42:10 43:15,15
43:16 44:2,5
46:12,13,21
47:17 48:17
51:22,25 52:1
52:2,3,12
53:14,16 56:7
56:9,13,15,21
56:24 57:1
59:17,18,19,22
60:3,3,7,7,9,10
60:19,20,24
61:15,18,19
62:4,5,6,8,16
62:16 63:20
64:7,8,10 65:9
65:10 66:18,24
67:11,22,23,25
68:4,16,18
69:1,11 70:8
71:7,9,14,15,18
71:25 72:5,8
73:5,11,13,14
74:5,9,13,14,21
74:23 75:2,3,7
75:9,9,12,13,16
77:25 78:18
79:23 80:25
81:6 87:2,6,10
88:3,4,6,8,11
**knowing** 54:3,6
55:17

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Case 1:20-cv-00876-LCB-JLW   Document 89-5   Filed 06/15/23   Page 40 of 56

**knowingly**
43:13 46:3
47:2 73:10
80:5,6
**knowledge**
36:8,13 44:17
72:1 80:14
**knows** 78:17
**kshields** 3:7

**l**

**lack** 32:15
33:11,18 44:24
78:18 87:4
**language** 48:1
48:8,12 82:8
**large** 52:12
56:6 61:23
63:1 71:8 91:5
**largely** 71:11
**lasted** 10:5
**laudatory** 68:4
**law** 11:3 21:25
22:4,19,24
23:2,19 28:1,7
28:10 29:9
30:19 32:11,16
32:25 33:25
34:12,17,24
35:4 36:10
38:4,11,22
39:2,23 41:18
42:21 43:6
44:25 45:25
50:21 54:3
55:15,17 56:15

57:9,14 62:18
63:5 65:11
70:18 72:25
73:19 80:3,23
81:4 82:16
86:4,20
**laws** 30:20 31:6
35:12 36:1
62:18,22 63:2
65:7 82:11
**lawson** 8:13
9:25 10:1,7,8
10:23,25 13:15
13:16 61:11
67:1 74:22
**lawson's** 60:12
**lawyer** 23:5,8
23:10
**lawyers** 34:6
**lay** 30:5 51:23
**lead** 10:9 68:20
**leaders** 60:24
61:20 62:5,7
**leave** 87:14
**leaving** 43:22
48:4
**left** 10:25 23:1
**legal** 8:9 17:12
18:9,10 19:1
19:22 20:4,7
20:11,14 23:14
23:17,18,22
24:3,7,9,14
25:5,9,18,21,23
25:24 27:6,25

28:4,18,19
31:17 32:14,23
33:13,18,23
34:10,16,18,22
35:2,11,16,25
36:14,16 37:8
37:11,16,18,24
38:3,18 40:11
42:18 43:4
45:2,7,16,18,20
46:1,25 49:7
49:21 66:21
74:15 77:2
82:3,10,17
93:23
**legislative** 63:8
**legislature**
60:13 65:21
**level** 18:15
21:21 29:24
31:7 65:3 67:5
68:1
**lexington** 2:5
**liability** 11:3
21:24 22:4
28:1,7,10 29:9
32:11,16,25
33:24 34:12,17
34:24 35:3
36:10 38:4,11
38:22 39:2,22
41:18 42:20
43:5 44:24
45:25 54:3
55:15 57:9,14

70:18 72:25
73:19 80:3,23
81:4 82:16
86:3,20
**liaison** 19:23
**licenses** 15:24
**lieu** 4:6
**light** 9:18
**likelihood**
79:15,21
**limiting** 52:16
59:1
**lindsey** 16:9
20:16
**line** 92:3,13
94:4,7,10,13,16
94:19
**list** 53:10 69:24
69:25 78:2
**litigation** 2:18
62:24
**little** 30:25 34:2
79:2
**llp** 2:4
**location** 1:14
**long** 9:22 11:15
11:24 44:22
82:17
**longer** 13:16,25
**look** 52:8 77:8
**looking** 40:25
**loperfido** 2:9
**lost** 45:12
**lot** 39:3 62:21
64:12 65:4,4

Veritext Legal Solutions
212-267-6868 www.veritext.com 516-608-2400
Case 1:20-cv-00876-LCB-JLW Document 89-5 Filed 06/15/23 Page 41 of 56

65:25 69:12,15
69:23 75:11
**lots** 69:6
**love** 8:14 10:18
10:18,19,20
12:24 13:23,24
16:21 49:24
67:2 81:8,19
83:11,14 84:5
86:14 88:24
**lundqvist** 2:4
5:1,4 6:24 7:4
7:10,16 23:3
25:19 33:15
35:19,23 36:24
37:15 39:19
45:14 46:8
48:15,18 49:8
49:12,13 54:14
55:3 58:10
66:4,7,17
67:15 76:7,15
78:13 80:18
83:3,6 86:23
89:19 90:2,5
90:11 92:7

**m**

**m** 1:16 91:3,22
**machine** 50:25
52:17
**made** 15:4 44:6
50:13 64:18,23
65:1,7 71:7
72:14 74:7,19
95:5

**mails** 32:1
**main** 72:9
**maintain** 80:1
**maintained**
53:11
**maintains**
20:23
**maintenance**
69:24,25
**make** 6:6,19
8:3 18:18 26:8
26:10 47:19
53:19 54:20
**makes** 65:11
69:14
**making** 21:5
39:3,4 41:9
47:24 59:15,21
61:17
**management**
17:19 18:12,15
41:2 51:7
**mandatory**
82:10
**manner** 4:14
**margin** 52:10
52:13
**mark** 6:25
**marked** 7:3,15
16:2 76:14
**marshall** 3:10
19:21 20:8,17
23:8,12 24:5
28:12 31:21

**martucci** 8:10
8:18 9:7 19:12
21:4 28:21
29:1 66:22
**martucci's** 14:7
14:10,16 29:3
73:4
**mary** 2:17
**match** 71:8
**matching** 10:12
63:14,18,21
**materials** 35:8
**matter** 8:25
29:18 33:13
35:15 38:20
45:8,16,20
50:15 89:8
**matters** 9:20
39:11
**mcbabb** 2:21
**mclove** 10:16
**mean** 34:14
42:24 47:17
48:6 68:22
73:1,2 74:13
77:5
**meaning** 80:6
**means** 80:10
**measures** 46:16
47:6 53:25
55:6,13 79:19
**mecklenburg**
91:14
**media** 64:12

**meet** 18:18
52:12
**meeting** 21:10
24:22 25:15
**meetings** 20:10
20:15,19,21,22
20:25 21:4,7
21:15,19 24:10
24:15 25:15
27:5,10,12,15
27:19 32:1
37:20 42:17
43:4
**meets** 28:2
82:18
**member** 22:20
23:4 40:7
**members** 8:8
17:5 20:3,5
22:8 28:5
32:13 34:6
37:24 38:18
45:21 49:7
59:19 60:6
61:8
**memorialized**
83:22
**memos** 34:15
**mention** 42:25
64:6 77:22
**mentioned**
12:14,21 16:21
18:3 19:7
38:22 42:4
52:7 57:5

| | | | |
|---|---|---|---|
| 68:21 70:15 | **name** 5:8 16:25 | **north** 1:1,3,6 | 36:19 37:13 |
| 83:18 85:24 | 75:2 | 1:10 2:2,11,14 | 39:12 46:5 |
| 88:12 | **national** 62:5 | 2:16 3:2,6 5:10 | 47:15 54:5,20 |
| **met** 23:21 24:8 | **nc** 1:3,14 2:3,19 | 5:11 11:12 | 58:5 64:3 80:7 |
| 26:3 30:4,25 | **ncdoj.gov** 2:20 | 15:18 56:9,11 | 86:21 |
| 74:9 82:13 | 2:21 3:7 93:2 | 58:9 59:20 | **observed** 29:4 |
| **method** 51:17 | **ncgs** 22:4 | 62:19,22 65:10 | **obvious** 26:2 |
| 52:21 | **ncsbe** 76:14 | 70:13 75:5 | **obviously** 18:9 |
| **methods** 32:6 | 92:19 | 91:5,15 | 37:8 74:16 |
| 51:22 | **near** 61:1 | **notary** 4:11,12 | **occasion** 10:3 |
| **middle** 1:1 12:3 | **necessarily** | 91:4 95:13,19 | **occur** 25:5 |
| 78:15 | 41:4 47:9 | **note** 93:10 | 60:25,25 68:2 |
| **midway** 47:22 | 71:19 | **noted** 95:7 | 71:16 |
| **mill** 29:16 39:5 | **necessary** 95:6 | **notes** 8:16 13:6 | **occurred** 60:8 |
| **mind** 32:18 | **need** 20:6 21:1 | 13:8,10,11,13 | 67:6 68:13,15 |
| **minds** 25:16 | 26:5 29:23 | 13:14 21:3,11 | 73:8 78:17 |
| **minimize** 67:13 | 30:8 39:4,21 | 21:12 | 83:20 |
| **minute** 66:3 | 82:5 | **notice** 7:1,2,7 | **occurring** |
| **minutes** 9:24 | **needed** 25:4 | 53:15 92:15 | 10:14 68:11,18 |
| 10:5 21:15 | 38:1 41:7 | **number** 8:21 | 81:15 |
| **misunderstand** | **needing** 21:21 | 8:23 16:10 | **october** 11:19 |
| 87:13 | 23:19 | 38:16 49:15,16 | **offenders** 79:16 |
| **morning** 5:2,3 | **needs** 24:4 25:8 | 51:21 52:3,4 | 79:22 |
| **motives** 67:24 | 58:15 | 61:18,23 74:24 | **office** 3:3 12:9 |
| **move** 73:15 | **neesby** 8:18 9:9 | **numbers** 51:19 | 12:25 13:9 |
| 74:10 | **negotiated** 7:21 | 65:12 | 17:9 49:23 |
| **multiple** 90:8 | **neither** 91:8 | **ny** 2:6 93:15 | 69:9 87:25 |
| **municipal** 59:4 | **never** 32:14 | | **officer** 8:19 |
| 62:15 | 45:22 | **o** | 16:16 17:13,16 |
| **muted** 90:7 | **new** 2:6 49:9 | | 65:2 |
| | **noncitizen** 62:6 | **o** 16:23 | **officers** 44:4,20 |
| **n** | 69:5 75:22 | **oath** 4:7,8 5:19 | **offices** 17:15 |
| | **nope** 5:14 | **object** 6:9 | **official** 11:18 |
| **n** 16:23 92:1 | **normal** 81:11 | **objecting** 54:22 | 57:2 65:2 |
| **n.c.** 93:4,4 94:1 | | **objection** 4:13 | 91:13 |
| 94:1 95:1,1 | | 22:9 25:11 | |
| | | 33:6 35:14 | |

**offset** 87:17
**oh** 10:2 16:14
　43:7 71:14
　90:5
**okay** 9:6 10:6
　10:19 11:4,8
　11:15 12:13
　13:21 14:17
　15:3,10,12,14
　17:2 21:14
　24:20 25:6
　26:7,10 27:2
　35:2,21 40:4
　41:22 46:15
　47:5,11 49:1,9
　49:12 53:5
　57:19,21 61:3
　63:16 64:22
　68:21 70:17
　73:24 75:20
　77:3,21 78:4
　79:7 81:20
　82:7,21 83:5
　83:21,24 84:2
　84:7 85:18
　90:2,9
**omitted** 11:5
**once** 63:6 70:18
**ones** 12:20 27:6
　27:15 52:14
**open** 77:18,25
**operates** 17:6
**operating**
　16:16 17:16

**operations**
　17:18
**opined** 45:22
**opinion** 81:9
**opportunity**
　79:13
**opposed** 75:8
**opposite** 25:20
　80:5
**oral** 21:22
**order** 42:7
　58:14
**ordinary** 58:21
**organization**
　17:3
**organizational**
　10:4 16:12,13
　16:18 26:15
**origins** 35:3
**outcome** 20:22
　76:3
**outcomes** 21:9
**outreach** 59:25
**outside** 14:15
　14:19 43:21
　49:22 56:12
　63:22 67:8
**overall** 63:1
**overlap** 10:22
**overlapped**
　10:23
**overlaps** 83:9
**overseeing** 18:6
　18:8

**oversees** 17:14
　17:17,21 18:23
**owing** 48:12
**own** 60:20 67:5

**p**

**p.m.** 90:17
**page** 7:12 8:2
　50:4 77:9,12
　77:15,16 78:9
　79:3 92:3,13
　94:4,7,10,13,16
　94:19
**pages** 7:25 9:1
　12:16,21,22
　66:15
**paragraph**
　78:14
**parole** 43:25
　44:3,20 72:13
**part** 9:13 13:5
　13:12 14:25
　21:1 23:15,25
　41:9 42:17
　59:9 60:17
　64:1 80:15,16
　84:17,18 88:23
**participated**
　40:11
**participates**
　20:15
**participating**
　4:2
**particular** 24:2
　24:5,21 34:19
　42:25 45:22

　48:8,12 50:1
　51:17 53:2
　73:6,17 80:10
**parties** 4:9
**party** 4:13 42:6
　42:13 91:9
**past** 46:6,9,10
　46:13 57:15
**paul** 1:11 4:23
　5:10 92:5 93:5
　94:2,24 95:2,4
　95:12
**penalties** 5:21
**pending** 6:16
　91:10
**people** 22:25
　42:3 43:21,22
　43:23 48:4
　51:20 53:11,19
　53:22 56:7,8
　56:10 68:24
　69:12 70:4
　86:9 87:13
　88:7
**period** 26:9
　27:8 47:5
　63:13
**person** 4:7
　16:14 28:15
　31:9,11 56:20
　71:24
**person's** 40:25
　41:14
**personnel**
　22:12

Case 1:20-cv-00876-LCB-JLW　Document 89-5　Filed 06/15/23　Page 44 of 56

perspective
  34:22
pertaining 9:11
pertains 87:5
phase 30:5
philip 1:3 2:2
  93:4 94:1 95:1
phone 8:13,15
  13:15
phrase 54:7
physically 4:3
pieces 45:1
pilot 52:15
  58:25
place 26:25
  30:9 32:20
  46:18 47:8,19
  55:13 59:3,5
  63:11 78:24
plain 69:15
plaintiff 1:4,15
  2:2
plaintiff's
  41:20
plaintiffs 5:7
  7:22
players 63:25
please 4:14,18
  5:8 6:3 17:2
point 6:8 12:11
  26:23 71:25
  74:6
points 21:3,7
policies 9:17
  10:12 40:8

50:16 52:25
policy 8:22 9:9
  11:1 12:16
  29:8,11,20
  39:16,18 40:5
  66:24 67:17,21
  69:18 83:19,21
  84:4,9,12
political 42:6
  59:7,10,11
  61:20
population
  56:7,8,10 70:4
posed 6:5
position 11:16
  11:20 13:22
  22:18 45:2,8,9
  45:16,17,19,20
  48:21 89:6
possible 38:20
  58:7
possibly 30:16
  36:22
post 12:22
  41:24 49:25
  50:3,5,5,12,17
  50:19 53:1
  58:15 59:2,7
  60:2,14 61:4
  63:12 64:16
  76:10,13,18
  84:15 87:7
  92:18
potential 5:21
  13:2 24:11,18

27:25 32:10
  39:8,23 40:12
  43:5,9 45:24
  46:2 47:1 53:2
  55:14 62:3
  68:9 70:18,21
  73:18 77:22
  81:3,24 85:1
  85:10 88:3,23
potentially
  27:18 31:12
  43:24 51:8
  54:2 55:16
  81:25 86:2
practice 72:11
  72:18,21
practices 9:10
  10:11 11:2
  26:11,14,15
  68:11 69:24,24
  69:25 70:17
predecessor
  81:8 84:5
premise 88:4
preparation
  13:5,12 15:1
  88:16 89:3
prepare 8:7
  16:6 49:20
  66:13 83:12
prepared 20:19
  20:21 21:18
  33:23 34:10
  76:22

preparer 76:25
  77:1
preparing 14:5
prescribed
  22:12
present 3:9 4:3
  16:8 26:10
  29:17
presented
  24:10,15 25:7
president 59:14
  59:14 61:16
  64:7,8
pressure 59:8
  59:10,11 60:5
  61:9,22 62:2
  84:25
pressured
  63:17
pretty 10:22
  62:18 69:2,3
  72:10 75:10
previously 34:5
  57:5
principally
  48:13
prior 11:20
  12:5 26:17
  27:3,9,11,20
  62:9,10 63:15
  65:23 72:18
  81:17
priorities 10:13
  11:1 29:8,21
  30:12,18,22

31:5 40:5
**prioritization**
    30:6
**prioritize**   26:24
    31:14
**priority**   29:11
    29:11,20,24
    39:18 75:1,15
**prison**   56:12
**privilege**   89:5
**privileged**
    36:20,23 89:8
**probably**   10:5
    10:21 14:14,14
    75:23
**probation**
    43:24 44:3,20
    56:25 72:12
**problems**   69:7
**procedures**
    22:12,13 49:25
    58:19 59:3
    60:15 61:4
**proceed**   4:17
    49:10
**process**   53:9
    58:19 72:5,7
    80:15
**processes**   53:15
**professional**
    1:17 15:23
    91:4
**program**   52:15
    59:1

**programmed**
    51:6
**progress**   20:25
**properly**   60:23
**prosecute**
    33:11,17 73:6
**prosecuted**
    86:12
**prosecuting**
    72:23
**prosecution**
    24:12,18 33:3
    35:1 39:23
    43:9 68:6 69:1
    69:14 72:14
    73:15,17 82:1
    82:5
**prosecutions**
    28:21 79:15,21
**prosecutor**
    31:2 33:2,9,12
    73:13
**prosecutors**
    31:18 32:16
    33:16,20 48:21
    49:2 73:2,5
    74:9
**proven**   52:20
**provide**   7:21
    28:19 29:20
    36:22 44:16
    49:4
**provided**   48:3
**provides**   18:10
    45:4

**providing**
    19:25
**provisional**
    51:5,9
**provisions**
    62:24 63:4
**public**   43:19
    48:2 50:13
    53:7 60:6,23
    67:10 68:1
    70:2 87:22,24
    89:15 91:4
    95:19
**publication**
    77:3
**pulling**   42:12
**pursuant**   7:7
**put**   18:14 30:4
    40:6,8 46:17
    47:7,18 51:23
    55:13 64:8
    78:24 87:16

**q**

**qualifications**
    22:7,17
**qualify**   24:11
    24:17
**question**   6:4,5
    6:10,16,17
    21:8 24:13
    25:13 28:14
    34:2 44:23
    46:20 47:16
    55:1,9,19 56:4
    57:13 61:1

69:10 70:24
    73:9 80:10
    81:22 85:23
    88:5 89:4,9
**questioning**
    11:6
**questions**   5:25
    24:7 29:7
    89:21,24,25
    90:6
**quick**   66:8
**quickly**   7:11
    90:3
**quite**   30:16
    69:14

**r**

**r**   16:23 94:3,3
**race**   40:23 41:2
    41:7,12 42:9
    42:10,14
**racial**   40:16,18
    41:16
**raise**   4:18
**raleigh**   1:14
    2:19 3:6 5:11
**randolph**   1:3
    2:2 93:4 94:1
    95:1
**random**   50:22
    50:22
**rather**   68:12
**rationale**   60:17
**reached**   23:24
    63:11

reaching  20:7
read  55:11
  66:14 90:14
  93:9 95:5
reading  66:18
readout  8:16
realize  69:15
really  18:8
  32:12 42:24
  44:5 53:8
  54:21
rear  3:13
reason  6:21
  30:13 43:15
  70:6 84:9,12
  93:11 94:6,9
  94:12,15,18,21
recall  9:5 10:15
  11:17 12:2
  13:14 40:14
  55:19 56:2
  65:14,23,24
receipt  93:18
receive  38:9,14
recent  47:11
  50:6,8
recently  47:19
  52:15
recess  66:3,6
recognition
  56:13
recollection
  35:10 60:12
  64:14 65:18

recommendat...
  25:1,7
recommending
  25:17
reconcile  51:20
  52:2
record  5:9 6:9
  41:1,1,14
  45:13 55:11
  66:5 67:25
  72:15 83:12
  86:9 90:3,12
  91:7
records  9:11
  41:12 42:2
  73:12
reduce  55:14
  79:13
refer  25:2,8,17
  25:21 26:1,6
  26:23 27:8
  31:1 39:22
  68:16 74:7
  82:10,15
reference  42:2
referenced  93:6
referral  24:11
  24:18 28:1
  41:6 69:3
  70:21 71:5
  72:9,14
referrals  41:18
  71:12
referred  25:13
  27:18 31:18

33:2 40:22
  43:9,12 44:24
  69:1,13 76:3
  81:25 82:4,5
  82:19 86:3
referring  8:1
  11:3,11,12
  16:2 22:3,4
  50:2,9
reflect  21:9
  35:13 36:2
  49:24 53:11
reflected  39:17
reflects  7:20
  31:7 36:11
  45:8,16,19
refreshed  70:3
regard  10:11
  10:12 11:2
  61:21 67:19
  86:25 87:24
  88:1
regarding  9:10
  12:22 31:18
  38:4 40:12
  67:17 69:10
  85:20
regardless
  30:23
register  71:20
  78:20
registered  1:16
  53:21 91:3
registering
  44:7

registers  71:24
registrants
  78:19
registration
  40:20,24 41:3
  41:11 42:14,14
  44:8 71:17
regular  20:2
  24:6 27:5,10
  27:15 37:23
  52:25
regularly  18:18
related  8:24
  12:25 13:10
  39:11 40:16
  47:13 91:9
relates  29:2
  38:11 41:17
  63:25
relationship
  59:18,19 70:1
released  64:16
relevant  72:22
remains  57:9
remember  35:8
  56:23
remotely  4:5,8
removed  54:1
  54:10 55:15,25
repeat  83:19
repeated  81:10
rephrase  6:3
  34:2
report  8:23
  9:19 10:9,11

19:9 20:18,20
21:17 24:1
26:18 42:1,4,5
42:12 50:3
64:17 65:22
66:19 76:10,13
76:18 78:5
87:18 89:16
92:18
**reported** 1:16
26:19 40:19
51:3 52:20
74:17
**reporter** 1:17
4:1,16 54:13
54:17,19,24
91:1,4 92:8
**reporting** 4:4
4:14 19:3
**reports** 19:4,5
19:6,17 20:1,2
50:6 87:4
**represent** 5:7
**representative**
36:9
**represented**
67:7 89:14
**representing**
37:5,7
**request** 41:20
64:18 65:1
**requests** 64:23
65:15,15,20
**require** 75:11

**required** 23:22
28:6 31:2 33:4
33:13 34:23,25
50:21 95:13
**requirement**
22:20 30:17
32:15 82:10
**requirements**
47:12 48:14
56:18 70:13,14
82:18
**requires** 25:21
**research** 23:19
86:17,24
**resource** 75:24
**resources**
17:18 29:22
31:15 68:10
69:4,7 74:5
**respect** 9:18
14:22 16:5
18:2 19:18
21:24 28:5
32:4,10,25
34:11 37:2
38:10 39:10,14
42:7,10 46:16
47:12 48:22
49:19 50:16
52:25 61:13
64:5 65:21
67:16 68:8
69:8 70:14
71:4 72:24
80:22 81:11,12

83:10 88:22
**response** 4:15
41:19 59:7,9
**responsible**
18:6
**rest** 15:4
**restored** 58:8
**result** 68:7
69:12 70:21
86:9
**resulted** 24:24
88:4
**results** 50:20
51:3,19 52:20
52:22 59:16,22
59:23 61:2
**return** 93:13,17
**review** 20:25
23:23 24:1,22
25:14 53:2
60:14 61:4
62:13 93:7
**reviewed** 8:21
9:1 12:15,18
12:21,23 16:12
49:24 70:19
**reviewing** 15:5
27:25 35:8
**reviews** 50:19
51:6
**revision** 48:11
**revisit** 84:9,12
**right** 4:19
10:17 12:12
13:3 14:2 15:6

19:11,16 27:22
34:7 47:4 50:7
90:14,15
**rights** 44:1
47:13,20 56:20
58:8 86:11
87:5,13 88:10
**rise** 21:21
**risk** 52:16 59:1
**road** 56:24
**role** 12:4 18:5
26:21
**rolls** 70:6
**room** 4:4
**routine** 8:25
**rpr** 91:22
**rules** 5:16
44:10 87:22
**run** 29:16 39:5

**s**

**s** 16:23 92:11
94:3
**safety** 43:19
48:2 53:8
67:10 70:2
87:24
**samford** 16:22
**sanford** 16:15
16:23
**saying** 46:21
**says** 77:18
79:12
**scope** 7:20
**scratch** 23:14

screens 90:8
scribbled 13:12
scroll 79:2
scsj.org 2:12,12
seal 91:13
second 7:11
 55:8 79:7,8
section 3:5 22:5
 77:10
security 65:11
see 52:8 54:21
 76:16 77:9,10
 77:13,17,21
 78:10,12,21
 79:10,17 89:12
seemed 62:5
seen 84:9,11
selection 50:22
 50:23
senior 19:10
sense 6:6,19 8:3
 23:18 72:5
 79:24
sent 93:14
sentence 28:17
 30:15 39:6
 44:11 47:21
 56:11,21,25
 68:10,25 70:5
 71:1,22 78:15
 79:9 87:23
separate 20:21
 37:9 81:22
 84:2

separating
 39:15
sequence 64:14
 65:18
series 50:18
serious 54:9,15
 55:6,10,24
 56:5,19
seriousness
 31:7
served 11:15
 73:17
services 3:5
serving 28:16
 30:15 39:6
 44:11 47:21
 56:8,10,21
 68:9,24 70:4
 71:1,21 87:23
set 8:2 58:23
shared 34:12
 86:13 88:24
sheet 93:11
shields 3:3 90:4
 90:6
shoes 35:7
short 44:25
show 83:1
showing 34:23
 80:5
shows 73:7
side 17:6 25:5
sign 25:22 26:6
 39:21 44:7
 47:7,13 76:25

76:25 90:14
 93:12
signature 91:20
signed 45:3
 74:11 93:20
significant
 10:22 62:18,23
 68:5 69:3,3
signing 46:17
 49:3
similar 10:21
 27:15 52:4,17
simplicity 7:24
simpson 2:4 5:4
single 27:24
sir 6:22 7:5,17
 11:16 13:22
 15:15 16:3
 22:2 29:13
 49:17 55:20
 56:2 58:13
 66:10 77:10
 78:10,21 82:25
 84:8 89:6
site 51:17 71:21
 71:25
sitting 14:7
 19:21 42:25
situation 36:4
situations
 28:14
six 17:10
sixth 29:10
skips 30:5

small 52:11
social 2:8 5:6
 65:11
solemnly 4:19
solutions 93:23
sorry 10:19
 16:22 19:8
 23:11 35:22
 57:21 66:15
 90:4,5,10
sort 17:10
 18:12,15 20:21
 21:4 30:4
 32:18 37:22
 39:15 43:23
 48:8 57:2 60:5
 64:17 65:12
 67:12,24 68:19
sorting 42:6
sound 5:17
 23:24
southern 2:8
 5:6
speak 73:1 81:6
 81:7
speaking 14:25
 88:15
special 2:18,18
 3:4 12:8
specific 13:10
 57:7 60:9,11
 65:15,20
specifically
 6:11 8:6 16:5
 20:20 22:19

28:9 32:4
34:16 38:13
49:19 59:12
60:3 61:12
62:2,12 63:20
63:21 64:4
66:12 83:16
86:2 89:18
**specifics** 14:22
27:24 38:7
**speculation**
54:5 58:5
**spend** 75:18
**spent** 14:5,24
**spoke** 8:8,10,11
8:12,14 10:2
10:25 11:5
13:14 16:7,14
16:15,15,20
49:21,21,23
83:14,14
**spot** 71:19
**spreadsheets**
20:24
**staff** 12:1 18:20
24:3 28:19
32:23 34:18
38:18 49:7,21
60:4 66:21,22
67:10 75:17,18
76:23 77:2,2
82:10
**stage** 70:20
**stages** 88:10

**stamped** 78:9
79:3
**standard** 52:14
58:23 72:10,18
72:20 84:18
**standing** 58:19
**start** 11:18
16:1
**state** 1:6,10
2:14 3:5 4:10
4:12,14 5:8 8:9
8:11,19,22,24
9:10,17,19
10:4,11 11:9
11:12,13,22,25
12:5,10,21
13:1,16,25
15:17 16:10,16
17:3 22:12,14
22:15 31:4,14
32:21 33:19
34:22 35:12
36:1,14,17
37:12 38:15
40:6,15,18
43:20 45:8,17
45:21 47:17,18
47:23 48:20,22
50:4,11,16,18
53:1,6,7 56:11
57:6,8,20,24
58:1,17 59:6
60:1,4,15,19
61:6,9,20 62:7
63:3,7,16

64:16,18,23
65:3,6,16,21
67:8,11 68:8
69:25 70:19,24
71:4 72:2 76:2
76:23 80:1,21
82:4,12,14
84:21,25 85:9
85:16,25 86:16
87:1,15,20
91:5 93:4 94:1
95:1
**state's** 43:19
**statements**
59:21 61:20
**states** 1:1
**statewide** 41:1
51:7
**statistical**
52:20
**status** 70:14
87:5,12
**statuses** 28:23
28:24
**statute** 30:17
33:5 82:8,18
**statutes** 38:16
38:16
**stay** 13:24
77:16
**stblaw.com** 2:7
**steed** 2:16 93:1
**steps** 30:8 78:9
**strach** 74:18

**straightforward**
28:11 39:2
**strategies** 32:8
**street** 2:19 3:5
5:10
**strict** 11:3
21:24 22:3
28:1,6,10 29:9
32:10,15,25
33:24 34:12,16
34:23 35:3
36:10 38:4,11
38:21 39:1,22
41:18 42:20
43:5 44:24
45:24 54:2
55:15 57:9,13
70:18 72:24
73:18 80:2,22
81:4 82:16
86:3,20
**strike** 84:3 85:8
**strong** 35:10
**structure** 10:4
16:12 18:13,15
19:3 26:15
78:5
**studied** 57:8
**studies** 57:25
**study** 54:7,8
55:23,23 57:7
57:18,23
**stuffing** 52:1
**subject** 62:23
68:6 89:19

submit  22:16
submitting
  44:9
subparagraph
  22:5
subpoenas
  12:24 69:8
subscribed
  95:14
subsequent
  77:21 81:5
  85:4
subsequently
  81:1
succeed  13:21
success  9:3
successful
  79:15,21
suffered  75:17
suggested  29:8
suite  2:10
summary  20:18
  21:17 77:12
supervisee's
  44:4
supervisees
  48:3
supervising
  72:12
supervision
  18:25 43:24,24
  44:1,2
supporting
  19:25

suppose  59:4
sure  21:5 24:14
  26:11 27:21
  34:4,20 35:24
  38:8 41:9 44:6
  44:25 46:7,11
  46:23 47:24
  48:25 49:6
  53:19 54:20
  55:4 62:15
  79:23,24
surrounding
  67:3
susan  1:16 91:3
  91:22
suspect  5:17
suspected
  77:18 78:1
sussman  2:8
swear  4:20
switch  49:8
sworn  4:12,19
  4:24 95:14
system  28:16
  41:2 51:7
  56:11,19 70:10
  88:11
systems  17:23

**t**

t  92:11 94:3,3
tabulation
  50:24 51:1,23
  52:17
tactics  32:8

take  6:14,17
  13:6 21:14
  23:4 30:8
  39:10 66:3
  72:2 80:9
taken  1:15
  26:25 48:21
  79:19
takes  32:20
  71:4
talk  90:7
talking  21:11
  26:9 48:9
tapped  64:8
targeted  81:14
  81:14
tasked  35:12
  36:1
team  8:9 17:12
  18:1,9 19:1
  20:4,11,14
  23:14,22 24:9
  24:14 25:7,9
  25:18,22,23,24
  27:7,25 28:4
  28:19 29:15
  31:17 32:14
  33:18,23 34:6
  34:10 35:2,11
  35:25 36:15
  37:16,18,24
  38:3,18 40:11
  41:25 42:8,18
  43:4 46:1,25
  59:15 82:17

team's  19:22
  34:22 37:3
  45:2,8,16,19
teams  36:16
  37:1,11
technical  19:3
  45:11
tell  4:20 5:19
  88:19
terence  2:16
  93:1
terence's  12:7
  35:7
term  82:9
terms  30:5
  51:23 60:20
testified  4:24
  28:21 46:23
  55:5 69:22
testifying  4:10
  5:21
testimony  6:22
  7:14,20 29:1,2
  29:7 36:8 56:2
  88:25 92:16
  93:9,18 95:8
thacher  2:4 5:5
thank  10:6
  52:24 54:24
  76:1 83:4
  84:13 89:22,23
  90:9,11
thereof  32:15
  91:11

**thing** 57:22 65:12
**things** 32:18 41:10 67:6 75:15 88:12
**think** 13:3 17:24 27:21 50:7 52:23 65:8,9,25 71:14 75:13 87:3
**thought** 33:12 74:23
**thoughts** 55:8
**three** 22:22,23 46:22 66:3
**tie** 88:2
**tied** 52:6
**time** 1:13 14:4 14:22,24 26:9 26:12 27:8 42:10 47:5 48:16 59:5 63:13 64:13 66:23 74:3,14 74:18 75:16,19 77:6 80:19 85:2 89:21 93:19
**timeframe** 93:8
**titled** 76:9
**today** 5:20 6:22 7:8 12:15,19 14:6 29:3 36:9 37:17 42:25

48:24 76:20 81:18 88:17 89:3
**today's** 8:7
**together** 18:14 64:9
**told** 60:20
**took** 5:19 13:13 13:14 58:12 63:10 66:8
**top** 18:15 52:9 78:2
**topic** 16:1,6 49:9,16,20 52:23 58:13 66:2,9,12 82:23,24 83:13 88:16,18,19
**topics** 7:14 8:2 8:5 10:21 29:2 32:2 92:16
**total** 56:7
**touch** 32:24
**touched** 28:25 65:25
**touchpoints** 18:2
**toward** 32:22 79:8 80:14 81:14
**towards** 78:15
**tracked** 7:25
**tracker** 20:24 21:2,6

**trackers** 21:9
**trained** 23:5,8 23:9
**transcript** 3:13 9:1 12:16 90:15 91:6 93:6,20 95:5,8
**transpired** 10:10 67:4
**true** 25:20 33:8 41:5 91:7 95:8
**truth** 4:20,20 4:21 5:20
**truthful** 6:22
**try** 55:10 67:13 67:25 87:16,21 88:9 89:12
**trying** 34:4,9 90:7
**tsteed** 2:20 93:2
**two** 20:12,13 22:23 24:10,16 32:18 38:21 41:10 46:9,10 66:15 74:19
**type** 20:18 21:17 34:10 58:18 59:11 63:18 80:2 86:17
**types** 38:14 44:14,16
**typically** 26:25 29:15 30:24,24 31:21 32:21

36:3 44:12,19

**u**

**u.s.** 12:25 69:8
**uc** 15:13
**uh** 16:24 35:17
**ultimate** 26:23 76:24,25 77:1
**ultimately** 58:16 62:25 77:5
**under** 11:3 17:9 22:12 29:10,11 31:2 32:15 33:4 34:23 41:18 42:20 56:11 60:5 74:15,16 82:5,11 86:19
**underneath** 17:7
**understand** 5:23 6:2,12 7:19 11:11 22:3 25:12 34:4,9 38:15 56:15 60:24 68:1 86:17
**understanding** 31:9,11 40:15 56:14 57:3 63:7,8 67:6,21 72:17 74:1 88:6
**understood** 6:5 9:6 12:4,10,13

Veritext Legal Solutions
212-267-6868    www.veritext.com    516-608-2400
Case 1:20-cv-00876-LCB-JLW   Document 89-5   Filed 06/15/23   Page 52 of 56

13:21 14:20
15:3 17:1
18:21 23:13,13
26:7 27:4
42:16 48:15
57:4,4 58:11
65:13 76:1
81:20 82:21
84:7,13
**undertake** 60:2
**undertaken**
36:5,14,18
37:11 41:25
57:6 58:24
59:6 67:13
76:2 86:16
87:21
**uniform** 22:14
53:17
**unintentional**
79:14
**unit** 18:23 20:6
20:11 22:8
23:5,16 24:17
27:7 28:5
34:13 40:2
42:19 46:1,25
**unit's** 19:18
38:10
**united** 1:1
**unknowingly**
54:11 56:1
**unrelated** 38:6
**updated** 21:6
48:6,17 53:11

**updates** 38:9
38:12,14
**updating** 44:7
**used** 35:7 93:20
**uses** 82:8

**v**

**v** 93:4 94:1
95:1
**vague** 22:9
64:3 86:21
**valsecchi** 1:16
91:3,22
**various** 17:14
42:3,7 51:6,22
56:15,18
**verification**
62:20
**verify** 93:9
**veritext** 93:14
93:23
**veritext.com**
93:15
**version** 8:1
**vice** 64:8
**victory** 52:10
52:13
**views** 25:3
**violated** 54:2
55:16
**violation** 30:7
31:12 73:7
82:11
**violations**
30:19 31:5
32:10 39:8

43:5 45:24
55:14 77:22
79:14 80:22
82:4 85:11
86:3
**violators** 46:3
47:1 81:4
**viva** 62:20
**volume** 74:2
**vote** 28:18 44:8
44:11 47:14
53:24 54:4
55:18 57:11,16
61:18 70:13
71:21 72:3
78:20 86:10,19
**voter** 40:20,24
41:3,11,12
42:2,14 43:13
44:6,6,7,21
47:24 51:11,15
52:4 54:11
56:1 62:20
65:10 70:6,12
72:11 75:8
80:4,6 84:21
88:14
**voter's** 40:19
41:1
**voters** 51:16
53:9,11,21
54:2 55:16
57:14 65:7
68:20 79:13
87:4 88:9,23

**votes** 59:23
61:19
**voting** 13:2
17:23 21:25
22:4 28:1,7,10
29:14 30:1,14
30:20 32:11,16
33:24 34:12,17
34:24 35:4
36:10 38:4,11
39:5,8,22
41:18 42:21
43:5,25 44:13
45:25 47:20
50:22 51:3,17
51:17,18,22
52:17 53:3
54:3 55:15
56:20 57:9
60:8,25 62:3,6
62:11,22 63:2
63:10 64:1,5,9
65:4,4 67:14
68:1,9,24
69:25 70:9,18
71:1,12,17,21
71:25 72:25
73:19 74:2
75:9,14,19,21
75:22 77:18,22
78:1 80:3,23
81:4,13,23,24
82:16 84:16,20
85:2,11,20
86:4,8,12,20

87:4,12,22,22
**vs** 1:5
**vtc** 1:9,11,17
2:5,9,17 3:4,9

**w**

**w** 2:19
**waiting** 68:12
**waive** 90:15
**wakely** 16:9
19:15,17 20:2
20:16
**walked** 14:4
**want** 8:6 11:18
16:1 19:23
26:10 29:1
53:18 58:13
66:1 73:14
82:22 83:1
88:2
**wanted** 54:20
54:25 67:20
**wanting** 59:21
**warning** 48:8
**warnings** 48:5
49:4
**waterfront** 9:4
**way** 18:12
41:17 44:22
46:7,11 51:14
52:9 72:6
79:25 80:12
**we've** 14:3 34:5
54:8 55:23
65:25 73:2
83:10 87:3

**web** 12:21,22
50:4
**website** 70:9
88:13
**week** 48:17
**weeks** 20:12,13
24:11,16
**west** 2:10 3:5
**wherewithal**
71:19
**willful** 79:16,22
**willingness**
60:14
**window** 71:17
**wise** 32:2
**witness** 4:10,11
4:22 22:10
25:12 33:7
35:15,18,21
36:21 37:14
39:13 46:6
47:16 48:16
54:6,17 55:1
58:6 64:4
66:18 78:12
80:8 83:5
86:22 90:13
91:12 93:8,10
93:12,19
**wondering**
89:1
**work** 19:25
47:18 74:5
75:11 87:25

**worked** 43:20
47:23 48:1
87:23
**works** 18:13
23:9
**world** 56:16
**worst** 51:25
**written** 33:24
**wrong** 31:10,13
69:16

**x**

**x** 92:1,11

**y**

**yeah** 19:20
20:14 26:14
29:12 35:24
36:21 40:24
42:23 43:7
50:11 54:19
55:4 63:23
66:4,17,17
69:11 70:17
81:12 83:3
86:5
**year** 14:1 15:14
43:2 45:23
46:6 47:22
48:7 56:24
**years** 15:22
16:10 35:9
46:9,10,12,13
46:22,24 47:6
**york** 2:6

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.