UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No. 1:20-cv-876

| | | |
|---|---|---|
| NORTH CAROLINA A. PHILIP RANDOLPH INSTITUTE, and ACTION, NC, | ) ) ) ) | **JOINT RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT BY STATE BOARD DEFENDANTS AND DA DEFENDANTS** |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| THE NORTH CAROLINA STATE BOARD OF ELECTIONS; et al. | ) ) ) | |
| Defendants. | ) ) | |

NOW COME State Board Defendants and DA Defendants to provide this joint response to Plaintiffs' Motion for Summary Judgment. [D.E. 85, 86].

## NATURE OF THE CASE

The North Carolina Constitution forbids a person convicted of a felony from voting "unless that person shall be first restored to the rights of citizenship in the manner prescribed by law." N.C. Const. art. VI, § 2(3). This provision is not challenged in this action. To give effect to and enforce this constitutional provision, N.C.G.S. § 163-275(5) makes it a felony "[f]or any person convicted of a crime which excludes the person from the right of suffrage, to vote at any primary or election without having been restored to the right of citizenship in due course and by the method provided by law."

Plaintiffs assert a facial challenge to the constitutionality of subsection 163-275(5), contending that it is void for vagueness in violation of the Due Process Clause of the Fourteenth Amendment [D.E. 36, Count One, ¶¶ 96-104], and was enacted in 1877,

and reenacted in 1899, with racially discriminatory intent in violation of the Equal Protection Clause of the Fourteenth Amendment [*id.*, Count Two, ¶¶ 105-113]. Both counts fail.

First, while it is undisputed that the predecessor to subsection 163-275(5) was initially enacted in the late 1800s with discriminatory intent, the scope of persons affected by the law was substantively altered with the new Constitution in 1971, creating a break from the history on which Plaintiffs rely. Plaintiffs have not presented any evidence that this later legislative and popular action of adopting a new constitution in 1971 was motivated by racial discrimination.

Second, subsection 163-275(5) provides an easily understood notice that once one loses the right to vote due to felony conviction, they cannot vote again until those rights are restored. The fact that subsection 163-275(5) requires reference to the statute governing rights restoration does not make the law so standardless that it is unconstitutionally vague.

For these reasons, Plaintiffs' due process and equal protection claims fail.

## **STATEMENT OF FACTS**

This responsive statement of facts will address each of Plaintiffs' subsections in their statement of facts and note where there is no dispute.

### **A. Subsection 163-275(5) Was Enacted with Discriminatory Intent in 1877.**

Defendants do not possess any evidence to dispute Plaintiffs' factual assertions in Plaintiffs' subsection A.

### B. Subsection 163-275(5) Was Reenacted with Discriminatory Intent in 1899.

Defendants do not possess any evidence to dispute Plaintiffs' factual assertions in Plaintiffs' subsection B.

### C. Subsection 163-275(5) Has Changed Since 1899.

Defendants dispute Plaintiffs' subsection C because subsection 163-275(5) has been substantively altered and amended since 1899, as revealed by a full review of its legislative history. *See also infra* Part I.

A version of felony disqualification has existed in each successive North Carolina Constitution since 1835 when it was added as an amendment to the 1776 Constitution of North Carolina. N.C. Const. of 1776, amends. of 1835, art. I, § 4, cls. 3–4; *see also* John V. Orth, *North Carolina Constitutional History*, 70 N.C. L. Rev. 1759, 1771 (1992). North Carolina replaced its 1776 Constitution in 1868 as part of its readmittance to the union following the Civil War. *Orth*, at 1771. The 1868 Constitution contained a similar provision disqualifying felons. N.C. Const. of 1868, art. VI, § 2. To enforce this provision, in 1877, North Carolina enacted a statute that punishes voting before one's rights are restored. *See* Plaintiffs' Exhibit 2, § 62; 1877 Chapter 275, Sec. 62 [D.E. 87-2, p. 2]. The 1877 statute stated, ". . . if any person so convicted [of any crime which excludes him from the right of suffrage] shall vote at the election, without having been legally restored to the rights of citizenship, he shall be deemed guilty of an infamous crime, and, on conviction thereof, shall be punished by a fine not exceeding one thousand dollars, or imprisoned at hard labor not exceeding two years, or both." *Id.*

3

In 1899, North Carolina reenacted the same statute, altering it only minimally. *See* Plaintiffs' Exhibit 4, at 681; 1899 Chapter 507, Sec. 72 [D.E. 3-19, p. 7; D.E. 87-4, p. 4].

In 1931, North Carolina reenacted the same statute again, this time as part of an act aimed at punishing corrupt actions related to primaries and elections. *See* Plaintiffs' Exhibit 5, 1931 Chapter 348 [D.E. 87-5]. The 1931 Act set forth multiple acts to be punished as misdemeanors and felonies related to elections and moved all such violations from the chapter governing criminal violations to the chapter governing elections. *Id.* Consideration was given to the substantive language of the conduct criminalized by the current subsection 163-275(5). Specifically, section 10, clause 5, of the 1931 Act, matched the present-day language of the statute by extending the application to primaries. *Id.*, p. 6.

In 1971, the enactment of a new Constitution necessarily altered and expanded the scope of section 163-275(5). In 1968, at the Governor's urging, the North Carolina State Bar and the North Carolina Bar Association jointly reviewed the 1868 Constitution to consider whether it should be amended. *See* the Report of the North Carolina State Constitution Study Commission attached as Exhibit 6 to Plaintiffs' motion [D.E. 88, p. 6]. Ultimately, the Commission determined that the 1868 Constitution required so many revisions that an entirely new Constitution was necessary. *Id.*, pp. 14-15, 19-22. For example, the Commission noted that the prior constitution contained "several provisions that are invalid because in conflict with the Constitution of the United States, such as the provision on racial segregation in the public schools." *Id.*, p. 14. The Commission expressly stated its objective was to "eliminate from the constitution obsolete and

4

unconstitutional provisions . . . ." *Id.*, pp. 19. The Commission drafted a new

Constitution, with explanatory comments, and submitted it to the General Assembly for

consideration on December 16, 1968. *Id.*, p. 6. The Commission itself stated that the

substantive changes made to Article VI, Suffrage and Eligibility to Office, were few, but

the first of those few substantive changes was to significantly expand the scope of felon

disenfranchisement. *Id.,* p. 93.

    In 1969, the General Assembly took up the proposed new Constitution. *See*

Session Laws 1969, ch. 1258, attached to the Declaration of Counsel as Exhibit A. The

approving legislation was passed unanimously in the Senate and with only one nay vote

in the House. *See* 1969 Journal of the Senate, Session 1969, attached to the Declaration

of Counsel as Exhibit B; *see also* 1969 Journal of the House, Session 1969, attached to

the Declaration of Counsel as Exhibit C. Accordingly, the proposed Constitution was

presented to the people for ratification during the general election of 1970. On

November 3, 1970, the new Constitution was approved by a vote of 393,759 to 251,132.

*See* Amendments to the North Carolina Constitution of 1971, p. 1, Session Laws 1969,

ch. 1258, attached to the Declaration of Counsel as Exhibit D**.** On July 1, 1971, the

newly ratified Constitution went into effect. *Id.*

    As part of this process, the General Assembly and the people of North Carolina

approved new language defining the scope of persons subject to exclusion from the right

of suffrage. The 1868 Constitution, Article VI, section 2, set forth the disqualification as

follows:

        No person who has been convicted, or who has confessed his guilt in

5

open court upon indictment, of any crime, the punishment of which now is, or may hereafter be, imprisonment in the State's Prison, shall be permitted to vote unless the said person shall be first restored to citizenship in the manner prescribed by law.

1868 N.C. Const., Art. VI, § 2, as amended in 1899.

By contrast, Article VI, section 2, clause 3 of the 1971 Constitution substantively altered this language to exclude from the right of suffrage "person[s] adjudged guilty of a felony against this State or the United States, or adjudged guilty of a felony in another state that also would be a felony if it had been committed in this State." N.C. Const., Art. VI, sec. 2, cl. 3; *see also* Plaintiffs' Exhibit 7 [D.E. 88-1, p. 27].

The language in subsection 163-275(5) itself is limited to a "person convicted of a crime which excludes the person from the right of suffrage," and those who are excluded from the right of suffrage are identified in Article VI, section 2, clause 3 of the 1971 Constitution. In 1973, section 163-55, which sets forth the qualifications for and exclusions from voting, was amended to contain the same new language found in Article VI, section 2, clause 3 of the 1971 Constitution expanding the exclusion to federal and out of state felonies. *See* 1973 Chapter 793, sec. 18, attached as Exhibit 8 to Plaintiffs' motion [D.E. 88-2, p. 6]. It follows that the 1971 Constitution substantively altered subsection 163-275(5) with respect to the scope of persons subject to prosecution.

### D. Subsection 163-275(5) Is Not Required to Contain Definitions.

Subsection D of Plaintiffs' statement of facts consists of legal argument rather than factual assertions. Defendants dispute this subsection for the reasons discussed below. *See infra* Part II-A.

6

### E. Election Violations Are Investigated and Enforced.

Defendants dispute any implication that the 2016 post-election audit was motivated by a desire to increase investigations into election law violations. [D.E. 86, p. 17[1]]. Rather, the State Board voluntarily conducted the audit in an effort to demonstrate that while illegal voting does occur, it is exceptionally rare and does not occur in an amount that would call into question the results of the elections. *See* the Deposition of Paul Cox, 60:17-62:8, attached to Plaintiffs' motion as Exhibit 15 [D.E. 89-5, 60:17-72:8]. This was done in part as a response to public statements made by the president-elect in 2016 and members of the General Assembly broadly questioning the integrity of election results, and the possibility that the General Assembly may enact legislation requiring such an audit. *Id.*, 59:6-61:21. Thus, the audit was done for these reasons and not in an effort to increase investigations into election law violations. *Id.*, 60:17-62:8.

As for the remainder of the subsection, Defendants do not dispute that the 2016 post-election audit occurred and resulted in investigations, referrals, declinations, and prosecutions. Defendants further do not dispute that the State Board continues to investigate election law violations and refers cases to District Attorneys for prosecution as required by law, and that District Attorneys continue to exercise their prosecutorial discretion to prosecute cases as they see fit.

---

[1] References to Plaintiffs' Memorandum are to the page number generated by ECF.

**F. Subsection 163-275(5)5 Has Been Lawfully Enforced by Defendants.**

Plaintiffs' subsection F presents legal argument, which is addressed below. *See infra* Part II-B.

**G. Subsection 163-275(5) Has Had A Disproportionate Effect on Black Voters.**

Defendants do not possess any evidence to dispute the factual assertions in Plaintiffs' subsection G.

<u>**QUESTION PRESENTED**</u>

Whether Plaintiffs are entitled to summary judgment.

<u>**LEGAL STANDARD**</u>

The movant has "the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting former Rule 56(c)). In this matter, Plaintiffs bring a facial challenge only to subsection 163-275(5). Facial challenges are "the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

<u>**ARGUMENT**</u>

**I. SUMMARY JUDGMENT MUT BE DENIED BECAUSE PLAINTIFFS FAIL TO DEMONSTRATE AN EQUAL PROTECTION VIOLATION.**

Analysis of Plaintiffs' claims must begin with the understanding that North Carolina is obliged to enact laws to carry out the mandates of the state constitution. This includes felony-based disenfranchisement, a constitutional requirement that has not been

8

challenged in this action, and which has been upheld by the federal courts in the face of a Fourteenth Amendment challenge. *Fincher v. Scott*, 352 F. Supp. 117, 119 (M.D.N.C. 1972), *aff'd,* 411 U.S. 961 (1973); *see also Richardson v. Ramirez*, 418 U.S. 24, 54 (1974). With this in mind, Plaintiffs fail to establish an equal protection violation under *Arlington Heights*.

"No State shall deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 1. When denial of equal protection on the basis of race is alleged, proof of racially discriminatory intent or purpose is required to show a violation. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).

To prove discriminatory intent, Plaintiffs must first demonstrate that racial discrimination was a "'substantial' or 'motivating' factor behind enactment of the law" that "continues to this day to have effect." *Hunter v. Underwood*, 471 U.S. 222, 228 (1985) (internal citations omitted).

Only after Plaintiffs prove that racial discrimination was a "substantial" or "motivating" factor, does the Court proceed to the second step, where the burden shifts to the defendant to prove that "'the law would have been enacted without' racial discrimination." *N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 303 (4th Cir. 2020) (quoting *Hunter*, 471 U.S. at 228). "It is only then that judicial deference to the legislature 'is no longer justified.'" *Id.* (quoting *Arlington Heights*, 429 U.S. at 265–66).

9

Because Plaintiffs fail to meet their burden of demonstrating that subsection 163-275(5) was enacted with discriminatory purpose, the Court need not move to this second step.

Defendants do not contest that the historical background from the original enactments of 1877 and 1899 is indefensible. Defendants further do not contest that the law currently impacts African-Americans at a higher rate than it does other citizens. However, Plaintiffs' theory of the case fails to address the substantive changes to the scope of subsection 163-275(5) resulting from the new 1971 Constitution proposed by the General Assembly and ratified by the voters.

The 1971 Constitution reiterated the State's commitment to disenfranchising anyone convicted of a felony, and in so doing, dramatically expanded those impacted by subsection 163-275(5). In the State Bar Commission's commentaries on the proposed constitution, the Commission considered the changes made to Article VI to be substantive. [D.E. 88, p. 93 ("The substantive changes proposed in Article VI are few"); *compare* D.E. 88, pp. 89-93 (Commentary for Article V, which expressly separated out those changes considered by the drafters to be substantive amendments, clarifying amendments, and editorial amendments)]. In light of this substantive expansion of felony-based disenfranchisement, including the resultant change it effected upon subsection 163-275(5), there was a legally significant historical break between the original statute enacted in 1877 and 1899 and the current version of subsection 163-275(5) as it exists today. *See Johnson v. Governor of Fla.*, 405 F.3d 1214, 1222 (11th Cir.) (*en banc*) (2005) (rejecting plaintiffs' equal protection challenge to a felon

10

disenfranchisement law originally enacted in 1868 because the law "was substantively altered and reenacted in 1968 in the absence of any evidence of racial bias."), *cert. denied*, 546 U.S. 1015 (2005); *see also Cotton v. Fordice*, 157 F.3d 388, 391-92 (5th Cir. 1998) ("Because Mississippi's procedure resulted both in 1950 and in 1968 in a re-enactment of [the challenged constitutional provision disenfranchising felons], each amendment superseded the previous provision and removed the discriminatory taint associated with the original version."); *Harness v. Watson*, 47 F.4th 296, 311 (5th Cir. 2022) (reaffirming that the 1968 reenactment of Mississippi's felony disenfranchisement provisions "superseded the previous provisions and removed the discriminatory taint associated with the provision adopted in 1890"), *cert. denied*, 2023 U.S. LEXIS 2836; *Hayden v. Paterson*, 594 F.3d 150, 164-67 (2d Cir. 2010) (finding that plaintiffs adequately alleged sufficient facts to plausibly show that 1821, 1846, and 1874 enactments were motivated by a discriminatory purpose, but failed to present the same for the 1894 enactment of the constitutional provision disenfranchising felons, which contained substantive changes).

The above decisions are persuasive here. And, notably, the Fourth Circuit has recognized that subsequent legislation can "eliminate the taint from a law that was originally enacted with discriminatory intent," albeit in a case where the court concluded a subsequent amendment to a law was insufficient to do so. *N.C. State Conf. of the NAACP v. McCrory*, 831 F.3d 204, 240 (4th Cir. 2016) (quoting *Johnson*, 405 F.3d at 1223).

Here, Plaintiffs have not presented evidence from the history surrounding the 1971

11

Constitution that suggests a discriminatory motivation. *Hunter*, 471 U.S. at 227-28 ("Official action will not be held unconstitutional solely because it results in a racially disproportionate impact. Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." (cleaned up)). In fact, the drafters of the new Constitution expressed the motivation to eliminate "provisions that are invalid because [they are] in conflict with the Constitution of the United States, such as the provision on racial segregation in the public schools." [D.E. 88, pp. 14, 19]. With these motivations in mind, the drafters expanded the scope of disenfranchisement from only state convictions to federal and out-of-state felonies. The General Assembly then voted with near unanimity to approve the Constitution and put it before the people for a vote. *See* Ex. B & C. The voters of North Carolina also approved the new Constitution, including the expanded felony-based disenfranchisement provision, by an overwhelming majority 393,759 to 251,132. Ex. D, p. 1.

Thus, North Carolinians "willingly broadened" that provision, *see Cotton*, at 391 n.8, while at the same time approving a constitution that was written to eliminate unconstitutional provisions on racial segregation. [D.E. 88, pp. 14, 19, 95]. This democratic process is difficult to square with discriminatory intent.

Instead, an "'obvious alternative explanation' exists to support the propriety of" the 1971 Constitution's felony-based disenfranchisement provision and the enforcement thereof by a criminal statute. *Hayden*, 594 F.3d at 167 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009)). Felony-based disenfranchisement has existed since ancient times,

Case 1:20-cv-00876-LCB-JLW   Document 94   Filed 07/31/23   Page 12 of 26

currently exists in nearly every state,[2] is affirmatively permitted by § 2 of the Fourteenth Amendment, and was approved in 1970 by a near-unanimous vote in the General Assembly and by popular vote of the people of North Carolina. *See id.* at 167-68 (detailing the history of felon disenfranchisement and finding that, absent any evidence of discriminatory intent, there exists an obvious, noninvidious purpose supporting it).

Because Plaintiffs have failed to present evidence of a discriminatory motive behind the 1971 Constitution that substantively altered the scope of subsection 163-275(5), they are not entitled to summary judgment on the equal protection claim.

## II. SUMMARY JUDGMENT MUST BE DENIED AS TO PLAINTIFFS' DUE PROCESS CLAIM BECAUSE N.C.G.S. § 163-275(5) IS EASILY UNDERSTOOD.

The Due Process Clause prohibits a "criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Beckles v. United States*, 137 S. Ct. 886, 892 (2017) (cleaned up). The question of vagueness under the due process clause requires a showing that the statute is "vague 'not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all.'" *Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 495 n.7 (1982) (quoting *Coates* v. *City of Cincinnati*, 402 U.S. 611, 614 (1971)).

---

[2] The exceptions are Maine, Vermont, and District of Columbia. *See* "Felon Voting Rights," National Council of State Legislatures, https://www.ncsl.org/elections-and-campaigns/felon-voting-rights, last updated April 6, 2023, last visited July 23, 2023.

As an initial matter, it bears noting that Plaintiffs' due process theory has repeatedly evolved over the course of this case. Plaintiffs' Amended Complaint claims subsection 163-275(5) is unconstitutionally vague for two reasons: (1) it does not define what crimes "exclude[] the person from the right of suffrage," and (2) it does not explain how an individual may be "restored to the right of citizenship." [D.E. 36, ¶ 98].

In Part II-A of their summary judgment memorandum, Plaintiffs continue to argue the latter point, but abandon the former regarding what crimes exclude a person from the right to vote. [D.E. 86, pp. 26-31, Part II-A].

Then in Part II-B, Plaintiffs for the first time, assert a new theory of liability that the statute is being arbitrarily enforcement. *Id.*, pp. 29-31. *See Cloaninger ex rel. Estate of Cloaninger v. McDevitt*, 555 F.3d 324, 336 (4th Cir. 2009) ("[A] plaintiff may not raise new claims after discovery has begun without amending his complaint.")

Defendants will respond to both arguments in turn.

## A. The Laws of North Carolina Provide Ample Notice of When Rights are Restored.

Plaintiffs incorrectly assert that subsection 163-275(5) is vague because it requires reference to section 13-1, a related statute explaining when a felon's rights are restored. Plaintiffs then bootstrap an attack against section 13-1, arguing that it contains undefined terms. These arguments are legally unsupported and defy a plain reading of the statutes.

First, a statute is not void for vagueness merely because it requires reference to another statute. Statutory provisions must be read together in context, and must be harmonized to give effect to each other. *Doe v. Cooper*, 842 F.3d 833, 844 (4th Cir.

14

2016) (In the context of statutory construction, "statutes that are *in pari materia*, i.e., which relate or are applicable to the same matter or subject, must be construed together to ascertain legislative intent.")

Second, Plaintiffs incorrectly assert that the State's citizenship restoration process does not provide notice to an ordinary person because "unconditional discharge" is not defined within section 13-1. [D.E. 86, p. 28]. However, the isolated phrase "unconditional discharge" does not have to be defined by statute for an ordinary person to have fair notice of when rights are restored under section 13-1, especially when that phrase is read in its full context, as it must.

Here is how the rights-restoration provision reads in full:

> Any person convicted of a crime, whereby the rights of citizenship are forfeited, shall have such rights automatically restored upon the occurrence of any one of the following conditions:
> (1)     The unconditional discharge of an inmate, of a probationer, or of a parolee by the agency of the State having jurisdiction of that person or of a defendant under a suspended sentence by the court.
> . . . .

N.C.G.S. § 13-1. The statute essentially repeats this same language with respect to persons serving federal or out-of-state felony sentences. *See id.* § 13-1(4) & (5).

The full text of this provision does the work of any definitions section. Both "unconditional" and "discharge" have clear, well-settled meanings. The word "unconditional" plainly means "not conditional." *See* "Unconditional," Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/unconditional, last visited July 30, 2023. Likewise, the word "discharge" means "release from confinement,

15

custody, or care." "Discharge," Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/discharge, last visited July 30, 2023. Thus, "unconditional discharge" means a release with no conditions. This understanding is further confirmed by the remainder of section 13-1, which explains that the "inmate," "probationer," or "parolee" must be discharged by the State agency or court with jurisdiction over them before their rights are restored. N.C.G.S. § 13-1(1). The entire provision explains when a person regains citizenship rights, thus no definitions section is needed. Section 13-1 is easily understood and does not render subsection 163-275(5) void for vagueness.

Moreover, while the specific phrase "unconditional discharge" was not a focus of the Supreme Court of North Carolina's opinion in *Community Success Initiative v. Moore*, 886 S.E.2d 16 (2023) (hereinafter "CSI"), section 13-1 was addressed as it was the focus of that case, contrary to what Plaintiffs claim. [D.E. 86, p. 15]. The state supreme court noted that "[t]he parties to this litigation agree that subsection (1) of section 13-1 renders persons convicted of felonies in our state courts ineligible for rights restoration until they have finished any applicable period of probation, parole, or post-release supervision (collectively, felony supervision)." *CSI* at 27. The willingness of the parties and the Court in *CSI* to accept this definition further demonstrates that the rights-restoration provision is so easily understood it remained undisputed among the parties, even in a case that was squarely focused on the constitutionality of section 13-1 itself. *Id.*; *see also United States v. King*, 119 F.3d 290, 293, (4th Cir. 1997); *Untied States v. Thomas*, 52 F.3d 82, 84 (4th Cir. 1995).

Finally, North Carolina law commands that when a person's citizenship rights have been restored, the state agency, department, or court that had jurisdiction over the person must "immediately issue a certificate or order in duplicate evidencing the offender's unconditional discharge and specifying the restoration of his rights of citizenship." N.C.G.S. § 13-2(a). North Carolina law also requires the State Board, the Division of Adult Correction, and the Administrative Office of the Courts to work together to inform persons of their restoration of rights and provide them an opportunity to register to vote. N.C.G.S. § 163-82.20A. These legal mandates, read in conjunction with section 13-1, further demonstrate that a person has notice of when their rights are restored.

Plaintiffs' reliance on *Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 786 (4th Cir. 2023), is distinguishable. [D.E. 86, p. 29]. In *Carolina Youth*, the challenged law "made it a crime to 'wilfully or unnecessarily' 'interfere with or to disturb in any way or in any place the students or teachers of any school or college in this State,' 'to loiter about such school or college premises,' or 'to act in an obnoxious manner thereon.'" *Carolina Youth*, 60 F.4th at 786. Although the Fourth Circuit agreed that a lack of scienter made the law more vague, it ultimately found that "the vagueness problem with the disturbing schools law stems from its utter failure to describe the specific conduct covered by the statute." *Id*. Alone, the lack of a *mens rea* element cannot render a statute unconstitutional. *See Lambert v. California*, 355 U.S. 225, 228 (1957) ("conduct alone without regard to intent of the doer is often sufficient" for criminal liability). In explaining the flaw in the challenged law, the Fourth Circuit found that the law was

17

overbroad, would subject countless children to prosecution for simply acting like children, and suffered from the use of the term "unnecessarily" which was vague and invited arbitrary enforcement. *Carolina Youth*, 60 F.4th at 786. Contrary to Plaintiffs' quotation from *Carolina Youth*, which focuses only on the lack of a *mens rea* element, the Fourth Circuit ultimately held that the "law lacks any analogous clarifying features" found in another case that "included a scienter standard and express temporal and spatial restrictions." *Id.* at 787.

Subsection 163-275(5) is simply not comparable to the law in *Carolina Youth.* Subsection 163-275(5) is limited in its application to only those who have been convicted of a felony, who are still serving their sentence for that conviction, and who have taken a very specific act while in that condition – voting. N.C.G.S. § 163-275(5). Thus, subsection 163-275(5) establishes both the limited class of persons within its scope, sets a limited time period when it applies, and defines the specific act those persons must undertake to run afoul of it. The South Carolina law enjoined in *Carolina Youth* was so ambiguous that it could apply to anyone at any time for undefined actions, thus inviting arbitrary enforcement. In fact, the only similarity between the law in *Carolina Youth* and subsection 163-275(5) appears to be that both laws lack a clear *mens rea* element. And, even then, it does not appear that the South Carolina law was intended to be a strict liability law, but rather arrived at that destination by accident through inartful drafting. *Carolina Youth*, 60 F.4th at 786 ("As a result [of the disjunctive 'or'], prosecutors need never show willfulness (or purpose, knowledge, intent, or any other culpable state of mind) so long as they can prove the offending conduct was done 'unnecessarily'—a word

18

steeped in its own vagueness problems.") That case is applicable here only to the extent it demonstrates subsection 163-275(5) is not vague by comparison.

Finally, Plaintiffs quote a single, out-of-context answer from the deposition of the general counsel for the State Board, to argue that subsection 163-275(5) is confusing. [D.E. 86, p. 28 (quoting Deposition of Paul Cox, 58:6-9, D.E. 89-5, 56:6-8)]. The full discussion demonstrates that Mr. Cox was acknowledging generally the difficulties encountered by any person navigating the criminal justice system and nothing more. [D.E. 89-5, 55:1-58:9]. He was not admitting that the law itself is confusing, but was instead acknowledging that not *everyone* who navigates the criminal justice system will fully understand their rights: "I have serious doubts as to whether *every person* who is advised of their rights about voting or not while serving a felony sentence . . . fully internalizes that when they're advised of that and can act accordingly and can remember that . . . a year down the road when they're still on a probation sentence . . . just based on human frailty." *Id.* at 56:19-57:3 (emphasis added). The mere possibility that *some* person may misunderstand that their conduct is criminal, or may forget, does not make a criminal law unconstitutionally vague. Instead, the standard is whether the law gives "ordinary people fair notice of the conduct it punishes." *Beckles*, 137 S. Ct. at 892.

Because N.C.G.S. § 163-275(5) is easily understood, Plaintiffs are not entitled to summary judgment on the due process claim.

**B. There is No Arbitrary Enforcement of the Statute.**

Regarding Plaintiffs' unpled theory asserting arbitrary enforcement, the need to ensure that a law is not so vague that it fails to provide minimum guidelines for

enforcement is rooted in our nation's commitment to the separation of powers. An ambiguous law risks granting another branch discretion to apply the law in a manner that extends beyond the legislature's intent. *Kolender v. Lawson*, 461 U.S. 352, 358 & n.7 (1983). To avoid that outcome, the law must be clear enough to preclude "a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections." *Id.* (quoting *Smith v. Goguen*, 415 U.S. 566, 574 (1974).

Similar to *Carolina Youth* discussed above, *Kolender* involved a challenge to a criminal statute that required "persons who loiter or wander on the streets to provide a 'credible and reliable' identification and to account for their presence when requested by a peace officer under circumstances that would justify a stop under the standards of *Terry v. Ohio*, 392 U.S. 1 (1968)." *Kolender,* 461 U.S. at 353. The Supreme Court found the use of the phrase "credible and reliable" to be so subjective that it invited arbitrary enforcement by law enforcement officers who must be subjectively satisfied by the identification produced or else they could arrest the person. *Id.* at 353, 358-61.

Here, subsection 163-275(5) contains no similarly subjective language that would invite arbitrary enforcement. The elements of the crime defined by the statute, and therefore the evidence necessary to prove a violation, are simple and objective. The law defines the class of person it applies to (persons convicted of a felony who have not had their rights restored) and the prohibited act (voting in an election). Executive officials enforcing the law need not engage in any subjective determinations. A straightforward statute like subsection 163-275(5) does not invite "a standardless sweep" subject to "personal predilections."

To support this theory of a due process violation, Plaintiffs present a small number of examples in which State Board investigations were not referred, or District Attorneys declined to prosecute, in an effort to portray subsection 163-275(5) as being subject to inconsistent interpretations or enforcement. [D.E. 86, pp. 30-31]. These examples conflate prosecutorial discretion with arbitrary enforcement, miscomprehend the prosecutorial decision-making process by District Attorneys, and fail to demonstrate any misunderstanding of the law by Defendants.

Plaintiffs allege that "inconsistent enforcement" by District Attorneys is evidence that prosecutors are unable to understand the elements of subsection 163-275(5). [D.E. 86, p. 30] To support this contention, Plaintiffs assert that some District Attorneys have declined to prosecute cases in which there was no evidence of intent. [D.E. 86, p. 30 citing Ex. 21, D.E. 89-11]. In support, Plaintiffs cite only communications from District Attorneys to the State Board declining to prosecute specific cases. [D.E. 89-11; *see also* D.E. 89-3, 89-4, and 89-12]. This contention disregards that prosecutors have broad discretion to decide when criminal charges should be pursued, in the interest of justice. An exercise of prosecutorial discretion does not equate to "arbitrary enforcement" of a statute.

Rather than demonstrating a misunderstanding of the law, the declination letters cited instead demonstrate a thoughtful and practical exercise of prosecutorial discretion. Society benefits from a prosecutor's weighing of case-specific factors, including the social value of obtaining a conviction, the time and expense to the State, and the prosecutor's own sense of justice. *See State v. Dammons*, 159 N.C. App. 284, 583 S.E.2d

21

606 (2003).  The referenced letters demonstrate that multiple considerations went into the decisions by the respective District Attorneys to decline prosecution.  The letters include critiques of the probation and parole system; the manner in which those on community supervision are educated about their rights; the documentation that is provided to such individuals; the flaws in the registration system that sometimes fail to prevent felons from registering; and the likelihood of a successful prosecution based in part on the historical track record for these kinds of cases with similar evidence.  [D.E. 89-3, p. 2; 89-4, pp. 2-3; 89-11, pp. 7-9].  That is exactly as it should be.

A prosecutor's discretion as to when to prosecute is firmly rooted in American law and vital to the function of our criminal justice system. *See McCleskey v. Kemp*, 481 U.S. 279, 311 (2007).  The fact that a District Attorney would make the decision not to prosecute a case in which a full review of the evidence of that case may, in their opinion, reflect a larger problem with the underlying interplay between those on community supervision and elections, reflects a thoughtful and practical prosecutorial decision based on the likelihood of success before a jury and the best utilization of the resources of that office.  Plaintiffs' efforts to paint those decisions as a misinterpretation of the law at issue are misplaced and unsupported by the limited evidence cited.

Notably, no letter cited by Plaintiffs states that subsection 163-275(5) itself is vague or ambiguous.  [D.E. 89-3, 89-4, 89-11, 89-12].  Moreover, Plaintiffs presented no other evidence from the District Attorneys regarding why they made their respective decisions.  [D.E. 86, p. 30].  Instead, Plaintiffs extrapolate from these summary letters the unsupported conclusion that certain District Attorneys have misinterpreted subsection

163-275(5), resulting in inconsistent enforcement.  Under Plaintiffs' theory, the exercise of prosecutorial discretion not to file charges in a case necessarily means a law has been arbitrarily enforced.  Plaintiffs cannot be correct.  If that were the law, then every criminal statute is subject to such a challenge.

With respect to the argument of inconsistent interpretation and application by the State Board, Plaintiffs misrepresent the evidence in the record by asserting that the State Board declined to refer "some cases" for prosecution as if those cases demonstrate a pattern of confusion or inconsistent interpretations.  [D.E. 86, p. 30].  However, the *two instances* cited were not inconsistent interpretations, but rather were limited errors involving cases that the State Board admits should have been referred to District Attorneys.  While the State Board admits these two errors, they are two out of *hundreds* of investigations and referrals of similar cases.  [D.E. 86, pp. 30-31; *see also* the Deposition of Candace Marshall, D.E. 89-10, 20:7-21:23; 46:22-47:6].  The State Board did not view these limited cases as reflecting differing interpretations of subsection 163-275(5), as Plaintiffs maintain.  *Id*.  Two investigations mistakenly not referred out of hundreds do not establish that a law is subject to inconsistent interpretations. If that were the case, the occasional divergence from enforcement protocol by law enforcement agencies would constantly be generating unconstitutional vagueness claims. The federal Constitution does not demand such strict uniformity in the execution of a law.  *See United States v. Buie*, 946 F.3d 443, 446 (8th Cir. 2019) (explaining the "arbitrary enforcement" theory does not mean the Constitution requires strictly uniform enforcement).

23

Because subsection 163-275(5) is clear and does not invite arbitrary enforcement, the Court should deny summary judgment as to Plaintiffs' due process claim.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for summary judgment should be denied.

Respectfully submitted this the 31st day of July, 2023.

**JOSHUA H. STEIN**
**Attorney General**

/s/ Terence Steed
Terence Steed
Special Deputy Attorney General
N.C. State Bar No. 52809
E-mail: tsteed@ncdoj.gov

/s/ Mary Carla Babb
Mary Carla Babb
Special Deputy Attorney General
N.C. State Bar No. 25731
E-mail: mcbabb@ncdoj.gov

N.C. Department of Justice
P.O. Box 629
Raleigh, NC 27602-0629
Telephone: (919) 716-6567
Facsimile: (919) 716-6761

*Counsel for State Board Defendants*

/s/ Elizabeth Curran O'Brien
Elizabeth Curran O'Brien
Special Deputy Attorney General
N.C. State Bar No. 28885
Email: eobrien@ncdoj.gov

24

N.C. Department of Justice
Post Office Box 629
Raleigh, NC  27602
Telephone: (919) 716-0091
Facsimile: 919-716-6755

*Counsel for District Attorney Defendants*

## CERTIFICATE OF COMPLIANCE WITH RULE 7.3(d)

Undersigned counsel certifies that the present filing is in compliance with Local Rule 7.3(d) of the Rules of Practice and Procedure of the United States District Court for the Middle District of North Carolina including the body of the brief, heading and footnotes, and contains no more than 6,250 words as indicated by Word, the program used to prepare the brief.

Respectfully submitted this the 31st day of July, 2023.

 /s Terence Steed
Terence Steed
Special Deputy Attorney General

Case 1:20-cv-00876-LCB-JLW   Document 94   Filed 07/31/23   Page 26 of 26