IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| NORTH CAROLINA A. PHILIP RANDOLPH INSTITUTE and ACTION NC,<br><br>*Plaintiffs*,<br><br>v.<br><br>THE NORTH CAROLINA STATE BOARD OF ELECTIONS, et al.,<br><br>*Defendants*. | Civil Action No.<br>1:20-cv-00876<br><br>**ORAL ARGUMENT REQUESTED** |

**REPLY MEMORANDUM IN FURTHER SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

|   |   | Page |
|---|---|---:|
| INTRODUCTION | | 1 |
| ARGUMENT | | 2 |
| I. | THE STRICT LIABILITY VOTING LAW VIOLATES THE EQUAL PROTECTION CLAUSE | 2 |
| II. | THE STRICT LIABILITY VOTING LAW VIOLATES THE DUE PROCESS CLAUSE | 6 |
| | A. The Strict Liability Voting Law Does Not Provide Adequate Notice To Individuals Of Ordinary Intelligence | 6 |
| | B. Inconsistent Enforcement Confirms The Law's Vagueness | 9 |
| CONCLUSION | | 12 |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Carolina Youth Action Project v. Wilson*,
  60 F.4th 770 (4th Cir. 2023) ......................................................................................... 7, 9

*Community Success Initiative v. Moore*,
  886 S.E.2d 16 (2023) ......................................................................................................... 8

*Cotton v. Fordice*,
  157 F.3d 388 (5th Cir. 1998) ............................................................................................ 5

*Cunney v. Bd. Of Trs. Of Grand View*,
  660 F.3d 612 (2d Cir. 2011) ........................................................................................... 12

*Doe v. Cooper*,
  842 F.3d 833 (4th Cir. 2016) ............................................................................................ 6

*Harness v. Watson*,
  47 F.4th 296 (5th Cir. 2022) ............................................................................................. 5

*Hayden v. Paterson*,
  594 F.3d 150 (2d Cir. 2010) ............................................................................................. 5

*Hunter v. Underwood*,
  471 U.S. 222 (1985) .......................................................................................................... 3

*Johnson v. Governor of Fla.*,
  405 F.3d 1214 (11th Cir. 2005) ........................................................................................ 5

*N. Carolina State Conf. of NAACP v. McCrory*,
  831 F.3d 204 (4th Cir. 2016) ........................................................................................ 4, 6

*Ramos v. Louisiana*,
  140 S. Ct. 1390 (2020) .................................................................................................. 4, 6

*State Farm Fire & Cas. Co. v. PPL Elec. Utils.*,
  2017 WL 2532005 (E.D. Pa. June 9, 2017) ..................................................................... 9

*Veasey v. Abbott*,
  888 F.3d 792 (5th Cir. 2018) ............................................................................................ 6

**Statutes**

N.C.G.S. § 15A-1342 ........................................................................................................ 8

N.C.G.S. § 15A-1343 ........................................................................................................ 8

N.C.G.S. § 15A-1344 ........................................................................................................ 8

# INTRODUCTION

The Court should grant summary judgment holding the Strict Liability Voting Law (the "Law") violates both the Equal Protection Clause and the Due Process Clause. There are no genuine issues of material fact in dispute.

Defendants do not dispute the central facts establishing that the Law is unconstitutional under the Equal Protection Clause. Defendants concede that the Law was enacted in 1877 and reenacted in 1899 with racially discriminatory intent. And Defendants concede that the Law continues to have a disproportionate impact on Black citizens. Therefore, the Court should enter summary judgment as a matter of law.

Defendants cannot save the Strict Liability Voting Law by claiming a 1971 amendment to the North Carolina constitution indirectly cleansed the Law's racist history and impact. In passing the constitutional amendment, the Legislature did not say anything about the Strict Liability Voting Law at all. The constitutional amendment only changed the scope of individuals who are ineligible to vote in elections in North Carolina. The amendment said nothing about the potential criminal sanctions if an ineligible person voted improperly or the state of mind required to find a person guilty of such a crime. The Strict Liability Voting Law established those mandates in 1877 and 1899 and they remain unchanged. Defendants have not—and cannot—point to any substantive amendment or reenactment of the Law itself in connection with the 1971 constitutional amendment. All of the Law's key features, including its lack of a scienter requirement and the conduct subject to criminal prosecution, have remained unchanged since 1899.

1

Defendants' indirect cleansing theory is unsupported and unprecedented, and cannot undo the discriminatory history that continues to permeate the Law and disproportionately impact Black citizens.

The Strict Liability Voting Law is also unconstitutionally vague under the Due Process Clause. Defendants do not dispute that "unconditional discharge," a key term under the Law explaining when the right to vote is restored, is not defined in the General Statutes. To make up for that deficiency, Defendants craft their own definition, which has never been adopted by a court or otherwise codified. Defendants' preferred reading of the statute, however, does not demonstrate that the Law is sufficiently clear to put a person of ordinary intelligence on reasonable notice of what conduct the Law prohibits. Inconsistent interpretations and enforcement of the Law by DAs and the NCSBE further demonstrate the Law's inherent vagueness. Defendants seek to justify this arbitrary enforcement as evidence of "prosecutorial discretion." But this argument misreads the record and overlooks the specific statements showing that some DAs read the Law as requiring intent as an essential element to obtain a conviction. The Strict Liability Voting Law falls well short of the clarity required for criminal statutes that do not include a scienter element. The Law cannot withstand Due Process scrutiny.

## ARGUMENT

I. **THE STRICT LIABILITY VOTING LAW VIOLATES THE EQUAL PROTECTION CLAUSE**

The Supreme Court has held that a statute violates the Equal Protection Clause if (i) "its original enactment was motivated by a desire to discriminate against [B]lacks on

account of race"; and (ii) it "continues to this day to have that effect." *Hunter v. Underwood*, 471 U.S. 222, 233 (1985). Defendants concede both points. Specifically, Defendants state that they "do not possess any evidence to dispute" that Subsection 163-275(5) was enacted with discriminatory intent in 1877 (Opp. 2 (ECF No. 94)), or that this Subsection was reenacted with discriminatory intent in 1899 (*id.* at 3). Defendants "do not contest that the historical background from the original enactments of 1877 and 1899 is indefensible." *Id.* at 10. Defendants also state that they "do not possess any evidence to dispute" that Subsection 163-275(5) has had a disproportionate effect on Black voters (*id.* at 8), and that they "do not contest that the law currently impacts African-Americans at a higher rate than it does other citizens." *Id.* at 10. Accordingly, the Court should grant summary judgment that the Law is unconstitutional under *Hunter*.

Defendants' sole argument to save the statute is that the Law's undisputed racist taint was purged in 1971. *Id.* at 10-13. But the Legislature has never substantively amended or reenacted the Law. Defendants do not—and cannot—cite any actions by the Legislature that substantively changed the text of the Strict Liability Voting Law itself in 1971, or at any other time since 1899. Instead of pointing to a change in the Strict Liability Voting Law, Defendants argue that a constitutional amendment in 1971 implicitly changed the "scope" of the Law and thereby indirectly purged its discriminatory history. Opp. 10. Defendants' indirect cleansing argument is a distraction with no basis or precedent.

3

In *North Carolina State Conference of the NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016), the Fourth Circuit held that an amendment to a voting statute did not "so fundamentally alter [a discriminatory feature of the law] as to eradicate its impact or otherwise 'eliminate the taint from a law that was originally enacted with discriminatory intent.'" *Id.* at 240 (citation omitted); *see also Ramos v. Louisiana*, 140 S. Ct. 1390, 1401 n.44 (2020) (merely "recodif[ying]" a racist law without amending the law's key features does not purge its "racist history"). Here, Defendants cannot point to any substantive amendment or reenactment of the Strict Liability Voting Law since 1899 that could possibly satisfy the Fourth Circuit's standards.

Before 1971, North Carolina's constitution provided that no person "found guilty of committing a felony against the State of North Carolina" could vote until that person had been "restored to the rights of citizenship." Ex. 6 at NCSBE_0685. In 1971, this provision was amended to include felonies against the United States and any felony in another state that also would be a felony if it had been committed in North Carolina. Ex. 7, Art. VI, Sec. 2(3). Nothing in the text or history of that amendment, however, addressed the Strict Liability Voting Law or the potential criminal ramifications for voting before a person had been "restored to the rights of citizenship." Defendants point to the State Constitution Study Commission that proposed the amended language (Opp. 10, 12), but the Commission did not suggest any connection between their proposed amendment and the Strict Liability Voting Law. *See* Ex. 6 at NCSBE_0685. There is no evidence in the record to suggest that the Legislature even considered reenacting the

4

Strict Liability Voting Law when it approved the general provision in the constitution. Nor is there any evidence that the voters who were asked to ratify the constitutional amendment were told anything about the Law. Defendants' suggestion that voters "willingly broadened" the Law in voting to ratify the constitution (Opp. 12) is therefore incorrect and unsupported. And, while the Defendants note that in 1973 the Legislature amended *Section 163-55* and other provisions in Chapter 163 (Opp. 6, Ex. 8), that point only highlights that the Legislature *did not amend Section 163-275(5)*—the Strict Liability Voting Law—after the constitutional amendment.

In addition, Defendants cannot cite any precedent for their indirect cleansing theory. All of the cited cases finding a subsequent reenactment or amendment had cleansed a statute's racist history involved legislative changes to the *specific* statute or provision that was challenged as unconstitutional. *See Johnson v. Governor of Fla.*, 405 F.3d 1214, 1225 (11th Cir. 2005) (finding felon disenfranchisement provision constitutional "because it was substantively altered and reenacted"); *Cotton v. Fordice*, 157 F.3d 388, 391 (5th Cir. 1998) ("Because Mississippi's procedure resulted both in 1950 and in 1968 in a re-enactment of § 241, each amendment superseded the previous provision and removed the discriminatory taint associated with the original version."); *Harness v. Watson*, 47 F.4th 296, 306 (5th Cir. 2022) ("This case is not analogous to *Hunter* because the provision has been, not only reenacted, but reenacted *twice*[.]"); *Hayden v. Paterson*, 594 F.3d 150, 165 (2d Cir. 2010) (while plaintiffs alleged sufficient facts that constitutional provisions were enacted with discriminatory purpose in 1821,

5

1846, and 1874, they had not made a showing of "impermissible motive" underlying constitutional enactment in 1894).

Only "substantial, race-neutral alterations in an old unconstitutional law may remove the discriminatory taint." *Veasey v. Abbott*, 888 F.3d 792, 802 (5th Cir. 2018). Nothing in the record suggests that the North Carolina Legislature "actually confront[ed]" the Strict Liability Voting Law's "tawdry past" when it adopted a separate amendment to the state constitution. *Ramos*, 140 S. Ct. at 1410 (Sotomayor, J., concurring in part). Nor have Defendants shown that the 1971 constitutional amendment "fundamentally alter[ed]" the Strict Liability Voting Law such that it "eradicate[d]" its discriminatory taint. *McCrory*, 831 F.3d at 240. There is no basis to find that the Law's undisputed racist history and impact has been cleansed. Accordingly, the Court should find the Law is unconstitutional.

## II. THE STRICT LIABILITY VOTING LAW VIOLATES THE DUE PROCESS CLAUSE

### A. The Strict Liability Voting Law Does Not Provide Adequate Notice To Individuals Of Ordinary Intelligence

Defendants concede that the Strict Liability Voting Law does not define the term "unconditional discharge" and requires analysis of an entirely different section of the General Statutes that is not mentioned in the Law itself. Opp. 14. Defendants nonetheless argue that the Law is not vague because "[s]tatutory provisions must be read together" and "harmonized to give effect to each other." *Id.* (citing *Doe v. Cooper*, 842 F.3d 833, 844 (4th Cir. 2016)). Defendants improperly conflate the standard for judicial

6

interpretation of statutes with the standard for vagueness. The Due Process Clause test asks whether a statute fails to "give a person of ordinary intelligence adequate notice of what conduct is prohibited." *Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 781 (4th Cir. 2023). Persons of ordinary intelligence should not be required to engage in judicial-level analysis of multiple statutes to avoid criminal penalties. Here, Defendants' attempt to demonstrate that the Law is "easily understood" by pointing to three other statutes to discern its meaning only underscores the labyrinthine exercise a voter would need to undertake. Opp. 16-17.[1]

Defendants also concede that there is no definition of "unconditional discharge" anywhere in the General Statutes and instead fashion their own definition as "a release with no conditions." *Id.* at 16. Defendants overlook the ambiguities that would exist even accepting this definition. For example, North Carolina's statute establishing "Conditions of probation" provides that "[a] defendant released on supervised probation must be given a written statement explicitly setting forth the conditions on which the

---

[1] Defendants refer to statutes mandating what information a person receives once his or her citizenship rights have been restored as purportedly "demonstrat[ing] that a person has notice of when their rights are restored." Opp. 17. But what information a voter receives once he or she is no longer at risk of violating the Law does not ameliorate the risk of confusion prior to that time. The record demonstrates that the Law has caused widespread confusion among individuals subject to potential prosecution, including because felons have not received adequate information regarding their ineligibility to vote. *E.g.*, Ex. 13 (noting "a pattern of confusion on the part of several felons with respect to their understanding concerning their eligibility to vote"); Ex. 21 at 5 ("[T]he probation officer acknowledged that he did not tell [probationer] that she could not vote because he assumed she knew of the restriction.").

7

defendant is being released," but there is no similar requirement for an individual on unsupervised probation. N.C.G.S. § 15A-1343(c). This underscores the risk that individuals placed on unsupervised probation may mistakenly believe that they fulfill all requirements for voting. Moreover, individuals with felony convictions whose only remaining "condition" of their sentence is paying court costs, fees, and restitution may not realize that the period before their voting rights are restored may be extended if they fail to pay these costs and fees. N.C.G.S. §§ 15A-1342(a), 15A-1344(a)(d); Pls.' Br. (ECF No. 86) at 9.[2] The Law's ambiguity is further evident among the prospective voters Plaintiffs and other voting rights organizations in North Carolina routinely encounter. *See* Exs. 30-32. And the NCSBE's general counsel conceded in his testimony as a Rule 30(b)(6) witness that "it is absolutely possible that someone could be confused about how rights are restored following a felony conviction in North Carolina"—the issue at the core of the Law's vagueness. Ex. 15 (Cox) 58:3-9.[3]

---

[2] Defendants rely on a so-called "definition" that the parties to the state court action in *Community Success Initiative v. Moore*, 886 S.E.2d 16 (2023), apparently agreed on (Opp. 16), but the North Carolina Supreme Court did not endorse that "definition" and the fact that different parties litigating different claims agreed on an interpretation of a section of N.C.G.S. § 13-1 for the purposes of that case does not mean it is binding on the litigants or the Court in this action.

[3] Defendants' argument that the concessions made by the NCSBE's 30(b)(6) representative do not relate to the Law, but rather "generally the difficulties encountered by any person navigating the criminal justice system" (Opp. 19) is an ill-disguised attempt to rewrite the record.

Here, as in *Carolina Youth Action*, the statute at issue fails to provide "fair warning about what is prohibited." 60 F.4th at 788. In both cases, no court had "provided a limiting construction" of the challenged statutes, which "lack[ed] [the] clarifying feature[]" of a "scienter standard." *Id.* at 786-88. The Fourth Circuit's well-reasoned opinion applies with equal force to the Strict Liability Voting Law and establishes that this Court should declare the Law unconstitutional.

**B.      Inconsistent Enforcement Confirms The Law's Vagueness**

That the Strict Liability Voting Law is unconstitutionally vague is further demonstrated by inconsistent enforcement and interpretations of the Law by the people tasked with enforcing it. The core question is whether a person of ordinary intelligence can understand the Law's requirements. Where trained lawyers at District Attorneys' offices and the NCSBE read the statute differently, and with different intent requirements, there can be no material dispute that the Law is too vague for ordinary voters.[4]

Defendants' assertions that the elements of the Strict Liability Voting Law are "simple and objective" and those charged with enforcing the Law "need not engage in

---

[4]   Defendants argue that Plaintiffs have asserted a "new theory of liability" related to the Law's inconsistent enforcement. Opp. 14. Plaintiffs have done no such thing, but rather presented evidence revealed in discovery in support of the Due Process claim alleged in the complaint. *See, e.g.*, *State Farm Fire & Cas. Co. v. PPL Elec. Utilities*, 2017 WL 2532005, at *6 (E.D. Pa. June 9, 2017) ("Plaintiffs are not raising a new claim. Rather, they assert an alternative theory of liability on the negligence claim that is supported by the allegations in the Complaint[.]").

9

any subjective determinations" (Opp. 20) are contrary to the record. The evidence demonstrates that some DAs have interpreted the Law to include an implicit scienter requirement and have declined to prosecute voters without evidence they acted with fraudulent intent, while others have prosecuted voters whose decision to vote was based on their mistaken belief that they were eligible to vote and without any evidence of intent. *See* Pls.' Br. 12-13. Defendants seek to justify this inconsistent enforcement as "prosecutorial discretion." Opp. 21-23. But that argument conflates the DAs' ultimate decisions with the rationale the DAs stated in their declination letters. The record establishes that DAs have repeatedly declined to prosecute potential violations of the Law based on their belief that doing so would require proof of intent. *See* Pls.' Br. 12-13; Exs. 13, 21-22.

Defendants further assert that the DAs who have declined prosecution have not specifically identified any vagueness in the Law. Opp. 22. But that is beside the point. The declination letters clearly state several DAs' interpretation of the statute as requiring evidence of intent. *See, e.g.*, Ex. 21 at 6 ("It is our belief that charges would *require some showing of knowledge* that each above listed individual's right to vote had been suspended.") (emphasis added); Ex. 22 ("In that this NCSBE investigation does not include documentation that the subject had actual knowledge that his voting privileges were suspended while on probation . . . there is little chance the State would be able to

10

satisfy its burden of proof at trial.").[5]  In fact, the NCSBE has admitted that several matters it referred for potential prosecution were "summarily declined because the [DAs] for those counties determined there was insufficient evidence to prove that the defendant was ever notified of his or her ineligibility to vote." Ex. 21 at 1.  That missing evidence of knowledge would not have been necessary if the DAs believed the Law did not require a showing of scienter.  Defendants cannot avoid the clear conflict between the interpretation of the Law by several DAs and their own stated position that no scienter is required to obtain a conviction.  *See* Ex. 3 at 5.

The NSCBE has also interpreted and applied the Law inconsistently.  Discovery has revealed at least two instances in which the NCSBE declined to refer cases for potential prosecution for the express reason that the investigators had not found evidence that the voters acted with intent.  That Defendants now maintain those cases were "mistakenly not referred" (Opp. 23) does not refute the fact that the decisions demonstrate inconsistent interpretations by NCSBE staff of the Law's requirements.  Such evidence is particularly probative of a statute's vagueness.  *See, e.g., Cunney v. Bd.*

---

[5] Defendants argue that Plaintiffs have only "present[ed] a small number of examples in which [NCSSBE] investigations were not referred, or District Attorneys declined to prosecute." Opp. 21.  Defendants omit that they limited their production of declination letters to a mere sampling of 40 case files from the list of over 250 cases that were declined for prosecution between 2015-2022.  *See* Exs. 33-34.  Given that this sampling uncovered repeated instances in which DAs declined prosecution based on their belief that the Law requires evidence of scienter, more fulsome discovery that the NCSBE resisted would likely have provided additional evidence of inconsistent enforcement and the Law's vagueness.

11

*Of Trs. Of Grand View*, 660 F.3d 612, 622 (2d Cir. 2011) ("Defendants' various interpretations of [ordinance's] requirements serve only to reinforce our view that the ordinance's vagueness authorizes arbitrary enforcement."); Pls' Br. 23-24.

Finally, as the Fourth Circuit held in *Carolina Youth Action Project*, evidence of disparate impact can "confirm" that "[a] law fails to give sufficient guidance to prevent discriminatory enforcement." 60 F.4th at 784 & n.10. Defendants do not dispute the Strict Liability Voting Law's disproportionate impact on Black citizens (Opp. 8), and this disparity further demonstrates that the Law is impermissibly vague under the Due Process Clause.

## CONCLUSION

The Court should grant summary judgment for Plaintiffs, declare the Law unconstitutional under the Equal Protection and Due Process Clauses, and enjoin Defendants from enforcing the Law.

Dated: August 14, 2023

By:   /s/ *Jeffrey Loperfido*

| | |
|---|---|
| SIMPSON THACHER & BARTLETT LLP<br>Jonathan K. Youngwood (*specially appearing*)<br>David Elbaum (*specially appearing*)<br>Nihara K. Choudhri (*specially appearing*)<br>Jacob Lundqvist (*specially appearing*)<br>425 Lexington Avenue<br>New York, NY 10017<br>Tel: (212) 455-2000<br>Fax: (212) 455-2502<br>jyoungwood@stblaw.com<br>delbaum@stblaw.com<br>nchoudhri@stblaw.com<br>jacob.lundqvist@stblaw.com | SOUTHERN COALITION FOR SOCIAL JUSTICE<br>Jacob H. Sussman (State Bar No. 31821)<br>Jeffrey Loperfido (State Bar No. 52939)<br>Mitchell D. Brown (State Bar No. 56122)<br>1415 West Highway 54, Suite 101<br>Durham, NC 27707<br>Tel: (919) 323-3380<br>Fax: (919) 323-3942<br>jsussman@scsj.org<br>jeffloperfido@scsj.org<br>mitchellbrown@scsj.org |

*Attorneys for Plaintiffs*

## CERTIFICATE OF WORD COUNT

Pursuant to Local Rules 7.3(d)(1), the undersigned counsel hereby certifies that the foregoing Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment contains 3,120 words (including headings and footnotes) as measured by Microsoft Word.

/s/ *Jeffrey Loperfido*
Jeffrey Loperfido

## CERTIFICATE OF SERVICE

I certify that on the 14th day of August, 2023, the foregoing Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment was served through the ECF system to all counsel of record, with consent of all counsel to accept service in this manner.

/s/ *Jeffrey Loperfido*
Jeffrey Loperfido
