# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| NORTH CAROLINA A. PHILIP RANDOLPH INSTITUTE and ACTION NC, | ) ) ) ) | |
| Plaintiffs, | ) ) | 1:20CV876 |
| v. | ) ) ) | |
| THE NORTH CAROLINA STATE BOARD OF ELECTIONS, *et al.*, | ) ) ) | |
| Defendants. | | |

## MEMORANDUM OPINION AND ORDER

LORETTA C. BIGGS, District Judge.

Plaintiffs North Carolina A. Philip Randolph Institute and Action NC bring this action against Defendants the North Carolina State Board of Elections (the "NCSBE"), Damon Circosta, Stella Anderson, Jeff Carmon III, Karen Brinson Bell, Stacy "Four" Eggers IV, Tommy Tucker (collectively, "NCSBE Defendants"), and North Carolina District Attorneys ("District Attorneys" or "DA Defendants"), alleging that N.C. Gen. Stat § 163-275(5) (2019) (the "Challenged Statute") violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment of the United States Constitution. (ECF No. 36 at 1–3, ¶ 7.) Before the Court is Plaintiffs' Motion for Summary Judgment. (ECF No. 85.) For the reasons stated herein, Plaintiffs' motion will be granted.

## I. BACKGROUND

The Challenged Statute makes it a Class I felony "[f]or any person convicted of a crime which excludes the person from the right of suffrage, to vote at any primary or election without

having been restored to the right of citizenship in due course and by the method provided by law." N.C. Gen. Stat. § 163-275(5) (2019). Violating the Challenged Statute while on parole, probation, or post-release supervision for a felony conviction may result in imprisonment for up to two years. (*See* ECF Nos. 36 ¶ 1; 1-1 at 127:4-9); *see also* N.C. Gen. Stat. § 15A-1340.17.

According to their Amended Complaint, Plaintiffs are nonprofit, nonpartisan organizations whose missions are, in part, to increase voter participation among Black and low-income communities in North Carolina. (ECF No. 36 ¶¶ 14–15.) The NCSBE and NCSBE Defendants administer and investigate violations of North Carolina election laws, and DA Defendants are responsible for prosecuting "all criminal actions" and "investigat[ing] . . . and prosecut[ing] any violations" of voting-related criminal statutes. (*Id.* ¶¶ 16–23 (quoting N.C. Gen. Stat. §§ 7A-61, 163-278).) At least two DA Defendants have brought criminal charges pursuant to the Challenged Statute against individuals "who mistakenly voted in the 2016 election while still on probation or parole for a felony conviction." (*Id.* ¶ 23.)

Plaintiffs allege that the Challenged Statute violates the Equal Protection Clause of the Fourteenth Amendment. (*See id.* ¶¶ 105–13.) They assert that the Challenged Statute was originally enacted with racially discriminatory intent, its key features have never been substantively amended, and it continues to disproportionately impact Black North Carolinians. (*See id.* ¶¶ 24–60.)

In addition, Plaintiffs allege that the Challenged Statute is void for vagueness and thus violates the Due Process Clause of the Fourteenth Amendment. (*See id.* ¶¶ 96–104.) Specifically, they allege that the Challenged Statute does not provide fair notice of criminal liability because it does not define which crimes "exclude[ ] the person from the right of suffrage," or provide information on restoration of citizenship rights. (*Id.* ¶¶ 61–78.)

2

Moreover, Plaintiffs assert that any confusion is "exacerbated by the State's inadequate procedures" for providing notice to felons who are ineligible to vote. (*Id.* ¶¶ 68, 82.) This confusion has "caused eligible individuals with criminal convictions to refrain from voting, for fear of unintentionally violating the law and triggering criminal charges." (*Id.* ¶ 79.) Plaintiffs request that the Court declare that the Challenged Statute violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution, enjoin Defendants from enforcing the law, and grant Plaintiffs reasonable costs and attorneys' fees. (*Id.* at 62–63.)

On June 15, 2023, Plaintiffs filed a Motion for Summary Judgment, along with an accompanying memorandum. (ECF Nos. 85; 86.) Defendants filed a Joint Response, and Plaintiffs replied. (ECF Nos. 94; 96.) Then, on October 18, 2023, NCSBE Defendants filed notice that the North Carolina General Assembly (or the "North Carolina Legislature") had enacted Senate Bill 747, which amended the Challenged Statute to include a scienter requirement, resulting in the current version of the statute, N.C. Gen. Stat. § 163-275(5) (2024) (the "Amended Statute"). (ECF No. 103 ¶¶ 1–2); *see* S. 747, 2023 Gen. Assem., Reg. Sess. § 38 (N.C. 2023); N.C. Gen. Stat. § 163-275(5) (2024). The Amended Statute became effective on January 1, 2024, and reads: "It shall be unlawful . . . [f]or any person convicted of a crime which excludes the person from the right of suffrage, to vote in any primary or election *knowing* the right of citizenship has not been restored in due course and by the method provided by law." N.C. Gen. Stat. § 163-275(5) (2024) (emphasis added) (amending N.C. Gen. Stat. § 163-275(5) (2019)).

Shortly thereafter, the Magistrate Judge set the matter for a hearing. (Text Order 10/27/2023.) In addition to the arguments presented in their summary judgment briefs, the

3

Court requested that the Parties file supplemental briefs prior to the oral arguments "to further assist the Court with Plaintiffs' position of their claims and arguments in their summary judgment motion in light of Senate Bill 747, particularly Section 38." (*See id.*)

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party." *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 568 (4th Cir. 2015) (citations and internal quotation marks omitted). "[I]n deciding a motion for summary judgment, a district court is required to view the evidence in the light most favorable to the nonmovant" and to "draw all reasonable inferences in his favor." *Harris v. Pittman*, 927 F.3d 266, 272 (4th Cir. 2019) (citing *Jacobs*, 780 F.3d at 568). A court "cannot weigh the evidence or make credibility determinations," *Jacobs*, 780 F.3d at 569 (citations omitted), and thus must "usually" adopt "the [nonmovant's] version of the facts," even if it seems unlikely that the nonmoving party would prevail at trial, *Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011) (internal quotation marks omitted) (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007)).

Where the nonmovant will bear the burden of proof at trial, the party seeking summary judgment bears the initial burden of "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this burden, then the burden shifts to the nonmoving party to point out "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In so doing, "the

4

nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013). Instead, the nonmoving party must support its assertions by "citing to particular parts of . . . the record" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1); *see also Celotex*, 477 U.S. at 324.

## III. DISCUSSION

Plaintiffs contend that summary judgment is appropriate on two grounds: (1) the Challenged Statute violates the Equal Protection Clause because it was enacted with discriminatory intent, has not been cleansed of its discriminatory taint, and continues to disproportionately impact Black voters; and (2) the Challenged Statute is void for vagueness in violation of the Due Process Clause because it fails to provide adequate notice of the prohibited conduct and fails to provide clear standards to prevent arbitrary enforcement. (ECF No. 86 at 7–8.) Defendants assert that Plaintiffs' Due Process and Equal Protection claims fail. (ECF No. 94 at 2.) Defendants argue that North Carolina's adoption of a new constitution in 1971 created a break from the Challenged Statute's discriminatory history, and that the Challenged Statute is not "so standardless that it is unconstitutionally vague." (*Id.*)

### A. Equal Protection Challenge

The Equal Protection Clause of the Fourteenth Amendment provides that no state shall prohibit "any person within its jurisdiction the equal protection of the laws." *Fisher v. King*, 232 F.3d 391, 399 (4th Cir. 2000) (quoting U.S. Const. amend. XIV, § 1). It "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Thus, no state can "purposely discriminat[e] between individuals on the basis of race" without conflicting with the Fourteenth

Amendment. *Shaw v. Reno*, 509 U.S. 630, 642 (1993) (citing *Washington v. Davis*, 426 U.S. 229, 239 (1976)).

Because the Challenged Statute is facially race-neutral, Plaintiffs must "establish that the State . . . acted with a discriminatory purpose" to prevail on their constitutional claims. *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 481−82 (1997) (citations omitted) (explaining that facially neutral actions only violate the Fourteenth and Fifteenth Amendments if motivated by discriminatory purpose). When motivated by invidious intent, facially neutral laws are "just as abhorrent, and just as unconstitutional, as laws that expressly discriminate on the basis of race." *N. Carolina State Conf. of the NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir. 2016) (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264−66 (1977)); *see also Davis*, 426 U.S. at 241. "Determining whether a statute was enacted with discriminatory intent is a factual question involving a two-step process." *N. Carolina State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 303 (4th Cir. 2020) (citing *Hunt v. Cromartie*, 526 U.S. 541, 549 (1999)). Plaintiffs must first demonstrate that racial discrimination was a "'substantial' or 'motivating' factor behind enactment of the law." *Hunter v. Underwood*, 471 U.S. 222, 228 (1985) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

In *Arlington Heights*, the Supreme Court set forth a non-exhaustive list of factors to guide this delicate investigation. *See* 429 U.S. at 266–68. Reviewing courts should consider: (1) the law's historical background; (2) the specific sequence of events leading up to the law's enactment, including any departures from normal legislative procedure; (3) the law's legislative and administrative history; and (4) whether the law's effect "bears more heavily on one race than another." *Id.* The Court further cautioned that, because legislative bodies are "[r]arely . . . motivated solely by a single concern," a challenger need only demonstrate that "invidious

6

discriminatory purpose was *a* motivating factor." *Id.* at 265–66 (emphasis added). "[T]he ultimate question," then, is whether a law was enacted "because of," and not "in spite of," the discriminatory effect it would likely produce. *McCrory*, 831 F.3d at 220 (internal quotation marks omitted) (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)). If "racial discrimination is shown to have been a 'substantial' or 'motivating' factor behind enactment of the law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor."[1] *Id.* at 221 (citation and internal quotation marks omitted).

### 1. The Challenged Statute was enacted with discriminatory intent.

Plaintiffs contend that the Challenged Statute was originally enacted in 1877 with the intent to exclude Black people from voting and continues to have a disproportionate impact on Black people. (*See* ECF No. 86 at 7.) As support, Plaintiffs point to the historical background and events leading up to the Challenged Statute's original enactment. (*See id.* at 9–10.) Specifically, they note that the North Carolina Legislature amended the state Constitution in 1875 to "reduc[e] the political influence of African Americans." (*Id.* at 9–10 (internal quotation marks omitted) (quoting *Cmty. Success Initiative v. Moore*, 886 S.E.2d 16, 25 (N.C. 2023)).) Plaintiffs also note that a constitutional provision that disenfranchised felons accompanied these facially discriminatory amendments. (*Id.* at 10); *see also* N.C. Const. art. VI,

---

[1] At this stage, the Court must "scrutinize the legislature's *actual* non-racial motivations to determine whether they *alone* can justify the legislature's choices." *N. Carolina State Conf. of the NAACP v. McCrory*, 831 F.3d 204, 221 (4th Cir. 2016) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). Further, because "racial discrimination is not just another competing consideration," the typical judicial deference accorded to legislators' "competing considerations" is "no longer justified." *Id.* (internal quotation marks omitted) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977)). Put differently, "the state's proffered non-racial interest" must be "sufficiently strong to cancel out" any discriminatory motive. *Id.* at 234 (internal quotation marks omitted) (quoting *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 614 (2d Cir. 2016)); *see also N. Carolina State Conf. of the NAACP v. Cooper*, 430 F. Supp. 3d 15, 28–29 (M.D.N.C. 2019), *rev'd sub nom. N. Carolina State Conf. of the NAACP v. Raymond*, 981 F.3d 295 (4th Cir. 2020).

§ 1 (1868) (as amended in 1875). While the disenfranchisement provision was facially neutral, it was commonly understood that "nearly every man convicted of a felony [was] a negro." (ECF No. 87-1 at 24 (citation and internal quotation marks omitted).)

Then, in 1877, two years after the adoption of the Constitution's disenfranchisement provision, to further "restore the 'purity of the ballot' and discriminate 'against certain characteristics of [the Black] race,'" the North Carolina Legislature enacted the first iteration of the Challenged Statute, which imposed harsh penalties on disenfranchised felons.[2] (*Id.*); *see* 1876–77 N.C. Sess. Laws 537. In 1899, the law underwent minor changes.[3] *See* 1899 N.C. Sess. Laws 681. In 1931, the law's language was streamlined, and its scope was expanded to include primary elections. 1931 N.C. Sess. Laws 441–45. From 1931 until 2023, the law remained virtually unchanged[4] and was eventually codified as N.C. Gen. Stat. § 163-275(5). *See* N.C. Gen. Stat. § 163-275(5) (2019).

Additionally, Plaintiffs argue that the Challenged Statute continues to disproportionately impact Black voters. (*Id.* at 19.) Approximately 22% of North Carolina's

---

[2] In pertinent part, the law read:

> If a person . . . challenged as being convicted of any crime which excludes him from the right of suffrage . . . shall vote at any election, without having been legally restored to the rights of citizenship, he shall be deemed guilty of an infamous crime, and, on conviction thereof, shall be punished by a fine not exceeding one thousand dollars, or imprisonment at hard labor not exceeding two years, or both.

1876–77 N.C. Sess. Laws 537.

[3] The 1899 law read in relevant part: "[I]f any person so convicted shall vote at the election without having been restored to the rights of citizenship he shall be guilty of an infamous crime and punished by a fine not exceeding one thousand dollars or imprisoned at hard labor not exceeding two years or both." 1899 N.C. Sess. Laws 681.

[4] The only change from 1931 to 2023 was that the gendered "him" was changed to "the person." *Compare* 1931 N.C. Sess. Laws 444, *with* N.C. Gen. Stat. § 163-275(5) (2019).

8

population is Black. (ECF No. 89-15 at 2.) However, from 2015 to 2022, approximately 63% of people investigated for violating the Challenged Statute were Black. (*See* ECF Nos. 89-16 at 5–8.) During the time periods of 2015–2016 and 2018–2022, approximately 56% of those referred for prosecution were Black. (ECF No. 89-16 at 5–8.) In 2018, nine of the twelve people prosecuted in Alamance County were Black. (*See* ECF No. 89-14 at 129:18–12.) And, in 2019, all four people charged with violating the Challenged Statute in Hoke County were Black. (*See id.* at 130:18–131:2.)

Defendants, in an extraordinary and telling concession, "do not contest that the historical background from the original enactments of 1877 and 1899 are indefensible. Defendants further do not contest that the law currently impacts African-Americans at a higher rate than it does other citizens." (ECF No. 94 at 10; *see also id.* at 2, 3, 8 (Defendants state that they "do not possess evidence to dispute Plaintiffs' factual assertions" that (1) the Challenged Statute "was enacted with discriminatory intent in 1877," (2) the Challenged Statute "was reenacted with discriminatory intent in 1899," and (3) the Challenged Statute "has had a disproportionate effect on Black voters.").) *See N. Carolina State Conf. of the NAACP v. Cooper*, 430 F. Supp. 3d 15, 28 (M.D.N.C. 2019), *rev'd sub nom. Raymond*, 981 F.3d 295 ("[R]are is the modern case in which the government has been candid about its discriminatory motives."); *see also Cromartie*, 526 U.S. at 553 ("Outright admissions of impermissible racial motivation are infrequent."); *Johnson v. De Grandy*, 512 U.S. 997, 1018 (1994) (acknowledging the shift away from "direct, over[t] impediments" toward "more sophisticated devices that dilute minority voting strength" (alteration in original)).

9

Given Defendants' acknowledgement that the Challenged Statute was originally enacted with discriminatory intent and continues to disproportionately impact Black voters,[5] the intent analysis is seemingly complete.[6] *See Hunter*, 471 U.S. at 233 (noting that if a law's "original enactment was motivated by a desire to discriminate against [B]lacks on account of race and the section continues to this day to have that effect," it "violates equal protection under *Arlington Heights*") However, Defendants argue that, by adopting a new constitution in 1971, the North Carolina Legislature cleansed the Challenged Statute of its discriminatory taint. (*See* ECF No. 94 at 10–13.) For the reasons discussed below, their argument fails.

2. The Challenged Statute has not been cleansed of its discriminatory taint.

If a law is determined to be discriminatory, a subsequent change to the challenged law can cleanse it of its discriminatory taint. *See Veasey v. Abbott*, 888 F.3d 792, 802 (5th Cir. 2018) (noting that "alterations in an old unconstitutional law may remove the discriminatory taint"); *see also Johnson v. Governor of State of Fla.*, 405 F.3d 1214, 1223–24 (11th Cir. 2005) (explaining that a "subsequent legislative re-enactment can [potentially] eliminate the taint from a law that was originally enacted with discriminatory intent" (citing *Hunter*, 471 U.S. at 233)).

---

[5] Additionally, courts have repeatedly recognized North Carolina's racist history, particularly relating to voter suppression, in the late 1800s and beyond. *See Gingles v. Edmisten*, 590 F. Supp. 345, 359 (E.D.N.C. 1984), *aff'd in part, rev'd in part sub nom. Thornburg v. Gingles*, 478 U.S. 30 (1986) ("In 1875, the Democratic Party, overwhelmingly white in composition, regained control of [the North Carolina] state government and began deliberate efforts to reduce participation by black citizens in the political processes."); *see also Shelby Cnty., Ala. v. Holder*, 570 U.S. 529, 536 (2013) (noting that, in southern states including North Carolina, "[t]he first century of congressional enforcement of the [Fifteenth] Amendment . . . can only be regarded as a failure"); *see also McCrory*, 831 F.3d at 223 ("Unquestionably, North Carolina has a long history of race discrimination generally and race-based vote suppression in particular.").

[6] The second step in the intent analysis requires Defendants to prove that "the law would have been enacted without racial discrimination." *Raymond*, 981 F.3d at 303 (citation and internal quotation marks omitted). However, Defendants do not present any argument regarding the second step. (*See* ECF No. 94 at 9–10.)

However, at a minimum, cleansing alterations must be "substantial" and "race-neutral," so that the discriminatory intent with which the law was enacted is fundamentally altered. *See Veasey*, 888 F.3d at 802; *see Abbott v. Perez*, 585 U.S. 579, 604 (2018) (rejecting the premise that "prun[ing]" a law of its unconstitutional offenses could cleanse a law because "the intent with which the [law] . . . had been adopted" remained unchanged). The Second Circuit reasoned that, for a legislature to cleanse a law, the change must be more "significant" than "quietly" reenacting the law. *See Hayden v. Paterson*, 594 F.3d 150, 167 (2d Cir. 2010); *see also Ramos v. Louisiana*, 140 S.Ct. 1390, 1410 (2020) (Sotomayor, J., concurring in part) (explaining that states' legislatures "never truly grappled with . . .[certain] laws' sordid history" of racial animus "in reenacting them" (citing *United States v. Fordice*, 505 U.S. 717, 729 (1992))). The Government has the burden of proof to show that the change has cleansed the discriminatory taint. *McCrory*, 831 F.3d at 240 (citation omitted); *see also Fordice*, 505 U.S. at 731.

In *North Carolina State Conference of the NAACP v. McCrory*, the Fourth Circuit considered whether an alteration to a discriminatory voter-ID law that exempted certain voters was sufficient to "eliminate the taint" from the law. 831 F.3d at 240. The Fourth Circuit reasoned that the law had not been "completely cure[d]" because it still imposed a "lingering burden" on Black voters and disproportionately impacted them. *Id.* at 240–41.

The Fourth Circuit also found that when a law is enacted with discriminatory intent, as opposed to only having a discriminatory effect, it inflicts "a broader injury," and thus the remedy must entirely cleanse the taint. *Id.* at 240 ("While remedies short of invalidation may be appropriate if a provision violates the Voting Rights Act *only* because of its *discriminatory effect,* laws passed with *discriminatory intent* inflict a broader injury and cannot stand."); *see also United States v. Virginia*, 518 U.S. 515, 547 (1996) ("A remedial decree . . . must closely fit the

constitutional violation; it must be shaped to place persons unconstitutionally denied an opportunity or advantage in the position they would have occupied in the absence of [discrimination]." (alteration in original) (internal quotations omitted)). "Thus, the proper remedy for a legal provision enacted with discriminatory intent is invalidation." *McCrory*, 831 F.3d at 239. In fact, "the Supreme Court has invalidated a state constitutional provision enacted with discriminatory intent even when its 'more blatantly discriminatory' portions had since been removed." *Id.* (citing *Hunter*, 471 U.S. at 232–33).

Here, Defendants assert that the Challenged Statute has been cleansed because, in 1971, the North Carolina Legislature adopted a new constitution, in part to "eliminate . . . obsolete and unconstitutional provisions." (ECF No. 94 at 4–5 (internal quotation marks omitted) (quoting ECF No. 88 at 19).) Yet, as Plaintiffs note, like its predecessor, the 1971 Constitution included a provision that disenfranchised felons convicted in North Carolina, but the 1971 Constitution expanded the scope to disenfranchise people convicted of felonies in other states.[7] N.C. Const. art. VI, § 2 (1971); (*see* ECF No. 86 at 13). Defendants assert that the alteration and expansion of the *Constitution* simultaneously "altered and expanded" the scope of the Challenged Statute, which, in turn, created a "legally significant historical break between the original statute . . . and the current version." (ECF No. 94 at 4, 10.) Therefore, the expansion of the constitutional provision's scope, Defendants assert, indirectly cleansed the Challenged Statute of its discriminatory taint. (*Id.* at 10–11.) As support for their theory,

---

[7] The felon disenfranchisement provision from the 1971 Constitution reads:

> Disqualification of felon. No person adjudged guilty of a felony against this State or the United States, or adjudged guilty of a felony in another state that also would be a felony if it had been committed in this State, shall be permitted to vote unless that person shall be first restored to the rights of citizenship in the manner prescribed by law.

N.C. Const. art. VI, § 2 (1971).

Defendants note that the commission charged with revising the Constitution stated that the expansion of the disenfranchisement provision was substantive. (*Id.* at 5 (citing ECF No. 88 at 93).)

Defendants' indirect cleansing theory fails for several reasons. First, Defendants do not cite any case law that supports their theory that amending one law—namely, the 1971 Constitution—can indirectly cleanse a wholly distinct law—namely, the Challenged Statute. (*Id.* at 10–11.) Instead, Defendants point to four non-binding cases in which other circuits directly upheld constitutional provisions regarding felon disenfranchisement. (*Id.*) But all four cases are easily distinguishable.

For example, Defendants argue that this case is analogous to *Johnson v. Governor of State of Florida*. 405 F.3d 1214. In *Johnson*, the plaintiffs brought an equal protection challenge against the state's constitutional provision that disenfranchised felons. *See generally id.* The Eleventh Circuit found that subsequent changes to the provision were sufficiently substantive to cleanse the law. *Id.* at 1224. The court reasoned that the law had been cleansed because, after completing "a deliberative process," the state legislature adopted a "markedly different" provision that *narrowed* the scope of the law, allowing more people to regain their suffrage rights. *Id.* at 1220–21, 1224. In contrast, here, the adoption of a new constitution *expanded* the scope, disenfranchising not only those who were convicted of felonies in North Carolina but also those convicted of felonies in all other states.[8]

---

[8] *Johnson* also differs in other ways from the instant action. In *Johnson*, the Government did not concede that the prior version of the constitution had been enacted with discriminatory intent. *See Johnson v. Governor of State of Fla.*, 405 F.3d 1214, 1219 (11th Cir. 2005). Nor did the court in *Johnson* find that the prior constitution had been enacted with discriminatory intent. *See id.* ("We do not doubt that racial discrimination may have motivated certain other provisions in Florida's 1868 Constitution . . . . The existence of racial discrimination behind some provisions of Florida's 1868 Constitution does not, however, establish that racial animus motivated the criminal disenfranchisement provision . . . ."). Moreover, the plaintiffs in *Johnson* conceded that, while they believed the prior version of the

Most importantly, the court in *Johnson* recognized that, there, the adoption of a new constitution *directly* cleansed the prior constitution. *See id.* at 1223–24. Here, Defendants suggest that the adoption of a new constitution *indirectly* cleansed a separate statute. (ECF No. 94 at 10–11.) Therefore, *Johnson* is not analogous to the instant case.[9]

Second, Defendants' indirect cleansing theory fails because it is ostensibly rooted in the intertwined relationship between the 1971 Constitution and the Challenged Statute; however, Defendants do not provide any connection between the two laws. They present no evidence that the North Carolina Legislature considered the Challenged Statute in any way when they amended the Constitution, let alone intended to cleanse the Challenged Statute. Had the Legislature wanted to cleanse the Challenged Statute of its discriminatory taint, it could have directly amended the Challenged Statute. In fact, Defendants note that the Legislature amended other statutes to echo the language in the 1971 Constitution. (ECF. No. 94 at 6.) Yet, the Legislature did not amend the Challenged Statute, and the Challenged Statute was left unchanged for another fifty years. Much like quietly reenacting a law is insufficient to cleanse it, *see Hayden*, 594 F.3d at 167, absent any evidence that the amending Legislature was even cognizant of the Challenged Statute, the constitutional amendment is insufficient to

---

constitution had been enacted with discriminatory intent, the amended constitution had not been enacted with discriminatory intent. *Id.* at 1223. ("[P]laintiffs concede that the 1968 provision was not enacted with discriminatory intent.").

[9] The other cases cited by Defendants in support of their position fare no better. The Court in *Cotton v. Fordice* addressed a constitutional provision that, while originally adopted with discriminatory intent, was reenacted twice without discriminatory intent, which the Court held directly cleansed the provision of any discriminatory intent. *See* 157 F.3d 388, 391 (5th Cir. 1998). Similarly, the court in *Harness v. Watson* considered the same constitutional provision as *Cotton* and reached the same conclusion. 47 F.4th 296, 311 (5th Cir. 2022). Also, in *Hayden v. Paterson*, the Second Circuit, too, held that a constitutional amendment directly cleansed the prior version of the constitution. 594 F.3d 150, 167−68 (2d Cir. 2010). None of these cases address whether a constitutional amendment can cleanse a wholly separate statute.

cleanse the Challenged Statute. Therefore, the Court declines to adopt Defendants' indirect cleansing theory.

Moreover, even if the Court was to adopt Defendants' indirect cleansing theory, the Challenged Statute would not be cleansed. The Fourth Circuit held in *McCrory* that a subsequent change does not cleanse the discriminatory taint if the law continues to place a lingering burden on Black voters. *McCrory*, 831 F.3d at 240−41. Here, Defendants concede that Black voters are still disproportionately impacted by the Challenged Statute. (*See* ECF No. 94 at 8.) Far from completely curing the law, by expanding the scope to include people convicted of felonies in other states, the constitutional amendment has presumably disenfranchised more Black people. *See Fordice*, 505 U.S. at 731 ("If the State perpetuates policies and practices traceable to its prior system that continue to have segregative effects . . . the State has not satisfied its burden of proving that it has dismantled its prior system."); *see also Perez*, 585 U.S. at 604.

Further, Defendants assert that, because the 1971 Legislature eliminated a constitutional provision permitting racially segregated schools, but did not eliminate the felon disenfranchisement provision, the disenfranchisement provision must be implicitly nondiscriminatory. (*See* ECF No. 94 at 12.) The Court declines to accept this generous interpretation.[10] The Legislature's feasible implicit assumption does not demonstrate that the

---

[10] The Court is mindful that

> [t]he record is replete with evidence of instances since the 1980s in which the North Carolina legislature has attempted to suppress and dilute the voting rights of African Americans. In some of these instances, the Department of Justice or federal courts have determined that the North Carolina General Assembly acted with discriminatory intent, "reveal[ing] a series of official actions taken for invidious purposes." ！In others, the Department of Justice or courts have found that the General Assembly's action produced discriminatory results. The latter evidence, of course, proves less about discriminatory intent

provision has been completely cured, nor does it indicate that the Legislature "truly grappled with the [law's] sordid history." *See Ramos*, 140 S.Ct. at 1410 (Sotomayor, J., concurring in part).

Instead, the Challenged Statute was enacted with discriminatory intent, has not been cleansed of its discriminatory taint, and continues to disproportionately impact Black voters. Therefore, the Court finds that the Challenged Statute violates the Equal Protection Clause.

### B. Due Process Challenge

Plaintiffs argue that the Challenged Statute violates the Due Process Clause of the Fourteenth Amendment because it is unconstitutionally vague. (ECF No. 86 at 26−27.) A claim that a statute is void for vagueness can arise under the Due Process Clause of the Fourteenth Amendment. *See Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 781 (4th Cir. 2023); *Fusaro v. Howard*, 19 F.4th 357, 361 (4th Cir. 2021). Generally, invalidating a statute as facially void is disfavored. *See Schleifer by Schleifer v. City of Charlottesville*, 159 F.3d 843, 853 (4th Cir. 1998). However, a statute will violate due process on vagueness grounds when it "fails to 'give a person of ordinary intelligence adequate notice of what conduct is prohibited' or lacks 'sufficient standards to prevent arbitrary and discriminatory enforcement.'" *Carolina Youth Action Project*, 60 F.4th at 781 (quoting *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 272 (4th Cir. 2019) (en banc)). "The prohibition of vagueness in criminal statutes is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules

_____

than the former, but it is informative. A historical pattern of laws producing discriminatory results provides important context for determining whether the same decisionmaking body has also enacted a law with discriminatory purpose.

*McCrory*, 831 F.3d at 223−24 (alteration in original) (internal citations omitted).

of law." *Doe v. Cooper*, 842 F.3d 833, 842 (4th Cir. 2016) (internal quotation marks omitted) (quoting *Johnson v. United States*, 576 U.S. 591, 595 (2015)).

### 1. The Challenged Statute does provide adequate notice of the prohibited conduct.

"The purpose of the fair notice requirement is to enable citizens to conform their conduct to the proscriptions of the law." *Manning*, 930 F.3d at 274. When a statute includes an undefined term and "the statutes and case law fail to provide any standards of what is meant by the term," such circumstances "compel[] the conclusion that use of the term in the challenged scheme is unconstitutionally vague." *Id.* The requirement does not require "perfect clarity and precise guidance." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989). Instead, a statute is vague if an individual must "necessarily guess at its meaning and differ as to its application." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926); *United States v. Morison*, 844 F.2d 1057, 1070 (4th Cir. 1988). While it is "a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined," *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972), "[t]he fact that [a legislature] might . . . have chosen clearer and more precise language" does not make a statute unconstitutionally vague, *United States v. Powell*, 423 U.S. 87, 94 (1975) (internal quotation marks omitted).

Plaintiffs argue that the Challenged Statute is vague because it does not provide adequate notice of the prohibited conduct. (ECF No. 86 at 27.) Plaintiffs contend that the Challenged Statute does not provide fair notice because it does not define when an individual has "been restored to the right of citizenship," nor does it "provide any guidance on when or how an individual regains those rights." (*Id.* at 28.) Plaintiffs assert that an individual, to find additional guidance, must look to another statute, N.C. Gen. Stat. § 13-1, which states that citizenship is restored upon "unconditional discharge." (ECF No. 86 at 28.) However,

Plaintiffs argue, the Challenged Statute "only implicitly references" N.C. Gen. Stat. § 13-1, and "unconditional discharge" is not defined, creating a lack of clarity. (*Id.*)

Defendants, on the other hand, argue that the laws of North Carolina provide ample notice of when a felon's rights are restored. (ECF No. 94 at 14.) Defendants contend that "[s]tatutory provisions must be read together in context, and must be harmonized to give effect to each other," (*id.*), and further argue that the "isolated phrase 'unconditional discharge' does not have to be defined by statute for an ordinary person to have fair notice of when rights are restored under section 13-1," (*id.* at 15).

Contrary to Plaintiffs' assertions, (*see* ECF No. 96 at 10–11), the doctrine of interpreting statutory provisions harmoniously to give effect to each other can apply in the context of the vagueness standard, *see Doe*, 842 F.3d at 844 (considering, in the context of the vagueness inquiry, whether the *in pari materia* statutory canon of construction applied). North Carolina "statutes which are *in pari materia, i.e.,* which relate or are applicable to the same matter or subject, although enacted at different times must be construed together in order to ascertain legislative intent." *Carver v. Carver*, 314 S.E.2d 739, 742 (N.C. 1984). As a result, since the Challenged Statute prohibits a felon from voting "without having been restored to the right of citizenship," N.C. Gen. Stat. § 163-275(5) (2019), and N.C. Gen. Stat. § 13-1 (the "Citizenship Restoration Statute") addresses the conditions under which "[a]ny person convicted of a crime, whereby the rights of citizenship are forfeited, shall have such rights automatically restored," the Challenged Statute and the Citizenship Restoration Statute must be construed together.

The relevant provision of the Citizenship Restoration Statute reads as follows:

18

> Any person convicted of a crime, whereby the rights of citizenship are forfeited, shall have such rights automatically restored upon the occurrence of any one of the following conditions:
>
> > (1) The unconditional discharge of an inmate, of a probationer, or of a parolee by the agency of the State having jurisdiction of that person or of a defendant under a suspended sentence by the court.
>
> . . . .

*Id.*

While the Challenged Statute and the Citizenship Restoration Statute must be construed together, the Court notes that the term "unconditional discharge" is undefined in the Citizenship Restoration Statute. *See generally id.* However, the Court agrees with Defendants' assertion that "unconditional" and "discharge" have clear meanings, and thus that "unconditional discharge" does not require a definition in the statute to be understood by a person of ordinary intelligence. (*See* ECF No. 94 at 15.)

The Court distinguishes between laws that "require[] a person to conform his conduct to an imprecise but comprehensible normative standard" and those that possess "no standard of conduct." *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971) (explaining that an ordinance that restricted "annoying" behavior provided no standard and was vague). The former retain a "constitutional 'core' in the sense that they 'apply without question to certain activities,' even though their application in marginal situations may be a close question." *Doe*, 842 F.3d at 842 (citing *Parker v. Levy*, 417 U.S. 733, 755–56 (1974)). The latter are unconstitutionally vague. *See id.*

The Court concludes that since the Challenged Statute permits voting upon restoration to the right of citizenship, it provides some type of "comprehensible normative standard" and thus retains its constitutional core. *Coates*, 402 U.S. at 614. It applies without question in certain situations—when the right has been restored, an individual can vote, but when the

right has not been restored, an individual cannot vote. *See United States v. Kimble*, Crim. No. WDQ-13-035, 2015 WL 4164820, at *17 (D. Md. July 8, 2015), *aff'd*, 855 F.3d 604 (4th Cir. 2017) (noting that a statute is not vague if it "sets an objective line" between those whose conduct is lawful and those whose conduct is unlawful); *see also Carolina Youth Action Project*, 60 F.4th at 784 (explaining that a law is vague if it requires a "multifactored balancing test to determine whether a thing a person undisputedly did is unlawful in the first place"). While there are marginal situations in which one might not be sure if the right has been restored, it does not require ordinary people to "necessarily guess" as to whether they can vote. *Connally*, 269 U.S. at 391.

The fair notice requirement is further satisfied because, if individuals need more guidance, they can look to N.C. Gen. Stat. § 13-1, which states that right of citizenship is "automatically restored" after the State's "unconditional discharge of an inmate, . . . probationer, or . . . parolee." Though it is not convenient to search for additional guidance in a different statute, it does not void the Challenged Statute. *See Doe*, 842 F.3d at 844 (quoting *United States v. Broncheau*, 645 F.3d 676, 685 (4th Cir. 2011)) (noting that "adjacent statutory subsections that refer to the same subject matter should be read harmoniously").

Further, Defendants note that the fair notice requirement is additionally satisfied because, once an individual has been restored to the right of citizenship, North Carolina law requires (1) the "immediate[] issu[ance] [of] a certificate or order in duplicate evidencing the offender's unconditional discharge and specifying the restoration of his rights of citizenship," (ECF No. 94 at 17 (quoting N.C. Gen. Stat. § 13-2(a))), and (2) "the State Board, the Division of Adult Correction, and the Administrative Office of the Courts to work together to inform persons of their restoration of rights and provide them an opportunity to register to vote."

(*id.* (citing N.C. Gen. Stat. § 163-82.20A)). The Court agrees that these statutory requirements provide additional notice.

The record demonstrates that the Challenged Statute provides some type of normative standard, the Citizenship Restoration Statute offers additional clarification on felons' restoration of their rights to citizenship, and an additional, related North Carolina statute requires the issuance of certificates to those who have had their rights restored and that formerly disenfranchised felons are provided the opportunity to register to vote. Therefore, the Court finds that the Challenged Statute provides fair notice to ordinary individuals.

> 2. <u>The Challenged Statute does not provide sufficiently clear standards that prevent arbitrary enforcement.</u>

"[T]he more important aspect of the vagueness doctrine is . . . the requirement that a legislature establish minimal guidelines to govern law enforcement." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (citation and internal quotation marks omitted). "A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned*, 408 U.S. at 108–09. In those instances, a criminal statute permits "a standardless sweep [that] allows [law enforcement] . . . to pursue their personal predilections." *Kolender*, 461 U.S. at 358 (first alteration in original) (internal quotation marks omitted) (quoting *Smith v. Goguen*, 415 U.S. 566, 575 (1974)).

Plaintiffs argue that the Challenged Statute fails to provide clear standards to prevent arbitrary enforcement. (ECF No. 86 at 29.) Plaintiffs assert that the Challenged Statute's vagueness is demonstrated by "inconsistent enforcement by the [District Attorneys] who enforce the [Challenged Statute]," pointing out that some District Attorneys have declined to prosecute cases in which there was no evidence of intent while others have prosecuted voters

21

without any evidence of intent. (*Id.* at 30.) In response, Defendants argue that Plaintiffs' assertion of inconsistent enforcement disregards that prosecutors exercise prosecutorial discretion to decide when criminal charges should be pursued, and that such discretion "does not equate to 'arbitrary enforcement' of a statute." (ECF No. 94 at 21.)

The Court agrees that it is surely within a District Attorney's prosecutorial discretion to decide against prosecuting a case based on insufficient evidence. Likewise, it is also within a prosecutor's discretion to pursue prosecution of those individuals who seemingly violated the law. *See United States v. Jackson*, 327 F.3d 273, 295 (4th Cir. 2003) ("'[A] prosecutor's charging decision is presumptively lawful' and . . . 'courts must . . . be cautious not to intrude unduly in the broad discretion given to prosecutors in making charging decisions.'" (quoting *United States v. Wilson*, 262 F.3d 305, 315 (4th Cir. 2001))); *see also McMellon v. United States*, 387 F.3d 329, 379 (4th Cir. 2004) (stating that the prosecutorial discretion is "fundamental to Executive power"); *see also Spence v. State of Wash.*, 418 U.S. 405, 414 n.9 (1974) (noting that "selective enforcement" of a statute was the result of prosecutorial discretion and not arbitrary enforcement). However, a distinction must be drawn between (1) the decision to pursue a case being based on whether or not the prosecutor believes sufficient evidence is present and (2) the decision to pursue a case being based on whether or not the prosecutor believes the criminalizing statute requires intent. *See United States v. Williams*, 553 U.S. 285, 306 (2008) ("What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is."). The rationale of the former involves prosecutorial discretion, while the rationale of the latter can be explained by the vagueness of the criminalizing statute.

22

According to the evidence in the record, some District Attorneys have declined to prosecute violations of the Challenged Statute due to their belief that charges would require some showing of knowledge that the individual's right to vote had been suspended.[11]  (*See* ECF Nos. 89-11 at 6–8; 89-3 at 2; 89-4 at 2–3; 89-12 at 2.)  On the other hand, record evidence also shows that District Attorneys prosecuted voters who voted before their rights to citizenship were restored without any evidence of intent.  (ECF Nos. 89-14 at 195:4-14; 36 ¶ 23; 39 ¶ 23.[12])  Although clearly inconsistent, no disputes exist with respect to this record evidence.

Record evidence demonstrating this inconsistency in District Attorneys' interpretation and enforcement of the Challenged Statute—that some believed that the Challenged Statute included a requirement of intent while others did not—compels the conclusion that the Challenged Statute permits a "standardless sweep" that allows prosecutors to "pursue their personal predilections" under the Challenged Statute.  *Kolender*, 461 U.S. at 358 (quoting *Smith*, 415 U.S. at 575).  The Court now reaches that conclusion.[13]

---

[11] The record also shows that the NCSBE recognized this trend of prosecutors declining to prosecute violations of the Challenged Statute for this reason, as it stated in a letter that several of the cases referred from a 2016 general elections audit were "summarily declined because the [D]istrict [A]ttorneys for those counties determined there was insufficient evidence to prove that the defendant was ever notified of his or her ineligibility to vote."  (ECF No. 89-11 at 2.)

[12] In Plaintiffs' Amended Complaint, they allege that "[a]t least two District Attorneys have brought criminal charges pursuant to the [Challenged Statute] against North Carolina residents who mistakenly voted in the 2016 election while still on probation or parole for a felony conviction."  (ECF No. 36 ¶ 23.)  In Defendants' Answer to the Amended Complaint, Defendants specifically state that this allegation is "[n]either admitted nor denied as this pertains to other parties."  (ECF No. 39 ¶ 23.)

[13] Plaintiffs also claim that the NCSBE referred cases for prosecution in some cases but also "declined to refer cases for prosecution where the individuals had cognitive impairments that rendered it unlikely they voted with fraudulent intent."  (ECF No. 86 at 30.)  The Court acknowledges, however, that the Associate General Counsel of the NCSBE, Candace Marshall, testified in her deposition that she believed that two cases were simply errors and should have been referred for prosecution, (*see* ECF No. 89-10 at 13:10-19, 20:7−21:23, 46:22−47:6; *see also* ECF No. 94 at 23), and clarified that election law violations must be investigated under the law, (*see* ECF No. 89-10 at 20:7−21:11).  Though the

23

Thus, the evidence in the record demonstrates that the Challenged Statute "lacks sufficient standards to prevent arbitrary and discriminatory enforcement." *Carolina Youth Action Project*, 60 F.4th at 781 (citations and internal quotation marks omitted). Accordingly, the Court concludes that the Challenged Statute is void for vagueness and violates the Due Process Clause.

## IV. CONCLUSION

The Court holds that the Challenged Statute violates both the Equal Protection and Due Process Clauses of the Fourteenth Amendment. Therefore, Plaintiffs' Motion for Summary Judgment will be granted. Accordingly, Plaintiffs' requested relief that this Court declare the Challenged Statute unconstitutional and enjoin the enforcement of that Statute are appropriate remedies under the circumstances of this case. As articulated by the Fourth Circuit, "the proper remedy for a legal provision enacted with discriminatory intent," as is the Challenged Statute, "is invalidation." *McCrory*, 831 F.3d at 239. And since the North Carolina General Assembly failed to repeal the Challenged Statute, the Court will permanently enjoin further enforcement of that Statute.

For the reasons stated herein, the Court enters the following:

### ORDER

**IT IS THEREFORE ORDERED AND ADJUDGED** that Plaintiffs' Motion for Summary Judgment, (ECF No. 85), is **GRANTED**. Judgment is hereby entered in favor of Plaintiffs and against Defendants on Counts I and II of the Amended Complaint. This Court

---

Court is satisfied there is nothing in the record to dispute Ms. Marshall's testimony that these two cases were errors, the Court need not reach a conclusion on whether this constitutes inconsistent interpretation and application by the NCSBE, since the Court has concluded that the Challenged Statute has been arbitrarily enforced by prosecutors.

24

hereby declares that the Challenged Statute violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution.

**IT IS FURTHER ORDERED** that Defendants and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them, are **HEREBY ENJOINED AND RESTRAINED** from enforcing the Challenged Statute.

This, the 22nd day of April 2024.

/s/ Loretta C. Biggs
United States District Judge